# EXHIBIT 1



## State of Connecticut Judicial Branch
# Superior Court Case Look-up

| | |
|---|---|
| Superior Court Case Look-up | **HHD-CV24-** |
|   Civil/Family | **6179556-S** |
|   Housing | **Prefix:** HD6 |
|   Small Claims | |

Superior Court Case Look-up
  Civil/Family
  Housing
  Small Claims
-
Attorney/Firm Juris Number Look-up &#8599;
-
Case Look-up
  By Party Name
  By Docket Number
  By Attorney/Firm Juris Number
  By Property Address
-
Short Calendar Look-up
  By Court Location
  By Attorney/Firm Juris Number
  Motion to Seal or Close
  Calendar Notices
-
Court Events Look-up
  By Date
  By Docket Number
  By Attorney/Firm Juris Number
-
Legal Notices
-
Pending Foreclosure Sales &#8599;
-
Understanding
Display of Case Information
-
Contact Us



Comments

**HHD-CV24-6179556-S**

**Prefix:** HD6

**STATE OF CONNECTICUT v. EIDP, INC. Et Al**

**Case Type:** M90    **File Date:** 01/25/2024    **Return Date:** 03/05/2024

**Case Detail**    Notices    History    Scheduled Court Dates    E-Services Login    Screen Section Help    ►

To receive an email when there is activity on this case, click here. &#8599;

Information Updated as of: 02/21/2024

| Case Information |
|---|
| **Case Type:** M90 - Misc - All other |
| **Court Location:** HARTFORD JD |
| **List Type:** No List Type |
| **Trial List Claim:** |
| **Last Action Date:** 02/05/2024  (The "last action date" is the date the information was entered in the system) |

| Disposition Information |
|---|
| **Disposition Date:** |
| **Disposition:** |
| **Judge or Magistrate:** |

| Party & Appearance Information | | | |
|---|---|---|---|
| **Party** | | **No Fee Party** | **Category** |
| **P-01  STATE OF CONNECTICUT** | | Y | Plaintiff |
|     **Attorney:** &#8599; CHRISTOPHER PATRICK KELLY (444375) File Date: 01/25/2024 AG-ENVIRONMENT 165 CAPITOL AVE 5TH FLR HARTFORD , CT 06106 | | | |
|     **Attorney:** &#8599; JULIA ROSE SUESSER (445210)    File Date: 02/05/2024 AG-ENVIRONMENT 165 CAPITOL AVE 5TH FLR HARTFORD , CT 06106 | | | |
| **D-01  EIDP, INC.** Non-Appearing | | | Defendant |
| **D-02  THE CHEMOURS COMPANY** Non-Appearing | | | Defendant |
| **D-03  THE CHEMOURS COMPANY FC, LLC** Non-Appearing | | | Defendant |
| **D-04  DUPONT DE NEMOURS, INC.** Non-Appearing | | | Defendant |
| **D-05  CORTEVA, INC.** Non-Appearing | | | Defendant |
| **D-06  3M COMPANY** Non-Appearing | | | Defendant |

**Viewing Documents on Civil, Housing and Small Claims Cases:**

If there is an &#8599; in front of the docket number at the top of this page, then the file is electronic (paperless).

- Documents, court orders and judicial notices in electronic (paperless) civil, housing and small claims cases with a return date on or after January 1, 2014 are available publicly over the internet.* For more information on what you can view in all cases, view the Electronic Access to Court Documents Quick Card.

- For civil cases filed prior to 2014, court orders and judicial notices that are electronic are available publicly over the internet. Orders can be viewed by selecting the link to the order from the list below. Notices can be viewed by clicking the **Notices** tab above and selecting the link.*

- Documents, court orders and judicial notices in an electronic (paperless) file can be viewed at any judicial district courthouse during normal business hours.*

- Pleadings or other documents that are not electronic (paperless) can be viewed only during normal business hours at the Clerk's Office in the Judicial District where the case is located.*

- An Affidavit of Debt is not available publicly over the internet on small claims cases filed before October 16, 2017.*

*Any documents protected by law Or by court order that are Not open to the public cannot be viewed by the public online And can only be viewed in person at the clerk's office where the file is located by those authorized by law or court order to see them.

| | | | **Motions / Pleadings / Documents / Case Status** | |
|---|---|---|---|---|
| **Entry No** | **File Date** | **Filed By** | **Description** | **Arguable** |
| | 02/05/2024 | P | **APPEARANCE** 📝 <br> Appearance | |
| 100.30 | 01/25/2024 | P | **SUMMONS** 📝 | No |
| 100.31 | 01/25/2024 | P | **COMPLAINT** 📝 | No |
| 100.32 | 01/25/2024 | P | **CONTINUATION OF PARTIES** 📝 | No |
| 100.33 | 01/25/2024 | P | **RETURN OF SERVICE** 📝 | No |

| **Scheduled Court Dates as of 02/20/2024** | | | | |
|---|---|---|---|---|
| **HHD-CV24-6179556-S - STATE OF CONNECTICUT v. EIDP, INC. Et Al** | | | | |
| **#** | **Date** | **Time** | **Event Description** | **Status** |
| | | | *No Events Scheduled* | |

Judicial ADR events may be heard in a court that is different from the court where the case is filed.  To check location information about an ADR event, select the **Notices** tab on the top of the case detail page.

Matters that appear on the Short Calendar are shown as scheduled court events on this page. The date displayed on this page is the date of the calendar.

The status of a Short Calendar matter is not displayed because it is determined by markings made by the parties as required by the calendar notices and the civil⧉ standing orders. Markings made electronically can be viewed by those who have electronic access through the Markings History link on the Civil/Family Menu in E-Services. Markings made by telephone can only be obtained through the clerk's office. If more than one motion is on a single short calendar, the calendar will be listed once on this page. You can see more information on matters appearing on Short Calendars by going to the Civil/Family Case Look-Up⧉ page and Short Calendars By Juris Number⧉ or By Court Location⧉.

Periodic changes to terminology that do not affect the status of the case may be made.

This list does not constitute or replace official notice of scheduled court events.

**Disclaimer:** For civil and family cases statewide, case information is displayed and is available for inquiry on this website for a period of time, one year to a maximum period of ten years, after the disposition date. To the extent that Connecticut Practice Book Sections 7-10 and 7-11 provide for a shorter period of time, this information will be displayed for the shorter period.

In accordance with the Federal Violence Against Women Act of 2005, cases involving relief from physical abuse (restraining orders), civil protection orders, foreign protective orders, and motions that would be likely to publicly reveal the identity or location of a protected party may not be displayed and may be available only at the courts.

Attorneys | Case Look-up | Courts | Directories | EducationalResources | E-Services | FAQ's | Juror Information | News & Updates
| Opinions | Opportunities | Self-Help | Home

Common Legal Terms | Contact Us | Site Map | Website Policies

Copyright © 2024, State of Connecticut Judicial Branch

Page Created on 2/21/2024 at 1:13:57 PM

**SUMMONS - CIVIL**
JD-CV-1  Rev. 2-22
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact a court clerk or go to: *www.jud.ct.gov/ADA.* |
|---|

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*



**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☒ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
|---|---|---|
| 95 Washington Street, Hartford 06106 | ( 860 ) 548 – 2700 | 03/05/2024 |

| ☒ Judicial District | G.A. | At *(City/Town)* | Case type code *(See list on page 2)* | |
|---|---|---|---|---|
| ☐ Housing Session | Number: | Hartford | Major: **M** | Minor: **90** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
|---|---|
| William M. Tong, AG, Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106 | 440323 |

| Telephone number | Signature of plaintiff *(if self-represented)* |
|---|---|
| ( 860 ) 808 – 5280 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book *(if agreed)* christopher.kelly@ct.gov |
|---|---|

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
|---|---|---|
| **First plaintiff** | Name: **State of Connecticut** <br> Address: **Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106** | P-01 |
| **Additional plaintiff** | Name: <br> Address: | P-02 |
| **First defendant** | Name: **EIDP, Inc.** <br> Address: **974 Centre Rd, Wilmington, DE 19805** | D-01 |
| **Additional defendant** | Name: **Agent for Service: C T Corporation System, 67 Burnside Ave, East Hartford, CT 06108** <br> Address: | D-02 |
| **Additional defendant** | Name: **The Chemours Company** <br> Address: **1007 Market Street, Wilmington, DE 19801** | D-03 |
| **Additional defendant** | Name: **Agent for Service: C T Corporation System, 67 Burnside Ave, East Hartford, CT 06108** <br> Address: | D-04 |

| Total number of plaintiffs: 1 | Total number of defendants: 6 | ☒ Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court | Name of person signing |
|---|---|---|---|
| 01/23/2024 | | ☐ Clerk | William M. Tong |

| If this summons is signed by a Clerk: | For Court Use Only |
|---|---|
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts. | File Date |
| b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law. | |
| c. The court staff is not permitted to give any legal advice in connection with any lawsuit. | |
| d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
|---|---|---|---|

RETURN DATE: MARCH 5, 2024                    SUPERIOR COURT

STATE OF CONNECTICUT                          JUDICIAL DISTRICT
                                              OF HARTFORD
v.

EIDP, INC.; DUPONT DE NEMOURS,                AT HARTFORD
INC.; THE CHEMOURS COMPANY; THE
CHEMOURS COMPANY FC, LLC;
CORTEVA, INC.; and 3M COMPANY                 JANUARY 23, 2024

## <u>COMPLAINT</u>

The State of Connecticut, by its Attorney General William Tong, brings this action to

obtain injunctive, monetary, and other equitable relief, and complains and alleges as follows:

## I.    NATURE OF THE ACTION

1.      The State of Connecticut brings this action against the above-named Defendants to

protect and restore lands, waters, and wildlife, among other natural resources and property,

which are contaminated with toxic chemicals known as per- and polyfluoroalkyl substances

("PFAS").

2.      Defendants are among the world's largest chemical manufacturers and have been the

primary historical manufacturers of PFAS and PFAS-containing chemicals and related products

(herein collectively referred to as "PFAS Products") since the 1940s.

3.      Defendants' PFAS Products have been used in Connecticut and throughout the

country in industrial processes and in consumer products. PFAS are typically added to make

products, including those under Defendants' brand names Teflon and Scotchgard, resistant to

stains, water, and heat. Among the items where Defendants' PFAS Products have been widely

used are food packaging, cookware, carpeting, upholstery, clothing, and cosmetics.

4.      PFAS do not exist naturally in the environment. They are synthetic chemicals which enter the environment through the normal and foreseeable disposal of consumer and commercial products and from industrial releases into the air, water, and soil.

5.      PFAS do not break down in the environment. Once released into the world, PFAS will migrate through the environment and accumulate in living organisms.

6.      Due to their longevity in the environment, PFAS are known as "Forever Chemicals."

7.      PFAS are toxic at extremely low concentrations. Scientific studies have linked the accumulation of PFAS in humans with harmful – and potentially lethal – conditions, including cancer and liver disease, as well as with adverse effects on pregnancies and child development.

8.      The manufacturers of PFAS Products have known about the harmful and persistent characteristics of PFAS for decades, but concealed material information about these characteristics to preserve their product lines.

9.      As early as the 1950s, substantial resources were devoted to toxicity testing on numerous animal species, which demonstrated incredibly dangerous impacts upon an array of mammals, birds, and fish. Human health studies demonstrated significantly increased cancer risks from PFAS exposure, as well as increased occurrence of birth defects and other health impacts. Defendants shared with each other their research and serious safety concerns but not with the public, even as they continued to produce these toxins.

10.      Defendants developed extensive research programs to study their chemicals and determined that their PFAS Products were polluting drinking water supplies, groundwater, surface waterbodies, soils, sediments, and wildlife.

11.      Since the 1970s, these manufacturers have also known that there is a "universal presence" of their PFAS in human blood.

12.    Despite legal obligations to report their knowledge, these risks were concealed from regulators and the public for decades.

13.    The Environmental Protection Agency ("EPA") only learned in 1998 that PFAS was in the blood of the general human population. Under pressure from the EPA, one Defendant, the 3M Company, then produced over 1,200 studies it had withheld from regulators for decades.

14.    With utter disregard for human health and the environment, Defendants had concealed their knowledge about these harmful chemicals from regulators and deceived their customers. Even after the EPA was alerted to the PFAS threat, manufacturers of PFAS Products labored to undermine regulatory efforts and scientific inquiry.

15.    Defendants concealed critical information in order to perpetuate their toxic trade, delaying any regulatory response to the PFAS threat for decades. As scientific awareness of the dangers of PFAS have grown, recent investigations have revealed widespread PFAS contamination across Connecticut, including in waterways and drinking water wells.

16.    The State, as *parens patriae* and trustee of natural resources, has an obligation to protect its citizens and environment from the ongoing PFAS threat and to restore Connecticut's environment for the benefit of future generations.

17.    Connecticut state agencies estimate that the State and its taxpayers will likely need to expend billions of dollars to mitigate PFAS contamination, remediate Connecticut's natural resources and property, and ensure the health and safety of Connecticut's residents.

18.    The State is not seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam, a firefighting material that contains PFAS which the State is addressing through a separate legal action to hold these and other defendants accountable.

## II.     THE PARTIES

### A.     The Plaintiff

19.     The State of Connecticut brings this action by and through William Tong, Attorney General of the State of Connecticut, with his principal office at 165 Capitol Avenue, Hartford, Connecticut 06106.

20.     The State of Connecticut is a sovereign state and brings this action in its capacity as sovereign, on behalf of its commissioners and agencies, as trustee of State natural resources and owner of substantial interests in property contaminated and injured by Defendants, and pursuant to its *parens patriae* authority on behalf of the citizens of Connecticut.

21.     This action is brought at the request of and pursuant to the authority granted to the Governor of the State of Connecticut, Ned Lamont, by Conn. Gen. Stat. § 3-5, as well as, by Connecticut common law, Conn. Gen. Stat. §§ 3-125, 22a-16, 22a-416 to 22a-599, 42-110m, and 52-552 to 52-552*l*. The State brings this action based upon its statutory enforcement authority to protect State natural resources and substantial interests in property and its common law police power. This power includes its authority to prevent pollution of the State's natural resources and State property, to prevent nuisances, to protect consumers and ensure fair trade practices, and to prevent and abate hazards to public health, safety, welfare, and the environment.

22.     The State of Connecticut brings this action to obtain injunctive, monetary, and other equitable relief. The State of Connecticut seeks to prevent continued violations of law and duties by Defendants, to compel investigation and remediation of environmental pollution, to obtain civil penalties for Defendants' violations of law, and to recover actual and punitive damages. These damages include, without limitation, past and future expenditures to identify and respond

4

to PFAS contamination of natural resources and property, including treating, monitoring, and remediating drinking water, as well as natural resource damages.

23.     In this Complaint, the term "State's natural resources and property" refers to all natural resources or property for which the State of Connecticut seeks damages, including without limitation fish, wildlife, biota, air, surface water, groundwater, wetlands, drinking water supplies, soil, sediment, public lands the State holds in trust, and where the State is an owner of substantial interests in property.

**B.     The Defendants**

24.     Defendants at all times relevant to this Complaint were and are designers, manufacturers, marketers, distributors, and/or sellers of PFAS Products. The following Defendants, at times relevant to this Complaint, designed, manufactured, marketed, distributed, and/or otherwise sold (directly or indirectly) PFAS Products that each such Defendant knew or should have known would be delivered into areas affecting the State's natural resources and property.

**1.     DuPont Defendants**

25.     This Complaint refers to EIDP, Inc., DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc., collectively, as the "DuPont Defendants."

26.     Defendant **EIDP, Inc. ("Old DuPont")**, formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Old Dupont has designed, manufactured, marketed, distributed, and/or sold PFAS Products throughout the United States. Since at least the 1940s, Old DuPont sold its trademarked PFAS Product "Teflon" for industrial uses and, since at least the 1960s, for

use in consumer products. As alleged herein, Old DuPont engaged in a multi-year scheme to

insulate its assets and defraud its creditors. Old DuPont is registered to do business in

Connecticut.

27.    Defendant **DuPont de Nemours, Inc. ("New DuPont")**, formerly known as

DowDuPont, Inc., is a Delaware corporation with its principal place of business at 974 Centre

Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off The Chemours

Company, Old DuPont and The Dow Chemical Company ("Old Dow") merged as subsidiaries of

a newly created entity, DowDuPont, Inc. Subsequently, DowDuPont, Inc. spun off both Corteva,

Inc. and Dow, Inc. ("New Dow") and transferred Old DuPont's historical assets and liabilities,

retaining the specialty products business. In connection with these transfers, the surviving entity

of the spin-offs, now known as DuPont de Nemours, Inc., assumed certain Old DuPont assets

and liabilities, which likely includes business lines and liabilities relating to the design,

manufacture, marketing, distribution, and/or sale of PFAS Products. New DuPont does business

throughout the United States.

28.    Defendant **The Chemours Company ("Chemours")** is a Delaware corporation with

its principal place of business at 1007 Market Street, Wilmington, Delaware 19801. In 2015, Old

DuPont spun off Chemours as an independent company, along with Old DuPont's performance

chemicals business and vast environmental liabilities, including those related to PFAS.

Chemours has designed, manufactured, marketed, distributed, and/or sold PFAS Products

throughout the United States. Chemours is registered to do business in Connecticut.

29.    Defendant **The Chemours Company FC, LLC ("Chemours FC")** is a Delaware

corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware

19801. Chemours FC operates as a subsidiary of Chemours and manufactures fluoropolymer resins. Chemours FC is registered to do business in Connecticut.

30. Defendant **Corteva, Inc. ("Corteva")** is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. In 2019, New DuPont spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont assets and liabilities, which likely includes business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of PFAS Products. Corteva is registered to do business in Connecticut.

### 2. 3M Company

31. Defendant **3M Company ("3M")**, formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144. Since at least the 1950s, 3M has designed, manufactured, marketed, distributed, and/or sold PFAS Products throughout the United States. Beginning in 1956, 3M sold many of those PFAS Products under the brand name "Scotchgard." 3M is registered to do business in Connecticut.

32. The Court has jurisdiction over Defendants under Connecticut's corporate long-arm statute, Conn. Gen. Stat. § 33-929, and individual long-arm statute, Conn. Gen. Stat. § 52-59b, owing to Defendants' transaction of business, tortious conduct, and injuries inflicted in the State.

## III.    FACTUAL ALLEGATIONS

### A.    PFAS Products Harm the Environment, Animals, and Human Health

33. PFAS are a group of thousands of human-made chemical compounds containing bonds of fluorine and carbon atoms. The fluorine-carbon bond is one of the strongest bonds in

chemistry. Due to their unique chemical structure, PFAS are extremely stable and repel oil, grease, water, and heat. They do not naturally occur in the environment.

34.    For purposes of this Complaint, "PFAS" includes, but is not limited to, the following ten PFAS compounds, including their precursors, acids, salts, ionic forms, and byproducts, for which the Connecticut Department of Public Health ("CT DPH") has developed drinking water "Action Levels" for specified concentrations:

       a.    **PFOS** (Perfluorooctanesulfonic acid)

       b.    **PFOA** (Perfluorooctanoic acid)

       c.    **6:2 Cl-PFESA** (6:2 chloropolyfluoroether sulfonic acid)

       d.    **8:2 Cl-PFESA** (8:2 chloropolyfluoroether sulfonic acid)

       e.    **HFPO-DA** (also known as GenX) (Hexafluoropropylene oxide dimer acid)

       f.    **PFBS** (Perfluorobutanesulfonic acid)

       g.    **PFBA** (perfluorobutanoic acid)

       h.    **PFHxS** (Perfluorohexanesulfonic acid)

       i.    **PFHxA** (Perfluorohexanoic acid)

       j.    **PFNA** (Perfluorononanoic acid)

35.    The unique chemical structure of PFAS make them (1) persistent, (2) mobile, (3) bioaccumulative and biomagnifying, and (4) toxic.

36.    PFAS are extremely persistent. PFAS do not break down or biodegrade in the environment or in living organisms. Once released into the environment, they will endure indefinitely until they are consumed by living organisms or are contained and removed. This extreme persistence has given them the nickname "Forever Chemicals."

37.     PFAS are highly mobile. They easily dissolve and spread through water. Once released into the environment, they can migrate long distances through a variety of media, including surface water, groundwater, soils, sediment, and air. Due to the mobility and persistence of PFAS, even releases of modest quantities can cause significant pollution of State natural resources and property.

38.     PFAS bioaccumulate in humans and in wildlife such as fish. PFAS are purged from individual organisms very slowly – over many years for humans and other large organisms – which leads to a buildup of PFAS within the body, even when exposure continues at extremely low levels. Thus, PFAS also can biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

39.     As humans are exposed to PFAS, whether through consumption of contaminated food or water, inhalation of contaminated air, or absorption through skin, the concentration of PFAS in their blood and organs increases.

40.     According to the CDC, the elimination half-lives of PFOA and PFOS, or the length of time for the concentration of those substances in the human body to decrease by one-half, are estimated to be 3.5 years and 4.8 years, respectively. For comparison, the half-lives of arsenic, lead (in human blood), and radioactive polonium are ten hours, thirty-two days, and forty days.

41.     PFAS also spread through humans and other mammals by crossing the placenta from mother to fetus and by passing to infants through breast milk.

42.     PFAS are toxic and cause significant adverse effects to human and animal health. Toxicology and human epidemiology studies by independent researchers, as well as decades of studies and lab animal testing by the Defendants, have demonstrated the unreasonable risk to human and animal health from PFAS.

43.     Federal government agencies, including the Center for Disease Control's Agency for Toxic Substances and Disease Registry, have concluded there are adverse human health effects associated with PFAS exposure, including kidney and testicular cancer; liver damage or changes in liver function; delayed growth and development (including decreased infant birth weight); decreased vaccine response; and increased cholesterol.

44.     Additional adverse human health effects associated with PFAS exposure include, but are not limited to, cancers of the liver, breasts, pancreas, and prostate; diabetes; fatty liver disease; adverse pregnancy outcomes; and infertility.

45.     Contamination from PFAS is a serious threat to human health and the environment, including to the State's natural resources and property.

46.     The presence of these chemicals in drinking water presents a serious threat to public health.

47.     Removal of PFAS from drinking water sources requires specialized and expensive drinking water treatment systems. Additionally, once PFAS are removed from drinking water through filtration media, they must be disposed of in a safe manner, which is costly and creates new risks.

48.     Known pathways for PFAS to enter the environment include releases to air, waters, and soil from industrial processes and sites and through the normal and foreseeable use and disposal of consumer, household, and commercial products containing PFAS.

49.     Once released into the environment, PFAS resist natural degradation, migrate through and contaminate State natural resources and property, harm human and animal life, and are difficult and costly to remove.

**B.**     **The State is Uncovering and Responding to PFAS Contamination in Connecticut**

   **1.**     **Federal Investigations and Changing Regulations Have Brought Attention to PFAS**

50.     Federal and state regulators began to learn of the substantial risks associated with PFAS exposure in the late 1990s, when the EPA received disclosures about two types of PFAS – PFOS and PFOA – and subsequently filed enforcement actions under the Toxic Substances Control Act (TSCA).

51.     Section 8(e) of TSCA requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." TSCA § 8(e), 15 U.S.C. § 2607(e). This reporting requirement has been included in TSCA since its enactment in 1976. *See* Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

52.     In December 2005, the EPA reached a settlement with Old DuPont related to violations of TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute, $10.25 million, and further required Old DuPont to perform Supplemental Environmental Projects worth $6.25 million.

53.     In April 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for 244 violations of TSCA, which included violations dating back decades for failing to disclose studies regarding PFOS, PFOA, and other fluorinated compounds.

54.     Concurrently with those enforcement actions, EPA sought to phase out the production of PFOS and PFOA. As the only known manufacturer of PFOS in the United States, 3M's phaseout of PFOS ceased all known domestic PFOS manufacturing. In 2006, EPA launched the PFOA Stewardship Program to coordinate the phaseout of intentional domestic PFOA

11

production by 2015, which the participants reported to have been achieved. The eight

participating companies were Arkema, Asahi, BASF, Clariant, Daikin, 3M/Dyneon, Old DuPont,

and Solvay Solexis.

55.    Since EPA learned of the substantial risks associated with PFAS exposure through its

investigations and Defendants' overdue disclosures, it has recognized the threat presented to

human health and the environment and has proposed regulations with considerable implications

for State regulators and their drinking water providers.

56.    In 2016, the EPA established a health advisory level ("HAL") for combined PFOS

and PFOA in drinking water at seventy parts per trillion (ppt). In June 2022, the EPA lowered the

HALs for PFOA and PFOS to .004 ppt and .02 ppt, respectively. One ppt is analogous to one

drop in twenty Olympic-sized swimming pools. In setting these new interim HALs, the EPA

relied on "data and draft analyses that indicate that the levels at which negative health effects

could occur are much lower than previously understood when the agency issued its 2016 health

advisories for PFOA and PFOS."

57.    In March 2023, the EPA proposed a new National Primary Drinking Water

Regulation for six PFAS, including PFOA, PFOS, PFNA, HFPO-DA/GenX, PFHxS, and PFBS.

The regulation establishes legally enforceable levels, called Maximum Contaminant Levels

(MCLs), for the six aforementioned PFAS, as well as health-based, non-enforceable Maximum

Contaminant Level Goals (MCLGs). If promulgated, water providers and their state regulators

will be required to monitor for these PFAS, notify the public of the levels of these PFAS, and

reduce the levels of these PFAS in drinking water if they exceed the proposed MCL standards.

58.    The proposed regulation would set the MCLs for PFOA and PFOS in drinking water

at 4.0 ppt, which is the lowest concentration that can be reliably quantified within specific limits

of precision and accuracy during routine laboratory operating conditions. The proposed regulation would set the MCLGs for PFOA and PFOS at zero because the EPA has determined that the chemicals "are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."

59.    Currently, the EPA is monitoring twenty-nine PFAS compounds under the fifth Unregulated Contaminant Monitoring Rule (UCMR 5). The UCMR 5 requires drinking water systems across the country to collect samples between 2023 and 2025 to test for the presence of twenty-nine PFAS (and lithium). The UCMR 5 requires monitoring of the contaminants from Public Water Systems ("PWS") that serve at least 3,300 people, as well as a randomly selected sampling of smaller PWS.

60.    In September 2022, the EPA also initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present substantial danger to public health or welfare or the environment when released into the environment." Once promulgated, States and publicly owned treatment works ("POTWs") will be responsible for monitoring and treating PFAS in wastewater, controlling the discharge of PFAS, and monitoring, treating, and managing the disposal of PFAS-contaminated biosolids.

**2.    PFAS Investigations and Response Measures Are Underway in Connecticut**

61.    As a consequence of the Defendants' design, manufacturing, marketing, distribution, and sale of PFAS Products, the natural resources and lands of the State of Connecticut are contaminated with PFAS.

62.    In July 2019, Governor Ned Lamont established the Interagency PFAS Task Force, led by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") and CT DPH, to develop a statewide PFAS strategy across eighteen State agencies and entities. The PFAS Action Plan, released on November 1, 2019, recommended thirty-four agency actions across four strategic focus areas: (1) protecting human health; (2) pollution prevention; (3) remediation; and (4) education, outreach, and communication. State agencies and other entities are uncovering the breadth of the State's toxic contamination by sampling environmental media, testing drinking water sources, and investigating sites of likely PFAS discharge.

63.    Two years later, the Connecticut General Assembly passed Public Act 21-191, which banned the sale of food packaging containing intentionally added PFAS as of December 31, 2023.

64.    The State has expended substantial resources to uncover and address the extensive PFAS contamination in Connecticut, including millions of dollars of state bond funds, clean water and drinking water loan funds, and brownfield grants. New staff have been hired to perform PFAS analysis and the CT DPH Laboratory has been outfitted with analytical equipment to perform testing, for example, of drinking water samples.

65.    Connecticut agencies developed PFAS testing programs as early as 2013, with the advent of the Unregulated Contaminant Monitoring Rule 3. As the primacy agency with responsibility for implementing the Safe Drinking Water Act, CT DPH is tasked with regulating nearly 2,400 public water systems serving over 2.7 million residents.

66.    Beginning in 2018, CT DPH established a drinking water Action Level – the concentration of a contaminant at which CT DPH recommends action be taken to reduce health risks – for a sum of five PFAS compounds. Based on evolving science and updated research, CT

14

DPH established individual Action Levels for four PFAS (PFOA, PFOS, PFNA, PFHxS) in June 2022 and for another six PFAS (GenX, PFHxA, PFBS, PFBA, 6:2 Cl-PFESA, 8:2 Cl-PFESA) in June 2023. The ten PFAS compounds for which Action Levels were established are among the most widely studied PFAS that have also been detected in human blood more frequently and at higher concentrations than other PFAS. With the establishment of Action Levels, CT DPH mandated PFAS testing for all new wells and recommended testing for all PWS.

67.    Building on past testing requirements and voluntary testing, testing of drinking water sources is ongoing under the UCMR 5 regime with support from CT DPH. The first quarterly results were released in August 2023. Of the Connecticut PWS that reported results for the first quarter disclosure, fourteen water sources operated by nine PWS reported detections of various PFAS compounds, with detection levels as high as 44.3 ppt.

68.    State agencies have also lent technical assistance and engaged in private well sampling in communities known to be affected by PFAS contamination from nearby sources. Connecticut has over 320,000 private residential wells serving more than 820,000 residents. Because PFAS does not biodegrade, CT DEEP expects private wells polluted with PFAS may require treatment in perpetuity, unless active remedial measures are implemented to isolate or remove the source of PFAS pollution to groundwater. During the State's PFAS investigations conducted to date, contaminated private wells have been found in the vicinity of PFAS sources, and additional contaminated wells are expected to be identified as environmental investigations of known or presumed PFAS sources continue.

69.    Site investigations are ongoing among the thousands of identified sites in Connecticut suspected of being contaminated with PFAS.

70.    Among those sites of known or suspected contamination are five closed landfills managed by the State. Bond funds have been allocated to address identified PFAS contamination associated with landfills in Hartford and Ellington, while testing is underway at landfills in Shelton, Wallingford, and Waterbury.

71.    In addition to its site investigations, the State has retained experts to conduct environmental contamination studies.

72.    In 2021, CT DEEP retained consultants to characterize PFAS levels in environmental media entering and discharging from POTWs in Connecticut. The study tested influent, effluent, and sludge from thirty-five POTWs. Additionally, incinerator sludge and incinerator scrubber water samples were collected from four biosolid incinerators, and surface water and fish tissue samples were collected near ten POTWs. The data collected indicated PFAS were present in all samples analyzed. Of the thirty-four individual PFAS tested, twenty-nine were detected in at least one sample. The identified PFAS included all PFAS compounds for which CT DPH has enacted drinking water Action Levels. The data on PFAS concentrations in fish tissue prompted CT DEEP and CT DPH to issue a consumption advisory for specific sections of the Hockanum River.

73.    Defendants' acts and omissions have caused or contributed to PFAS contamination in Connecticut. Defendants failed to disclose to their customers and the users of PFAS Products the environmental and health risks of PFAS that were known or should have been known to them, resulting in the release and proliferation of PFAS. As a result, the risks associated with PFAS were unknown to the users of PFAS Products; were unknown to the State; and were generally unknown to those other than Defendants who could have reduced or limited the PFAS contamination and injury described above. As designers, manufacturers, marketers, distributors,

and sellers of PFAS Products, Defendants were in the best position to mitigate the risk of harm of their products.

74.     As a consequence of Defendants' acts and omissions, the State is expending substantial resources to identify, contain, remediate, or otherwise mitigate the effects of PFAS contamination across Connecticut.

**C.     There is Widespread PFAS Contamination of Connecticut's Natural Resources**

75.     PFAS contamination from Defendants' PFAS Products has injured and continues to injure the natural resources and property of the State and the property, health, safety, and welfare of Connecticut's citizens.

76.     Since 1971, the State of Connecticut has declared that "[t]he air, water, land and other natural resources, taken for granted since the settlement of the state, are now recognized as finite and precious" and that it is the policy of the State "to manage the basic resources of air, land and water to the end that the state may fulfill its responsibility as trustee of the environment for the present and future generations." Conn. Gen. Stat. § 22a-1.

77.     It is the policy of the State of Connecticut that "carefully selected areas of land and water of outstanding scientific, educational, biological, geological, paleontological or scenic value be preserved." Conn. Gen. Stat. § 23-5a.

78.     It is also the policy of the State of Connecticut that "there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same." Conn. Gen. Stat. § 22a-15.

79.     The State owns lands throughout Connecticut that it maintains for the benefit of the public, such as State Forests, State Parks, and wildlife management areas.

80.    The State holds its natural resources in trust for the State's citizens and has an obligation to protect public interests in these resources through, among other things, maintaining the environmental quality of its air, lands, and waters. The State's natural resources include, without limitation, its air; its waters, such as groundwater, springs, streams, wetlands, ocean waters, and estuaries; certain lands and the resources found on them, such as forests and the trees within; and its wildlife, such as birds and fish, within its boundaries or otherwise subject to its jurisdiction.

81.    PFAS attributable to Defendants' PFAS Products have been found in groundwater, surface water, sediments, soils, and biota in the State where PFAS Products were used, stored, disposed of, or otherwise discharged. Furthermore, the State anticipates that additional contamination of natural resources from PFAS attributable to Defendants' PFAS Products will be uncovered as its investigation continues.

82.    Contamination from PFAS Products persists in the State's natural resources, damages their intrinsic value, and impairs the public benefits derived from access to, use, and enjoyment of the State's natural resources.

83.    The current and future residents of the State have a substantial interest in natural resources free of PFAS contamination, as do the tourism, recreation, fishing, and other industries that rely on maintaining a clean and safe environment for their businesses, patrons, and tourists to visit and enjoy.

84.    Defendants' PFAS Products are major sources of PFAS contamination in Connecticut. Numerous locations in Connecticut are known to be contaminated and injured by Defendants' PFAS Products, including locations in the vicinity of landfills, POTWs, and operating or closed manufacturing facilities.

85.     Releases of PFAS directly to soil or water allow PFAS to spread through the environment. PFAS on contaminated sites, such as those named above, have migrated between soils, groundwater, and surface water, which threaten human health and contaminate the sediments and biota found within those environments. A healthy and functioning ecosystem depends upon the interplay between non-impaired waters, soils, sediments, and wildlife.

### 1.     Groundwater

86.     Groundwater is a precious, limited, and invaluable natural resource that is used for drinking water, irrigation, and other important purposes.

87.     A majority of Connecticut residents rely on groundwater for drinking water, including the twenty-three percent of residents who rely solely on private residential wells.

88.     The people of Connecticut also use groundwater to irrigate agricultural crops and to provide drinking water to animals raised for human consumption in the State.

89.     PFAS attributable to Defendants' PFAS Products have contaminated and injured the State's groundwater in locations throughout the State, including, for example, at the closed landfills in Hartford and Ellington.

90.     PFAS attributable to Defendants' PFAS Products have contaminated and injured drinking water that is drawn from groundwater sources in locations throughout the State, including, for example, in public water systems in Manchester and Norwalk.

91.     Defendants have caused PFAS contamination of groundwater at these and a myriad of other locations in Connecticut by designing, manufacturing, marketing, distributing, and/or selling PFAS Products – all while knowingly concealing and misrepresenting the dangers posed by those products to groundwater.

92.     Ongoing additional testing continues to reveal further PFAS contamination and injury of groundwater in locations throughout Connecticut.

93.     It is virtually certain that additional testing will reveal further PFAS contamination and injury of groundwater in locations throughout Connecticut.

        **2.    Surface Waters**

94.     Surface waters are precious, limited, and invaluable State natural resources that are used for drinking water, recreation, fishing, and ecological and other important purposes.

95.     Connecticut has 618 miles of shoreline on the Long Island Sound. The State contains 6,000 miles of streams and rivers, and over 2,000 lakes and reservoirs.

96.     Surface waters are sources of drinking water. Approximately seventy-six percent of Connecticut's population is served by water systems with the capability to supply both ground and surface water supplies – twenty-one percent of large water systems in Connecticut rely exclusively on surface supplies.

97.     Connecticut's surface waterbodies are central to its economic wellbeing. The State's tourism and recreation industries are dependent upon clean water that is safe for recreation and capable of supporting aquatic life, including a recreational boating sector worth $3.6 billion each year and a sportfishing sector worth over $650 million each year.

98.     Significant releases of PFAS have created ecological and public health crises in Connecticut rivers.

99.     Defendants' PFAS Products have contaminated Connecticut surface waterbodies in the vicinity of POTWs and other release sites, including, but not limited to, the following waterbodies, each of which has tested and detected PFAS compounds:

        a.     Connecticut River, Hartford

      b.      Farmington River, Farmington and Windsor

      c.      Hockanum River, Vernon

      d.      Naugatuck River, Beacon Falls

      e.      Pequabuck River, Bristol

      f.      Quinnipiac River, Wallingford

      g.      Scantic River, Somers

100.    Ongoing additional testing continues to reveal further PFAS contamination and injury of surface waters in locations throughout Connecticut.

101.    It is virtually certain that additional testing will reveal further PFAS contamination and injury of surface waters in locations throughout Connecticut.

### 3.    Fish and Wildlife

102.     The State's biota – including both flora and fauna – are critical ecological resources. Wildlife, including birds and fish, are held in trust by the State for the benefit of its citizens.

103.    The State's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of cultural and economic activity in Connecticut. Hunting, fishing, and wildlife watching, for example, generate hundreds of millions of dollars each year through tourism and recreation. Connecticut's fish, marine resources, and wild game also provide important sources of food.

104.    Injuries to Connecticut's biota impact not only the individual species, but also the entire ecosystem of which they are a part.

105.    The State has identified PFAS compounds attributable to the Defendants' PFAS Products in its public trust fish. Since 2016, Connecticut state agencies have tested finfish tissue for the presence of PFAS.

106.    PFAS attributable to Defendants' PFAS Products have contaminated and injured fish in waterbodies across Connecticut, leading CT DPH to issue consumption advisories against consuming fish caught in certain waterbodies. Those advisories recommend limiting consumption of these fish to one meal per month or warn against any consumption at all.

107.    For example, solely in response to detected PFOS levels, CT DPH has issued consumption advisories concerning fish caught throughout or in portions of the following rivers:

  a.    Connecticut River

  b.    Farmington River

  c.    Hockanum River

  d.    Housatonic River

  e.    Natchaug River

  f.    Naugatuck River

  g.    Pequabuck River

  h.    Quinnipiac River

  i.    Scantic River

  j.    Shetucket River

  k.    Still River

  l.    Tankerhoosen River

  m.    Willimantic River

108.    Connecticut state agencies, including the Department of Agriculture and the University of Connecticut, are also investigating PFAS contamination of shellfish beds in Long Island Sound.

22

109.    Connecticut state agencies have expended substantial resources to conduct PFAS testing in finfish and shellfish. This testing will need to continue to update fish consumption guidance.

110.    In addition to fish testing, Connecticut state agencies are also preparing to test raptor blood and tissue, including those of bald eagles, for PFAS and other compounds.

111.    Ongoing additional testing continues to reveal further PFAS contamination and injury of wildlife in locations throughout Connecticut.

112.    It is virtually certain that additional testing will reveal further PFAS contamination and injury of wildlife in locations throughout Connecticut.

**D.      The Defendants Knew or Should Have Known of the Dangers of PFAS**

**1.      3M Has Known for Decades of Health and Environmental Risks from PFAS**

113.    3M was the largest manufacturer of PFAS chemicals in the United States from the 1940s through the early 2000s.

114.    3M manufactured PFAS by electrochemical fluorination beginning in the 1940s.

115.    3M was the only known manufacturer of PFOS and PFHxS in the United States.

116.    3M knew for decades that its PFAS Products were toxic and would adversely affect the environment and human health.

117.    3M began testing the physiological and toxicological properties of PFAS compounds as early as 1950. Based on these internal studies, 3M knew that PFOA and PFOS were harmful to humans and the environment as early as the 1950s.

118.    In 1950, 3M documented that PFAS accumulate in the blood of mice when exposed to the chemicals in laboratory tests.

119.    By 1956, studies showed that 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

120.    By 1960, 3M knew that its waste PFAS could leach into groundwater and otherwise enter the environment. An internal 3M memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells." Later that year, 3M confirmed that PFAS had already polluted the wells.

121.    As early as 1963, 3M knew that its PFAS were highly stable in the environment and did not degrade after disposal. A 1963 3M report described PFAS as being stable in the environment and "completely resistant to biological attack." The same report also confirmed that 3M knew the chemicals to be "toxic."

122.    By the mid-1960s, it already considered PFAS to be "toxic" and persistent and it understood the propensity of these chemicals to spread and pollute the environment. 3M chose to withhold its knowledge from its customers and the public, even as its knowledge of the dangers of PFAS continued to grow.

123.    By the 1970s, 3M researchers had documented PFAS in fish and were aware that its PFAS Products were hazardous to marine life.

124.    In 1970, outside researchers conducted toxicity testing of 3M's Light Water line of PFAS-containing firefighting foam and found it to be "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

125.    In 1972, toxicity tests conducted with 3M's Light Water foam on bluegill, grass shrimp, fiddler crab, and mummichog further confirmed PFAS's toxicity. After exposure to a 33.4 mg/l concentration of Light Water foam, 100 percent of bluegills died.

126.    By the 1970s, 3M was concerned about the risks posed to the general population by exposure to its fluorochemicals.

127.    In 1975, 3M learned there was a "universal presence" of PFAS in human blood samples taken from across the United States. After reporting organic fluorine compounds in blood bank samples taken from around the United States at levels corresponding to approximately forty-five ppb, one of the researchers who made this discovery contacted the company to see if it knew of "possible sources" of the chemicals, inquiring about consumer products like Teflon and Scotchgard. 3M's scientists concluded internally that the fluorine compounds resembled 3M's own PFAS, but "plead ignorance" to the researcher, misled him by "advis[ing] him that 'Scotchgard' was a polymeric material not a [fluorochemical]," and did not share this information outside the company.

128.    In 1976, 3M began monitoring the blood of its employees for the presence of PFAS because the company was concerned about potential health effects. For example, workers at 3M's Chemolite plant in Cottage Grove, Minnesota, were found in June 1976 to have blood PFAS levels at "1,000 times normal."

129.    During the late 1970s, 3M's internal studies continued to demonstrate the environmental persistence and severe toxicity of the company's chemicals.

130.    In 1978, a 3M study warned that PFAS "are likely to persist in the environment for extended periods" and that they were "shown to be completely resistant to biodegradation."

131.    In 1978, 3M conducted multiple PFOS and PFOA studies in monkeys and rats. The studies showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested. Results of a ninety-day animal study conducted by 3M in 1978 indicated that PFAS "should be regarded as toxic."

132.    In 1978, 3M had to abort a study when all of the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of the chemical.

133.    In 1979, an internal 3M report discussing the studies on PFOS and PFOA toxicity to animals stated that the compounds were "more toxic than anticipated" and recommended that "lifetime rodent studies should be undertaken as soon as possible."

134.    In 1979, a 3M study reported that one of 3M's fluorosurfactants was found to be completely resistant to biological test conditions and that it appeared waterways were the "environmental sink" for the fluorosurfactants.

135.    In 1979, 3M studies documented PFAS in fish taken from the Tennessee River in the proximity of 3M's plant in Decatur, Alabama, with the "definite conclusion" that PFAS "do appear to bioaccumulate in river fish under natural conditions."

136.    With mounting evidence that its PFAS were toxic, persistent, and mobile in the environment, concerns were growing internally at 3M about the possible risks to its employees.

137.    A 1979 memo from an employee in 3M's medical department concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure." That same year, an outside researcher recommended additional testing and told 3M that reducing employees' exposure to PFAS "should have top priority."

138.    By 1979, Old DuPont and 3M were sharing research on the effects of PFAS to determine the risk to their employees.

139.    In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure." This was based on internal research showing that PFAS compounds were causing birth defects in rats.

140.    In 1983, 3M Environmental Laboratory scientists advocated for funding to perform an ecological risk assessment of fluorochemicals and argued that concerns about PFAS give rise to "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment." No testing was authorized in response to the proposed plan.

141.    In 1984, 3M's internal analyses documented increasing levels of fluorochemicals in 3M workers, concluding that potential uptake of fluorochemicals was exceeding excretion capabilities of the body. The bioaccumulation of fluorochemicals in 3M's employees was occurring despite the protective measures already taken.

142.    In 1987, 3M shared with Old DuPont the results of a two-year study where rats were fed a diet with added fluorochemicals, resulting in the growth of cancerous tumors. The data from the study spurred subsequent discussions where Old DuPont scientists questioned whether they were required to label the fluorochemicals as carcinogens in animals. Old DuPont would perform its own follow-up study and summarized the results in a TSCA 8(e) letter to the EPA, which was also sent to 3M.

143.    In 1989, a review of mortality data among 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

144.    In 1996, 3M employees visited Washington Works in Parkersburg, West Virginia for discussions with Old DuPont about finding replacements for their fluorochemicals. At a prior meeting in May 1995, the companies had set a goal of finding a replacement by 2000.

145.    In 1998, a 3M environmental specialist prepared an ecological risk assessment which evaluated whether PFOS concentrations accumulating up the food chain were similar to concentrations that cause adverse effects, determining that ambient environmental levels of PFOS posed a substantial risk to marine mammals.

146.    By the late 1990s, 3M's own toxicologist had calculated a "safe" level for PFOS in human blood to be 1.05 ppb, at a time when 3M was well aware that the average level of PFOS found in the blood of the general population of the United States was approximately thirty times higher than this "safe" blood level. 3M did not disclose this information for more than two decades.

147.    Despite decades of knowledge about the ubiquity and toxicity of its PFAS, 3M only shared its concerns with EPA beginning in May 1998, with the submission of a TSCA 8(e) letter for PFOS. However, that submission downplayed concerns about the environmental impacts of PFAS, as described by a 3M employee:

> Just before that submission we found PFOS in the blood of eaglets – eaglets still young enough that their only food consisted of fish caught in remote lakes by their parents. This finding indicates a widespread environmental contamination and food chain transfer and probably bioaccumulation and bio-magnification. This is a very significant finding that the 8e reporting rule was created to collect. 3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information.

148.    The same 3M employee, environmental specialist Dr. Rich Purdy, in his resignation letter in 1999 called PFOS "the most insidious pollutant since PCB [polychlorinated biphenyl]. It is probably more damaging than PCB because it does not degrade, whereas PCB does; it is more

toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Dr. Purdy sent his resignation letter to the EPA, effectively blowing the whistle on 3M's harmful and illegal activities.

149.    In 2000, under pressure from the EPA, 3M announced that it would phase out production of PFOS, PFOA, and certain related products. The press release stated that "our products are safe" and cited the company's "principles of responsible environmental management" as the reason to cease production.

150.    The same day as 3M's announcement, the EPA issued a press release about 3M's phaseout stating "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

151.    In 2006, EPA cited 3M for 244 violations of the Toxic Substances Control Act, accusing 3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk information." 3M was fined $1.52 million for these violations.

**2.    DuPont Defendants Have Known for Decades of PFAS's Health and Environmental Risks**

152.    In the 1950s, Old DuPont began using PFOA and other PFAS in its specialty chemical applications, including household products like Teflon, and supplied PFAS Products to third parties for use in manufacturing.

153.    Old DuPont quickly thereafter developed an understanding of the dangers of using these chemicals. Rather than warn the public or its consumers about these risks, Old DuPont covered up this information and promoted its PFAS-related products as safe.

154.    During this time, Old DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that the PFAS

present in Teflon and its other specialty chemical products would proliferate and contaminate the environment. Old DuPont was further aware that industrial facilities related to products like Teflon emitted and discharged PFOA and other PFAS into the environment in large quantities and that scores of people had been exposed to its PFAS, including via public and private drinking water supplies.

155.    In approximately 1951, Old DuPont started using PFOA in making Teflon for industrial uses at its Washington Works manufacturing plant in Parkersburg, West Virginia. As early as 1954, employees at Old DuPont's Washington Works plant reported that PFOA might be toxic. In 1961, seven years later, Teflon-coated consumer products hit the marketplace.

156.    By 1961, Old DuPont scientists were issuing internal warnings about the toxicity associated with PFOA, after testing with PFOA led to enlarged livers – "the most sensitive sign of toxicity" – in rats, rabbits, and dogs. Old DuPont's Toxicology Section Chief cautioned that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

157.    In 1964, a group of Old DuPont employees working in Teflon manufacturing became sick after their department was moved to a more enclosed workspace. They experienced chills, fever, difficulty breathing, and a tightness in the chest – symptoms referred to variously as "polymer-fume fever," "Teflon flu," or simply, "the shakes." Polymer-fume fever was first reported in the medical literature in 1951.

158.    In 1965, Old DuPont sponsored a study where rats were fed a PFAS compound over a ninety-day period. Necropsies revealed discoloration of the liver, increased liver and kidney weight, and increased spleen size.

159.    As early as 1966, Old DuPont was aware that PFOA could leach into groundwater.

160.     In 1970, an internal memo stated that Old DuPont's internal laboratory had found PFOA to be "highly toxic when inhaled and moderately toxic when injected."

161.     In 1973, Old DuPont scientists issued results from a study showing that PFOA caused adverse liver reactions in rats and dogs.

162.     In 1975, Old DuPont toxicologists met with 3M employees to discuss the possible toxic effects of PFAS in food products. 3M provided Old DuPont with the results of its toxicity testing on rats and the companies discussed continued sharing of research.

163.     By 1976, Old DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers believed could be a potential result of human exposure to PFAS.

164.     In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFAS, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

165.     In 1979, Old DuPont scientists issued an internal summary of PFOA toxicity testing conducted on various animal species; PFAS-exposed rats showed liver enlargement at low doses, and some were observed to have "corneal opacity and ulceration" that remained for up to forty-two days after. The scientists reported these chemicals to be "highly toxic when inhaled." The chemical was also administered in a single dose of 450 mg to two dogs, who died within two days after ingestion and who showed increased plasma enzyme levels "indicative of cellular damage."

31

166.    By 1979, Old DuPont had data indicating that, not only was organic fluorine/PFAS building up in the blood of its exposed workers, but those workers exposed to PFAS had a significantly higher incidence of health issues than did unexposed workers.

167.    In 1980, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that "people accumulate [PFOA]" in their tissues, and that "continued exposure is not tolerable."

168.    By the 1980s, Old DuPont not only knew that PFAS accumulated in humans, but it was also aware that PFAS could cross the placenta from an exposed woman to her fetus. Old DuPont concealed its knowledge of the connection between PFAS and birth defects and chose to mislead its employees about the risks they faced.

169.    By 1981, Old DuPont had obtained a 3M internal study that documented birth defects in the eyes of unborn rats exposed to PFAS in utero and urged female workers who came into contact with PFAS to consult their doctors "prior to contemplating pregnancy." Contemporaneously with 3M, Old DuPont reassigned "female employees of childbearing capability" from jobs where they would be in direct contact with PFAS.

170.    In 1981, Old DuPont began secretly monitoring female employees who had been exposed to PFOA and conducted blood sampling of those who were pregnant or recently pregnant. Of the eight women who gave birth during this time period, two of the eight gave birth to children with birth defects in their eyes or face, and a third child had PFOA in the umbilical cord. As Old DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question – does [PFOA] cause abnormal children?" The results of the research were described as "statistically significant." Old DuPont abandoned the study without informing regulators or employees.

171.    The observations in the pregnancy monitoring were consistent with 3M's rat study, and in March 1981 Old DuPont had a pathologist and a birth defects expert review the 3M study. They concluded that "the study was valid" and that "the observed fetal eye defects were due to [PFOA]."

172.    Later in 1981, Old DuPont informed their employees "based on our review of the results of the further studies, it does not seem that the observed effects on the eyes of the unborn rats were due to [PFOA]."

173.    Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed its data confirming the transplacental movement of PFOA in humans.

174.    In 1982, Old DuPont's medical director warned in a confidential memo about employees being exposed to potentially dangerous levels of PFOA. He recommended that "available practical steps be taken to reduce this exposure."

175.    In addition to its knowledge of PFOA's toxicity dating back to the 1960s, Old DuPont was also aware that PFAS were capable of contaminating the surrounding environment, leading to human exposure. In 1984, Old DuPont secretly sent employees to obtain drinking water samples from surrounding communities. The results showed that PFOA released from its manufacturing operations was contaminating local drinking water supplies in Lubeck, West Virginia and Little Hocking, Ohio, but Old DuPont said nothing to regulators or the affected communities.

176.    In 1984, after obtaining data on these releases and the consequent contamination near Old DuPont's Washington Works plant in West Virginia, Old DuPont held an internal meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues

related to PFOA. Old DuPont's management was concerned about "[PFOA] exposures off plant as well as to our customers and the communities in which they operate." Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will most likely take a position of total elimination" of PFOA use in Old DuPont's business and that these departments had "no incentive to take any other position."

177.    Nevertheless, Old DuPont not only decided to keep using and releasing PFOA, but affirmatively misrepresented to regulators, the scientific community, and the public that its PFOA releases presented no risks to human health or the environment. Old DuPont continued to use PFOA for almost thirty years after the meeting.

178.    In an October 20, 1986, memorandum, an Old DuPont employee stated that Old DuPont's management in Wilmington, Delaware, was "concerned about the possible liability resulting from long-term [PFOA] exposure to our employees and to the population in the surrounding communities and those downriver from the [Washington Works] plant."

179.    In 1988, Old DuPont began treating PFOA internally as a possible human carcinogen.

180.    In 1999, Old DuPont received preliminary results from a study showing that PFOA caused monkeys to lose weight and increased their liver size. Even monkeys given the lowest doses suffered liver enlargement, and one became so ill it had to be euthanized.

181.    After being sued by a West Virginia farmer in 1999, an internal Old DuPont memorandum regarding its litigation strategy shows that Old DuPont sought to "not create [the]

impression that DuPont did harm to the environment" and wanted to "keep [the] issue out of the press as much as possible."

182.    In 2000, John R. Bowman, an in-house counsel for PFOA issues, wrote an email to several colleagues: "I think we need to make more of an effort to get [Old DuPont] to look into what we can do to get the Lubeck community a clean source of water or filter the [PFOA] out of the water." He continued:

> I think we are more vulnerable than the MTBE defendants [manufacturers of another notorious groundwater contaminant, MTBE] because many states have adopted a drinking water guideline for MTBE and it is not biopersistent. My gut tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful.

> We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives. [Bernard Reilly, another DuPont attorney] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject. Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the bio-persistence of this chemical.

183.    In a 2001 email, in-house lawyer Bernard Reilly described Old DuPont's response to the [PFOA] issue as "a debacle at best." Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Mr. Reilly wrote, "[t]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

184.    Notwithstanding its internal knowledge of PFOA's health and environmental risks from as early as the 1950s, Old DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with [PFOA] exposure," and that "[PFOA] is not a human health issue."

185.    Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. An ERB member called such statements "[s]omewhere between misleading and disingenuous." For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

186.    In October 2006, contrary to ERB's advice, Old DuPont's chief medical officer issued a press release stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

187.    In 2004, EPA filed an administrative enforcement action against Old DuPont for its failure to disclose toxicity and exposure information for PFOA, in violation of TSCA and the Resource Conservation and Recovery Act ("RCRA"). Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and undertake supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

188.    At about the time this penalty was issued, Old DuPont was making approximately $1 billion a year in revenue from products containing PFOA.

### 3.    Defendants Suppressed Information about the Risks of PFAS, Deceived Consumers and Regulators, and Failed to Act on their Knowledge

189.    Despite their knowledge of the harms of their products, Defendants actively sought to suppress scientific research on the hazards associated with PFAS and mounted a campaign to control the scientific dialogue on the risks of PFAS.

190.    Through their roles as the designers, manufacturers, marketers, distributors, and sellers of PFAS Products, Defendants had considerable influence over the information available to their customers, environmental regulators, and the general public. Defendants had a vested financial interest in exercising this influence to conceal the true harmful nature of PFAS, in spite of their obligations to provide this information and to be truthful in advertising.

191.    In internal documents and testimony made public, Defendants evidenced an intentional corporate strategy to "shape the debate at all levels." One consultant retained by Old DuPont to work on PFAS issues outlined the company's goal in a 2003 proposal to:

> [C]reate the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating *Daubert* precedent to discourage additional lawsuits . . . . This battle must be won in the minds of the regulators, judges, potential jurors, and the plaintiff's bar . . . . Manufacturers must be the aggressors.

192.    Defendants' efforts to suppress knowledge of the harms of PFAS began as soon as evidence of its toxicity began to emerge, when the Defendants marked scientific studies and related documents as "confidential," withholding their disclosure in spite of the obvious public interest and evidencing an awareness of legal liability. As 3M's Dr. Rich Purdy wrote:

> 3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process. This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions.

193.    3M used a variety of tactics to deceive others and to hide the negative effects of PFAS. In Dr. Rich Purdy's letter of resignation from 3M, he detailed, among other things: 3M's tactics to prevent research into the adverse effects of its PFOS; 3M's submission of misinformation about its PFOS to EPA; 3M's failure to disclose substantial risks associated with its PFOS to EPA; 3M's failure to inform the public of the widespread dispersal of its PFOS in

the environment and population; 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain; and 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

194.    3M intentionally withheld scientific information about the material risks of its PFAS Products. When researchers Guy and Taves contacted 3M in 1975 about the "universal presence" of organic fluorine in compounds in blood among the general population, 3M "plead ignorance," misled them by "advis[ing] him that 'Scotchgard' was a polymeric material not a [fluorochemical]," and took a position of "scientific curiosity and desire to assist in any way possible." 3M directed its Central Analytical Laboratory (CAL) to conduct similar sampling from blood banks, from which an internal report concluded that the organic fluorine compounds "resembled most closely" PFOS, confirming the suspicions held by the 3M researchers. Subsequent 3M research in 1976 confirmed that the compounds found in human blood by Guy and Taves were PFOS manufactured by 3M.

195.    Guy and Taves proceeded to author a paper in 1979 speculating that the detected compounds were POAA (an ammonium salt of PFOA) and sent the paper to CAL for review. Despite its internal knowledge that the compounds were PFOS and its pledge to "assist in any way possible," 3M withheld the identity of the compound at the urging of its lawyers. 3M facilitated the misdirection through two studies authored by the same CAL scientists who internally identified PFOS in the blood bank samples; one study published in 1979 "suggest[ed] the accuracy of Guy and Taves' conclusions about the identity of the [organic fluorine] found in blood," and a second in 1981 stated that the detected compounds were instead a naturally occurring substance.

196.    3M withheld material scientific information from government agencies as well. From the 1970s, 3M conducted over a thousand studies related to the properties of PFAS and its effects on human health and the environment. These studies should have been disclosed to the EPA, pursuant to TSCA Section 8(e), but from 1980 to 1993, 3M submitted only eighty-four studies or reports to the EPA. From 1998 to 2000, 3M submitted over 1,218 studies or reports, many of which had been prepared decades earlier.

197.    Even after 3M's phaseout, the company worked to control and to distort the science on PFAS. When 3M revealed in 1998 that PFOS was in the blood of the general population, it developed a "Science Publication Strategy" to simultaneously publish select studies in academic journals to create a "context which demonstrates that there is no medical or scientific basis to attribute any adverse health effects to 3M products." Meanwhile, Dr. John Butenhoff, 3M's Manager of Corporate Toxicology, had already calculated a "safe" level of PFOS in human blood of 1.05 ppb and he reported internally that 3M needed to replace "PFOS-based chemistry as these compounds [are] **VERY** persistent and thus insidiously toxic."

198.    3M's PFAS strategy included providing "[s]elective funding of outside research through 3M 'grant' money," including millions of dollars to a professor, John Giesy, who publicly presented himself as an independent expert but behind the scenes worked for 3M by reviewing articles submitted to academic journals for publishing. Dr. Giesy's goal, as expressed in a March 25, 2008, email, was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations they can be a large obstacle to refute." The deceptive intentions of 3M and Dr. Giesy were further evidenced by his assurances to his benefactor that he acted to ensure "there was no paper trail to 3M."

199.    Similarly, Old DuPont conducted its own studies of the toxicity of PFOA but did not

communicate the results to the public or to regulators. Old DuPont understood the nature of

PFAS, the significance of its concentrations, and the hazards it presented to the company's

employees, the public, and the environment.

200.    Despite its knowledge, Old DuPont continued to manufacture PFAS while it actively

suppressed scientific awareness of the hazards of its products.

201.    By the late 1990s, Old DuPont understood its substantial liability exposure from its

decades of releasing toxic PFAS into the environment. Internally, its employees expressed

concerns that "toxicity issues associated with [PFOA] exposure could turn it into the #1 DuPont

torte [sic] issue."

202.    These liability concerns extended to their interactions with regulators and their

misleading disclosures. Old DuPont lawyer Bernard Reilly said in 2001:

> [O]ur analytical technique [for measuring PFOA in water] has very poor recovery, often
> 25%, so any results we get should be multiplied by a factor of 4 or 5. However, that has
> not been the practice, so we have been telling the agencies results that surely are low. Not
> a pretty situation, especially since we have been telling the drinking water folks not to
> worry, results have been under the level we deem "safe" of 1 ppb.
>
> [W]e are exceeding the levels we say we set as our own guideline, mostly because no one
> bothered to do the air modeling until now, and our water test has [been] completely
> inadequate . . . . I have been telling the business to get out all the bad news . . . . Too bad
> the business wants to hunker down as though everything will not come out in the
> litigation, god knows how they could be so clueless.

203.    After EPA learned of the hazards of PFAS, the agency filed administrative actions

against 3M and Old DuPont for concealing their knowledge in violation of federal law.

204.    In December 2005, Old DuPont settled with the EPA to pay approximately $16.5

million to resolve TSCA and RCRA claims alleged in two complaints filed by the agency in July

2004 and December 2004. Those claims included "multiple failures to report information to EPA

about substantial risk of injury to human health or the environment from a chemical during a period beginning in June of 1981 through March of 2001."

205.    In April 2006, 3M settled with the EPA to pay approximately $1.5 million to resolve 244 separate counts under TSCA related to PFOS and PFOA, following a company-wide audit.

206.    Once EPA was first alerted to the health hazards of PFAS in 1998 and received a late disclosure of over 1,200 reports and studies, the EPA and the general scientific community commenced significant scientific inquiries into the nature of these chemicals. Since then, the scientific community has produced a substantial body of research, with some years exceeding 1,000 published studies on PFAS. The extraordinary number of studies which have been conducted in the last two decades reflect the profound lack of knowledge held by the government and the general scientific community about the properties and risks of PFAS, as a consequence of Defendants concealing and suppressing knowledge and research for decades. Defendants sought to exploit that lack of knowledge to preserve their PFAS and related business lines.

207.    Acting for commercial gain, Defendants manipulated, obfuscated, and failed to disclose scientific studies and results relating to the persistence, bioaccumulation, and toxicity of their PFAS Products. Defendants deceptively sought to mislead their customers about the safety of their PFAS Products for environmental and human health and thereby delay the adoption of safe or safer alternatives to PFAS Products.

208.    Consequently, PFAS Products are still being released into the sediments, soils, and waters of the State, harming the environment and endangering human health.

**E.    DuPont Defendants Executed a Fraudulent Scheme to Isolate Their Assets from Their PFAS Liabilities and Hinder Creditors**

209.    As regulators and the public became aware of the hazards presented by PFAS, Old DuPont planned and executed a series of corporate restructurings, beginning in or about 2013

and continuing through at least June 2019, designed to shield its assets from its substantial environmental liabilities, especially those arising from PFOA and other PFAS contamination.

210.    By 2013, Old DuPont knew, or reasonably should have known, that it had a potential cumulative liability of billions of dollars arising from its PFAS-related activities.

211.    Since at least 1999, when members of the Tennant family sued Old DuPont in West Virginia federal court for contaminating their property with PFOA wastes from a landfill, Old DuPont has been subject to mounting litigation arising from its half-century of designing, manufacturing, marketing, distributing, and/or selling of PFAS.

212.    In 2005, a West Virginia court approved a settlement from a class action lawsuit filed against Old DuPont on behalf of 70,000 Ohio and West Virginia residents who were exposed to PFOA discharged by Old DuPont from Washington Works.

213.    Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which diseases were linked to PFOA exposure; to filter local water from impacted public and private drinking water supplies; and to pay up to $235 million for medical monitoring of the affected community for any diseases that the Science Panel linked to PFOA exposure. The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest whether the class members' exposure to PFOA could have caused each of the linked diseases.

214.    By 2012, after seven years of analysis, the Science Panel confirmed "probable links" between exposure to PFOA and the following serious human diseases: medically diagnosed high cholesterol; ulcerative colitis; pregnancy induced hypertension; thyroid disease; testicular cancer; and kidney cancer.

215.    After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of those linked diseases under the terms of the 2005 class settlement. In 2013, these claims were consolidated in federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the U.S. District Court for the Southern District of Ohio ("Ohio MDL"). Forty bellwether trials were scheduled to take place in 2015 and 2016.

216.    The first three trials in the Ohio MDL ended in verdicts for the plaintiffs. Each jury awarded damages in a larger amount than the one before it—the first awarded $1.6 million, the second awarded $5.6 million, and the third awarded $12.5 million. The second and third jury awards included punitive damages. Old DuPont then settled the remaining, pending claims for $670.7 million.

217.    Old DuPont knew, or should have known, prior to and following the Ohio MDL trials, that it faced substantial liability for personal injury and environmental claims related to PFOA and other toxic PFAS contamination caused by its manufacturing operations and that its liability likely measured in the billions of dollars.

218.    On information and belief, including but not limited to a complaint filed by Chemours in Delaware, Old DuPont commenced an internal initiative, in or about 2013, where Old DuPont's management would restructure the company to evade responsibility for the widespread environmental harm that Old DuPont's actions had caused and shield billions of dollars in assets from those liabilities. This initiative was referred to internally as "Project Beta."

219.    In furtherance of possible restructuring opportunities, including potential mergers, Old DuPont and Old Dow began to discuss a possible "merger of equals" in or about 2013.

220.    On information and belief, including but not limited to a complaint filed by Chemours in Delaware, Old DuPont recognized that Old Dow or any other rational merger partner would never agree to a transaction that would expose it to the substantial PFAS and other environmental liabilities held by Old DuPont.

221.    Accordingly, Old DuPont's management executed a three-step corporate restructuring specifically orchestrated to shield Old DuPont's valuable tangible assets from creditors of its substantial environmental liabilities and to convince Old Dow to accept the proposed merger.

222.    Old DuPont's restructuring plan consisted of (1) Old DuPont's attempt to cast off its massive environmental liabilities onto Chemours and spinning off Chemours as a separate publicly traded company; (2) the creation of New DuPont to facilitate a purported merger with Old Dow; and (3) a series of internal restructurings and divestitures that culminated with the spin-off of Old DuPont to its newly formed parent, Corteva.

223.    The first step (the "Chemours Spin-off") in Old DuPont's fraudulent scheme was to transfer its performance chemicals business, which included Teflon and other products ("Performance Chemicals Business"), into its wholly owned subsidiary, Chemours. Then, in July 2015, Old DuPont saddled Chemours with Old DuPont's massive environmental liabilities and "spun off" Chemours as a separate, publicly traded entity.

224.    On information and belief, Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it had forced upon Chemours. Old DuPont also knew that the Chemours Spin-off alone would not fully insulate its assets from PFAS liability because Old DuPont still faced direct liability for its own conduct.

225.    The second step (the "DowDuPont Merger") involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old

DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

226.    In the third step (the "DowDuPont Separation"), DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures," which transferred, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont and culminated in DowDuPont spinning off two new publicly traded companies: Corteva, which currently holds Old DuPont as a subsidiary, and New Dow, which currently holds Old Dow as a subsidiary. DowDuPont was then renamed DuPont de Nemours, Inc. (i.e., New DuPont).

227.    As a result of this restructuring, between December 2014 (before the Chemours Spin-off) and December 2019 (after the DowDuPont Separation), the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately one-half.

228.    New DuPont, New Dow, and Corteva now hold a significant portion of the tangible assets that Old DuPont formerly owned.

229.    Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. On information and belief, Old DuPont, New DuPont, New Dow, and Corteva are concealing from creditors, such as the State, the details of where Old DuPont's valuable assets were transferred and of the inadequate consideration that Old DuPont received in return.

230.    In greater detail, the restructuring scheme was implemented as follows.

### 1.    Step One: The Chemours Spin-off

231.    In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary.

232.    In April 2015, Chemours was converted from a limited liability company to a corporation named "The Chemours Company," in preparation for the July 2015 Spin-Off.

233.    At the time of the Spin-off, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFOA into the environment.

234.    During the Spin-Off preparations, the Chemours Board consisted exclusively of three Old DuPont employees who would not remain with Chemours following the Spin-off – DuPont's M&A Counsel, Nigel Pond; DuPont's Treasury Manager, Michael Heffernan; and DuPont's M&A Manager, Steven Zelac. A fourth board member was appointed on June 19, 2015, who had served on Old DuPont's board of directors for the prior seventeen years.

235.    During the Spin-off preparations, Chemours did not have procedural protections to effectuate a meaningful, arm's-length negotiation of the Spin-off, such as a Board or management independent of Old DuPont. Old DuPont also did not allow Chemours or its DuPont-selected prospective management team to have independent counsel to represent Chemours's interests in structuring the Chemours Spin-off – all documents for the Chemours Spin-off were prepared by Old DuPont and its outside counsel.

236.    To effectuate the Chemours Spin-off, a separation agreement (the "Chemours Separation Agreement") between Old DuPont and Chemours was executed on June 26, 2015, by Nigel Pond on Chemours's behalf, acting in the temporary role of "Vice President" of Chemours.

237.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including thirty-seven active chemical plants.

238.    At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature, value of probable maximum loss, and anticipated timing of the liabilities that Chemours assumed are not publicly available.

239.    The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "[a]ny and all Liabilities relating to, arising primarily out of or resulting primarily from, the operation or conduct of the [Performance Chemicals] Business, as conducted at any time," including "any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historical liabilities relating to and arising from its decades of emitting PFAS and related products into the environment. The indemnification provision is uncapped and does not have a survival period.

240.    Under the Chemours Separation Agreement, Chemours must indemnify Old DuPont against and assume for itself the Chemours Liabilities regardless of (1) when or where such liabilities arose; (2) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Spin-off; (3) where or against whom such liabilities are asserted or determined; (4) whether such liabilities arise from or are alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (5) the accuracy of the maximum probable loss values assigned to such liabilities; and (6) which entity is named in any action associated with any liability.

241.    In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

242.    Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would assume, Old DuPont also caused Chemours to transfer to Old DuPont on July 1, 2015, a "dividend" of $3.9 billion – approximately $3.4 billion in cash, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

243.    Old DuPont required Chemours to fund the dividend through financing transactions, including senior secured term loans and senior unsecured notes, totaling approximately $3.995 billion, entered into on May 12, 2015.

244.    Chemours distributed approximately $3 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

245.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spin-off were unavailable to creditors with current or future PFAS claims, like those of the State, and Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours transferred almost $7 billion in stock, cash, and notes to Old DuPont and its shareholders. Old DuPont, however, transferred only $4.1 billion in net assets to Chemours and saddled the fledgling company with many billions of dollars in PFAS and other liabilities.

246.    On July 1, 2015, Old DuPont completed the spin-off of Chemours, and Chemours became a separate, publicly traded entity.

247.    Shortly after the Chemours Spin-off, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

248.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spin-off, Chemours was thinly capitalized and unable to satisfy the substantial liabilities it had assumed from Old DuPont. Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

249.    The Chemours Spin-off was so one-sided that in May 2019, Chemours sued Old DuPont, New DuPont, and Corteva in Delaware Chancery Court. *See Chemours Company v. DowDuPont, C.A. No. 2019-0351 (Del. Ch. Ct., filed May 13, 2019)*.

250.    In its Amended Complaint Chemours alleged that the primary motivation for the Chemours Spin-off, the subsequent creation of New DuPont, and the final separation of Corteva was to enable Old DuPont to "wash its hands of its environmental liabilities."

251.    Chemours also alleged, among other things, that if the full value of Old DuPont's PFAS and environmental liabilities were properly estimated, and if the Delaware court did not limit the liability that the Chemours Separation Agreement imposed on it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

252.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. Following the Spin-off, Chemours reported in its 2015 Annual Report that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

253.    In the 2015 Annual Report, removing Chemours's goodwill and other intangibles of $176 million yields tangible net worth of negative $46 million (that is, Chemours's liabilities were greater than its tangible assets).

49

254.    Chemours reported that these liabilities included $454 million in "other accrued liabilities," which included $11 million for accrued litigation and $68 million for environmental remediation. Chemours had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

255.    This report significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS contamination, which Old DuPont and Chemours knew or should have known would be billions of dollars.

256.    For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the Ohio MDL brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

257.    Had Chemours accounted for the full extent of Old DuPont's legacy liabilities, as it should have done, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at the time of the Chemours Spin-off.

**2.      Step Two: The DowDuPont Merger**

258.    After the Chemours Spin-off, Old DuPont took the position that it was no longer responsible for the widespread PFAS contamination that it had caused. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals Business rested solely with Chemours, not Old DuPont.

259.    Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spin-off. On information and belief, Old DuPont knew that it could still face exposure for PFAS liabilities. So Old DuPont moved to the next phase of its fraudulent scheme.

260.    On December 11, 2015, less than six months after the Chemours Spin-off, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spin-offs, each of which would occur eighteen to twenty-four months following the closing of the merger.

261.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc. (i.e., New DuPont) – and the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

262.    Thus, as a result of the merger, and in accordance with the Dow-DuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

263.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont.

### 3.     Step Three: The DowDuPont Separation

264.     Following the merger, New DuPont (DowDuPont) underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

265.     While much of the details of these transactions were hidden from the State and other creditors, it is apparent that the transactions were intended to further frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

266.     Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to New DuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: the "Agriculture Business"; the "Specialty Products Business"; and the "Materials Science Business."

267.     While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to New DuPont for less than the assets were worth.

268.     Once the assets of Old DuPont and Old Dow were combined and reorganized, New DuPont incorporated two new companies to hold two of the three newly formed business lines. Corteva became the parent holding company of Old DuPont, which in turn holds the Agriculture Business. New Dow became the parent holding company of Old Dow and holds the Materials

Science Business. New DuPont retained the Specialty Products Business and prepared to spin off

Corteva and New Dow into separate, publicly traded companies.

269.    The mechanics of the separations are governed by the April 1, 2019, Separation and

Distribution Agreement among Corteva, New Dow, and New DuPont (the "DowDuPont

Separation Agreement").

270.    The DowDuPont Separation Agreement generally allocates the assets primarily

related to the respective business divisions of Corteva (Agriculture Business), New Dow

(Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also

retained several "non-core" business segments and product lines that once belonged to Old

DuPont.

271.    Corteva, New Dow, and New DuPont likewise retained the liabilities primarily

related to the business divisions that they retained. In particular, Corteva retained and assumed

the liabilities related to the Agriculture Business, New DuPont retained and assumed the

liabilities related to the Specialty Products Business, and New Dow retained and assumed the

liabilities related to the Materials Science Business.

272.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that

was not related to the Agriculture, Materials Science, or Specialty Products Businesses,

including, on information and belief, the PFAS liabilities. These assumed PFAS liabilities are

allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

These assumed PFAS liabilities are allocated on a pro rata basis between Corteva and New

DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have

satisfied certain conditions, future liabilities are allocated seventy-one percent to New DuPont

and twenty-nine percent to Corteva.

273.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the State's claims in this case.

274.    The separation of New Dow was completed on or about April 1, 2019, when New DuPont distributed all of New Dow's common stock to New DuPont stockholders as a pro rata dividend.

275.    New DuPont then consolidated the Agricultural Business line into Old DuPont and "contributed" Old DuPont to Corteva.

276.    On June 1, 2019, New DuPont spun off Corteva as an independent public company, when New DuPont distributed all of Corteva's common stock to New DuPont stockholders as a pro rata dividend.

277.    Corteva now holds 100 percent of the outstanding common stock of Old DuPont.

278.    Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (i.e., New DuPont).

279.    On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

**F.    The Effect of the Years-Long Conspiracy to Defraud the State and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities**

280.    The net result of these transactions was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont, New Dow, and Corteva for far less than the assets are worth.

281.    Old DuPont estimated that the DowDuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

282.    SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

283.    For example, for the 2014 fiscal year, prior to the Chemours Spin-off, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128 percent in net income and a decrease of seventy-three percent in annual operating cash flow.

284.    Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

285.    The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the 2014 fiscal year, prior to the Chemours Spin-off, Old DuPont owned nearly $41 billion in tangible assets. For the 2019 fiscal year, Old DuPont owned just under $21 billion in tangible assets.

286.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets, totaling $20 billion.

287.    As of September 2019, just after the Corteva separation, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were composed of intangible assets, including "goodwill" from its successive restructuring activities.

288.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva separation was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

289.    Old DuPont's tangible net worth between September 30 and December 31, 2019, declined even further, whereby Old DuPont ended fiscal year 2019 with tangible net worth of negative $1.125 billion.

290.    Neither New DuPont, New Dow, nor Corteva have publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that any of those entities will be able to satisfy future judgments.

291.    Indeed, New DuPont—to which seventy-one percent of Old DuPont's liabilities are allocated under the DowDuPont Separation Agreement once certain conditions are satisfied—has divested numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value.

292.    In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

293.    On or about December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion.

294.    In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

295.    The Chemours Spin-off, the DowDuPont Merger, and the DowDuPont Separation were part of a single coordinated fraudulent scheme to hinder, delay, and defraud Old DuPont's creditors. The Chemours Spin-off constitutes a fraudulent transfer, which entitles the State to, among other things, void the transaction and recover property or value transferred from

Chemours in the transaction. The DowDuPont Merger and DowDuPont Separation likewise constitute fraudulent transfers that entitle the State to, among other things, recover property and value transferred to New DuPont, New Dow, and Corteva.

## COUNT I
## (PUBLIC NUISANCE)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count I as if fully set forth herein.

296.    The Connecticut General Assembly has declared "that the pollution of the waters of the state is inimical to the public health, safety and welfare of the inhabitants of the state, is a public nuisance and is harmful to wildlife, fish and aquatic life and impairs domestic, agricultural, industrial, recreational and other legitimate beneficial uses of water." Conn. Gen. Stat. § 22a-422.

297.    The health, safety, and welfare of the citizens of Connecticut, including those affected by the contamination of Connecticut drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources is a matter of great public interest to the State.

298.    By their acts and omissions, Defendants have created a public nuisance which unreasonably and substantially interferes with public health, safety, and welfare and the environment and which obstructs the public's free use and comfortable enjoyment of Connecticut's natural resources for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

299.    Defendants designed, manufactured, marketed, distributed, and/or sold PFAS Products in a manner which created a public nuisance that is harmful to public health and obstructs the free use and enjoyment of Connecticut's natural resources.

57

300.    Defendants knew or should have known that their PFAS Products, as ordinarily used, were likely to end up contaminating drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources.

301.    Defendants' conduct and the release of their PFAS Products onto State natural resources and property has a natural tendency to create danger and inflict injury upon persons and property.

302.    Defendants' conduct created and maintained, and continues to create and maintain, a public nuisance which interferes with public rights and with public health and safety.

303.    By their acts and omissions, Defendants' creation of the public nuisance was unreasonable and/or unlawful.

### COUNT II
### (TRESPASS)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count II as if fully set forth herein.

296.    The State has significant property interests in its natural resources and property, including its role as trustee of certain public trust resources which authorizes the State to take action to protect such natural resources from contamination and injury.

297.    The State owns in fee certain property within the State, including lands and some drinking water wells.

298.    The State also brings this action in its *parens patriae* capacity on behalf of its citizens to protect quasi-sovereign interests, including the integrity of the State's natural resources held in trust on behalf of its citizens. The State in its *parens patriae* capacity seeks relief for the invasion of these possessory interests by PFAS Products.

299. Defendants' acts and omissions directly and proximately caused PFAS Products to intrude onto and contaminate State natural resources and property, including groundwater, surface waters, soils, sediments, and other natural resources and property.

300. At the time of Defendants' acts and omissions, Defendants knew and understood, or should have known and understood, the properties of their PFAS Products, including through their knowledge and experience regarding contamination at their own facilities where they manufactured and/or used the PFAS Products. Defendants knew with substantial certainty that PFAS Products would intrude onto and contaminate State natural resources and property, including groundwater, surface waters, soils, sediments, and other natural resources and property. Despite this knowledge, Defendants designed, manufactured, marketed, distributed, and/or sold PFAS Products to the detriment of the State.

301. Defendants actively concealed material information about the harms they were inflicting.

302. The State never authorized Defendants' invasion of its natural resources and property with the PFAS Products.

303. As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFAS Products and as a result the State's damages include without limitation damages to natural resources, wildlife, and property in Connecticut. The State has incurred and will continue to incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

## COUNT III
## (NEGLIGENCE)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as

Paragraphs 1 through 295 of this Count III as if fully set forth herein.

296.    Defendants owed a duty of care to the State of Connecticut and to all parties

foreseeably injured by their PFAS Products, including, but not limited to, the exercise of

reasonable care in the design, manufacture, marketing, distribution, and sale of their PFAS

Products.

297.    Defendants breached that duty of care in the course of designing, manufacturing,

marketing, distributing, and/or selling their PFAS Products because they knew or should have

known that the PFAS Products are hazardous to State natural resources and property, including

groundwater, surface waters, soils, sediments, and other natural resources and property, and

would cause the State and other injured parties to suffer substantial damages and incur

substantial expenditures.

298.    Defendants knew or should have known that: the use of PFAS Products in their

intended manner would result in the discharge, disposal, or release of PFAS into the

environment; PFAS are extremely persistent in the environment, very mobile, and highly soluble

in water; when released, PFAS would contaminate property and natural resources located

throughout Connecticut, including soils, sediments, groundwater, surface waters, wildlife, and

drinking water supplies; PFAS posed substantial risks to human health and the environment; and

ultimately, PFAS would be difficult and costly to remove.

299.    Defendants were untruthful about their products, hid relevant information, and failed

to disclose or were otherwise unforthcoming with relevant information about the characteristics

and dangers of their PFAS Products.

60

300.    Despite the fact that Defendants knew or should have known that PFAS are toxic, persistent, mobile in the environment, and cause injury to human health and the environment, Defendants negligently designed, manufactured, marketed, distributed, and/or sold PFAS Products.

301.    These and other negligent acts by Defendants were a direct and proximate cause of widespread PFAS contamination in Connecticut and as a result the State's damages include without limitation damages to natural resources, wildlife, and property in Connecticut. Additionally, the State has incurred and will continue to incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

**COUNT IV**
**(Conn. Gen. Stat. § 22a-16 – CONNECTICUT ENVIRONMENTAL PROTECTION ACT)**

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count IV as if fully set forth herein.

296.    The General Assembly has found and declared that "there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same" and further "that it is in the public interest to provide all persons with an adequate remedy to protect the air, water and other natural resources from unreasonable pollution, impairment or destruction." Conn. Gen. Stat. § 22a-15.

297.    The Attorney General may "maintain an action in the superior court . . . for declaratory and equitable relief . . . for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction." Conn. Gen. Stat. § 22a-16.

298.    In such an action maintained by the Attorney General, the court may also order defendants to: "provide for the restoration of any natural resource or the investigation, remediation or mitigation of any environmental pollution on or at any real property which resource or property are unrelated to such action"; "provide for any other project approved by the Commissioner of Energy and Environmental Protection for the enhancement of environmental protection or conservation of natural resources"; or make a financial contribution to an environmental research project or to a State remediation fund. Conn. Gen. Stat. § 22a-16a.

299.    The natural resources of the State of Connection have been polluted and impaired with PFAS, including but not limited to, its air, soils, sediments, biota, surface water, estuaries, submerged lands, wetlands, groundwater, and drinking water.

300.    Defendants, through their acts and omissions as alleged herein, have unreasonably polluted, impaired, and/or destroyed the State's air, soil, sediment, biota, surface water, estuaries, submerged lands, wetlands, groundwater, drinking water, and other natural resources by releasing PFAS into the environment and allowing them to bioaccumulate, biomagnify, and persist in the State's natural resources.

301.    As a direct and proximate result of Defendants' acts and omissions as described herein, the State's natural resources have been unreasonably polluted, impaired, and/or destroyed.

302.    As a direct and proximate result of Defendants' acts and omissions as described herein, the State of Connecticut has incurred and will continue to incur substantial expenses and damages as set forth herein.

303.    The acts and omissions of the Defendants have caused PFAS contamination which amounts to unreasonable pollution, impairment, and/or destruction of the State's natural

resources, necessitating declaratory and equitable relief to protect the public trust under Conn.
Gen. Stat. § 22a-16.

## COUNT V
## (Conn. Gen. Stat. § 22a-430 – DISCHARGE WITHOUT A PERMIT)

1-295.   Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as
Paragraphs 1 through 295 of this Count V as if fully set forth herein.

296.    Under Conn. Gen. Stat. § 22a-430, "[n]o person or municipality shall initiate, create,
originate or maintain any discharge of water, substance or material into the waters of the state
without a permit for such discharge issued by the [CT DEEP] commissioner."

297.    "Waters" means "all tidal waters, harbors, estuaries, rivers, brooks, watercourses,
waterways, wells, springs, lakes, ponds, marshes, drainage systems and all other surface or
underground streams, bodies or accumulations of water, natural or artificial, public or private,
which are contained within, flow through or border upon this state or any portion thereof." Conn.
Gen. Stat. § 22a-423.

298.    Defendants, through their acts and omissions as alleged herein, have caused the
discharge of PFAS into the waters of the state without a permit.

299.    As a result of Defendants' design, manufacturing, marketing, distribution, and/or sale
of PFAS Products, highly mobile and polluting PFAS have been discharged into the waters of
the State.

300.    As a result of Defendants' omissions, representations, and deceptions, highly mobile
and polluting PFAS have been and continue to be discharged in the State of Connecticut either
directly or indirectly into the waters of the state.

301.    As alleged herein, numerous waters of the state have been polluted and impaired by
Defendants' PFAS.

302.    Pursuant to Conn. Gen. Stat. § 22a-430(d), "[i]f the [CT DEEP] commissioner finds that any person or municipality has initiated, created or originated or is maintaining any discharge into the waters of the state without a permit . . . the commissioner may request the Attorney General to bring an action . . . to enjoin such discharge by such person or municipality until the person or municipality has received a permit from the commissioner or has complied with a permit which the commissioner has issued pursuant to this section, or for injunctive relief to remediate the effects of such discharge."

303.    The Defendants have initiated, created, originated, or maintained a discharge to the waters of the State without a permit in violation of Conn. Gen. Stat. § 22a-430.

304.    Pursuant to Conn. Gen. Stat. § 22a-438, any person who violates any provision of this chapter shall be assessed a civil penalty not to exceed twenty-five thousand dollars per day per violation to be fixed by the court, for each offense.

**COUNT VI**
**(Conn. Gen. Stat. § 22a-427 – POLLUTION OR DISCHARGE OF WASTES PROHIBITED)**

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count VI as if fully set forth herein.

296.    Under Conn. Gen. Stat. § 22a-427, "[n]o person or municipality shall cause pollution of any of the waters of the state or maintain a discharge of any treated or untreated wastes in violation of any provision of this chapter."

297.    "Pollution" means "harmful thermal effect or the contamination or rendering unclean or impure or prejudicial to public health of any waters of the state by reason of any wastes or other material discharged or deposited therein by any public or private sewer or otherwise so as directly or indirectly to come in contact with any waters." Conn. Gen. Stat. § 22a-423.

298.    "Wastes" means "sewage or any substance, liquid, gaseous, solid or radioactive, which may pollute or tend to pollute any of the waters of the state." Conn. Gen. Stat. § 22a-423.

299.    "Waters" means "all tidal waters, harbors, estuaries, rivers, brooks, watercourses, waterways, wells, springs, lakes, ponds, marshes, drainage systems and all other surface or underground streams, bodies or accumulations of water, natural or artificial, public or private, which are contained within, flow through or border upon this state or any portion thereof." Conn. Gen. Stat. § 22a-423.

300.    Defendants, through their acts and omissions as alleged herein, have caused pollution of the waters of the state with PFAS from their PFAS Products.

301.    As a result of Defendants' design, manufacturing, marketing, distribution, and/or sale of PFAS Products, highly mobile and polluting PFAS have been discharged into the waters of the State.

302.    As a result of Defendants' omissions, representations, and deceptions, highly mobile and polluting PFAS have been and continue to be discharged in the State of Connecticut either directly or indirectly into the waters of the state.

303.    The discharge of PFAS into the waters of the state, or onto the lands of the state and from which the PFAS have traveled to the waters of the state, has contaminated and rendered various waters unclean and prejudicial to public health.

304.    As alleged herein, numerous waters of the state have been contaminated with PFAS.

305.    Pursuant to Conn. Gen. Stat. § 22a-438, any person who violates any provision of this chapter shall be assessed a civil penalty not to exceed twenty-five thousand dollars per day per violation, to be fixed by the court, for each offense.

65

## COUNT VII
## (Conn. Gen. Stat. § 22a-451 – LIABILITY FOR POLLUTION, CONTAMINATION, OR EMERGENCY)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count VII as if fully set forth herein.

296.    Under Conn. Gen. Stat. § 22a-451, "[a]ny person, firm, or corporation which directly or indirectly causes pollution and contamination of any land or waters of the state or indirectly causes an emergency through the maintenance, discharge, spillage, uncontrolled loss, seepage or filtration of . . . chemical liquids or solid, liquid or gaseous products or hazardous wastes or which owns any hazardous wastes deemed by the [CT DEEP] commissioner to be a potential threat to human health or the environment and removed by the commissioner shall be liable for all costs and expenses incurred in investigating, containing, removing, monitoring or mitigating such pollution and contamination, emergency or hazardous waste, and legal expenses and court costs incurred in such recovery."

297.    The cost and expenses which may be recovered under this section include "the administrative cost of such action calculated at ten per cent of the actual cost plus the interest on the actual cost at a rate of ten per cent per year thirty days from the date such costs and expenses were sought."

298.    Conn. Gen. Stat. § 22a-451 further provides that "if such pollution or contamination or emergency was negligently caused, such person, firm or corporation may, at the discretion of the court, be liable for damages equal to one-half times the cost and expenses incurred and provided further if such pollution or contamination or emergency was wilfully caused, such person, firm or corporation may, at the discretion of the court, be liable for damages equal to two times the cost and expenses incurred."

299.    As alleged herein, Defendants have caused pollution and contamination of the lands and waters of the State of Connecticut by PFAS.

300.    Defendants have created an emergency by directly and/or indirectly causing the maintenance, discharge, spillage, uncontrolled loss, seepage, or filtration of PFAS into or onto the lands and waters of the State of Connecticut.

301.    As alleged herein, there is widespread pollution and contamination of lands and water in the State by PFAS.

302.    The State has incurred and will continue to incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, as well as costs and expenses incurred responding to the PFAS pollution of non-State lands and waters.

303.    Defendants, through their acts and omissions, willfully caused the PFAS pollution and contamination and emergency. As alleged herein, Defendants had knowledge of the characteristics of PFAS and their PFAS Products and knew or reasonably should have known that the use of such products would injure the State and its citizens. Despite their knowledge, Defendants chose to conceal and misrepresent material facts about their PFAS Products and continued to supply those products to the State and others.

304.    As a consequence of Defendants' acts and omissions, Defendants are liable to the State under Conn. Gen. Stat. § 22a-451 for two times the cost and expenses incurred by the State responding to PFAS water pollution.

**COUNT VIII**
**(Conn. Gen. Stat. § 22a-471(b)(4)B) – REIMBURSEMENT FOR PROVISION OF POTABLE DRINKING WATER)**

1-295.   Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count VIII as if fully set forth herein.

296.   Under Conn. Gen. Stat. § 22a-471(b)(4)(B), "any person or municipality responsible for pollution of the groundwaters" may be required to reimburse "the state, a water company, and any municipality" for "the expenses each incurred in providing potable drinking water to any person affected by such pollution."

297.   The cost and expenses which may be recovered under this section include "(i) the expenses each incurred in providing potable drinking water to any person affected by such pollution, provided the required reimbursement for such expenses shall not exceed the actual cost of short-term provision of potable drinking water and an amount equal to the reasonable cost of planning and implementing the most cost-effective long-term method of providing potable drinking water as determined by the [CT DEEP] commissioner and the Commissioner of Public Health; (ii) costs for recovering such reimbursement; (iii) interest on the expenses specified in (i) at a rate of ten per cent a year from the date such expenses were paid; and (iv) reasonable attorney's fees."

298.   Conn. Gen. Stat. § 22a-471(b)(5) further provides that "[f]or purposes of this section except . . . subparagraph (B)(ii) of subdivision (4) of this subsection, 'cost' includes only those costs that the [CT DEEP] commissioner determines are necessary and reasonable, including, but not limited to, the cost of plans and specifications, construction or installation and supervision thereof."

299.    As alleged herein, Defendants have caused pollution and contamination of groundwaters of the State of Connecticut by PFAS.

300.    Defendants have caused the incurrence, and continued incurrence, of costs for providing potable drinking water to persons affected by groundwater pollution, including but not limited to the short-term provision of potable drinking water, the planning and implementation of long-term methods of providing potable drinking water, and the construction or installation and supervision of methods for providing potable drinking water.

301.    As a consequence of Defendants' acts and omissions, Defendants are liable under Conn. Gen. Stat. § 22a-471 for all expenses of providing potable drinking water in response to polluted groundwater, including interest on those costs and attorney's fees.

## COUNT IX
## (Conn. Gen. Stat. § 42-110b – UNFAIR TRADE PRACTICES)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count IX as if fully set forth herein.

296.    Defendants' unfair acts and practices were in contravention of Connecticut's public policy, including but not limited to the policy set forth in Conn. Gen. Stat. § 22a-1, which states that "the policy of the state of Connecticut is to conserve, improve and protect its natural resources and environment and to control air, land, and water pollution in order to enhance the health, safety and welfare of the people of the state."

297.    Furthermore, Defendants' unfair acts and practices were in contravention of the State's public policy set forth in Conn. Gen. Stat. § 22a-15, which states "that there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same."

298.    Furthermore, Defendants' unfair acts and practices were in contravention of the State's public policy set forth in Conn. Gen. Stat. § 23-5a, which states that "carefully selected areas of land and water of outstanding scientific, educational, biological, geological, paleontological or scenic value be preserved."

299.    Furthermore, Defendants' unfair acts and practices were in contravention of the State's public policy, including but not limited to, as set forth in Conn. Gen. Stat. §§ 22a-16, 22a-427, 22a-430, 22a-451, and 22a-471.

300.    Defendants' unfair acts and practices – including, but not limited to, the following – were immoral, unethical, oppressive, and/or unscrupulous:

a.    deceiving and concealing material information from Connecticut consumers about the health, safety, economic, and environmental effects of using PFAS Products; and

b.    undermining and delaying the adoption of alternative products, driven by informed consumer choice, which could have avoided the most devastating effects of PFAS.

301.    Defendants' unfair acts and practices have directly and proximately caused substantial injury to consumers within the State of Connecticut by causing harmful pollutants to contaminate the lands, waters, and other natural resources of the State.

302.    The substantial injury to consumers by Defendants' unfair acts and practices is not outweighed by any countervailing benefits, but rather resulted in the stifling of an open marketplace for alternative products, thereby leaving consumers unable to reasonably avoid the detrimental consequences of using PFAS Products.

303.    Defendants' deceptive acts and concealment of material information about their business practices and their environmental impact constitute an unfair trade practice in violation of Conn. Gen. Stat. § 42-110b.

## COUNT X
### (Conn. Gen. Stat. § 42-110o – WILLFUL UNFAIR TRADE PRACTICES)

1-303.  Paragraphs 1 through 303 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 303 of this Count X as if fully set forth herein.

304.    Defendants engaged in the acts and practices alleged herein when they knew or should have known that their conduct was unfair, in violation of Conn. Gen. Stat. § 42-110b(a) and, therefore, are liable for civil penalties of up to $5,000 per willful violation pursuant to Conn. Gen. Stat. § 42-110o(b).

## COUNT XI
### (Conn. Gen. Stat. § 52-552e(a)(1) – Actual Fraudulent Transfer Related to the Chemours Spin-off)
### (Against the DuPont Defendants)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count XI as if fully set forth herein.

296.    Under Conn. Gen. Stat. § 52-552e(a)(1), a transaction is fraudulent if made by a debtor with "actual intent to hinder, delay, or defraud any creditor of the debtor."

297.    The actual intent of the debtor may be determined by considering statutorily enumerated badges of fraud, including, whether: (1) "[t]he transfer or obligation was to an insider"; (2) "[t]he transfer or obligation was disclosed or concealed"; (3) "[b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit"; (4) "[t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred"; (5) "[t]he debtor was insolvent or

became insolvent shortly after the transfer was made or the obligation was incurred"; and (6) "[t]he transfer occurred shortly before or after a substantial debt was incurred."

298.    Under Conn. Gen. Stat. § 52-552b, a "creditor" means "a person who has a claim." §52-552b(4). A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." §52-552b(3).

299.    Where a transfer is found to have been fraudulent, a creditor may bring an action to: (1) avoid the transfer as to the creditor's claim; (2) to attach the creditor's claim against assets transferred or other property of the transferee; or (3) after obtaining judgment on a claim against the debtor, and if the court orders, levy execution on the asset transferred or its proceeds.

300.    The State is and was a creditor of Old DuPont at all relevant times. After the 2015 Chemours Spin-off, the State became a creditor of Chemours.

301.    Old Dupont transferred the Performance Chemicals Business to Chemours in 2015 and executed the Chemours Spin-off with the intent to hinder, delay, or defraud creditors that held claims related to environmental and human health damages from Old DuPont's PFAS-containing fluorochemical products.

302.    During the Chemours Spin-off, Chemours assumed $4 billion of debt and significant liabilities under the Separation Agreement, while simultaneously transferring valuable assets to Old DuPont, including the $3.9 billion dividend.

303.    Through the transfer of assets and liabilities as part of the Chemours Spin-off, Old DuPont limited the availability of assets to cover its PFAS liabilities, to the detriment of existing creditors, such as the State of Connecticut.

304.    The exchange of assets and liabilities in the Chemours Spin-off was made to benefit, or for the benefit of, Old DuPont.

305.    At the time of the Chemours Spin-off, Old DuPont was in a position to control, and did control, Chemours.

306.    Old DuPont and Chemours acted with the actual intent to hinder, delay, and defraud creditors such as the State.

307.    The actual fraudulent intent of the Defendants is evidenced by statutorily enumerated badges of fraud present in the Chemours Spin-off. *See* Conn. Gen. Stat. § 52-552e(b).

308.    At the time of the Chemours Spin-off, Old DuPont and Chemours were mutual insiders. *See* Conn. Gen. Stat. § 52-552e(b)(1). The assumption of PFAS liabilities by Chemours, the transfer of the dividend to Old DuPont, and the approval of the Chemours Spin-off occurred while Chemours was under the control of Old Dupont, through its ownership and agents.

309.    The Chemours Spin-off concealed the liabilities actually assumed by Chemours. *See* Conn. Gen. Stat. § 52-552e(b)(3). Old DuPont and Chemours acted to conceal information about the 2015 Spin-off, including withholding information from Chemours management designees, withholding the schedules to the Chemours Separation Agreement from the public, and requiring confidential mediation of all disputes related to the transaction, under terms that favored Old DuPont.

310.    The Chemours Spin-off occurred at a time when Old DuPont and the business line that Chemours would come to own had been sued or threatened with suit related to environmental liabilities. *See* Conn. Gen. Stat. § 52-552e(b)(4). By the 2015 Spin-off, Old DuPont had been sued, threatened with suit, and had knowledge of the likelihood of future litigation regarding Old DuPont's liabilities for PFAS contamination.

311.    Chemours did not receive reasonably equivalent consideration in the Spin-off. *See* Conn. Gen. Stat. § 52-552e(b)(8). Chemours received consideration which was not reasonably equivalent to the actual obligations incurred by Chemours under the Separation Agreement and the transfer of the dividend to Old Dupont.

312.    Chemours was insolvent or became insolvent shortly after the Chemours Spin-off. *See* Conn. Gen. Stat. § 52-552e(b)(9). The Connecticut Uniform Fraudulent Transfer Act (UFTA) recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation, or when a debtor is generally not paying debts as they become due. *See* Conn. Gen. Stat. § 52-552c(a), (b). Chemours was balance-sheet insolvent at the time of the Chemours Spin-off. Additionally, the trading prices for Chemours's debt reflect insolvency as of the date the Chemours Spin-off closed and spiraled downhill in the immediate aftermath of the Chemours Spin-off. Further, as a result of the Chemours Spin-off, Chemours could not pay its debts as they became due.

313.    The Chemours Spin-off occurred shortly before or shortly after a substantial debt was incurred. *See* Conn. Gen. Stat. § 52-552e(b)(10). As part of the Chemours Spin-off, Chemours incurred significant obligations, including the Chemours Assumed Environmental Liabilities (as defined in the Chemours Separation Agreement) and the indemnification obligations under Section 6.3 of the Chemours Separation Agreement. Additionally, Chemours incurred a $4 billion loan to transfer the dividend to Old DuPont.

314.    The State has been harmed by this transaction, which was designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

315.    Under Conn. Gen. Stat. § 52-552, the State is entitled to void the Chemours Spin-off and to recover property or value transferred to Old DuPont.

316.    Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Old Dupont and the incurrence of obligations to Old DuPont in the Chemours Spin-off, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold the DuPont Defendants liable for any damages or other remedies that may be awarded through this lawsuit.

317.    Upon information and belief, New DuPont, New Dow, and Corteva have assumed Old DuPont's liability described above.

318.    New DuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the dividend, to Old DuPont in the Chemours Spin-off, and later to New DuPont, New Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the dividend, the fraudulent intent underlying the Chemours Spin-off, and/or Chemours's insolvency.

**Count XII**
**(Conn. Gen. Stat. § 52-552e(a)(2) – Constructive Fraudulent Transfer Related to the**
**Chemours Spin-off)**
**(Against the DuPont Defendants)**

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count XII as if fully set forth herein.

296.    Under UFTA's constructive fraudulent transfer provisions, a transaction made by a debtor is fraudulent as to a creditor if the debtor made the transfer:

> [W]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor…was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or…intended to incur, or believed or reasonably should have believed that [the debtor] would incur, debts beyond [the debtor's] ability to

pay as they became due. Conn. Gen. Stat. § 52-552e(a)(2).

297.    At all relevant times, the State is and was a creditor of Old DuPont. After the 2015 Spin-off, the State became a creditor of Chemours.

298.    The exchange of assets and liabilities in the Chemours Spin-off was made to benefit, or for the benefit of, Old DuPont.

299.    At the time this transaction was made, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

300.    Chemours did not receive reasonably equivalent value in return for the assumption of Chemours Spin-off related obligations, including the transfer of the dividend. Old DuPont and Chemours acted without providing a reasonably equivalent value in exchange for the transfer or obligation, and Old DuPont believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

301.    At the time of the Chemours Spin-off, Chemours was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to its business, and/or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

302.    At the time of the Chemours Spin-off, Old DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries from Old DuPont's design, manufacturing, marketing, distribution, and/or sale of PFAS Products and other PFAS, including those damages and injuries caused by the business line that Chemours would come to own.

303.    At the time of the Chemours Spin-off, and at all times relevant to this Complaint, Chemours has been balance-sheet insolvent.

304.    On information and belief, New DuPont, New Dow, and Corteva have assumed Old DuPont's liability described above.

305.    The State has been harmed by this transaction, which was designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

306.    Under Conn. Gen. Stat. § 52-552, the State is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

307.    Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Old Dupont and the incurrence of obligations to Old DuPont in the Chemours Spin-off, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold the DuPont Defendants liable for any damages or other remedies that may be awarded through this lawsuit.

308.    New DuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the dividend, to Old DuPont in the Chemours Spin-off, and later to New DuPont, New Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the dividend, the fraudulent intent underlying the Chemours Spin-off, and/or Chemours's insolvency.

**COUNT XIII**
**(Conn. Gen. Stat. § 52-552f(a) – Constructive Fraudulent Transfer Related to the Chemours Spin-off)**
**(Against the DuPont Defendants)**

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count XIII as if fully set forth herein.

296.    Under UFTA's constructive fraudulent transfer provisions, a transaction made by a debtor is fraudulent as to a creditor if the debtor made the transfer "without receiving a reasonably equivalent value" and if "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Conn. Gen. Stat. §52-552f(a).

297.    At all relevant times, the State is and was a creditor of Old DuPont. After the 2015 Spin-off, the State became a creditor of Chemours.

298.    The exchange of assets and liabilities in the Chemours Spin-off was made to benefit, or for the benefit of, Old DuPont.

299.    At the time this transaction was made, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

300.    Chemours did not receive reasonably equivalent value in return for the assumption of Chemours Spin-off related obligations, including the transfer of the dividend.

301.    Chemours was insolvent as a result of the Chemours Spin-off. Chemours was balance-sheet insolvent at the time of the Chemours Spin-off. Additionally, debt trading prices reflected insolvency as of the date the Chemours Spin-off closed and spiraled downhill in the immediate aftermath of the Chemours Spin-off. Further, as a result of the Chemours Spin-off, Chemours could not pay its debts as they became due.

302.    On information and belief, New DuPont, New Dow, and Corteva have assumed Old DuPont's liability described above.

303.    The State has been harmed by this transaction, which was designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

304.    Under Conn. Gen. Stat. § 52-552, the State is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

305.    Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Old Dupont and the incurrence of obligations to Old DuPont in the Chemours Spin-off, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold the DuPont Defendants liable for any damages or other remedies that may be awarded through this lawsuit.

306.    New DuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the dividend, to Old DuPont in the Chemours Spin-off, and later to New DuPont, New Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the dividend, the fraudulent intent underlying the Chemours Spin-off, and/or Chemours's insolvency.

**COUNT XIV**
**(Conn. Gen. Stat. § 52-552e(a)(1) – Actual Fraudulent Transfer Related to the DowDuPont Merger and the DowDuPont Separation)**
**(Against Old DuPont, New DuPont, New Dow, and Corteva)**

1-295.    Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count XIV as if fully set forth herein.

296.    Under Conn. Gen. Stat. § 52-552e(a)(1), a transaction is fraudulent if made by a debtor with "actual intent to hinder, delay, or defraud any creditor of the debtor."

297. The actual intent of the debtor may be determined by considering statutorily enumerated badges of fraud, including, whether: (1) "[t]he transfer or obligation was to an insider"; (2) "[t]he transfer or obligation was disclosed or concealed"; (3) "[b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit"; (4) "[t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred"; (5) "[t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred"; and (6) "[t]he transfer occurred shortly before or after a substantial debt was incurred."

298. Under Conn. Gen. Stat. § 52-552b, a "creditor" means "a person who has a claim." §52-552b(4). A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." §52-552b(3).

299. Where a transfer is found to have been fraudulent, a creditor may bring an action to: (1) avoid the transfer as to the creditor's claim; (2) to attach the creditor's claim against assets transferred or other property of the transferee; or (3) after obtaining judgment on a claim against the debtor, and if the court orders, levy execution on the asset transferred or its proceeds. The Court may also appoint a receiver to take charge of the assets transferred or other property, issue an injunction against further disposition of the assets, or provide such other relief as the circumstances may require. *See* Conn. Gen. Stat. § 52-552h.

300. At all relevant times, the State is and was a creditor of Old DuPont and New DuPont.

301. Through its participation in the DowDuPont Merger and the DowDuPont Separation, Old DuPont transferred valuable assets and business lines to New DuPont, New Dow, and Corteva.

302.    The DowDuPont Merger and DowDuPont Separation were for the benefit of New DuPont, New Dow, and/or Corteva and were made to the detriment of Old DuPont's creditors.

303.    The transactions resulted in Old DuPont transferring significant assets to New DuPont, New Dow, and Corteva, totaling roughly $20 billion.

304.    At the time the sales and transfers were made, New DuPont was in a position to control, and did control, Old DuPont, New Dow, and Corteva.

305.    At the time of these transactions, Old DuPont, New DuPont, New Dow, and Corteva intended and expected Old DuPont to incur debts beyond its ability to pay as they became due or should reasonably have expected that Old DuPont would incur debts beyond its ability to pay as they became due.

306.    Old DuPont, New DuPont, New Dow, and Corteva acted with the actual intent to hinder, delay, and defraud current and future creditors of Old DuPont, including the State.

307.    The actual fraudulent intent of the Defendants is evidenced by statutorily enumerated badges of fraud present in the Separation Transfers. *See* Conn. Gen. Stat. § 52-552e(b).

308.    In connection with the DowDuPont Separation, New DuPont divided up Old DuPont's assets and obligations among entities it controlled, namely New DuPont, New Dow, and Corteva. *See* Conn. Gen. Stat. § 52-552e(b)(1). Upon information and belief, certain obligations were assumed by New DuPont, New Dow, and Corteva, including Old DuPont's PFAS-related liabilities, as well as the indemnification obligations under Article VIII of the DowDuPont Separation Agreement. The transfer of these obligations from Old DuPont to New DuPont, then certain of them from New DuPont to New Dow and Corteva, occurred at a time that New DuPont controlled New Dow and Corteva through New DuPont's Board members, New DuPont employees, and New DuPont agents. New DuPont was an insider of Old DuPont,

New Dow, and Corteva, throughout the DowDuPont Separation. *See* Conn. Gen. Stat. § 52-552b(1).

309.     The DowDuPont Separation concealed the liabilities actually assumed by New DuPont, New Dow, and Corteva. *See* Conn. Gen. Stat. § 52-552e(b)(3). The true scope of the obligations that were to be assumed by New DuPont, New Dow, and Corteva in the DowDuPont Separation Agreement were concealed and the schedules to the DowDuPont Separation Agreement were not publicly filed.

310.     The DowDuPont Separation occurred at a time when Old DuPont and New DuPont had been sued or threatened with suit related to environmental liabilities. *See* Conn. Gen. Stat. § 52-552e(b)(4). Prior to and throughout the DowDuPont Separation, Old DuPont and New DuPont had been sued, had been threatened with suit, and had knowledge of the likelihood of future litigation regarding Old DuPont's and New DuPont's liabilities for PFAS contamination.

311.     Old DuPont did not receive consideration from New DuPont, New Dow, and Corteva reasonably equivalent to the value of the assets exchanged. *See* Conn. Gen. Stat. § 52-552e(b)(8). After the transactions, Old DuPont was left with assets that Old DuPont, New DuPont, New Dow, and Corteva knew were insufficient to pay its extensive environmental liabilities, including the State's claims.

312.     Old DuPont was insolvent or became insolvent shortly after the DowDuPont Separation. *See* Conn. Gen. Stat. § 52-552e(b)(9). UFTA recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. *See* Conn. Gen. Stat. § 52-552c(a). Old DuPont was balance-sheet insolvent at the time of the DowDuPont Separation.

313.    Finally, the DowDuPont Separation occurred shortly before or shortly after a substantial debt was incurred. *See* Conn. Gen. Stat. § 52-552e(b)(10). As part of the DowDuPont Separation, Old DuPont incurred $4 billion in indebtedness to Corteva.

314.    The State has been harmed by these transactions, which were designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

315.    Under Conn. Gen. Stat. § 52-552, the State is entitled to void these transactions and to recover property or value transferred from Old DuPont to New DuPont, New Dow, and Corteva.

316.    Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to New DuPont, New Dow, and Corteva and the incurrence of obligations to New DuPont, New Dow, and Corteva in the DowDuPont Merger and DowDuPont Separation, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold Old DuPont, New DuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

317.    New DuPont, New Dow, and Corteva are not good-faith transferees of the assets transferred through the DowDuPont Merger and DowDuPont Separation to New DuPont, New Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the DowDuPont Merger and DowDuPont Separation and/or the insolvency of Old DuPont.

**COUNT XV**
**(Conn. Gen. Stat. § 52-552e(a)(2) – Constructive Fraudulent Transfer Related to the**
**DowDuPont Merger and the DowDuPont Separation)**
**(Against Old DuPont, New DuPont, New Dow, and Corteva)**

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as

Paragraphs 1 through 295 of this Count XV as if fully set forth herein.

296.    Under UFTA's constructive fraudulent transfer provisions, a transaction made by a

debtor is fraudulent as to a creditor if the debtor made the transfer:

> [W]ithout receiving a reasonably equivalent value in exchange for the transfer or
> obligation, and the debtor…was engaged or was about to engage in a business or a
> transaction for which the remaining assets of the debtor were unreasonably small in
> relation to the business or transaction; or…intended to incur, or believed or reasonably
> should have believed that [the debtor] would incur, debts beyond [the debtor's] ability to
> pay as they became due. Conn. Gen. Stat. § 52-552e(a)(2).

297.    At all relevant times, the State is and was a creditor of Old DuPont and New DuPont.

298.    The exchange of assets and liabilities in the DowDuPont Separation were made to

benefit, or for the benefit of, New DuPont, New Dow, and/or Corteva.

299.    At the time these transactions were made, New DuPont was in a position to control,

and did control, Old DuPont, New Dow, and Corteva.

300.    Old DuPont did not receive consideration from New DuPont, New Dow, and Corteva

reasonably equivalent to the value of the assets exchanged. After the transactions, Old DuPont

was left with assets that Old DuPont, New DuPont, New Dow, and Corteva knew or should have

known were insufficient to pay its extensive environmental liabilities, including the State's

claims.

301.    At the time of the DowDuPont Separation, Old DuPont was engaged or was about to

engage in a business for which its remaining assets were unreasonably small in relation to its

business.

302.    At the time of the DowDuPont Separation, Old DuPont, New DuPont, New Dow, and Corteva believed or reasonably should have believed that Old DuPont would incur debts beyond its ability to pay as they became due.

303.    At the time of the DowDuPont Separation, Old DuPont and New DuPont had been sued, threatened with suit, and had knowledge of the likelihood of litigation to be filed regarding Old DuPont's and New DuPont's liability for damages and injuries from Old DuPont's design, manufacturing, marketing, distribution, and sale of PFAS Products.

304.    At the time of the DowDuPont Separation, and at all times relevant to this Complaint, Old DuPont has been insolvent because its debts were greater than the fair valuation of its assets.

305.    The State has been harmed by these transactions, which were designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

306.    Under Conn. Gen. Stat. § 52-552, the State is entitled to void these transactions and to recover property or value transferred from Old DuPont to New DuPont, New Dow, and Corteva.

307.    Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to New DuPont, New Dow, and Corteva and the incurrence of obligations to New DuPont, New Dow, and Corteva in the DowDuPont Merger and DowDuPont Separation, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold Old DuPont, New DuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

308.    New DuPont, New Dow, and Corteva are not good-faith transferees of the assets transferred through the DowDuPont Merger and DowDuPont Separation to New DuPont, New

Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the DowDuPont Merger and DowDuPont Separation and/or the insolvency of Old DuPont.

**COUNT XVI**
**(Conn. Gen. Stat. § 52-552f(a) – Constructive Fraudulent Transfer Related to the DowDuPont Merger and the DowDuPont Separation)**
**(Against Old DuPont, New DuPont, New Dow, and Corteva)**

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count XVI as if fully set forth herein.

296.    Under UFTA's constructive fraudulent transfer provisions, a transaction made by a debtor is fraudulent as to a creditor if the debtor made the transfer "without receiving a reasonably equivalent value" and if "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Conn. Gen. Stat. §52-552f(a).

297.    At all relevant times, the State is and was a creditor of Old DuPont and New DuPont.

298.    The exchange of assets and liabilities in the DowDuPont Separation was made to benefit, or for the benefit of, New DuPont, New Dow, and/or Corteva.

299.    At the time these transactions were made, New DuPont was in a position to control, and did control, Old DuPont, New Dow, and Corteva.

300.    Old DuPont did not receive consideration from New DuPont, New Dow, and Corteva reasonably equivalent to the value of the assets exchanged.

301.    Old DuPont was insolvent as a result of the DowDuPont Separation. Old DuPont was balance-sheet insolvent at the time of the DowDuPont Separation. Further, as a result of the DowDuPont Separation, Old DuPont could not pay its debts as they became due.

302.    The State has been harmed by this transaction, which was designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

303.    Under Conn. Gen. Stat. § 52-552, the State is entitled to void these transactions and to recover property or value transferred from Old DuPont to New DuPont, New Dow, and Corteva.

304.    Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to New DuPont, New Dow, and Corteva and the incurrence of obligations to New DuPont, New Dow, and Corteva in the DowDuPont Merger and DowDuPont Separation, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold Old DuPont, New DuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

305.    New DuPont, New Dow, and Corteva are not good-faith transferees of the assets transferred through the DowDuPont Merger and DowDuPont Separation to New DuPont, New Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the DowDuPont Merger and DowDuPont Separation and/or the insolvency of Old DuPont.

**PRAYER FOR RELIEF**

WHEREFORE, in accordance with applicable law, including but not limited to Conn. Gen. Stat.

§§ 22a-16, 22a-438, 22a-451, 22a-471, 42-110m, 42-110o, and 52-552h, the State of Connecticut

requests the following relief:

1. Injunctive relief to address past, present, and future PFAS pollution, including, without
   limitation:

   a. an order compelling Defendants to abate all PFAS pollution in the State of
      Connecticut;

   b. an order compelling Defendants to implement a program of public outreach with
      information about the harms of PFAS, the status of investigation and remediation
      activities, and resources available to assist with abatement and remediation;

   c. an order compelling Defendants to implement a program of information sharing
      with local and state government agencies concerning investigation and
      remediation activities; and

   d. an order compelling Defendants to disclose all research and studies in their
      possession, including such research and studies previously conducted directly or
      indirectly by them, their respective agents, affiliates, servants, officers, directors,
      employees, and all persons acting in concert with them, that relates to the human
      health and environmental effects of PFAS;

2. Compensatory damages arising from PFAS pollution of State natural resources and
   property, including surface waters, groundwaters, public and private drinking water
   supply wells, soils and sediments, biota, wildlife including fish, and all other public trust
   resources and State property, according to proof, including, without limitation:

a.  past and future costs of investigation, testing, and monitoring;

b.  past and future costs of providing water from alternate sources;

c.  past and future costs of installing and maintaining wellhead treatment;

d.  past and future costs of installing and maintaining a wellhead protection program;

e.  past and future costs of installing and maintaining early warning systems to detect PFAS before it reaches wells;

f.  past and future costs of implementing biomonitoring programs;

g.  past and future costs of remediating PFAS from natural resources, including groundwater, surface waters, soils, sediments, and other natural resources;

h.  past and future costs of implementing educational outreach in communities where natural resources have become contaminated with PFAS;

i.  past and future costs of collecting, replacing, and safely disposing of PFAS;

j.  past and future costs of remediating PFAS contamination at release sites; and

k.  natural resource damages;

3.  An order compelling Defendants to pay all other damages sustained by the State in its public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of Defendants' acts and omissions alleged herein with respect to PFAS Products;

4.  Any and all temporary and permanent equitable relief and such conditions upon Defendants as are needed to prevent further pollution, impairment, and destruction of the natural resources and property of Connecticut;

5.  A finding that by the acts alleged herein, Defendants have unreasonably polluted, impaired, and destroyed public trust resources in the State of Connecticut in violation of the Connecticut Environmental Protection Act, Conn. Gen. Stat. § 22a-16;

6.  Equitable relief pursuant to Conn. Gen. Stat. § 22a-16a for past, present, and future pollution, impairment, and/or destruction of public trust resources;

7.  An order pursuant to Conn. Gen. Stat. § 22a-438 directing Defendants to pay a civil penalty of $25,000 per day per violation of Conn. Gen. Stat. § 22a-430;

8.  An order pursuant to Conn. Gen. Stat. § 22a-438 directing Defendants to pay a civil penalty of $25,000 per day per violation of Conn. Gen. Stat. § 22a-427;

9.  An order pursuant to Conn. Gen. Stat. § 22a-451 directing Defendants to pay the State two times the costs and expenses incurred in responding to PFAS water pollution;

10. An order pursuant to Conn. Gen. Stat. § 22a-471 directing Defendants to pay the State for all expenses incurred in providing potable drinking water in response to groundwater pollution;

11. A finding that by the acts alleged herein, Defendants engaged in unfair acts and practices in the course of engaging in trade or commerce within the State of Connecticut in violation of the Connecticut Unfair Trade Practices Act;

12. An injunction pursuant to Conn. Gen. Stat. § 42-110m permanently enjoining Defendants from engaging in any acts that violate the Connecticut Unfair Trade Practices Act, including, but not limited to, the unfair acts and practices alleged herein;

13. An order pursuant to Conn. Gen. Stat. § 42-110o directing Defendants to pay a civil penalty of $5,000 for each and every willful violation of the Connecticut Unfair Trade Practices Act;

14. An order for equitable relief pursuant to Conn. Gen. Stat. § 42-110m for past and ongoing unfair acts and practices associated with PFAS, including but not limited to relief for remediation and mitigation;

15. An order for any and all other equitable relief authorized under Conn. Gen. Stat. § 42-110m, including but not limited to restitution and disgorgement, that is appropriate to rectify the unlawful behavior complained of herein;

16. An order voiding the fraudulent transfers of assets among the DuPont Defendants and recovering the property or value fraudulently transferred among these Defendants to put the State in the position in which it would have been had these fraudulent transfers not occurred;

17. An order enjoining the DuPont Defendants from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont and/or impose a constructive trust over any proceeds from the sale of Old DuPont assets for the benefit of the State;

18. Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

19. Punitive damages;

20. Prejudgment interest; and

21. Such other relief as the Court may deem just and equitable.

PLAINTIFF
STATE OF CONNECTICUT

By: _____

WILLIAM M. TONG
Juris No. 440323
Attorney General
MATTHEW I. LEVINE
Juris No. 414845
Deputy Associate Attorney General
CHRISTOPHER PATRICK KELLY
Juris No. 444375
Assistant Attorney General
MICHAEL W. LYNCH
Juris No. 435586
Assistant Attorney General
JULIA R. SUESSER
Juris No. 445210
Special Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5250
Fax: (860) 808-5386
christopher.kelly@ct.gov

RETURN DATE: MARCH 5, 2024             SUPERIOR COURT

STATE OF CONNECTICUT                   JUDICIAL DISTRICT
                                       OF HARTFORD
v.

EIDP, INC.; DUPONT DE NEMOURS,         AT HARTFORD
INC.; THE CHEMOURS COMPANY; THE
CHEMOURS COMPANY FC, LLC;
CORTEVA, INC.; and 3M COMPANY          JANUARY 23, 2024

<b><u>STATEMENT OF AMOUNT IN DEMAND</u></b>

The Plaintiff states that the amount in demand is greater than Fifteen Thousand Dollars

($15,000), exclusive of interest and costs.

PLAINTIFF
STATE OF CONNECTICUT

By: _____

WILLIAM M. TONG
Juris No. 440323
Attorney General
MATTHEW I. LEVINE
Juris No. 414845
Deputy Associate Attorney General
CHRISTOPHER PATRICK KELLY
Juris No. 444375
Assistant Attorney General
MICHAEL W. LYNCH
Juris No. 435586
Assistant Attorney General
JULIA R. SUESSER
Juris No. 445210
Special Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5250
Fax: (860) 808-5386
christopher.kelly@ct.gov

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2   Rev. 9-12

STATE OF CONNECTICUT
**SUPERIOR COURT**

First named Plaintiff *(Last, First, Middle Initial)*

**State of Connecticut**

First named Defendant *(Last, First, Middle Initial)*

**EIDP, Inc.**

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 03 |
| | | 04 |
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| The Chemours Company FC, LLC | 1007 Market Street, Wilmington, DE 19801 | 05 |
| | Agent for Service: C T Corporation System, 67 Burnside Ave, East Hartford, CT 06108 | 06 |
| DuPont de Nemours, Inc. | 974 Centre Road, Wilmington, DE 18805 | 07 |
| | Agent for Service: Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 08 |
| Corteva, Inc. | 974 Centre Road, Wilmington, DE 18805 | 09 |
| | Agent for Service: C T Corporation System, 67 Burnside Ave, East Hartford, CT 06108 | 10 |
| 3M Company | 3M Center, Saint Paul, MN 55144 | 11 |
| | Agent for Service: Corporation Service Company, 225 Asylum Street, 20th Floor, Hartford, CT 06103 | 12 |
| | | 13 |
| | | 14 |

FOR COURT USE ONLY - File Date

Docket number

CIVIL SUMMONS-Continuation

STATE OF CONNECTICUT}
               } SS: GLASTONBURY,     JANUARY 23, 2024
COUNTY OF HARTFORD  }

Then and by virtue hereof, on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **EIDP, INC.,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **EIDP, Inc. C/O The Secretary,** 974 Centre Road, Wilmington, DE 19805.

Also, on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **THE CHEMOURS COMPANY,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **The Chemours Company, C/O The Secretary,** 1007 Market Street, Wilmington, DE 19801.

Also, on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **THE CHEMOURS COMPANY FC, LLC,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **The Chemours Company FC, LLC, C/O The Secretary,** 1007 Market Street, Wilmington, DE 19801.

Also, on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **DUPONT DE NEMOURS, INC.,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **DuPont De Nemours, Inc, C/O The Secretary,** 974 Centre Road, Wilmington, DE 19805.

Also, on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **DUPONT DE NEMOURS, INC.,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **DuPont De Nemours, Inc, C/O The Corporation Trust Company, Corporation Trust Center,** 1209 Orange Street, Wilmington, DE 19801.

Also, on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **CORTEVA, INC.,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **Corteva, Inc, C/O The Secretary,** 974 Centre Road, Wilmington, DE 19805.

Also, on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **3M COMPANY,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **3M Company, C/O The Secretary,** 3M Center, Saint Paul, MN 55144.

Afterwards on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **EIDP, INC.,** by leaving a verified true and attested copy of the within **Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Gary Scappini, duly authorized to accept service for CT Corporation System, Agent For Service for said Defendant, at 67 Burnside Avenue, in the Town of East Hartford.

Also on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **THE CHEMOURS COMPANY,** by leaving a verified true and attested copy of the within **Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Gary Scappini, duly authorized to accept service for CT Corporation System, Agent For Service for said Defendant, at 67 Burnside Avenue, in the Town of East Hartford.

Also on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **THE CHEMOURS COMPANY FC, LLC,** by leaving a verified true and attested copy of the within **Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Gary Scappini, duly authorized to accept service for CT Corporation System, Agent For Service for said Defendant, at 67 Burnside Avenue, in the Town of East Hartford.

Also on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **CORTEVA, INC.,** by leaving a verified true and attested copy of the within **Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Gary Scappini, duly authorized to accept service for CT Corporation System, Agent For Service for said Defendant, at 67 Burnside Avenue, in the Town of East Hartford.

Afterwards on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **3M COMPANY,** I left a verified true and attested copy of the within original **Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Shelley Kurpaska, duly authorized to accept for Corporation Service Company, Agent For Service for said Defendant, at 225 Asylum Street, 20th Floor, in the City of Hartford.

## SUPPLEMENTAL RETURN TO FOLLOW

The within is the original **Summons, Complaint, and Statement of Amount in Demand,** with my doings hereon endorsed.

FEES:                                                ATTEST:

Pages            $ 900.00
Endorsements    18.50                        ALEX J. RODRIGUEZ
Service           330.00                      STATE MARSHAL
Travel             12.00                      HARTFORD COUNTY
Postage            66.00

Total           $ 1326.50

**APPEARANCE**
JD-CL-12  Rev. 12-21
P.B. §§ 3-1 through 3-12, 10-13, 25-6A, 25a-2, 25a-3

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*

☐ *I am filing this appearance to let the court and all attorneys and self-represented parties of record know that I have changed my address. My new address is below.*

| Return date *(For Civil/Family cases)* |
| --- |
| **Mar-05-2024** |
| Docket Number |
| **HHD-CV-24-6179556-S** |

**Name of case** *(Full name of first Plaintiff v. Full name of first Defendant)  Note: In Criminal/Motor Vehicles cases, the Plaintiff is The State of Connecticut*

**STATE OF CONNECTICUT  v. EIDP, INC. Et Al**

| Housing Session | ☐ Judicial District | ☑ Geographic Area | Address of court *(Number, street, town and zip code)* | Scheduled court date *(Criminal/Motor Vehicle cases only)* |
| --- | --- | --- | --- | --- |
| | | | **95 WASHINGTON STREET HARTFORD, CT 06106** | |

## Enter the Appearance of

| Name *(Your name or name of official, firm, professional corporation, or individual attorney)* | Juris number *(For attorney/law firm)* |
| --- | --- |
| **JULIA ROSE SUESSER** | **445210** |

| Mailing address | Post Office box number | Telephone number *(Area code first)* |
| --- | --- | --- |
| **AG-ENVIRONMENT 165 CAPITOL AVE 5TH FLR** | | **860-808-5250** |

| City/town | State | Zip code | Fax number | E-mail address |
| --- | --- | --- | --- | --- |
| **HARTFORD** | **CT** | **06106** | | **julia.suesser@ct.gov** |

in the case named above for: *(Select one of the following parties)*

| PLAINTIFF | DEFENDANT |
| --- | --- |
| ☑ The Plaintiff. | ☐ The Defendant. |
| ☐ All Plaintiffs. | ☐ All Defendants. |
| ☐ The following Plaintiff(s) only: | ☐ The following Defendant(s) only: |

☐ **Other** *(Specify):*

☐ This is a **Family Matters** case (such as divorce, custody, or child support). My appearance is for: *(Select one or both)*
  ☐ matters in the Family Division of the Superior Court    ☐ Title IV-D Child Support matters

☐ This is a **Criminal/Motor Vehicle** case, and I am filing this appearance as ☐ a Public Defender  or  ☐ Assigned Counsel
☐ This appearance is for the purpose of a bail hearing only.                                    *(Special Public Defender)*
☐ This appearance is for the purpose of alternative arraignment proceedings only.

If an appearance by other counsel or self-represented party is on file for this party/parties, select one option below:

1. ☐ This appearance is in place of the appearance of: _____
   *Name and Juris Number (if applicable) to be replaced*

2. ☑ This appearance is in addition to an appearance already on file.

**I agree that documents can be delivered (served) to me electronically in this case. (Practice Book Sec. 10-13)** ☑ Yes  ☐ No

| Signed *(Individual attorney or self-represented party)* | Name of person signing at left *(Print or type)* | Date signed |
| --- | --- | --- |
| **445210** | **JULIA ROSE SUESSER** | **Feb 05 2024** |

## Certification

I certify that a copy of this document was or will immediately be mailed or delivered electronically or non-electronically on *(date)* ___Feb 05 2024___ to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties of record who received or will immediately be receiving electronic delivery.

*FOR COURT USE ONLY*

Name and address of each party and attorney that copy was or will be mailed or delivered to*

**CHRISTOPHER KELLY - AG-ENVIRONMENT/165 CAPITOL AVE 5TH FLR/HARTFORD, CT 06106**

*If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to.

| Signed *(Signature of filer)* | Print or type name of person signing | Date signed |
| --- | --- | --- |
| *445210* | **JULIA ROSE SUESSER** | **Feb 05 2024** |