**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STATE OF CONNECTICUT, | Case No. 3:24-cv-00239-SRU |
| Plaintiff, | |
| v. | |
| EIDP, INC.; DUPONT DE NEMOURS, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; and 3M COMPANY, | April 8, 2024 |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR REMAND TO SUPERIOR COURT AND FOR COSTS AND FEES**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................. 2

III. LEGAL STANDARD ......................................................................................... 4

IV.  ARGUMENT....................................................................................................... 4

      A.   Federal Officer Removal Is Improper For Non-AFFF PFAS Claims. ................. 6

          1.   Defendant's asserted federal authority bears no relation to its charged conduct. ................................................................. 7

          2.   Defendant's federal defense does not apply to the State's claims. ........... 11

      B.   The State's Claims Are Not Subject to Federal Enclave Jurisdiction. ................. 16

      C.   Defendant's Objectively Unreasonable Removal Justifies Awarding Attorneys' Fees to The State.............................................................................. 20

V.   CONCLUSION ................................................................................................... 21

### TABLE OF AUTHORITIES

**CONSTITUTIONAL PROVISIONS**                                                  **PAGE(S)**

U.S. Const. art. I, § 8, cl. 17.................................................................................................16

**CASES**

*Agyin v. Razmzan*
  986 F.3d 168 (2d Cir. 2021)...........................................................................................8

*Ayo v. 3M Co.*
  No. 18-cv-0373(JS)(AYS), 2018 U.S. Dist. LEXIS 170996 (E.D.N.Y. Sept. 30, 2018).......................14

*Batchelor v. Am. Optical Corp.*
  185 F. Supp. 3d 1358 (S.D. Fla. 2016) ...........................................................................9

*Betzner v. Boeing Co.*
  910 F.3d 1010 (7th Cir. 2018)........................................................................................8

*Boyle v. United Technologies Corp.*
  487 U.S. 500 (1988).................................................................................................6, 11

*Caterpillar, Inc. v. Williams*
  482 U.S. 386 (1987)...............................................................................................15, 17

*City & Cnty. Of Honolulu v. Sunoco LP*
  39 F.4th 1101 (9th Cir. 2022) ...................................................................................17, 19

*Cnty. Of San Mateo v. Chevron Corp.*
  32 F.4th 733 (9th Cir. 2022) ........................................................................................17

*Connecticut v. Exxon Mobil Corp.*
  83 F.4th 122 (2d Cir. 2023) ....................................................................................6, 7, 8

*Connecticut v. Exxon Mobil Corp.*
  No. 3:20-cv-1555, 2021 U.S. Dist. LEXIS 111334 (D. Conn. Jun. 2, 2021)...................................19, 20

*Dougherty v. A.O. Smith Corp.*
  No. 13-1972-SLR-SRF, 2014 U.S. Dist. LEXIS 96290 (D. Del. July 16, 2014) ....................................9

*Durham v. Lockheed Martin Corp.*
  445 F.3d 1247 (9th Cir. 2006)......................................................................................17

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust*
  463 U.S. 1 (1983).....................................................................................................4

*Hayden v. 3M Co.*
  Civil Action No. 15-2275, 2015 U.S. Dist. LEXIS 104534 (E.D. La. Aug. 10, 2015)...........................9

*Home Depot U.S.A., Inc. v. Jackson*
   139 S. Ct. 1743 (2019) ........................................................................................................ 4

*Illinois ex rel. Raoul v. 3M Co.*
   No. 4:22-cv-4075, 2023 U.S. Dist. LEXIS 168231 (C.D. Ill. 2023) ................................. *passim*

*In re: High-Tech Emp. Antitrust Litig.*
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ........................................................................... 18

*In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*
   488 F.3d 112 (2d Cir. 2007) ................................................................................................ 7

*In re: Aqueous Film-Forming Foams Prods. Liab. Litig.*
   MDL No. 2:18-mn-2873-RMG (MDL No. 2873), ECF 103 (D.S.C. May 24, 2019) ........... 14

*In re: Aqueous Film-Forming Foams Prods. Liab. Litig.*
   MDL No. 2:18-mn-2873-RMG (MDL No. 2873), ECF 320 (D.S.C. Sept. 27, 2019) ......... 14

*In re: Aqueous Film-Forming Foams Prods. Liab. Litig.*
   MDL No. 2:18-mn-2873-RMG (MDL No. 2873), ECF 325 (D.S.C. Oct. 1, 2019) ............. 13

*In re: Aqueous Film-Forming Foams Product Liability Litigation*
   MDL No. 2:18-mn-2873-RMG (MDL No. 2873), ECF 620 (J.P.M.L. Mar. 27, 2020) ......... 5

*Isaacson v. Dow Chem. Co.*
   517 F.3d 129 (2d Cir. 2008) .................................................................................. 6, 7, 8, 11

*Kelleher v. A.W. Chesterton Co.*
   No. 15-CV-893-SMY-SCW, 2015 U.S. Dist. LEXIS 159783 (S.D. Ill. Nov. 23, 2015) ....... 9, 12

*Kokkonen v. Guardian Life Ins. Co. of Am.*
   511 U.S. 375 (1994) ............................................................................................................ 4

*Madden v. A.H. Voss Co.*
   No. C 09-03786 JSW, 2009 U.S. Dist. LEXIS 101680 (N.D. Cal. Oct. 21, 2009) ............. 10

*Maine v. 3M Co.*
   No. 2:23-cv-210-JAW, 2023 U.S. Dist. LEXIS 128740 (D. Me. 2023) ......................... *passim*

*Martin v. Franklin Capital Corp.*
   546 U.S. 132 (2005) .......................................................................................................... 20

*Maryland v. 3M Co.*
   No. RDB-23-1836, 2024 U.S. Dist. LEXIS 48428 (D. Md. 2024) ................................. *passim*

*Mayor & City Council of Balt. v. BP P.L.C.*
   388 F. Supp. 3d 538 (D. Md. 2019) ................................................................................. 18

*Minnesota v. API*
   Civil No. 20-1636 (JRT/HB), 2021 U.S. Dist. LEXIS 62653 (D. Minn., Mar. 31, 2021) ..... 19

*Morgan Guaranty Trust Co. v. Republic of Palau*
  971 F.2d 917 (2d Cir. 1992) ................................................................................................ 21

*Nessel v. Chemguard, Inc.*
  No. 1:20-cv-1080, 2021 U.S. Dist. LEXIS 39175 (W.D. Mich. Jan. 6, 2021) ..................... 12

*New Hampshire v. 3M Co.*
  665 F. Supp. 3d 215 (D. N.H. 2023) ............................................................................ *passim*

*Papp v. Fore-Kast Sales Co.*
  842 F.3d 805 (3d Cir. 2016) ................................................................................................ 11

*Phillips v. Asbestos Corp. Ltd.*
  No. C 13-5655 CW, 2014 U.S. Dist. LEXIS 24792 (N.D. Cal. Feb. 26, 2014) ..................... 9

*Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*
  943 F.3d 613 (2d Cir. 2019) .................................................................................................. 4

*Rhode Island v. Shell Oil Prods. Co.*
  979 F.3d 50 (1st Cir. 2020) ("*Rhode Island I*") .................................................................... 7

*Rhode Island v. Shell Oil Prods. Co., L.L.C.*
  35 F.4th 44 (1st Cir. 2022) ("*Rhode Island II*") ........................................................... 16, 19

*Robinson v. Pfizer Inc.*
  No. 4:16-CV-439 (CEJ), 2016 U.S. Dist. LEXIS 57174 (E.D. Mo. Apr. 29, 2016) ............. 21

*Savino v. Savino*
  590 F. Appx. 80 (2d Cir. 2015) ........................................................................................... 22

*Sawyer v. Foster Wheeler LLC*
  860 F.3d 249 (4th Cir. 2017) ................................................................................................ 8

*Schulz v. Crane Co.*
  No. 2:13-cv-02370-KJM-AC, 2014 U.S. Dist. LEXIS 9198 (E.D. Cal. Jan. 23, 2014) .......... 9

*Somlyo v. J. Lu-Rob Enters., Inc.*
  932 F.2d 1043 (2d Cir. 1991) ................................................................................................ 4

*South Carolina v. 3M Co.*
  No. 2:23-cv-05979-RMG (D.S.C. Feb. 29, 2024) ......................................................... *passim*

*United Food & Com. Workers Union, Loc. 919 v. CenterMark Props. Meriden Square, Inc.*
  30 F.3d 298 (2d Cir. 1994) .................................................................................................... 4

*Willingham v. Morgan*
  395 U.S. 402 (1969) ............................................................................................................... 7

## STATUTES

28 U.S.C § 1441 (a) .................................................................................................. 4, 16

28 U.S.C. § 1331 ................................................................................................... 5, 16, 17

28 U.S.C. § 1442(a)(1) ................................................................................................ *passim*

28 U.S.C. § 1447(c) ...................................................................................................... 20

## I.    INTRODUCTION

Plaintiff State of Connecticut ("State") brought this action in Connecticut state court to address hazardous and costly pollution caused by the use of toxic per- and polyfluoroalkyl substances ("PFAS"). PFAS have been detected in natural resources and lands throughout the State of Connecticut, including in drinking water wells, groundwater, rivers, and in the soil of State-owned lands. This statewide environmental crisis provides the backdrop for the State's Complaint ("Compl."), which exclusively alleges causes of action arising under state law. Through the Complaint, the State seeks to enforce state environmental and consumer protection statutes against six corporate defendants. These defendants are the largest historical manufacturers of PFAS for use in consumer products and industrial processes.

This action has been inappropriately removed to federal court under a false premise. Defendant 3M Company's Notice of Removal ("Notice") attempts to rewrite the State's Complaint into something that it is not – an action to hold Defendant corporations liable for PFAS-containing aqueous film forming foam ("AFFF"). Lawsuits concerning military designed-AFFF are potentially removable under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), but this lawsuit, which involves only PFAS for consumer and industrial uses, is not. The Notice recognizes that the State's Complaint expressly omits any claims related to AFFF. Indeed, as Defendant is aware, the State of Connecticut has filed a separate complaint, in a separate action, to address such claims and that complaint was removed by the Defendant and transferred out of this District to the AFFF Multidistrict Litigation in South Carolina ("AFFF MDL"). *See In re: Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2:18-mn-2873-RMG (MDL No. 2873) (D.S.C.). Conflating the allegations in that complaint with the allegations in this case is improper and disingenuous.

Five district courts have considered Defendant's removal arguments in nearly identical

PFAS cases; all have found Defendant's attempts to rewrite those complaints to justify removal unavailing.[1] Defendant cannot overcome the fact that this action — like those cases — is simply and expressly not about AFFF. Defendant cannot avail itself of federal officer removal nor federal enclave jurisdiction for its production of products that are outside the scope of this case. To the extent that Defendant's Notice details concerns about "commingling" of PFAS with AFFF, such matters are evidentiary questions for determining the extent of injury at trial and do not provide a federal defense to the State's allegations. Defendant is simply pursuing a failed strategy to frustrate state lawsuits and avoid being held accountable for its actions. This Court should therefore remand this case to its proper venue – the Connecticut Superior Court.

## II.     STATEMENT OF FACTS

On January 25, 2024, the State filed the Complaint in the instant case in Connecticut Superior Court for the Judicial District of Hartford. *See* Compl. The Complaint named six defendants and alleged sixteen counts of common law and statutory violations related to the defendants' production, sale, and contamination of property and the environment by PFAS, expressly excluding any PFAS used in AFFF. *Id.* On the same day, the State filed a separate action in which it alleged twenty counts against twenty-eight defendants specifically for their role in the production and sale of AFFF. *See Connecticut v. 3M Co.*, No. 3:24-cv-234-JCH (D. Conn.). That action was removed by the Defendant to this District and was subsequently transferred to the Federal District Court for the District of South Carolina. *See Connecticut v. 3M Co.*, No. 2:24-cv-1217-RMG (D.S.C.).

In the instant action, the State's Complaint alleges that the Defendants – chemical

---

[1] *See New Hampshire v. 3M Co.*, 665 F. Supp. 3d 215 (D. N.H. 2023), *appeal pending*, No. 23-1362 (1st Cir.); *Maine v. 3M Co.*, No. 2:23-cv-210-JAW, 2023 U.S. Dist. LEXIS 128740 (D. Me. 2023), *appeal pending*, No. 23-1709 (1st Cir.); *Illinois ex rel. Raoul v. 3M Co.*, No. 4:22-cv-4075, 2023 U.S. Dist. LEXIS 168231 (C.D. Ill. 2023), *appeal pending*, No. 23-3031 (7th Cir.) ; *Maryland v. 3M Co.*, No. RDB-23-1836, 2024 U.S. Dist. LEXIS 48428 (D. Md. 2024), *appeal pending*, No. 24-1218 (4th Cir.); *South Carolina v. 3M Co.*, No. 2:23-cv-05979-RMG (D.S.C. Feb. 29, 2024), *appeal pending*, No. 24-1270 (4th Cir.).

manufacturers that produced PFAS chemicals for decades and "concealed their knowledge about these harmful chemicals from regulators and deceived their customers" – are responsible for contaminating Connecticut's environment with PFAS. Compl. ¶¶ 14-15. The scope of the Complaint is limited by an express disclaimer against any recovery for AFFF.[2] The Complaint exclusively alleges state law causes of action: public nuisance; trespass; negligence; violations of the Connecticut Environmental Protection Act; violations of the Connecticut Water Pollution Control Act; violations of the Connecticut Unfair Trade Practices Act; and the Connecticut Uniform Fraudulent Transfer Act. The Complaint identifies sites that the State alleges to be contaminated with *non-AFFF* PFAS. *E.g.*, *id.* ¶ 89 ("PFAS attributable to Defendants' PFAS Products have contaminated and injured the State's groundwater in locations throughout the State, including, for example, at the closed landfills in Hartford and Ellington."); *id.* ¶ 90 ("PFAS attributable to Defendants' PFAS Products have contaminated and injured drinking water that is drawn from groundwater sources in locations throughout the State, including, for example, in public water systems in Manchester and Norwalk."); *id.* ¶ 99 (listing surface waterbodies where PFAS compounds were detected in the vicinity of publicly owned treatment works ("POTWs") and related release sites). The State alleges that the identified examples, among other sites, were contaminated with PFAS from "industrial processes and sites and through the normal and foreseeable use and disposal of consumer, household, and commercial products containing PFAS." *Id.* ¶ 48. The State further alleges that the presence of PFAS contamination is especially likely at "locations in the vicinity of landfills, POTWs, and operating or closed manufacturing facilities." *Id.* ¶ 84. On February 28, 2024, the Judicial Panel on Multidistrict Litigation declined to transfer this Complaint to the AFFF Multidistrict Litigation in South Carolina. Order of JPML,

---

[2] *See* Compl. ¶ 18 ("The State is not seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam, a firefighting material that contains PFAS which the State is addressing through a separate legal action to hold these and other defendants accountable.").

*In re: Aqueous Film-Forming Foams Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG (MDL No. 2873), ECF 2403 (J.P.M.L. Feb. 28, 2024) (denying transfer to MDL).

## III.   LEGAL STANDARD

As a court of limited jurisdiction, a federal court must presume that a case lies outside of its jurisdiction unless and until jurisdiction has been shown to be proper. *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Though a defendant can seek removal of a case "brought in a State court of which the district courts of the United States have original jurisdiction," 28 U.S.C § 1441 (a), the "defendant has the burden of establishing that removal is proper." *United Food & Com. Workers Union, Loc. 919 v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994). In such instances, federal courts "construe the removal statute narrowly, resolving any doubts against removability." *Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 617 (2d Cir. 2019) (quoting *Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1045-46 (2d Cir. 1991)). The presumption against removal, and the Defendant's burden, is even greater in actions brought by a State exercising its sovereign authority to enforce its own laws. *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 21 n. 22 (1983) ("[C]onsiderations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it.").

## IV.   ARGUMENT

The State of Connecticut filed the Complaint in this action to exercise its sovereign authority to protect its natural resources from statewide PFAS pollution and it must be remanded back to Connecticut Superior Court to allow the State to prosecute its claims in the proper venue. Defendant has removed the Complaint to this Court pursuant to two federal jurisdiction arguments – removal pursuant to the federal officer removal statute, 28 U.S.C. § 1442, and

original jurisdiction granted by the federal enclave doctrine, 28 U.S.C. § 1331. Notice ¶¶ 3, 5. Both of Defendant's jurisdictional arguments rely, in whole or in part, upon recasting the State's Complaint as something other than what it actually is – an enforcement action directed solely at PFAS unrelated to AFFF.

This is not Defendant's first attempt to revise a sovereign's PFAS action to suit its own purposes. To date, federal courts in Illinois, Maine, Maryland, New Hampshire, and South Carolina have rejected substantially identical arguments from the Defendant to recast non-AFFF complaints as federal AFFF actions. In each of those decisions, the sovereign's express disclaimer against seeking recovery for AFFF contamination proved dispositive. *See, e.g.*, *New Hampshire*, 665 F. Supp. 3d at 229 (barring federal officer removal when plaintiff expressly disclaimed claims related to federal activity); *Maine*, 2023 U.S. Dist. LEXIS 128740, at *28 (same); *Illinois*, 2023 U.S. Dist. LEXIS 168231, at *19 (same); *Maryland*, 2024 U.S. Dist. LEXIS 48428, at *9 (same); *South Carolina*, No. 2:23-cv-05979-RMG (D.S.C. Feb. 29, 2024), at *5 (same).

Here, too, the Defendant argues that all PFAS lawsuits must also be AFFF lawsuits and consequently subject to federal jurisdiction. That argument is meritless. The State's Complaint only alleges claims grounded in state law and makes no reference to AFFF or to federal enclaves, meaning that Defendant faces a high bar to substantiate its federal jurisdiction arguments.[3] Furthermore, the Complaint has expressly disclaimed any recovery for AFFF, limiting this action to PFAS products without a federal nexus.

---

[3] *See* Order Denying Transfer at 2, *In re: Aqueous Film-Forming Foams Product Liability Litigation*, MDL No. 2:18-mn-2873-RMG (MDL No. 2873), ECF 620 (J.P.M.L. Mar. 27, 2020) ("Given our continued concern about the manageability of this litigation, a party seeking transfer of an action that does not on its face raise AFFF claims bears a significant burden to persuade us that transfer is appropriate and will not undermine the efficient progress of the AFFF MDL.").

A.      **Federal Officer Removal Is Improper For Non-AFFF PFAS Claims.**

Federal officer jurisdiction allows for removal of a civil action commenced against "any officer (or person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office . . . ." 28 U.S.C. § 1442(a)(1). Federal officer removal permits federal officers – or those acting under federal officers – to have their federal defense heard in a federal forum. *See Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008) (describing the federal officer removal statute's "purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed.").

Defendant alleges that it is entitled to remove this action pursuant to the federal officer removal statute, 28 U.S.C. § 1442, "[b]ecause the alleged PFAS contamination at issue in this action is (in part) attributable and/or related to MilSpec AFFF use at military or other facilities in Connecticut . . . ." Notice ¶ 37. MilSpec AFFF refers to AFFF manufactured to conform with design specifications issued by the Department of Defense. *Id.* ¶ 2. As an essential element to its federal officer removal argument, Defendant declares in the Notice its intent to assert a federal defense, the federal government contractor immunity described in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988), as a defense to liability for its AFFF involvement. Notice ¶ 2.

To satisfy § 1442(a)(1)'s three-part test, Defendant must "(1) show that it is a person within the meaning of the statute who acted under a federal officer" and "(2) show that it performed the actions for which it is being sued under color of federal office . . . ." *Connecticut v. Exxon Mobil Corp.*, 83 F.4th 122, 142 (2d Cir. 2023) (quoting *Isaacson*, 517 F.3d at 135) (cleaned up). In practice, the "first two of these prongs 'tend to collapse into a single requirement: that *the acts that form the basis for the state civil . . . suit* were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations." *Connecticut*, 83 F.4th

at 143 (quoting *In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) (emphasis in original)). Additionally, Defendant is required to "(3) 'raise a colorable federal defense.'" *Connecticut*, 83 F.4th at 142-43 (quoting *Isaacson*, 517 F.3d at 135). If Defendant cannot demonstrate all three of these elements, then it cannot remove this case to federal court under § 1442(a)(1). *See Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50, 59 (1st Cir. 2020) ("*Rhode Island I*"). Defendant's Notice fails to satisfy all three elements of federal officer removal and does not support federal jurisdiction in this matter.

>     1.     **Defendant's asserted federal authority bears no relation to its charged conduct.**

Defendant has not satisfied the requirements of § 1442(a)(1) because it bases its entire federal officer argument on a product that is not at issue in this litigation. The Notice argues that Defendant meets the first prong of § 1442(a)(1) because it "acted under the direction and control of federal officers" when "designing, manufacturing, and supplying the MilSpec AFFF at issue . . . ." Notice ¶ 42. The Notice likewise argues that Defendant meets the second prong because "the State's alleged injuries plausibly arise at least in part from MilSpec AFFF." *Id.* ¶ 45. The Notice does not allege that the Defendant meets these two overlapping requirements for any reason other than its production of MilSpec AFFF.

To meet the first and second prongs of § 1442(a)(1), Defendant bears the "burden of providing 'candid, specific and positive' allegations . . . that [it was] acting under federal officers" when it performed the actions for which it has been sued. *MTBE*, 488 F.3d at 130 (quoting *Willingham v. Morgan*, 395 U.S. 402, 408 (1969)). Even if Defendant arguably met the first prong of § 1442(a)(1) solely because it supplied MilSpec AFFF pursuant to military specifications, *see Isaacson*, 517 F.3d at 136 ("The words "acting under" are to be interpreted broadly, and the statute as a whole must be liberally construed."), Defendant fails to meet the

second prong because it has not proved that it performed the actions for which it is being used "under color of federal office."

Defendant must prove not only that it has acted under the direction of federal officers, but that such direction bears a causal nexus to the injuries claimed in the instant complaint.[4] *See Connecticut*, 83 F.4th at 144. As the Second Circuit recently explained, "a bona fide federal officer could not remove a trespass suit that occurred while he was taking out the garbage – there must be a 'causal connection between the charged conduct and asserted official authority.'" *Id.* (quoting *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018)). "Translated to non-governmental corporate defendants, such entities must demonstrate that the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government." *Isaacson*, 517 F.3d at 137 (emphasis in original).

Defendant's federal officer argument fails because it attempts to avail itself of protections afforded to federal officers based on actions which are not subject to the State's Complaint. Defendant claims federal officer jurisdiction premised solely on its production of MilSpec AFFF. However, Defendant will not and cannot be held liable for its production of MilSpec AFFF in this matter. As Defendant conceded in its Notice for Removal, the State has excluded *all forms* of AFFF from the allegations in its Complaint. Notice ¶¶ 4, 10, 27. Indeed, Defendant must make that concession because the Complaint expressly disclaims "*any relief* for contamination or injury related to Aqueous Film Forming Foam," Compl. ¶ 18 (emphasis added), and alleges

---

[4] Defendant's Notice misstates the applicable legal threshold for meeting the "under color of federal office" requirement. Notice ¶ 43 ("To meet this requirement, 'there need be only *a connection or association* between the act in question and the federal office.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (internal quotation marks omitted) (explaining that 28 U.S.C. § 1442 permits removal of actions "for or relating to any act under color of [federal] office")) (emphasis in original). That language reflects a lower threshold for federal officer removal which has been rejected by the Second Circuit in favor of requiring a "causal nexus." *See Sawyer*, 860 F.3d at 258 (describing a lower standard to meet "under color of federal office" following the Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545); *but see Connecticut*, 83 F.4th at 145 n. 7; s*ee also Agyin v. Razmzan*, 986 F.3d 168, 179 (2d Cir. 2021) (finding sufficient nexus where defendant's "challenged conduct was directed by federal regulation and he was acting under a federal officer.").

liability solely for non-AFFF PFAS contamination. Nowhere in Defendant's Notice are the products actually at issue – any PFAS compounds or PFAS-containing products other than AFFF – alleged to have been produced "under color of federal office."

The State's disclaimer is dispositive because it severs any potential relationship between this action and Defendant's federal activities. "'[F]ederal courts have consistently granted motions to remand' based on a plaintiff 'expressly disclaim[ing] the claims upon which federal officer removal was based.'" *Batchelor v. Am. Optical Corp.*, 185 F. Supp. 3d 1358, 1363 (S.D. Fla. 2016) (quoting *Dougherty v. A.O. Smith Corp.*, No. 13-1972-SLR-SRF, 2014 U.S. Dist. LEXIS 96290, at *35 (D. Del. July 16, 2014)); *see, e.g.*, *Kelleher v. A.W. Chesterton Co.*, No. 15-CV-893-SMY-SCW, 2015 U.S. Dist. LEXIS 159783, at *13 (S.D. Ill. Nov. 23, 2015) (remanding asbestos case where "[i]n the complaint and the notice of disclaimer, Plaintiff has made clear statements that his claims [based on asbestos exposure] do not include any work performed while in the military or on military machinery."); *Hayden v. 3M Co.*, Civil Action No. 15-2275, 2015 U.S. Dist. LEXIS 104534, at *22 (E.D. La. Aug. 10, 2015) (remanding asbestos case because plaintiff's "disclaimer eliminates any cause of action related to exposure while [the plaintiff] was in the Navy and the only valid grounds for removal relate to that specific time period."); *Phillips v. Asbestos Corp. Ltd.*, No. C 13-5655 CW, 2014 U.S. Dist. LEXIS 24792, at *5 (N.D. Cal. Feb. 26, 2014) (remanding asbestos case because plaintiff "expressly disclaimed and waived any claim arising out of or related to any asbestos exposure aboard federal jobsites and navy vessels," as this "removes any claims to which military contractor immunity might act as a defense."); *Schulz v. Crane Co.*, No. 2:13-cv-02370-KJM-AC, 2014 U.S. Dist. LEXIS 9198, at *5 (E.D. Cal. Jan. 23, 2014) ("The court agrees with the several district courts that have found similar waivers in asbestos cases sufficient to justify remand."); *Madden v. A.H. Voss Co.*, No. C

09-03786 JSW, 2009 U.S. Dist. LEXIS 101680, at *7 (N.D. Cal. Oct. 21, 2009) (disclaimer defeated removal jurisdiction where the disclaimer stated that the "[p]laintiff's claims against [a specific defendant] exclude plaintiff's asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels").

This well-established means by which a plaintiff can accurately define and limit the scope of its case has been recognized in this exact context by five other district courts in granting remand of a state's non-AFFF PFAS lawsuit. In each of the five cases where courts have addressed motions to remand in similar PFAS lawsuits, the court has found federal officer removal to be improper in the presence of a disclaimer against AFFF recovery – including the very judge who oversees the AFFF MDL. *See South Carolina*, No. 2:23-cv-05979-RMG (D.S.C. Feb. 29, 2024), at 5 ("Because it does not matter that 3M acted in accordance with federal authority, the charged conduct here is not connected to the alleged federal authority."); *see also Maryland*, 2024 U.S. Dist. LEXIS 48428, at *11 ("Because the State has expressly disclaimed any AFFF-related claims, 3M cannot establish the requisite nexus between charged conduct and asserted official authority."); *Illinois*, 2023 U.S. Dist. LEXIS 168231, at *19 (finding the exclusion of AFFF frustrates federal officer removal); *Maine*, 2023 U.S. Dist. LEXIS 128740, at *28 (same); *New Hampshire*, 665 F. Supp. 3d at 229 (same). In each of these matters, the plaintiff provided an express disclaimer identical or nearly identical to the one provided in the Complaint, and the court found each disclaimer to void federal officer removal.

The State's express disclaimer is dispositive and anything but illusory. It is an express, unambiguous, and plain disclaimer "which eliminates any connection between the State's claims in this suit and 3M's production of MilSpec AFFF." *New Hampshire*, 665 F. Supp. 3d at 220. Simply put, this case does not seek relief for AFFF-related PFAS pollution and therefore, there is

no basis for removal under the federal officer removal statute.

### 2.    Defendant's federal defense does not apply to the State's claims.

Federal officer removal requires the moving party to raise a "colorable" federal defense, meaning one which is "legitimate and [could] reasonably be asserted, given the facts presented and the current law." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 815 (3d Cir. 2016) (alteration in original) (citation omitted). Defendant has declared its intention to raise the federal government contractor defense described by the Supreme Court in *Boyle v. United Technologies Corporation* to defend its production of MilSpec AFFF. 487 U.S. at 512. Notice ¶ 2. The federal government contractor defense protects military suppliers from liability when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

The threshold issue for whether Defendant has claimed a "colorable" federal defense is not whether the defense would succeed on the merits, but whether it could reasonably be raised as a defense to liability. *See Isaacson*, 517 F.3d at 139 (the purpose of the federal officer removal statute is to "secure that the validity of the defense will be tried in federal court."). Here, again, the State's AFFF disclaimer proves to be dispositive. If the purpose of the government contractor defense is to protect *military contractors* from "[l]iability for design defects in military equipment," *Boyle*, 487 U.S. at 512, then Defendant must raise its federal defense in relation to its supply of military equipment, instead of the consumer and industrial products at issue in the Complaint. Yet, Defendant has premised its intention to raise the government contractor defense only upon its provision of MilSpec AFFF – a product which is outside the scope of this case and not at issue for liability. Notice ¶¶ 46-55.

If Defendant cannot be held liable for AFFF in this case, then it cannot raise a defense to

liability for AFFF. By definition, a defense which cannot be raised is not "colorable." To suggest that Defendant has a potential government contractor defense and to allow removal of this case on federal officer grounds "would affirm [the] right to assert a defense against a claim that does not exist." *Kelleher*, 2015 U.S. Dist. LEXIS 159783, at *11.

Although the New Hampshire, Maine, Illinois, and Maryland decisions pre-dated the Notice of Removal in this action, Defendant never mentions its attempts to remove these cases, nor does it attempt to distinguish the resulting decisions. Instead, Defendant heavily relies upon a wholly distinguishable case from the Western District of Michigan to suggest it has an inalienable right to raise the government contractor defense. *See, e.g.,* Notice ¶ 21 ("Plaintiffs cannot decide what defense Defendants might present.") (citing *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 U.S. Dist. LEXIS 39175, at *10 (W.D. Mich. Jan. 6, 2021)). In *Nessel*, the State of Michigan sued AFFF manufacturers for the provision of commercially available AFFF and attempted to exclude MilSpec AFFF from its lawsuit. *Nessel*, 2021 U.S. Dist. LEXIS 39175, at *3-4. The AFFF manufacturer defendants removed the case to federal district court, arguing that the claimed AFFF injuries were "indivisible" and subject to a purported government contractor defense. *Id.* at 4. The *Nessel* court declined to remand the case, noting that "while Plaintiffs attempt to surgically divide their complaints between Commercial and MilSpec AFFF, they cannot prevent Defendants from raising the production of MilSpec AFFF as a defense or an alternate theory, particularly when Plaintiffs admit that Defendants produced MilSpec AFFF and that PFAS from AFFF spread contamination throughout the state." *Id.* at 10 (emphasis omitted).

Defendant's reliance on *Nessel* is misplaced. The *Nessel* court's decision to not remand is a clear outlier – subsequent cases have expressly declined to extend the reasoning in *Nessel* to non-AFFF PFAS lawsuits. *See, e.g.*, *Illinois*, 2023 U.S. Dist. LEXIS 168231, at *17-18

(explaining why the *Nessel* court's reasoning is not dispositive); *Maine*, 2023 U.S. Dist. LEXIS 128740, at *27 (explaining why "the Court concludes that New Hampshire is more persuasive" than *Nessel*); *New Hampshire*, 665 F. Supp. 3d at 229 (explaining why "the court does not find the reasoning of *Nessel* persuasive"). The court in *Nessel* never engaged with the line of cases providing that a defendant cannot assert federal officer removal where (as here) a plaintiff has expressly limited its claims to injuries from products not made at the direction of a federal officer. Nor did *Nessel* address the fact – highlighted in the New Hampshire case – that the limited scope of the commercial AFFF case meant that "there is no scenario under which [the defendants] could be found liable for any damages caused by AFFF . . . regardless of whether" it was supplied under federal authority. *New Hampshire*, 665 F. Supp. 3d at 227-28.

Furthermore, *Nessel* is plainly distinguishable from the instant action because the State's Complaint expressly disclaims any relief for AFFF. That distinction is important, as the liability of the defendants in *Nessel* for any alleged AFFF contamination was subject to a factfinder determining whether it was produced under a military specification. *Id.* at 228-29. In the instant action and as a result of the State's express disclaimer, "whether an alternate source of contamination was MilSpec AFFF is irrelevant because this suit does not involve AFFF, regardless of whether it is MilSpec or another version of AFFF." *Id.* at 229.

Defendant relies on additional AFFF cases in its Notice that are similarly plainly distinguishable. In one decision, the AFFF MDL court declined to remand a case that disclaimed relief for "any injuries traceable to federally mandated MilSpec AFFF" but not to "*commercial AFFF use by non-federal consumers* at fire readiness and suppression sites in Northern Bergen County, New Jersey." *In re: Aqueous Film-Forming Foams Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG (MDL No. 2873), ECF 325 (D.S.C. Oct. 1, 2019) ("Ridgewood Water")

(emphasis in original). The AFFF MDL court concluded that "civilian" AFFF was effectively a federal product just as much as "MilSpec AFFF," because both were designed under "the military's guidance" and based on "MilSpec standards," and so determined that the defendants could reasonably raise a government contractor defense. *Id.* at 4-5. Like *Nessel*, this case is distinguishable because it still concerned AFFF. Defendant also makes passing citation to three other decisions, but these cases are not even superficially on point. Notice ¶ 19. One is essentially identical to *Ridgewood Water*. *In re: Aqueous Film-Forming Foams Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG (MDL No. 2873), ECF 320 (D.S.C. Sept. 27, 2019) (treating civilian AFFF as a federal product). Two others merely assert jurisdiction over claims for contamination from MilSpec AFFF. *Ayo v. 3M Co.*, No. 18-cv-0373(JS)(AYS), 2018 U.S. Dist. LEXIS 170996 (E.D.N.Y. Sept. 30, 2018); *In re: Aqueous Film-Forming Foams Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG (MDL No. 2873), ECF 103 (D.S.C. May 24, 2019). Each of the cases cited by the Defendant is premised on seeking relief for *some form of AFFF* and not the non-AFFF PFAS at issue here.

Additionally, Defendant devotes much of the Notice of Removal to arguing that the State's Complaint has been filed under a false premise. *See, e.g.*, Notice ¶ 1 (describing the defining distinction between the Complaint and the State's separate AFFF lawsuit as "illusory" and "one without a meaningful difference"). Defendant makes a "commingling" argument throughout its Notice of Removal that suggests this case really is about MilSpec AFFF because the State may not be able to definitively distinguish AFFF-related PFAS and non-AFFF PFAS. *See id.* ¶ 10 (alleging that the State has not excluded MilSpec AFFF from this case because its Complaint did not explain how it will factually and scientifically differentiate sources of PFAS). Much of the Notice supports this "commingling" argument using allegations drawn from

complaints outside of this action. *See, e.g.*, *id.* ¶¶ 27-31, 33-36 (citing similarities in the State's separate AFFF complaint to suggest that "PFAS from MilSpec AFFF plausibly has commingled with PFAS from non-AFFF sources in Connecticut"); *id.* ¶ 32 (citing a conflicting allegation from the complaint filed in *First Taxing Dist. of City of Norwalk Connecticut v. 3M Co., et al.*, No. 2:23-cv-02268 (D.S.C.), ECF No. 1).

Nothing cited by the Defendant suggests it can raise the government contractor defense here. What defendant has done, in raising the issue of the possible commingling of AFFF and non-AFFF PFAS, is not to raise a colorable *federal* defense that it cannot be held liable for the non-AFFF PFAS, but rather raise an *ordinary* defense that it is impossible to discern between those two types of PFAS. This is clear because a *federal* defense would rely on Defendant's production – pursuant to federal direction or military specifications – of the PFAS at issue in this case. For reasons previously explained, this defense fails because Defendant was not acting as a federal officer with regard to the PFAS *actually* at issue in this case, which are exclusively those PFAS unrelated to AFFF. Instead, the argument Defendant raises is simply that the PFAS for which it faces liability in this case (non-AFFF) is too commingled with PFAS for which it does not face liability (AFFF) so that either liability or damages cannot be proven. But a defense – even a likely defense that raises a federal issue – cannot form the basis for removal. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987).

The State's express disclaimer against recovering for AFFF renders any defense related to MilSpec AFFF entirely moot. *New Hampshire*, 665 F. Supp. 3d at 228 ("Because the State is not making any claims here for injuries from the only product that 3M asserts it supplied at the direction of a federal officer, the validity of that assertion will simply not be tested in this action."). Consistent with the decisions that have considered *Nessel* in other PFAS cases, this

action's Complaint is distinguishable by virtue of its express disclaimer. Likewise, any attempt to raise a government contractor defense by alleging that MilSpec AFFF is part of this action, commingled or not, falls flat.

**B.     The State's Claims Are Not Subject to Federal Enclave Jurisdiction.**

In its Notice of Removal, Defendant raises the Federal Enclave Doctrine as a second justification for federal jurisdiction – "[b]ecause the State's claims arose in part on federal enclaves, such as the Naval Submarine Base New London (*see* AFFF Complaint ¶ 125), the claims involve a federal question, and Defendant is entitled to remove the action to federal court under 28 U.S.C. §§ 1331 and 1441 (a)." Notice ¶ 5.

The Constitution's Enclave Clause grants Congress the power to exercise legislative authority "over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." U.S. Const. art. I, § 8, cl. 17. Such "federal enclaves" are generally governed by federal law and, under certain circumstances, claims which arise there might be removable under 28 U.S.C. § 1441(a). In order to remove a complaint brought in state court, *all* of the pertinent events must have occurred on the federal enclave. *See, e.g.*, *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1271 (10th Cir. 2022), cert. denied, 143 S. Ct. 1795, 215 L. Ed. 2d 678 (2023); *see Mayor & City Council of Baltimore v. BP P.L.C.,* 31 F.4th 178, 217-19 (4th Cir. 2022); *Rhode Island v. Shell Oil Prods. Co., L.L.C.*, 35 F.4th 44, 58 (1st Cir. 2022) ("*Rhode Island II*"). There is no federal enclave jurisdiction in this action because the events giving rise to the State's claims did not arise on a federal enclave.

Federal enclave jurisdiction confers original federal jurisdiction under 28 U.S.C. § 1331, which therefore would allow removal under 28 U.S.C. § 1441(a). *Maryland*, 2024 U.S. Dist. LEXIS 48428, at *11. The "well-pleaded complaint rule" applies when interpreting jurisdiction

under § 1331 claims, which states that "federal question jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc.*, 482 U.S. at 392. This rule enables a plaintiff, as the State did here, to be the "master of the claim" and "avoid federal jurisdiction by exclusive reliance on state law." *Id.*

Federal enclave removal is appropriate only where "the complaint reveal[s]" that a plaintiff's claims arose on federal enclaves. *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006). Federal enclave jurisdiction is to be interpreted narrowly. *City & Cnty. Of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1111 (9th Cir. 2022). The complaint "must allege that an injury occurred on a federal enclave or that an injury stemmed from conduct on a federal enclave" and "the connection between injuries and conduct must not be 'too attenuated and remote.'" *Id.* (quoting *Cnty. Of San Mateo v. Chevron Corp.*, 32 F.4th 733, 750 (9th Cir. 2022)). "[A] defendant cannot use activities on federal enclaves to create instant jurisdiction for a state-law claim." *Honolulu*, 39 F.4th at 1111.

To make its federal enclave argument, Defendant attempts to attribute the State's injuries to federal enclaves in two ways. Defendant first claims this Court has federal enclave jurisdiction through AFFF contamination from the federal facilities cited in the State's AFFF complaint, specifically citing the New London Naval Submarine Base. Notice ¶ 59. This argument is unpersuasive. To make this argument, relies on allegations from a different action – the State's AFFF complaint – but, under *Durham* and *Honolulu*, Defendant cannot establish federal enclave jurisdiction by looking beyond this Complaint. *Durham*, 445 F.3d, at 1250; *Honolulu*, 39 F.4th, at 1111. Allegations relating to MilSpec AFFF are also inapplicable, and consequently cannot confer federal enclave jurisdiction, as a result of the State's express disclaimer. *See* Compl. ¶ 18.

Defendant makes a second attempt to establish federal enclave jurisdiction by alleging

non-AFFF PFAS contamination from activities at the New London Naval Submarine Base. Notice ¶ 60 ("For instance, the use of PFAS in metal plating operations at the Naval Submarine Base plausibly has contributed to PFAS contamination at that site that is encompassed within the 'non-AFFF' PFAS contamination for which the State is seeking to recover in this case."). This argument fails because Defendant has neither argued nor offered evidence that all of the pertinent events concerning the PFAS subject to this Complaint originated on the New London Submarine Base. The fact that a case could "plausibly" overlap with some activity on a federal enclave is not sufficient to recast it as a federal matter. *Maryland*, 2024 U.S. Dist. LEXIS 48428, at *12 ("The fact some of the State's claims may have arisen in part from some federal enclaves is insufficient to grant federal enclave jurisdiction.").

Federal courts across the country have consistently held that "[t]he doctrine of federal enclave jurisdiction generally requires 'that *all* pertinent events t[ake] place on a federal enclave.'" *Boulder*, 25 F.4th at 1271 (second alteration in original) (citation omitted); *see also Mayor & City Council of Balt. v. BP P.L.C.*, 388 F. Supp. 3d 538, 565 (D. Md. 2019) ("[C]ourts have only found that claims arise on federal enclaves, and thus fall within federal question jurisdiction, when all or most of the pertinent events occurred there."); *see also In re: High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1125 (N.D. Cal. 2012) ("[T]he federal enclave doctrine only applies when the locus in which the claim arose is the federal enclave itself."). Even if Defendant could establish that some small quantity of non-AFFF PFAS contamination in Connecticut was contributed from or to a federal enclave, such contribution was not exclusive to the enclave, nor was the production, distribution, or marketing of PFAS. "While the various injuries alleged in [a] complaint may be felt on federal enclaves as much as they are felt anywhere, the Court requires a more substantive and explicit relationship between the actual claims alleged and a specific federal enclave to exercise jurisdiction." *Connecticut v. Exxon Mobil Corp.,* No. 3:20-cv-1555,

2021 U.S. Dist. LEXIS 111334 at *35 n.13 (D. Conn. Jun. 2, 2021) (quoting *Minnesota v. API*, Civil No. 20-1636 (JRT/HB), 2021 U.S. Dist. LEXIS 62653 at *11 (D. Minn. Mar. 31, 2021)).

Recent jurisprudence on federal enclave jurisdiction has reinforced this narrow application in the context of widespread impacts. *See, e.g.*, *Baltimore*, 31 F.4th at 217-18 (explaining that "federal-question jurisdiction is not conferred merely because *some* of Defendants' activities occurred on military installations.") (emphasis in original); *see also Honolulu*, 39 F.4th at 1111 (no federal enclave jurisdiction because "Plaintiffs' claims are not about Defendants' [federal activities], and Defendants' activities on federal enclaves are too remote and attenuated from Plaintiffs' injuries."). In *Rhode Island II*, the State sought damages for defendant energy companies' knowing production of climate-warming fossil fuels. 35 F.4th, at 50. Defendants removed the case to federal court and attempted to justify federal enclave jurisdiction by claiming that "a big chunk of their 'operative activities occurred on federal land . . . .'" *Id.* at 58. The First Circuit concluded that "some of the pertinent events . . . occurred *outside* federal enclaves" and rejected federal enclave jurisdiction as it "generally requires that *all* pertinent events t[ake] place on a federal enclave." *Id.* at 58 (emphasis in original) (alteration in original) (citing *Boulder*, 25 F.4th at 1271).

Defendant has made similar federal enclave arguments before three other district courts, each of which rejected the argument and remanded the case before it. *Maryland*, 2024 U.S. Dist. LEXIS 48428, at *12 ("Quite simply, 3M's allegations are insufficient to meet the requirements for federal enclave jurisdiction."); *Maine*, 2023 U.S. Dist. LEXIS 128740, at *28-29; *South Carolina*, No. 2:23-cv-05979-RMG (D.S.C. Feb. 29, 2024), at *5-6. Here, too, Defendant has provided an insufficient basis for federal enclave jurisdiction, offering only one plausible example of PFAS pollution originating from a federal enclave. In contrast, the State's Complaint

alleged statewide PFAS pollution with examples of examples of non-AFFF sources, including landfills and POTWs. Compl. ¶¶ 70, 72. To recognize federal enclave jurisdiction on so slight a basis would, as this Court recognized of the defendant's argument in *Connecticut v. Exxon Mobil Corp.*, "give rise to federal jurisdiction in any case involving injuries that occur throughout a state, no matter how minor the injuries occurring on federal enclaves are in relation to the claims at issue." 2021 U.S. Dist. LEXIS 111334, at *35. Such an expansive reinterpretation of the federal enclave doctrine would amount to a sea change in jurisdiction, undermining the ability of states to enforce their own laws, and has been expressly rejected by this District. *Id.*

The Defendant's reliance on the federal enclave doctrine is inconsistent with applicable law and not a basis for removal of this action.

### C.    Defendant's Objectively Unreasonable Removal Justifies Awarding Attorneys' Fees to The State.

The State respectfully requests this Court award costs and expenses incurred by the State in responding to Defendant's Notice of Removal. *See* 28 U.S.C. § 1447(c) ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."). Recognizing that unjustified removal "delays resolution of the case, imposes additional costs on both parties, and wastes judicial resources," Congress promulgated Code section 1447(c) to "deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party . . . ." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 140 (2005). In determining whether to award costs and fees, courts consider whether the removing party had an objectively reasonable basis for removal. *Id.* at 141 ("[T]he standard for awarding fees should turn on the reasonableness of the removal. Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal."). District courts have discretion in

determining whether to award attorneys' fees, *id.* at 139, and a "great deal of discretion and flexibility . . . in fashioning awards of costs and fees." *Morgan Guaranty Trust Co. v. Republic of Palau*, 971 F.2d 917, 924 (2d Cir. 1992).

Defendant's retread Notice is objectively unreasonable for two reasons. First, Defendant has advanced these same arguments in jurisdictions across the country without success. *See, e.g.*, *New Hampshire*, 665 F. Supp. 3d at 220 (rejecting Defendant's argument that the PFAS lawsuit was removable under the federal officer doctrine); *Illinois*, 2023 U.S. Dist. LEXIS 168231, at *19 (same); *Maine*, 2023 U.S. Dist. LEXIS 128740, at *28-29 (rejecting Defendant's argument that the PFAS lawsuit was removable under either the federal officer doctrine or the federal enclave doctrine); *Maryland*, 2024 U.S. Dist. LEXIS 48428, at *11-13 (same); *South Carolina*, No. 2:23-cv-05979-RMG (D.S.C. Feb. 29, 2024), at *5-6 (same). Defendant has received multiple decisions from district courts stating that removal is baseless when plaintiffs explicitly disclaim liability and remedies for AFFF, yet they continue to advance the same arguments without regard to prior judicial decisions. *See Robinson v. Pfizer Inc.*, No. 4:16-CV-439 (CEJ), 2016 U.S. Dist. LEXIS 57174, at *12 (E.D. Mo. Apr. 29, 2016) (awarding attorneys' fees because defendant had no objectively reasonable basis for removal after multiple courts had remanded cases removed on same basis), *vacated as moot*, 855 F.3d 893 (8th Cir. 2017). Defendant did not inform this Court that the arguments it advanced had been rejected by various district courts, nor did it otherwise acknowledge these adverse rulings.

Second, Defendant continues to assert the same arguments regardless of the specific allegations plead. The State explicitly stated that AFFF was excluded from this suit, yet Defendant ignored the well-pleaded complaint rule to shoehorn MilSpec AFFF into this case. Both of Defendant's removal arguments are based upon conduct that is clearly not part of this

lawsuit. That alone is grounds for an award of attorneys' fees. *See Savino v. Savino*, 590 F. Appx. 80, 81 (2d Cir. 2015) (affirming award of attorneys' fees when removal did not follow well-pleaded complaint rule).

## V.   CONCLUSION

For the foregoing reasons, the State respectfully requests that this Court remand the Complaint to Connecticut Superior Court and award attorney's fees to the State for time spent litigating Defendant's objectively unreasonable removal of this action.

Respectfully submitted,

PLAINTIFF STATE OF CONNECTICUT

WILLIAM M. TONG
ATTORNEY GENERAL

  */s/ Christopher P. Kelly*

MATTHEW I. LEVINE (ct18898)
Deputy Associate Attorney General
CHRISTOPHER PATRICK KELLY (ct31247)
MICHAEL W. LYNCH (ct29076)
KAELAH M. SMITH (ct30358)
Assistant Attorneys General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5250
Fax: (860) 808-5386
matthew.levine@ct.gov
christopher.kelly@ct.gov
michael.w.lynch@ct.gov
kaelah.smith@ct.gov

# EXHIBIT 1




**State of Connecticut Judicial Branch**
# Superior Court Case Look-up

| | |
|---|---|
| Superior Court Case Look-up | |
|    Civil/Family | |
|    Housing | |
|    Small Claims | |

🔵 **HHD-CV24-6179556-S**     **STATE OF CONNECTICUT v. EIDP, INC. Et Al**

**Prefix:** HD6     **Case Type:** M90     **File Date:** 01/25/2024     **Return Date:** 03/05/2024

**Case Detail** | Notices | History | Scheduled Court Dates | E-Services Login | Screen Section Help     ▶

Attorney/Firm Juris Number Look-up 🔗

To receive an email when there is activity on this case, click here. 🔗

| | |
|---|---|
| Case Look-up | |
|    By Party Name | |
|    By Docket Number | |
|    By Attorney/Firm Juris Number | |
|    By Property Address | |

**Information Updated as of:** 02/21/2024

| Case Information |
|---|
| **Case Type:** M90 - Misc - All other |
| **Court Location:** HARTFORD JD |
| **List Type:** No List Type |
| **Trial List Claim:** |
| **Last Action Date:** 02/05/2024 (The "last action date" is the date the information was entered in the system) |

| | |
|---|---|
| Short Calendar Look-up | |
|    By Court Location | |
|    By Attorney/Firm Juris Number | |
|    Motion to Seal or Close | |
|    Calendar Notices | |

| Disposition Information |
|---|
| **Disposition Date:** |
| **Disposition:** |
| **Judge or Magistrate:** |

| | |
|---|---|
| Court Events Look-up | |
|    By Date | |
|    By Docket Number | |
|    By Attorney/Firm Juris Number | |

| Party & Appearance Information |
|---|

| Legal Notices |
|---|


Comments

| Party | | No Fee Party | Category |
|---|---|---|---|
| **P-01** | **STATE OF CONNECTICUT** | Y | Plaintiff |
| | Attorney: 🔵 CHRISTOPHER PATRICK KELLY (444375) File Date: 01/25/2024 AG-ENVIRONMENT 165 CAPITOL AVE 5TH FLR HARTFORD , CT 06106 | | |
| | Attorney: 🔵 JULIA ROSE SUESSER (445210)     File Date: 02/05/2024 AG-ENVIRONMENT 165 CAPITOL AVE 5TH FLR HARTFORD , CT 06106 | | |
| **D-01** | **EIDP, INC.** Non-Appearing | | Defendant |
| **D-02** | **THE CHEMOURS COMPANY** Non-Appearing | | Defendant |
| **D-03** | **THE CHEMOURS COMPANY FC, LLC** Non-Appearing | | Defendant |
| **D-04** | **DUPONT DE NEMOURS, INC.** Non-Appearing | | Defendant |
| **D-05** | **CORTEVA, INC.** Non-Appearing | | Defendant |
| **D-06** | **3M COMPANY** Non-Appearing | | Defendant |

Pending Foreclosure Sales 🔗

Understanding Display of Case Information

Contact Us

**Viewing Documents on Civil, Housing and Small Claims Cases:**

If there is an 🔵 in front of the docket number at the top of this page, then the file is electronic (paperless).

- Documents, court orders and judicial notices in electronic (paperless) civil, housing and small claims cases with a return date on or after January 1, 2014 are available publicly over the internet.* For more information on what you can view in all cases, view the Electronic Access to Court Documents Quick Card.

- For civil cases filed prior to 2014, court orders and judicial notices that are electronic are available publicly over the internet. Orders can be viewed by selecting the link to the order from the list below. Notices can be viewed by clicking the **Notices** tab above and selecting the link.*

- Documents, court orders and judicial notices in an electronic (paperless) file can be viewed at any judicial district courthouse during normal business hours.*

- Pleadings or other documents that are not electronic (paperless) can be viewed only during normal business hours at the Clerk's Office in the Judicial District where the case is located.*

- An Affidavit of Debt is not available publicly over the internet on small claims cases filed before October 16, 2017.*

*Any documents protected by law Or by court order that are Not open to the public cannot be viewed by the public online And can only be viewed in person at the clerk's office where the file is located by those authorized by law or court order to see them.

| | | | Motions / Pleadings / Documents / Case Status | |
|---|---|---|---|---|
| Entry No | File Date | Filed By | Description | Arguable |
| | 02/05/2024 | P | **APPEARANCE** 📝 <br> Appearance | |
| 100.30 | 01/25/2024 | P | **SUMMONS** 📝 | No |
| 100.31 | 01/25/2024 | P | **COMPLAINT** 📝 | No |
| 100.32 | 01/25/2024 | P | **CONTINUATION OF PARTIES** 📝 | No |
| 100.33 | 01/25/2024 | P | **RETURN OF SERVICE** 📝 | No |

| Scheduled Court Dates as of 02/20/2024 | | | | |
|---|---|---|---|---|
| HHD-CV24-6179556-S - STATE OF CONNECTICUT v. EIDP, INC. Et Al | | | | |
| # | Date | Time | Event Description | Status |
| | | | No Events Scheduled | |

Judicial ADR events may be heard in a court that is different from the court where the case is filed.  To check location information about an ADR event, select the **Notices** tab on the top of the case detail page.

Matters that appear on the Short Calendar are shown as scheduled court events on this page. The date displayed on this page is the date of the calendar.

The status of a Short Calendar matter is not displayed because it is determined by markings made by the parties as required by the calendar notices and the civil standing orders. Markings made electronically can be viewed by those who have electronic access through the Markings History link on the Civil/Family Menu in E-Services. Markings made by telephone can only be obtained through the clerk's office. If more than one motion is on a single short calendar, the calendar will be listed once on this page. You can see more information on matters appearing on Short Calendars by going to the Civil/Family Case Look-Up page and Short Calendars By Juris Number or By Court Location.

Periodic changes to terminology that do not affect the status of the case may be made.

This list does not constitute or replace official notice of scheduled court events.

**Disclaimer:** For civil and family cases statewide, case information is displayed and is available for inquiry on this website for a period of time, one year to a maximum period of ten years, after the disposition date. To the extent that Connecticut Practice Book Sections 7-10 and 7-11 provide for a shorter period of time, this information will be displayed for the shorter period.

In accordance with the Federal Violence Against Women Act of 2005, cases involving relief from physical abuse (restraining orders), civil protection orders, foreign protective orders, and motions that would be likely to publicly reveal the identity or location of a protected party may not be displayed and may be available only at the courts.

Attorneys | Case Look-up | Courts | Directories | EducationalResources | E-Services | FAQ's | Juror Information | News & Updates | Opinions | Opportunities | Self-Help | Home

Common Legal Terms | Contact Us | Site Map | Website Policies

Copyright © 2024, State of Connecticut Judicial Branch

Page Created on 2/21/2024 at 1:13:57 PM

**SUMMONS - CIVIL**
JD-CV-1   Rev. 2-22
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| | | |
|---|---|---|
| **Instructions are on page 2.** | For information on ADA accommodations, contact a court clerk or go to: *www.jud.ct.gov/ADA.* | STATE OF CONNECTICUT **SUPERIOR COURT** *www.jud.ct.gov*  |

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☒ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
|---|---|---|
| 95 Washington Street, Hartford 06106 | ( 860 ) 548 – 2700 | 03/05/2024 |

| ☒ Judicial District | G.A. | At *(City/Town)* | Case type code *(See list on page 2)* | |
|---|---|---|---|---|
| ☐ Housing Session | Number: | Hartford | Major: **M** | Minor: **90** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
|---|---|
| William M. Tong, AG, Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106 | 440323 |

| Telephone number | Signature of plaintiff *(if self-represented)* |
|---|---|
| ( 860 ) 808 – 5280 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. | ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book *(if agreed)* christopher.kelly@ct.gov |
|---|---|---|

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
|---|---|---|
| **First plaintiff** | Name: **State of Connecticut** Address: **Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106** | P-01 |
| **Additional plaintiff** | Name: Address: | P-02 |
| **First defendant** | Name: **EIDP, Inc.** Address: **974 Centre Rd, Wilmington, DE 19805** | D-01 |
| **Additional defendant** | Name: Agent for Service: C T Corporation System, 67 Burnside Ave, East Hartford, CT 06108 Address: | D-02 |
| **Additional defendant** | Name: **The Chemours Company** Address: **1007 Market Street, Wilmington, DE 19801** | D-03 |
| **Additional defendant** | Name: Agent for Service: C T Corporation System, 67 Burnside Ave, East Hartford, CT 06108 Address: | D-04 |

| Total number of plaintiffs: 1 | Total number of defendants: 6 | ☒ Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
**The court staff is not allowed to give advice on legal matters.**

| Date 01/23/2024 | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court ☐ Clerk | Name of person signing William M. Tong |
|---|---|---|---|

| If this summons is signed by a Clerk: | | For Court Use Only |
|---|---|---|
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts. | | File Date |
| b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law. | | |
| c. The court staff is not permitted to give any legal advice in connection with any lawsuit. | | |
| d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | | |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
|---|---|---|---|

RETURN DATE: MARCH 5, 2024                    SUPERIOR COURT

STATE OF CONNECTICUT                          JUDICIAL DISTRICT
                                              OF HARTFORD
v.

EIDP, INC.; DUPONT DE NEMOURS,                AT HARTFORD
INC.; THE CHEMOURS COMPANY; THE
CHEMOURS COMPANY FC, LLC;
CORTEVA, INC.; and 3M COMPANY                 JANUARY 23, 2024


## <u>COMPLAINT</u>

The State of Connecticut, by its Attorney General William Tong, brings this action to

obtain injunctive, monetary, and other equitable relief, and complains and alleges as follows:


## I.      NATURE OF THE ACTION

1.      The State of Connecticut brings this action against the above-named Defendants to

protect and restore lands, waters, and wildlife, among other natural resources and property,

which are contaminated with toxic chemicals known as per- and polyfluoroalkyl substances

("PFAS").

2.      Defendants are among the world's largest chemical manufacturers and have been the

primary historical manufacturers of PFAS and PFAS-containing chemicals and related products

(herein collectively referred to as "PFAS Products") since the 1940s.

3.      Defendants' PFAS Products have been used in Connecticut and throughout the

country in industrial processes and in consumer products. PFAS are typically added to make

products, including those under Defendants' brand names Teflon and Scotchgard, resistant to

stains, water, and heat. Among the items where Defendants' PFAS Products have been widely

used are food packaging, cookware, carpeting, upholstery, clothing, and cosmetics.

4.      PFAS do not exist naturally in the environment. They are synthetic chemicals which enter the environment through the normal and foreseeable disposal of consumer and commercial products and from industrial releases into the air, water, and soil.

5.      PFAS do not break down in the environment. Once released into the world, PFAS will migrate through the environment and accumulate in living organisms.

6.      Due to their longevity in the environment, PFAS are known as "Forever Chemicals."

7.      PFAS are toxic at extremely low concentrations. Scientific studies have linked the accumulation of PFAS in humans with harmful – and potentially lethal – conditions, including cancer and liver disease, as well as with adverse effects on pregnancies and child development.

8.      The manufacturers of PFAS Products have known about the harmful and persistent characteristics of PFAS for decades, but concealed material information about these characteristics to preserve their product lines.

9.      As early as the 1950s, substantial resources were devoted to toxicity testing on numerous animal species, which demonstrated incredibly dangerous impacts upon an array of mammals, birds, and fish. Human health studies demonstrated significantly increased cancer risks from PFAS exposure, as well as increased occurrence of birth defects and other health impacts. Defendants shared with each other their research and serious safety concerns but not with the public, even as they continued to produce these toxins.

10.     Defendants developed extensive research programs to study their chemicals and determined that their PFAS Products were polluting drinking water supplies, groundwater, surface waterbodies, soils, sediments, and wildlife.

11.     Since the 1970s, these manufacturers have also known that there is a "universal presence" of their PFAS in human blood.

12.     Despite legal obligations to report their knowledge, these risks were concealed from regulators and the public for decades.

13.     The Environmental Protection Agency ("EPA") only learned in 1998 that PFAS was in the blood of the general human population. Under pressure from the EPA, one Defendant, the 3M Company, then produced over 1,200 studies it had withheld from regulators for decades.

14.     With utter disregard for human health and the environment, Defendants had concealed their knowledge about these harmful chemicals from regulators and deceived their customers. Even after the EPA was alerted to the PFAS threat, manufacturers of PFAS Products labored to undermine regulatory efforts and scientific inquiry.

15.     Defendants concealed critical information in order to perpetuate their toxic trade, delaying any regulatory response to the PFAS threat for decades. As scientific awareness of the dangers of PFAS have grown, recent investigations have revealed widespread PFAS contamination across Connecticut, including in waterways and drinking water wells.

16.     The State, as *parens patriae* and trustee of natural resources, has an obligation to protect its citizens and environment from the ongoing PFAS threat and to restore Connecticut's environment for the benefit of future generations.

17.     Connecticut state agencies estimate that the State and its taxpayers will likely need to expend billions of dollars to mitigate PFAS contamination, remediate Connecticut's natural resources and property, and ensure the health and safety of Connecticut's residents.

18.     The State is not seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam, a firefighting material that contains PFAS which the State is addressing through a separate legal action to hold these and other defendants accountable.

## II.     THE PARTIES

### A.     The Plaintiff

19.     The State of Connecticut brings this action by and through William Tong, Attorney General of the State of Connecticut, with his principal office at 165 Capitol Avenue, Hartford, Connecticut 06106.

20.     The State of Connecticut is a sovereign state and brings this action in its capacity as sovereign, on behalf of its commissioners and agencies, as trustee of State natural resources and owner of substantial interests in property contaminated and injured by Defendants, and pursuant to its *parens patriae* authority on behalf of the citizens of Connecticut.

21.     This action is brought at the request of and pursuant to the authority granted to the Governor of the State of Connecticut, Ned Lamont, by Conn. Gen. Stat. § 3-5, as well as, by Connecticut common law, Conn. Gen. Stat. §§ 3-125, 22a-16, 22a-416 to 22a-599, 42-110m, and 52-552 to 52-552*l*. The State brings this action based upon its statutory enforcement authority to protect State natural resources and substantial interests in property and its common law police power. This power includes its authority to prevent pollution of the State's natural resources and State property, to prevent nuisances, to protect consumers and ensure fair trade practices, and to prevent and abate hazards to public health, safety, welfare, and the environment.

22.     The State of Connecticut brings this action to obtain injunctive, monetary, and other equitable relief. The State of Connecticut seeks to prevent continued violations of law and duties by Defendants, to compel investigation and remediation of environmental pollution, to obtain civil penalties for Defendants' violations of law, and to recover actual and punitive damages. These damages include, without limitation, past and future expenditures to identify and respond

to PFAS contamination of natural resources and property, including treating, monitoring, and remediating drinking water, as well as natural resource damages.

23.     In this Complaint, the term "State's natural resources and property" refers to all natural resources or property for which the State of Connecticut seeks damages, including without limitation fish, wildlife, biota, air, surface water, groundwater, wetlands, drinking water supplies, soil, sediment, public lands the State holds in trust, and where the State is an owner of substantial interests in property.

### B.     The Defendants

24.     Defendants at all times relevant to this Complaint were and are designers, manufacturers, marketers, distributors, and/or sellers of PFAS Products. The following Defendants, at times relevant to this Complaint, designed, manufactured, marketed, distributed, and/or otherwise sold (directly or indirectly) PFAS Products that each such Defendant knew or should have known would be delivered into areas affecting the State's natural resources and property.

#### 1.     DuPont Defendants

25.     This Complaint refers to EIDP, Inc., DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc., collectively, as the "DuPont Defendants."

26.     Defendant **EIDP, Inc. ("Old DuPont")**, formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Old Dupont has designed, manufactured, marketed, distributed, and/or sold PFAS Products throughout the United States. Since at least the 1940s, Old DuPont sold its trademarked PFAS Product "Teflon" for industrial uses and, since at least the 1960s, for

5

use in consumer products. As alleged herein, Old DuPont engaged in a multi-year scheme to insulate its assets and defraud its creditors. Old DuPont is registered to do business in Connecticut.

27.     Defendant **DuPont de Nemours, Inc. ("New DuPont")**, formerly known as DowDuPont, Inc., is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off The Chemours Company, Old DuPont and The Dow Chemical Company ("Old Dow") merged as subsidiaries of a newly created entity, DowDuPont, Inc. Subsequently, DowDuPont, Inc. spun off both Corteva, Inc. and Dow, Inc. ("New Dow") and transferred Old DuPont's historical assets and liabilities, retaining the specialty products business. In connection with these transfers, the surviving entity of the spin-offs, now known as DuPont de Nemours, Inc., assumed certain Old DuPont assets and liabilities, which likely includes business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of PFAS Products. New DuPont does business throughout the United States.

28.     Defendant **The Chemours Company ("Chemours")** is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19801. In 2015, Old DuPont spun off Chemours as an independent company, along with Old DuPont's performance chemicals business and vast environmental liabilities, including those related to PFAS. Chemours has designed, manufactured, marketed, distributed, and/or sold PFAS Products throughout the United States. Chemours is registered to do business in Connecticut.

29.     Defendant **The Chemours Company FC, LLC ("Chemours FC")** is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware

19801. Chemours FC operates as a subsidiary of Chemours and manufactures fluoropolymer resins. Chemours FC is registered to do business in Connecticut.

30. Defendant **Corteva, Inc. ("Corteva")** is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. In 2019, New DuPont spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont assets and liabilities, which likely includes business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of PFAS Products. Corteva is registered to do business in Connecticut.

### 2. 3M Company

31. Defendant **3M Company ("3M")**, formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144. Since at least the 1950s, 3M has designed, manufactured, marketed, distributed, and/or sold PFAS Products throughout the United States. Beginning in 1956, 3M sold many of those PFAS Products under the brand name "Scotchgard." 3M is registered to do business in Connecticut.

32. The Court has jurisdiction over Defendants under Connecticut's corporate long-arm statute, Conn. Gen. Stat. § 33-929, and individual long-arm statute, Conn. Gen. Stat. § 52-59b, owing to Defendants' transaction of business, tortious conduct, and injuries inflicted in the State.

## III. FACTUAL ALLEGATIONS

### A. PFAS Products Harm the Environment, Animals, and Human Health

33. PFAS are a group of thousands of human-made chemical compounds containing bonds of fluorine and carbon atoms. The fluorine-carbon bond is one of the strongest bonds in

chemistry. Due to their unique chemical structure, PFAS are extremely stable and repel oil, grease, water, and heat. They do not naturally occur in the environment.

34. For purposes of this Complaint, "PFAS" includes, but is not limited to, the following ten PFAS compounds, including their precursors, acids, salts, ionic forms, and byproducts, for which the Connecticut Department of Public Health ("CT DPH") has developed drinking water "Action Levels" for specified concentrations:

      a.    **PFOS** (Perfluorooctanesulfonic acid)

      b.    **PFOA** (Perfluorooctanoic acid)

      c.    **6:2 Cl-PFESA** (6:2 chloropolyfluoroether sulfonic acid)

      d.    **8:2 Cl-PFESA** (8:2 chloropolyfluoroether sulfonic acid)

      e.    **HFPO-DA** (also known as GenX) (Hexafluoropropylene oxide dimer acid)

      f.    **PFBS** (Perfluorobutanesulfonic acid)

      g.    **PFBA** (perfluorobutanoic acid)

      h.    **PFHxS** (Perfluorohexanesulfonic acid)

      i.    **PFHxA** (Perfluorohexanoic acid)

      j.    **PFNA** (Perfluorononanoic acid)

35. The unique chemical structure of PFAS make them (1) persistent, (2) mobile, (3) bioaccumulative and biomagnifying, and (4) toxic.

36. PFAS are extremely persistent. PFAS do not break down or biodegrade in the environment or in living organisms. Once released into the environment, they will endure indefinitely until they are consumed by living organisms or are contained and removed. This extreme persistence has given them the nickname "Forever Chemicals."

37.     PFAS are highly mobile. They easily dissolve and spread through water. Once released into the environment, they can migrate long distances through a variety of media, including surface water, groundwater, soils, sediment, and air. Due to the mobility and persistence of PFAS, even releases of modest quantities can cause significant pollution of State natural resources and property.

38.     PFAS bioaccumulate in humans and in wildlife such as fish. PFAS are purged from individual organisms very slowly – over many years for humans and other large organisms – which leads to a buildup of PFAS within the body, even when exposure continues at extremely low levels. Thus, PFAS also can biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

39.     As humans are exposed to PFAS, whether through consumption of contaminated food or water, inhalation of contaminated air, or absorption through skin, the concentration of PFAS in their blood and organs increases.

40.     According to the CDC, the elimination half-lives of PFOA and PFOS, or the length of time for the concentration of those substances in the human body to decrease by one-half, are estimated to be 3.5 years and 4.8 years, respectively. For comparison, the half-lives of arsenic, lead (in human blood), and radioactive polonium are ten hours, thirty-two days, and forty days.

41.     PFAS also spread through humans and other mammals by crossing the placenta from mother to fetus and by passing to infants through breast milk.

42.     PFAS are toxic and cause significant adverse effects to human and animal health. Toxicology and human epidemiology studies by independent researchers, as well as decades of studies and lab animal testing by the Defendants, have demonstrated the unreasonable risk to human and animal health from PFAS.

43.     Federal government agencies, including the Center for Disease Control's Agency for Toxic Substances and Disease Registry, have concluded there are adverse human health effects associated with PFAS exposure, including kidney and testicular cancer; liver damage or changes in liver function; delayed growth and development (including decreased infant birth weight); decreased vaccine response; and increased cholesterol.

44.     Additional adverse human health effects associated with PFAS exposure include, but are not limited to, cancers of the liver, breasts, pancreas, and prostate; diabetes; fatty liver disease; adverse pregnancy outcomes; and infertility.

45.     Contamination from PFAS is a serious threat to human health and the environment, including to the State's natural resources and property.

46.     The presence of these chemicals in drinking water presents a serious threat to public health.

47.     Removal of PFAS from drinking water sources requires specialized and expensive drinking water treatment systems. Additionally, once PFAS are removed from drinking water through filtration media, they must be disposed of in a safe manner, which is costly and creates new risks.

48.     Known pathways for PFAS to enter the environment include releases to air, waters, and soil from industrial processes and sites and through the normal and foreseeable use and disposal of consumer, household, and commercial products containing PFAS.

49.     Once released into the environment, PFAS resist natural degradation, migrate through and contaminate State natural resources and property, harm human and animal life, and are difficult and costly to remove.

**B.    The State is Uncovering and Responding to PFAS Contamination in Connecticut**

    **1.    Federal Investigations and Changing Regulations Have Brought Attention to PFAS**

50.    Federal and state regulators began to learn of the substantial risks associated with PFAS exposure in the late 1990s, when the EPA received disclosures about two types of PFAS – PFOS and PFOA – and subsequently filed enforcement actions under the Toxic Substances Control Act (TSCA).

51.    Section 8(e) of TSCA requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." TSCA § 8(e), 15 U.S.C. § 2607(e). This reporting requirement has been included in TSCA since its enactment in 1976. *See* Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

52.    In December 2005, the EPA reached a settlement with Old DuPont related to violations of TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute, $10.25 million, and further required Old DuPont to perform Supplemental Environmental Projects worth $6.25 million.

53.    In April 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for 244 violations of TSCA, which included violations dating back decades for failing to disclose studies regarding PFOS, PFOA, and other fluorinated compounds.

54.    Concurrently with those enforcement actions, EPA sought to phase out the production of PFOS and PFOA. As the only known manufacturer of PFOS in the United States, 3M's phaseout of PFOS ceased all known domestic PFOS manufacturing. In 2006, EPA launched the PFOA Stewardship Program to coordinate the phaseout of intentional domestic PFOA

production by 2015, which the participants reported to have been achieved. The eight

participating companies were Arkema, Asahi, BASF, Clariant, Daikin, 3M/Dyneon, Old DuPont,

and Solvay Solexis.

55.     Since EPA learned of the substantial risks associated with PFAS exposure through its

investigations and Defendants' overdue disclosures, it has recognized the threat presented to

human health and the environment and has proposed regulations with considerable implications

for State regulators and their drinking water providers.

56.     In 2016, the EPA established a health advisory level ("HAL") for combined PFOS

and PFOA in drinking water at seventy parts per trillion (ppt). In June 2022, the EPA lowered the

HALs for PFOA and PFOS to .004 ppt and .02 ppt, respectively. One ppt is analogous to one

drop in twenty Olympic-sized swimming pools. In setting these new interim HALs, the EPA

relied on "data and draft analyses that indicate that the levels at which negative health effects

could occur are much lower than previously understood when the agency issued its 2016 health

advisories for PFOA and PFOS."

57.     In March 2023, the EPA proposed a new National Primary Drinking Water

Regulation for six PFAS, including PFOA, PFOS, PFNA, HFPO-DA/GenX, PFHxS, and PFBS.

The regulation establishes legally enforceable levels, called Maximum Contaminant Levels

(MCLs), for the six aforementioned PFAS, as well as health-based, non-enforceable Maximum

Contaminant Level Goals (MCLGs). If promulgated, water providers and their state regulators

will be required to monitor for these PFAS, notify the public of the levels of these PFAS, and

reduce the levels of these PFAS in drinking water if they exceed the proposed MCL standards.

58.     The proposed regulation would set the MCLs for PFOA and PFOS in drinking water

at 4.0 ppt, which is the lowest concentration that can be reliably quantified within specific limits

of precision and accuracy during routine laboratory operating conditions. The proposed regulation would set the MCLGs for PFOA and PFOS at zero because the EPA has determined that the chemicals "are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."

59.     Currently, the EPA is monitoring twenty-nine PFAS compounds under the fifth Unregulated Contaminant Monitoring Rule (UCMR 5). The UCMR 5 requires drinking water systems across the country to collect samples between 2023 and 2025 to test for the presence of twenty-nine PFAS (and lithium). The UCMR 5 requires monitoring of the contaminants from Public Water Systems ("PWS") that serve at least 3,300 people, as well as a randomly selected sampling of smaller PWS.

60.     In September 2022, the EPA also initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present substantial danger to public health or welfare or the environment when released into the environment." Once promulgated, States and publicly owned treatment works ("POTWs") will be responsible for monitoring and treating PFAS in wastewater, controlling the discharge of PFAS, and monitoring, treating, and managing the disposal of PFAS-contaminated biosolids.

**2.      PFAS Investigations and Response Measures Are Underway in Connecticut**

61.     As a consequence of the Defendants' design, manufacturing, marketing, distribution, and sale of PFAS Products, the natural resources and lands of the State of Connecticut are contaminated with PFAS.

62.     In July 2019, Governor Ned Lamont established the Interagency PFAS Task Force, led by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") and CT DPH, to develop a statewide PFAS strategy across eighteen State agencies and entities. The PFAS Action Plan, released on November 1, 2019, recommended thirty-four agency actions across four strategic focus areas: (1) protecting human health; (2) pollution prevention; (3) remediation; and (4) education, outreach, and communication. State agencies and other entities are uncovering the breadth of the State's toxic contamination by sampling environmental media, testing drinking water sources, and investigating sites of likely PFAS discharge.

63.     Two years later, the Connecticut General Assembly passed Public Act 21-191, which banned the sale of food packaging containing intentionally added PFAS as of December 31, 2023.

64.     The State has expended substantial resources to uncover and address the extensive PFAS contamination in Connecticut, including millions of dollars of state bond funds, clean water and drinking water loan funds, and brownfield grants. New staff have been hired to perform PFAS analysis and the CT DPH Laboratory has been outfitted with analytical equipment to perform testing, for example, of drinking water samples.

65.     Connecticut agencies developed PFAS testing programs as early as 2013, with the advent of the Unregulated Contaminant Monitoring Rule 3. As the primacy agency with responsibility for implementing the Safe Drinking Water Act, CT DPH is tasked with regulating nearly 2,400 public water systems serving over 2.7 million residents.

66.     Beginning in 2018, CT DPH established a drinking water Action Level – the concentration of a contaminant at which CT DPH recommends action be taken to reduce health risks – for a sum of five PFAS compounds. Based on evolving science and updated research, CT

14

DPH established individual Action Levels for four PFAS (PFOA, PFOS, PFNA, PFHxS) in June 2022 and for another six PFAS (GenX, PFHxA, PFBS, PFBA, 6:2 Cl-PFESA, 8:2 Cl-PFESA) in June 2023. The ten PFAS compounds for which Action Levels were established are among the most widely studied PFAS that have also been detected in human blood more frequently and at higher concentrations than other PFAS. With the establishment of Action Levels, CT DPH mandated PFAS testing for all new wells and recommended testing for all PWS.

67.    Building on past testing requirements and voluntary testing, testing of drinking water sources is ongoing under the UCMR 5 regime with support from CT DPH. The first quarterly results were released in August 2023. Of the Connecticut PWS that reported results for the first quarter disclosure, fourteen water sources operated by nine PWS reported detections of various PFAS compounds, with detection levels as high as 44.3 ppt.

68.    State agencies have also lent technical assistance and engaged in private well sampling in communities known to be affected by PFAS contamination from nearby sources. Connecticut has over 320,000 private residential wells serving more than 820,000 residents. Because PFAS does not biodegrade, CT DEEP expects private wells polluted with PFAS may require treatment in perpetuity, unless active remedial measures are implemented to isolate or remove the source of PFAS pollution to groundwater. During the State's PFAS investigations conducted to date, contaminated private wells have been found in the vicinity of PFAS sources, and additional contaminated wells are expected to be identified as environmental investigations of known or presumed PFAS sources continue.

69.    Site investigations are ongoing among the thousands of identified sites in Connecticut suspected of being contaminated with PFAS.

70.     Among those sites of known or suspected contamination are five closed landfills managed by the State. Bond funds have been allocated to address identified PFAS contamination associated with landfills in Hartford and Ellington, while testing is underway at landfills in Shelton, Wallingford, and Waterbury.

71.     In addition to its site investigations, the State has retained experts to conduct environmental contamination studies.

72.     In 2021, CT DEEP retained consultants to characterize PFAS levels in environmental media entering and discharging from POTWs in Connecticut. The study tested influent, effluent, and sludge from thirty-five POTWs. Additionally, incinerator sludge and incinerator scrubber water samples were collected from four biosolid incinerators, and surface water and fish tissue samples were collected near ten POTWs. The data collected indicated PFAS were present in all samples analyzed. Of the thirty-four individual PFAS tested, twenty-nine were detected in at least one sample. The identified PFAS included all PFAS compounds for which CT DPH has enacted drinking water Action Levels. The data on PFAS concentrations in fish tissue prompted CT DEEP and CT DPH to issue a consumption advisory for specific sections of the Hockanum River.

73.     Defendants' acts and omissions have caused or contributed to PFAS contamination in Connecticut. Defendants failed to disclose to their customers and the users of PFAS Products the environmental and health risks of PFAS that were known or should have been known to them, resulting in the release and proliferation of PFAS. As a result, the risks associated with PFAS were unknown to the users of PFAS Products; were unknown to the State; and were generally unknown to those other than Defendants who could have reduced or limited the PFAS contamination and injury described above. As designers, manufacturers, marketers, distributors,

and sellers of PFAS Products, Defendants were in the best position to mitigate the risk of harm of their products.

74. As a consequence of Defendants' acts and omissions, the State is expending substantial resources to identify, contain, remediate, or otherwise mitigate the effects of PFAS contamination across Connecticut.

**C. There is Widespread PFAS Contamination of Connecticut's Natural Resources**

75. PFAS contamination from Defendants' PFAS Products has injured and continues to injure the natural resources and property of the State and the property, health, safety, and welfare of Connecticut's citizens.

76. Since 1971, the State of Connecticut has declared that "[t]he air, water, land and other natural resources, taken for granted since the settlement of the state, are now recognized as finite and precious" and that it is the policy of the State "to manage the basic resources of air, land and water to the end that the state may fulfill its responsibility as trustee of the environment for the present and future generations." Conn. Gen. Stat. § 22a-1.

77. It is the policy of the State of Connecticut that "carefully selected areas of land and water of outstanding scientific, educational, biological, geological, paleontological or scenic value be preserved." Conn. Gen. Stat. § 23-5a.

78. It is also the policy of the State of Connecticut that "there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same." Conn. Gen. Stat. § 22a-15.

79. The State owns lands throughout Connecticut that it maintains for the benefit of the public, such as State Forests, State Parks, and wildlife management areas.

80.     The State holds its natural resources in trust for the State's citizens and has an

obligation to protect public interests in these resources through, among other things, maintaining

the environmental quality of its air, lands, and waters. The State's natural resources include,

without limitation, its air; its waters, such as groundwater, springs, streams, wetlands, ocean

waters, and estuaries; certain lands and the resources found on them, such as forests and the trees

within; and its wildlife, such as birds and fish, within its boundaries or otherwise subject to its

jurisdiction.

81.     PFAS attributable to Defendants' PFAS Products have been found in groundwater,

surface water, sediments, soils, and biota in the State where PFAS Products were used, stored,

disposed of, or otherwise discharged. Furthermore, the State anticipates that additional

contamination of natural resources from PFAS attributable to Defendants' PFAS Products will

be uncovered as its investigation continues.

82.     Contamination from PFAS Products persists in the State's natural resources, damages

their intrinsic value, and impairs the public benefits derived from access to, use, and enjoyment

of the State's natural resources.

83.     The current and future residents of the State have a substantial interest in natural

resources free of PFAS contamination, as do the tourism, recreation, fishing, and other industries

that rely on maintaining a clean and safe environment for their businesses, patrons, and tourists

to visit and enjoy.

84.     Defendants' PFAS Products are major sources of PFAS contamination in

Connecticut. Numerous locations in Connecticut are known to be contaminated and injured by

Defendants' PFAS Products, including locations in the vicinity of landfills, POTWs, and

operating or closed manufacturing facilities.

85.     Releases of PFAS directly to soil or water allow PFAS to spread through the environment. PFAS on contaminated sites, such as those named above, have migrated between soils, groundwater, and surface water, which threaten human health and contaminate the sediments and biota found within those environments. A healthy and functioning ecosystem depends upon the interplay between non-impaired waters, soils, sediments, and wildlife.

### 1.     Groundwater

86.     Groundwater is a precious, limited, and invaluable natural resource that is used for drinking water, irrigation, and other important purposes.

87.     A majority of Connecticut residents rely on groundwater for drinking water, including the twenty-three percent of residents who rely solely on private residential wells.

88.     The people of Connecticut also use groundwater to irrigate agricultural crops and to provide drinking water to animals raised for human consumption in the State.

89.     PFAS attributable to Defendants' PFAS Products have contaminated and injured the State's groundwater in locations throughout the State, including, for example, at the closed landfills in Hartford and Ellington.

90.     PFAS attributable to Defendants' PFAS Products have contaminated and injured drinking water that is drawn from groundwater sources in locations throughout the State, including, for example, in public water systems in Manchester and Norwalk.

91.     Defendants have caused PFAS contamination of groundwater at these and a myriad of other locations in Connecticut by designing, manufacturing, marketing, distributing, and/or selling PFAS Products – all while knowingly concealing and misrepresenting the dangers posed by those products to groundwater.

92.     Ongoing additional testing continues to reveal further PFAS contamination and injury of groundwater in locations throughout Connecticut.

93.     It is virtually certain that additional testing will reveal further PFAS contamination and injury of groundwater in locations throughout Connecticut.

**2.     Surface Waters**

94.     Surface waters are precious, limited, and invaluable State natural resources that are used for drinking water, recreation, fishing, and ecological and other important purposes.

95.     Connecticut has 618 miles of shoreline on the Long Island Sound. The State contains 6,000 miles of streams and rivers, and over 2,000 lakes and reservoirs.

96.     Surface waters are sources of drinking water. Approximately seventy-six percent of Connecticut's population is served by water systems with the capability to supply both ground and surface water supplies – twenty-one percent of large water systems in Connecticut rely exclusively on surface supplies.

97.     Connecticut's surface waterbodies are central to its economic wellbeing. The State's tourism and recreation industries are dependent upon clean water that is safe for recreation and capable of supporting aquatic life, including a recreational boating sector worth $3.6 billion each year and a sportfishing sector worth over $650 million each year.

98.     Significant releases of PFAS have created ecological and public health crises in Connecticut rivers.

99.     Defendants' PFAS Products have contaminated Connecticut surface waterbodies in the vicinity of POTWs and other release sites, including, but not limited to, the following waterbodies, each of which has tested and detected PFAS compounds:

        a.     Connecticut River, Hartford

      b.     Farmington River, Farmington and Windsor

      c.     Hockanum River, Vernon

      d.     Naugatuck River, Beacon Falls

      e.     Pequabuck River, Bristol

      f.     Quinnipiac River, Wallingford

      g.     Scantic River, Somers

100.    Ongoing additional testing continues to reveal further PFAS contamination and injury of surface waters in locations throughout Connecticut.

101.    It is virtually certain that additional testing will reveal further PFAS contamination and injury of surface waters in locations throughout Connecticut.

### 3. Fish and Wildlife

102.    The State's biota – including both flora and fauna – are critical ecological resources. Wildlife, including birds and fish, are held in trust by the State for the benefit of its citizens.

103.    The State's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of cultural and economic activity in Connecticut. Hunting, fishing, and wildlife watching, for example, generate hundreds of millions of dollars each year through tourism and recreation. Connecticut's fish, marine resources, and wild game also provide important sources of food.

104.    Injuries to Connecticut's biota impact not only the individual species, but also the entire ecosystem of which they are a part.

105.    The State has identified PFAS compounds attributable to the Defendants' PFAS Products in its public trust fish. Since 2016, Connecticut state agencies have tested finfish tissue for the presence of PFAS.

106.     PFAS attributable to Defendants' PFAS Products have contaminated and injured fish in waterbodies across Connecticut, leading CT DPH to issue consumption advisories against consuming fish caught in certain waterbodies. Those advisories recommend limiting consumption of these fish to one meal per month or warn against any consumption at all.

107.     For example, solely in response to detected PFOS levels, CT DPH has issued consumption advisories concerning fish caught throughout or in portions of the following rivers:

      a.     Connecticut River

      b.     Farmington River

      c.     Hockanum River

      d.     Housatonic River

      e.     Natchaug River

      f.     Naugatuck River

      g.     Pequabuck River

      h.     Quinnipiac River

      i.     Scantic River

      j.     Shetucket River

      k.     Still River

      l.     Tankerhoosen River

      m.     Willimantic River

108.     Connecticut state agencies, including the Department of Agriculture and the University of Connecticut, are also investigating PFAS contamination of shellfish beds in Long Island Sound.

109.     Connecticut state agencies have expended substantial resources to conduct PFAS testing in finfish and shellfish. This testing will need to continue to update fish consumption guidance.

110.     In addition to fish testing, Connecticut state agencies are also preparing to test raptor blood and tissue, including those of bald eagles, for PFAS and other compounds.

111.     Ongoing additional testing continues to reveal further PFAS contamination and injury of wildlife in locations throughout Connecticut.

112.     It is virtually certain that additional testing will reveal further PFAS contamination and injury of wildlife in locations throughout Connecticut.

**D.     The Defendants Knew or Should Have Known of the Dangers of PFAS**

**1.     3M Has Known for Decades of Health and Environmental Risks from PFAS**

113.     3M was the largest manufacturer of PFAS chemicals in the United States from the 1940s through the early 2000s.

114.     3M manufactured PFAS by electrochemical fluorination beginning in the 1940s.

115.     3M was the only known manufacturer of PFOS and PFHxS in the United States.

116.     3M knew for decades that its PFAS Products were toxic and would adversely affect the environment and human health.

117.     3M began testing the physiological and toxicological properties of PFAS compounds as early as 1950. Based on these internal studies, 3M knew that PFOA and PFOS were harmful to humans and the environment as early as the 1950s.

118.     In 1950, 3M documented that PFAS accumulate in the blood of mice when exposed to the chemicals in laboratory tests.

23

119. By 1956, studies showed that 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

120. By 1960, 3M knew that its waste PFAS could leach into groundwater and otherwise enter the environment. An internal 3M memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells." Later that year, 3M confirmed that PFAS had already polluted the wells.

121. As early as 1963, 3M knew that its PFAS were highly stable in the environment and did not degrade after disposal. A 1963 3M report described PFAS as being stable in the environment and "completely resistant to biological attack." The same report also confirmed that 3M knew the chemicals to be "toxic."

122. By the mid-1960s, it already considered PFAS to be "toxic" and persistent and it understood the propensity of these chemicals to spread and pollute the environment. 3M chose to withhold its knowledge from its customers and the public, even as its knowledge of the dangers of PFAS continued to grow.

123. By the 1970s, 3M researchers had documented PFAS in fish and were aware that its PFAS Products were hazardous to marine life.

124. In 1970, outside researchers conducted toxicity testing of 3M's Light Water line of PFAS-containing firefighting foam and found it to be "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

125. In 1972, toxicity tests conducted with 3M's Light Water foam on bluegill, grass shrimp, fiddler crab, and mummichog further confirmed PFAS's toxicity. After exposure to a 33.4 mg/l concentration of Light Water foam, 100 percent of bluegills died.

126.    By the 1970s, 3M was concerned about the risks posed to the general population by exposure to its fluorochemicals.

127.    In 1975, 3M learned there was a "universal presence" of PFAS in human blood samples taken from across the United States. After reporting organic fluorine compounds in blood bank samples taken from around the United States at levels corresponding to approximately forty-five ppb, one of the researchers who made this discovery contacted the company to see if it knew of "possible sources" of the chemicals, inquiring about consumer products like Teflon and Scotchgard. 3M's scientists concluded internally that the fluorine compounds resembled 3M's own PFAS, but "plead ignorance" to the researcher, misled him by "advis[ing] him that 'Scotchgard' was a polymeric material not a [fluorochemical]," and did not share this information outside the company.

128.    In 1976, 3M began monitoring the blood of its employees for the presence of PFAS because the company was concerned about potential health effects. For example, workers at 3M's Chemolite plant in Cottage Grove, Minnesota, were found in June 1976 to have blood PFAS levels at "1,000 times normal."

129.    During the late 1970s, 3M's internal studies continued to demonstrate the environmental persistence and severe toxicity of the company's chemicals.

130.    In 1978, a 3M study warned that PFAS "are likely to persist in the environment for extended periods" and that they were "shown to be completely resistant to biodegradation."

131.    In 1978, 3M conducted multiple PFOS and PFOA studies in monkeys and rats. The studies showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested. Results of a ninety-day animal study conducted by 3M in 1978 indicated that PFAS "should be regarded as toxic."

25

132.    In 1978, 3M had to abort a study when all of the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of the chemical.

133.    In 1979, an internal 3M report discussing the studies on PFOS and PFOA toxicity to animals stated that the compounds were "more toxic than anticipated" and recommended that "lifetime rodent studies should be undertaken as soon as possible."

134.    In 1979, a 3M study reported that one of 3M's fluorosurfactants was found to be completely resistant to biological test conditions and that it appeared waterways were the "environmental sink" for the fluorosurfactants.

135.    In 1979, 3M studies documented PFAS in fish taken from the Tennessee River in the proximity of 3M's plant in Decatur, Alabama, with the "definite conclusion" that PFAS "do appear to bioaccumulate in river fish under natural conditions."

136.    With mounting evidence that its PFAS were toxic, persistent, and mobile in the environment, concerns were growing internally at 3M about the possible risks to its employees.

137.    A 1979 memo from an employee in 3M's medical department concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure." That same year, an outside researcher recommended additional testing and told 3M that reducing employees' exposure to PFAS "should have top priority."

138.    By 1979, Old DuPont and 3M were sharing research on the effects of PFAS to determine the risk to their employees.

139.   In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure." This was based on internal research showing that PFAS compounds were causing birth defects in rats.

140.   In 1983, 3M Environmental Laboratory scientists advocated for funding to perform an ecological risk assessment of fluorochemicals and argued that concerns about PFAS give rise to "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment." No testing was authorized in response to the proposed plan.

141.   In 1984, 3M's internal analyses documented increasing levels of fluorochemicals in 3M workers, concluding that potential uptake of fluorochemicals was exceeding excretion capabilities of the body. The bioaccumulation of fluorochemicals in 3M's employees was occurring despite the protective measures already taken.

142.   In 1987, 3M shared with Old DuPont the results of a two-year study where rats were fed a diet with added fluorochemicals, resulting in the growth of cancerous tumors. The data from the study spurred subsequent discussions where Old DuPont scientists questioned whether they were required to label the fluorochemicals as carcinogens in animals. Old DuPont would perform its own follow-up study and summarized the results in a TSCA 8(e) letter to the EPA, which was also sent to 3M.

143.   In 1989, a review of mortality data among 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

144.    In 1996, 3M employees visited Washington Works in Parkersburg, West Virginia for discussions with Old DuPont about finding replacements for their fluorochemicals. At a prior meeting in May 1995, the companies had set a goal of finding a replacement by 2000.

145.    In 1998, a 3M environmental specialist prepared an ecological risk assessment which evaluated whether PFOS concentrations accumulating up the food chain were similar to concentrations that cause adverse effects, determining that ambient environmental levels of PFOS posed a substantial risk to marine mammals.

146.    By the late 1990s, 3M's own toxicologist had calculated a "safe" level for PFOS in human blood to be 1.05 ppb, at a time when 3M was well aware that the average level of PFOS found in the blood of the general population of the United States was approximately thirty times higher than this "safe" blood level. 3M did not disclose this information for more than two decades.

147.    Despite decades of knowledge about the ubiquity and toxicity of its PFAS, 3M only shared its concerns with EPA beginning in May 1998, with the submission of a TSCA 8(e) letter for PFOS. However, that submission downplayed concerns about the environmental impacts of PFAS, as described by a 3M employee:

> Just before that submission we found PFOS in the blood of eaglets – eaglets still young enough that their only food consisted of fish caught in remote lakes by their parents. This finding indicates a widespread environmental contamination and food chain transfer and probably bioaccumulation and bio-magnification. This is a very significant finding that the 8e reporting rule was created to collect. 3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information.

148.    The same 3M employee, environmental specialist Dr. Rich Purdy, in his resignation letter in 1999 called PFOS "the most insidious pollutant since PCB [polychlorinated biphenyl]. It is probably more damaging than PCB because it does not degrade, whereas PCB does; it is more

toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Dr. Purdy sent his resignation letter to the EPA, effectively blowing the whistle on 3M's harmful and illegal activities.

149.    In 2000, under pressure from the EPA, 3M announced that it would phase out production of PFOS, PFOA, and certain related products. The press release stated that "our products are safe" and cited the company's "principles of responsible environmental management" as the reason to cease production.

150.    The same day as 3M's announcement, the EPA issued a press release about 3M's phaseout stating "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

151.    In 2006, EPA cited 3M for 244 violations of the Toxic Substances Control Act, accusing 3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk information." 3M was fined $1.52 million for these violations.

**2.      DuPont Defendants Have Known for Decades of PFAS's Health and Environmental Risks**

152.    In the 1950s, Old DuPont began using PFOA and other PFAS in its specialty chemical applications, including household products like Teflon, and supplied PFAS Products to third parties for use in manufacturing.

153.    Old DuPont quickly thereafter developed an understanding of the dangers of using these chemicals. Rather than warn the public or its consumers about these risks, Old DuPont covered up this information and promoted its PFAS-related products as safe.

154.    During this time, Old DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that the PFAS

present in Teflon and its other specialty chemical products would proliferate and contaminate the environment. Old DuPont was further aware that industrial facilities related to products like Teflon emitted and discharged PFOA and other PFAS into the environment in large quantities and that scores of people had been exposed to its PFAS, including via public and private drinking water supplies.

155.    In approximately 1951, Old DuPont started using PFOA in making Teflon for industrial uses at its Washington Works manufacturing plant in Parkersburg, West Virginia. As early as 1954, employees at Old DuPont's Washington Works plant reported that PFOA might be toxic. In 1961, seven years later, Teflon-coated consumer products hit the marketplace.

156.    By 1961, Old DuPont scientists were issuing internal warnings about the toxicity associated with PFOA, after testing with PFOA led to enlarged livers – "the most sensitive sign of toxicity" – in rats, rabbits, and dogs. Old DuPont's Toxicology Section Chief cautioned that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

157.    In 1964, a group of Old DuPont employees working in Teflon manufacturing became sick after their department was moved to a more enclosed workspace. They experienced chills, fever, difficulty breathing, and a tightness in the chest – symptoms referred to variously as "polymer-fume fever," "Teflon flu," or simply, "the shakes." Polymer-fume fever was first reported in the medical literature in 1951.

158.    In 1965, Old DuPont sponsored a study where rats were fed a PFAS compound over a ninety-day period. Necropsies revealed discoloration of the liver, increased liver and kidney weight, and increased spleen size.

159.    As early as 1966, Old DuPont was aware that PFOA could leach into groundwater.

160.    In 1970, an internal memo stated that Old DuPont's internal laboratory had found PFOA to be "highly toxic when inhaled and moderately toxic when injected."

161.    In 1973, Old DuPont scientists issued results from a study showing that PFOA caused adverse liver reactions in rats and dogs.

162.    In 1975, Old DuPont toxicologists met with 3M employees to discuss the possible toxic effects of PFAS in food products. 3M provided Old DuPont with the results of its toxicity testing on rats and the companies discussed continued sharing of research.

163.    By 1976, Old DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers believed could be a potential result of human exposure to PFAS.

164.    In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFAS, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

165.    In 1979, Old DuPont scientists issued an internal summary of PFOA toxicity testing conducted on various animal species; PFAS-exposed rats showed liver enlargement at low doses, and some were observed to have "corneal opacity and ulceration" that remained for up to forty-two days after. The scientists reported these chemicals to be "highly toxic when inhaled." The chemical was also administered in a single dose of 450 mg to two dogs, who died within two days after ingestion and who showed increased plasma enzyme levels "indicative of cellular damage."

166.    By 1979, Old DuPont had data indicating that, not only was organic fluorine/PFAS building up in the blood of its exposed workers, but those workers exposed to PFAS had a significantly higher incidence of health issues than did unexposed workers.

167.    In 1980, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that "people accumulate [PFOA]" in their tissues, and that "continued exposure is not tolerable."

168.    By the 1980s, Old DuPont not only knew that PFAS accumulated in humans, but it was also aware that PFAS could cross the placenta from an exposed woman to her fetus. Old DuPont concealed its knowledge of the connection between PFAS and birth defects and chose to mislead its employees about the risks they faced.

169.    By 1981, Old DuPont had obtained a 3M internal study that documented birth defects in the eyes of unborn rats exposed to PFAS in utero and urged female workers who came into contact with PFAS to consult their doctors "prior to contemplating pregnancy." Contemporaneously with 3M, Old DuPont reassigned "female employees of childbearing capability" from jobs where they would be in direct contact with PFAS.

170.    In 1981, Old DuPont began secretly monitoring female employees who had been exposed to PFOA and conducted blood sampling of those who were pregnant or recently pregnant. Of the eight women who gave birth during this time period, two of the eight gave birth to children with birth defects in their eyes or face, and a third child had PFOA in the umbilical cord. As Old DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question – does [PFOA] cause abnormal children?" The results of the research were described as "statistically significant." Old DuPont abandoned the study without informing regulators or employees.

171.    The observations in the pregnancy monitoring were consistent with 3M's rat study, and in March 1981 Old DuPont had a pathologist and a birth defects expert review the 3M study. They concluded that "the study was valid" and that "the observed fetal eye defects were due to [PFOA]."

172.    Later in 1981, Old DuPont informed their employees "based on our review of the results of the further studies, it does not seem that the observed effects on the eyes of the unborn rats were due to [PFOA]."

173.    Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed its data confirming the transplacental movement of PFOA in humans.

174.    In 1982, Old DuPont's medical director warned in a confidential memo about employees being exposed to potentially dangerous levels of PFOA. He recommended that "available practical steps be taken to reduce this exposure."

175.    In addition to its knowledge of PFOA's toxicity dating back to the 1960s, Old DuPont was also aware that PFAS were capable of contaminating the surrounding environment, leading to human exposure. In 1984, Old DuPont secretly sent employees to obtain drinking water samples from surrounding communities. The results showed that PFOA released from its manufacturing operations was contaminating local drinking water supplies in Lubeck, West Virginia and Little Hocking, Ohio, but Old DuPont said nothing to regulators or the affected communities.

176.    In 1984, after obtaining data on these releases and the consequent contamination near Old DuPont's Washington Works plant in West Virginia, Old DuPont held an internal meeting at its corporate headquarters in Wilmington, Delaware to discuss health and environmental issues

33

related to PFOA. Old DuPont's management was concerned about "[PFOA] exposures off plant as well as to our customers and the communities in which they operate." Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will most likely take a position of total elimination" of PFOA use in Old DuPont's business and that these departments had "no incentive to take any other position."

177.    Nevertheless, Old DuPont not only decided to keep using and releasing PFOA, but affirmatively misrepresented to regulators, the scientific community, and the public that its PFOA releases presented no risks to human health or the environment. Old DuPont continued to use PFOA for almost thirty years after the meeting.

178.    In an October 20, 1986, memorandum, an Old DuPont employee stated that Old DuPont's management in Wilmington, Delaware, was "concerned about the possible liability resulting from long-term [PFOA] exposure to our employees and to the population in the surrounding communities and those downriver from the [Washington Works] plant."

179.    In 1988, Old DuPont began treating PFOA internally as a possible human carcinogen.

180.    In 1999, Old DuPont received preliminary results from a study showing that PFOA caused monkeys to lose weight and increased their liver size. Even monkeys given the lowest doses suffered liver enlargement, and one became so ill it had to be euthanized.

181.    After being sued by a West Virginia farmer in 1999, an internal Old DuPont memorandum regarding its litigation strategy shows that Old DuPont sought to "not create [the]

impression that DuPont did harm to the environment" and wanted to "keep [the] issue out of the press as much as possible."

182.    In 2000, John R. Bowman, an in-house counsel for PFOA issues, wrote an email to several colleagues: "I think we need to make more of an effort to get [Old DuPont] to look into what we can do to get the Lubeck community a clean source of water or filter the [PFOA] out of the water." He continued:

> I think we are more vulnerable than the MTBE defendants [manufacturers of another notorious groundwater contaminant, MTBE] because many states have adopted a drinking water guideline for MTBE and it is not biopersistent. My gut tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful.

> We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives. [Bernard Reilly, another DuPont attorney] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject. Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the bio-persistence of this chemical.

183.    In a 2001 email, in-house lawyer Bernard Reilly described Old DuPont's response to the [PFOA] issue as "a debacle at best." Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Mr. Reilly wrote, "[t]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

184.    Notwithstanding its internal knowledge of PFOA's health and environmental risks from as early as the 1950s, Old DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with [PFOA] exposure," and that "[PFOA] is not a human health issue."

185.    Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. An ERB member called such statements "[s]omewhere between misleading and disingenuous." For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

186.    In October 2006, contrary to ERB's advice, Old DuPont's chief medical officer issued a press release stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

187.    In 2004, EPA filed an administrative enforcement action against Old DuPont for its failure to disclose toxicity and exposure information for PFOA, in violation of TSCA and the Resource Conservation and Recovery Act ("RCRA"). Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and undertake supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

188.    At about the time this penalty was issued, Old DuPont was making approximately $1 billion a year in revenue from products containing PFOA.

### 3.    Defendants Suppressed Information about the Risks of PFAS, Deceived Consumers and Regulators, and Failed to Act on their Knowledge

189.    Despite their knowledge of the harms of their products, Defendants actively sought to suppress scientific research on the hazards associated with PFAS and mounted a campaign to control the scientific dialogue on the risks of PFAS.

190.     Through their roles as the designers, manufacturers, marketers, distributors, and sellers of PFAS Products, Defendants had considerable influence over the information available to their customers, environmental regulators, and the general public. Defendants had a vested financial interest in exercising this influence to conceal the true harmful nature of PFAS, in spite of their obligations to provide this information and to be truthful in advertising.

191.     In internal documents and testimony made public, Defendants evidenced an intentional corporate strategy to "shape the debate at all levels." One consultant retained by Old DuPont to work on PFAS issues outlined the company's goal in a 2003 proposal to:

> [C]reate the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating *Daubert* precedent to discourage additional lawsuits . . . . This battle must be won in the minds of the regulators, judges, potential jurors, and the plaintiff's bar . . . . Manufacturers must be the aggressors.

192.     Defendants' efforts to suppress knowledge of the harms of PFAS began as soon as evidence of its toxicity began to emerge, when the Defendants marked scientific studies and related documents as "confidential," withholding their disclosure in spite of the obvious public interest and evidencing an awareness of legal liability. As 3M's Dr. Rich Purdy wrote:

> 3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process. This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions.

193.     3M used a variety of tactics to deceive others and to hide the negative effects of PFAS. In Dr. Rich Purdy's letter of resignation from 3M, he detailed, among other things: 3M's tactics to prevent research into the adverse effects of its PFOS; 3M's submission of misinformation about its PFOS to EPA; 3M's failure to disclose substantial risks associated with its PFOS to EPA; 3M's failure to inform the public of the widespread dispersal of its PFOS in

the environment and population; 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain; and 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

194. 3M intentionally withheld scientific information about the material risks of its PFAS Products. When researchers Guy and Taves contacted 3M in 1975 about the "universal presence" of organic fluorine in compounds in blood among the general population, 3M "plead ignorance," misled them by "advis[ing] him that 'Scotchgard' was a polymeric material not a [fluorochemical]," and took a position of "scientific curiosity and desire to assist in any way possible." 3M directed its Central Analytical Laboratory (CAL) to conduct similar sampling from blood banks, from which an internal report concluded that the organic fluorine compounds "resembled most closely" PFOS, confirming the suspicions held by the 3M researchers. Subsequent 3M research in 1976 confirmed that the compounds found in human blood by Guy and Taves were PFOS manufactured by 3M.

195. Guy and Taves proceeded to author a paper in 1979 speculating that the detected compounds were POAA (an ammonium salt of PFOA) and sent the paper to CAL for review. Despite its internal knowledge that the compounds were PFOS and its pledge to "assist in any way possible," 3M withheld the identity of the compound at the urging of its lawyers. 3M facilitated the misdirection through two studies authored by the same CAL scientists who internally identified PFOS in the blood bank samples; one study published in 1979 "suggest[ed] the accuracy of Guy and Taves' conclusions about the identity of the [organic fluorine] found in blood," and a second in 1981 stated that the detected compounds were instead a naturally occurring substance.

196.     3M withheld material scientific information from government agencies as well. From the 1970s, 3M conducted over a thousand studies related to the properties of PFAS and its effects on human health and the environment. These studies should have been disclosed to the EPA, pursuant to TSCA Section 8(e), but from 1980 to 1993, 3M submitted only eighty-four studies or reports to the EPA. From 1998 to 2000, 3M submitted over 1,218 studies or reports, many of which had been prepared decades earlier.

197.     Even after 3M's phaseout, the company worked to control and to distort the science on PFAS. When 3M revealed in 1998 that PFOS was in the blood of the general population, it developed a "Science Publication Strategy" to simultaneously publish select studies in academic journals to create a "context which demonstrates that there is no medical or scientific basis to attribute any adverse health effects to 3M products." Meanwhile, Dr. John Butenhoff, 3M's Manager of Corporate Toxicology, had already calculated a "safe" level of PFOS in human blood of 1.05 ppb and he reported internally that 3M needed to replace "PFOS-based chemistry as these compounds [are] **VERY** persistent and thus insidiously toxic."

198.     3M's PFAS strategy included providing "[s]elective funding of outside research through 3M 'grant' money," including millions of dollars to a professor, John Giesy, who publicly presented himself as an independent expert but behind the scenes worked for 3M by reviewing articles submitted to academic journals for publishing. Dr. Giesy's goal, as expressed in a March 25, 2008, email, was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations they can be a large obstacle to refute." The deceptive intentions of 3M and Dr. Giesy were further evidenced by his assurances to his benefactor that he acted to ensure "there was no paper trail to 3M."

199.    Similarly, Old DuPont conducted its own studies of the toxicity of PFOA but did not communicate the results to the public or to regulators. Old DuPont understood the nature of PFAS, the significance of its concentrations, and the hazards it presented to the company's employees, the public, and the environment.

200.    Despite its knowledge, Old DuPont continued to manufacture PFAS while it actively suppressed scientific awareness of the hazards of its products.

201.    By the late 1990s, Old DuPont understood its substantial liability exposure from its decades of releasing toxic PFAS into the environment. Internally, its employees expressed concerns that "toxicity issues associated with [PFOA] exposure could turn it into the #1 DuPont torte [sic] issue."

202.    These liability concerns extended to their interactions with regulators and their misleading disclosures. Old DuPont lawyer Bernard Reilly said in 2001:

> [O]ur analytical technique [for measuring PFOA in water] has very poor recovery, often 25%, so any results we get should be multiplied by a factor of 4 or 5. However, that has not been the practice, so we have been telling the agencies results that surely are low. Not a pretty situation, especially since we have been telling the drinking water folks not to worry, results have been under the level we deem "safe" of 1 ppb.

> [W]e are exceeding the levels we say we set as our own guideline, mostly because no one bothered to do the air modeling until now, and our water test has [been] completely inadequate . . . . I have been telling the business to get out all the bad news . . . . Too bad the business wants to hunker down as though everything will not come out in the litigation, god knows how they could be so clueless.

203.    After EPA learned of the hazards of PFAS, the agency filed administrative actions against 3M and Old DuPont for concealing their knowledge in violation of federal law.

204.    In December 2005, Old DuPont settled with the EPA to pay approximately $16.5 million to resolve TSCA and RCRA claims alleged in two complaints filed by the agency in July 2004 and December 2004. Those claims included "multiple failures to report information to EPA

about substantial risk of injury to human health or the environment from a chemical during a period beginning in June of 1981 through March of 2001."

205.    In April 2006, 3M settled with the EPA to pay approximately $1.5 million to resolve 244 separate counts under TSCA related to PFOS and PFOA, following a company-wide audit.

206.    Once EPA was first alerted to the health hazards of PFAS in 1998 and received a late disclosure of over 1,200 reports and studies, the EPA and the general scientific community commenced significant scientific inquiries into the nature of these chemicals. Since then, the scientific community has produced a substantial body of research, with some years exceeding 1,000 published studies on PFAS. The extraordinary number of studies which have been conducted in the last two decades reflect the profound lack of knowledge held by the government and the general scientific community about the properties and risks of PFAS, as a consequence of Defendants concealing and suppressing knowledge and research for decades. Defendants sought to exploit that lack of knowledge to preserve their PFAS and related business lines.

207.    Acting for commercial gain, Defendants manipulated, obfuscated, and failed to disclose scientific studies and results relating to the persistence, bioaccumulation, and toxicity of their PFAS Products. Defendants deceptively sought to mislead their customers about the safety of their PFAS Products for environmental and human health and thereby delay the adoption of safe or safer alternatives to PFAS Products.

208.    Consequently, PFAS Products are still being released into the sediments, soils, and waters of the State, harming the environment and endangering human health.

**E.    DuPont Defendants Executed a Fraudulent Scheme to Isolate Their Assets from Their PFAS Liabilities and Hinder Creditors**

209.    As regulators and the public became aware of the hazards presented by PFAS, Old DuPont planned and executed a series of corporate restructurings, beginning in or about 2013

and continuing through at least June 2019, designed to shield its assets from its substantial environmental liabilities, especially those arising from PFOA and other PFAS contamination.

210.    By 2013, Old DuPont knew, or reasonably should have known, that it had a potential cumulative liability of billions of dollars arising from its PFAS-related activities.

211.    Since at least 1999, when members of the Tennant family sued Old DuPont in West Virginia federal court for contaminating their property with PFOA wastes from a landfill, Old DuPont has been subject to mounting litigation arising from its half-century of designing, manufacturing, marketing, distributing, and/or selling of PFAS.

212.    In 2005, a West Virginia court approved a settlement from a class action lawsuit filed against Old DuPont on behalf of 70,000 Ohio and West Virginia residents who were exposed to PFOA discharged by Old DuPont from Washington Works.

213.    Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which diseases were linked to PFOA exposure; to filter local water from impacted public and private drinking water supplies; and to pay up to $235 million for medical monitoring of the affected community for any diseases that the Science Panel linked to PFOA exposure. The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest whether the class members' exposure to PFOA could have caused each of the linked diseases.

214.    By 2012, after seven years of analysis, the Science Panel confirmed "probable links" between exposure to PFOA and the following serious human diseases: medically diagnosed high cholesterol; ulcerative colitis; pregnancy induced hypertension; thyroid disease; testicular cancer; and kidney cancer.

215.     After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of those linked diseases under the terms of the 2005 class settlement. In 2013, these claims were consolidated in federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the U.S. District Court for the Southern District of Ohio ("Ohio MDL"). Forty bellwether trials were scheduled to take place in 2015 and 2016.

216.     The first three trials in the Ohio MDL ended in verdicts for the plaintiffs. Each jury awarded damages in a larger amount than the one before it—the first awarded $1.6 million, the second awarded $5.6 million, and the third awarded $12.5 million. The second and third jury awards included punitive damages. Old DuPont then settled the remaining, pending claims for $670.7 million.

217.     Old DuPont knew, or should have known, prior to and following the Ohio MDL trials, that it faced substantial liability for personal injury and environmental claims related to PFOA and other toxic PFAS contamination caused by its manufacturing operations and that its liability likely measured in the billions of dollars.

218.     On information and belief, including but not limited to a complaint filed by Chemours in Delaware, Old DuPont commenced an internal initiative, in or about 2013, where Old DuPont's management would restructure the company to evade responsibility for the widespread environmental harm that Old DuPont's actions had caused and shield billions of dollars in assets from those liabilities. This initiative was referred to internally as "Project Beta."

219.     In furtherance of possible restructuring opportunities, including potential mergers, Old DuPont and Old Dow began to discuss a possible "merger of equals" in or about 2013.

220. On information and belief, including but not limited to a complaint filed by Chemours in Delaware, Old DuPont recognized that Old Dow or any other rational merger partner would never agree to a transaction that would expose it to the substantial PFAS and other environmental liabilities held by Old DuPont.

221. Accordingly, Old DuPont's management executed a three-step corporate restructuring specifically orchestrated to shield Old DuPont's valuable tangible assets from creditors of its substantial environmental liabilities and to convince Old Dow to accept the proposed merger.

222. Old DuPont's restructuring plan consisted of (1) Old DuPont's attempt to cast off its massive environmental liabilities onto Chemours and spinning off Chemours as a separate publicly traded company; (2) the creation of New DuPont to facilitate a purported merger with Old Dow; and (3) a series of internal restructurings and divestitures that culminated with the spin-off of Old DuPont to its newly formed parent, Corteva.

223. The first step (the "Chemours Spin-off") in Old DuPont's fraudulent scheme was to transfer its performance chemicals business, which included Teflon and other products ("Performance Chemicals Business"), into its wholly owned subsidiary, Chemours. Then, in July 2015, Old DuPont saddled Chemours with Old DuPont's massive environmental liabilities and "spun off" Chemours as a separate, publicly traded entity.

224. On information and belief, Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it had forced upon Chemours. Old DuPont also knew that the Chemours Spin-off alone would not fully insulate its assets from PFAS liability because Old DuPont still faced direct liability for its own conduct.

225. The second step (the "DowDuPont Merger") involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old

DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

226.   In the third step (the "DowDuPont Separation"), DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures," which transferred, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont and culminated in DowDuPont spinning off two new publicly traded companies: Corteva, which currently holds Old DuPont as a subsidiary, and New Dow, which currently holds Old Dow as a subsidiary. DowDuPont was then renamed DuPont de Nemours, Inc. (i.e., New DuPont).

227.   As a result of this restructuring, between December 2014 (before the Chemours Spin-off) and December 2019 (after the DowDuPont Separation), the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately one-half.

228.   New DuPont, New Dow, and Corteva now hold a significant portion of the tangible assets that Old DuPont formerly owned.

229.   Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. On information and belief, Old DuPont, New DuPont, New Dow, and Corteva are concealing from creditors, such as the State, the details of where Old DuPont's valuable assets were transferred and of the inadequate consideration that Old DuPont received in return.

230.   In greater detail, the restructuring scheme was implemented as follows.

**1.      Step One: The Chemours Spin-off**

231.   In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary.

232.     In April 2015, Chemours was converted from a limited liability company to a corporation named "The Chemours Company," in preparation for the July 2015 Spin-Off.

233.     At the time of the Spin-off, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFOA into the environment.

234.     During the Spin-Off preparations, the Chemours Board consisted exclusively of three Old DuPont employees who would not remain with Chemours following the Spin-off – DuPont's M&A Counsel, Nigel Pond; DuPont's Treasury Manager, Michael Heffernan; and DuPont's M&A Manager, Steven Zelac. A fourth board member was appointed on June 19, 2015, who had served on Old DuPont's board of directors for the prior seventeen years.

235.     During the Spin-off preparations, Chemours did not have procedural protections to effectuate a meaningful, arm's-length negotiation of the Spin-off, such as a Board or management independent of Old DuPont. Old DuPont also did not allow Chemours or its DuPont-selected prospective management team to have independent counsel to represent Chemours's interests in structuring the Chemours Spin-off – all documents for the Chemours Spin-off were prepared by Old DuPont and its outside counsel.

236.     To effectuate the Chemours Spin-off, a separation agreement (the "Chemours Separation Agreement") between Old DuPont and Chemours was executed on June 26, 2015, by Nigel Pond on Chemours's behalf, acting in the temporary role of "Vice President" of Chemours.

237.     Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including thirty-seven active chemical plants.

238.    At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature, value of probable maximum loss, and anticipated timing of the liabilities that Chemours assumed are not publicly available.

239.    The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "[a]ny and all Liabilities relating to, arising primarily out of or resulting primarily from, the operation or conduct of the [Performance Chemicals] Business, as conducted at any time," including "any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historical liabilities relating to and arising from its decades of emitting PFAS and related products into the environment. The indemnification provision is uncapped and does not have a survival period.

240.    Under the Chemours Separation Agreement, Chemours must indemnify Old DuPont against and assume for itself the Chemours Liabilities regardless of (1) when or where such liabilities arose; (2) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Spin-off; (3) where or against whom such liabilities are asserted or determined; (4) whether such liabilities arise from or are alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (5) the accuracy of the maximum probable loss values assigned to such liabilities; and (6) which entity is named in any action associated with any liability.

241.    In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

242.    Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would assume, Old DuPont also caused Chemours to transfer to Old DuPont on July 1, 2015, a "dividend" of $3.9 billion – approximately $3.4 billion in cash, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

243.    Old DuPont required Chemours to fund the dividend through financing transactions, including senior secured term loans and senior unsecured notes, totaling approximately $3.995 billion, entered into on May 12, 2015.

244.    Chemours distributed approximately $3 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

245.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spin-off were unavailable to creditors with current or future PFAS claims, like those of the State, and Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours transferred almost $7 billion in stock, cash, and notes to Old DuPont and its shareholders. Old DuPont, however, transferred only $4.1 billion in net assets to Chemours and saddled the fledgling company with many billions of dollars in PFAS and other liabilities.

246.    On July 1, 2015, Old DuPont completed the spin-off of Chemours, and Chemours became a separate, publicly traded entity.

247.    Shortly after the Chemours Spin-off, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

248.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spin-off, Chemours was thinly capitalized and unable to satisfy the substantial liabilities it had assumed from Old DuPont. Indeed, Chemours disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

249.    The Chemours Spin-off was so one-sided that in May 2019, Chemours sued Old DuPont, New DuPont, and Corteva in Delaware Chancery Court. *See Chemours Company v. DowDuPont, C.A. No. 2019-0351 (Del. Ch. Ct., filed May 13, 2019)*.

250.    In its Amended Complaint Chemours alleged that the primary motivation for the Chemours Spin-off, the subsequent creation of New DuPont, and the final separation of Corteva was to enable Old DuPont to "wash its hands of its environmental liabilities."

251.    Chemours also alleged, among other things, that if the full value of Old DuPont's PFAS and environmental liabilities were properly estimated, and if the Delaware court did not limit the liability that the Chemours Separation Agreement imposed on it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

252.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. Following the Spin-off, Chemours reported in its 2015 Annual Report that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

253.    In the 2015 Annual Report, removing Chemours's goodwill and other intangibles of $176 million yields tangible net worth of negative $46 million (that is, Chemours's liabilities were greater than its tangible assets).

254. Chemours reported that these liabilities included $454 million in "other accrued liabilities," which included $11 million for accrued litigation and $68 million for environmental remediation. Chemours had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

255. This report significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS contamination, which Old DuPont and Chemours knew or should have known would be billions of dollars.

256. For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the Ohio MDL brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

257. Had Chemours accounted for the full extent of Old DuPont's legacy liabilities, as it should have done, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at the time of the Chemours Spin-off.

### 2. Step Two: The DowDuPont Merger

258. After the Chemours Spin-off, Old DuPont took the position that it was no longer responsible for the widespread PFAS contamination that it had caused. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals Business rested solely with Chemours, not Old DuPont.

259.    Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spin-off. On information and belief, Old DuPont knew that it could still face exposure for PFAS liabilities. So Old DuPont moved to the next phase of its fraudulent scheme.

260.    On December 11, 2015, less than six months after the Chemours Spin-off, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spin-offs, each of which would occur eighteen to twenty-four months following the closing of the merger.

261.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc. (i.e., New DuPont) – and the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

262.    Thus, as a result of the merger, and in accordance with the Dow-DuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

263.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont.

### 3. Step Three: The DowDuPont Separation

264. Following the merger, New DuPont (DowDuPont) underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

265. While much of the details of these transactions were hidden from the State and other creditors, it is apparent that the transactions were intended to further frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

266. Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to New DuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: the "Agriculture Business"; the "Specialty Products Business"; and the "Materials Science Business."

267. While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to New DuPont for less than the assets were worth.

268. Once the assets of Old DuPont and Old Dow were combined and reorganized, New DuPont incorporated two new companies to hold two of the three newly formed business lines. Corteva became the parent holding company of Old DuPont, which in turn holds the Agriculture Business. New Dow became the parent holding company of Old Dow and holds the Materials

Science Business. New DuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

269.    The mechanics of the separations are governed by the April 1, 2019, Separation and Distribution Agreement among Corteva, New Dow, and New DuPont (the "DowDuPont Separation Agreement").

270.    The DowDuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions of Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

271.    Corteva, New Dow, and New DuPont likewise retained the liabilities primarily related to the business divisions that they retained. In particular, Corteva retained and assumed the liabilities related to the Agriculture Business, New DuPont retained and assumed the liabilities related to the Specialty Products Business, and New Dow retained and assumed the liabilities related to the Materials Science Business.

272.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including, on information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement. These assumed PFAS liabilities are allocated on a pro rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated seventy-one percent to New DuPont and twenty-nine percent to Corteva.

273.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the State's claims in this case.

274.    The separation of New Dow was completed on or about April 1, 2019, when New DuPont distributed all of New Dow's common stock to New DuPont stockholders as a pro rata dividend.

275.    New DuPont then consolidated the Agricultural Business line into Old DuPont and "contributed" Old DuPont to Corteva.

276.    On June 1, 2019, New DuPont spun off Corteva as an independent public company, when New DuPont distributed all of Corteva's common stock to New DuPont stockholders as a pro rata dividend.

277.    Corteva now holds 100 percent of the outstanding common stock of Old DuPont.

278.    Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc. (i.e., New DuPont).

279.    On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

**F.      The Effect of the Years-Long Conspiracy to Defraud the State and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities**

280.    The net result of these transactions was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont, New Dow, and Corteva for far less than the assets are worth.

281.    Old DuPont estimated that the DowDuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

282.    SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

283.    For example, for the 2014 fiscal year, prior to the Chemours Spin-off, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128 percent in net income and a decrease of seventy-three percent in annual operating cash flow.

284.    Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (a/k/a Earnings Before Tax, or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

285.    The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the 2014 fiscal year, prior to the Chemours Spin-off, Old DuPont owned nearly $41 billion in tangible assets. For the 2019 fiscal year, Old DuPont owned just under $21 billion in tangible assets.

286.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets, totaling $20 billion.

287.    As of September 2019, just after the Corteva separation, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were composed of intangible assets, including "goodwill" from its successive restructuring activities.

288.     At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva separation was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

289.     Old DuPont's tangible net worth between September 30 and December 31, 2019, declined even further, whereby Old DuPont ended fiscal year 2019 with tangible net worth of negative $1.125 billion.

290.     Neither New DuPont, New Dow, nor Corteva have publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that any of those entities will be able to satisfy future judgments.

291.     Indeed, New DuPont—to which seventy-one percent of Old DuPont's liabilities are allocated under the DowDuPont Separation Agreement once certain conditions are satisfied—has divested numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value.

292.     In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

293.     On or about December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion.

294.     In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

295.     The Chemours Spin-off, the DowDuPont Merger, and the DowDuPont Separation were part of a single coordinated fraudulent scheme to hinder, delay, and defraud Old DuPont's creditors. The Chemours Spin-off constitutes a fraudulent transfer, which entitles the State to, among other things, void the transaction and recover property or value transferred from

56

Chemours in the transaction. The DowDuPont Merger and DowDuPont Separation likewise constitute fraudulent transfers that entitle the State to, among other things, recover property and value transferred to New DuPont, New Dow, and Corteva.

## COUNT I
### (PUBLIC NUISANCE)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count I as if fully set forth herein.

296.     The Connecticut General Assembly has declared "that the pollution of the waters of the state is inimical to the public health, safety and welfare of the inhabitants of the state, is a public nuisance and is harmful to wildlife, fish and aquatic life and impairs domestic, agricultural, industrial, recreational and other legitimate beneficial uses of water." Conn. Gen. Stat. § 22a-422.

297.     The health, safety, and welfare of the citizens of Connecticut, including those affected by the contamination of Connecticut drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources is a matter of great public interest to the State.

298.     By their acts and omissions, Defendants have created a public nuisance which unreasonably and substantially interferes with public health, safety, and welfare and the environment and which obstructs the public's free use and comfortable enjoyment of Connecticut's natural resources for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

299.     Defendants designed, manufactured, marketed, distributed, and/or sold PFAS Products in a manner which created a public nuisance that is harmful to public health and obstructs the free use and enjoyment of Connecticut's natural resources.

300.     Defendants knew or should have known that their PFAS Products, as ordinarily used, were likely to end up contaminating drinking water, groundwater, surface water, fish, soil, sediment, and other natural resources.

301.     Defendants' conduct and the release of their PFAS Products onto State natural resources and property has a natural tendency to create danger and inflict injury upon persons and property.

302.     Defendants' conduct created and maintained, and continues to create and maintain, a public nuisance which interferes with public rights and with public health and safety.

303.     By their acts and omissions, Defendants' creation of the public nuisance was unreasonable and/or unlawful.

### COUNT II
### (TRESPASS)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count II as if fully set forth herein.

296.     The State has significant property interests in its natural resources and property, including its role as trustee of certain public trust resources which authorizes the State to take action to protect such natural resources from contamination and injury.

297.     The State owns in fee certain property within the State, including lands and some drinking water wells.

298.     The State also brings this action in its *parens patriae* capacity on behalf of its citizens to protect quasi-sovereign interests, including the integrity of the State's natural resources held in trust on behalf of its citizens. The State in its *parens patriae* capacity seeks relief for the invasion of these possessory interests by PFAS Products.

299.    Defendants' acts and omissions directly and proximately caused PFAS Products to intrude onto and contaminate State natural resources and property, including groundwater, surface waters, soils, sediments, and other natural resources and property.

300.    At the time of Defendants' acts and omissions, Defendants knew and understood, or should have known and understood, the properties of their PFAS Products, including through their knowledge and experience regarding contamination at their own facilities where they manufactured and/or used the PFAS Products. Defendants knew with substantial certainty that PFAS Products would intrude onto and contaminate State natural resources and property, including groundwater, surface waters, soils, sediments, and other natural resources and property. Despite this knowledge, Defendants designed, manufactured, marketed, distributed, and/or sold PFAS Products to the detriment of the State.

301.    Defendants actively concealed material information about the harms they were inflicting.

302.    The State never authorized Defendants' invasion of its natural resources and property with the PFAS Products.

303.    As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFAS Products and as a result the State's damages include without limitation damages to natural resources, wildlife, and property in Connecticut. The State has incurred and will continue to incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

## COUNT III
## (NEGLIGENCE)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count III as if fully set forth herein.

296.  Defendants owed a duty of care to the State of Connecticut and to all parties foreseeably injured by their PFAS Products, including, but not limited to, the exercise of reasonable care in the design, manufacture, marketing, distribution, and sale of their PFAS Products.

297.  Defendants breached that duty of care in the course of designing, manufacturing, marketing, distributing, and/or selling their PFAS Products because they knew or should have known that the PFAS Products are hazardous to State natural resources and property, including groundwater, surface waters, soils, sediments, and other natural resources and property, and would cause the State and other injured parties to suffer substantial damages and incur substantial expenditures.

298.  Defendants knew or should have known that: the use of PFAS Products in their intended manner would result in the discharge, disposal, or release of PFAS into the environment; PFAS are extremely persistent in the environment, very mobile, and highly soluble in water; when released, PFAS would contaminate property and natural resources located throughout Connecticut, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies; PFAS posed substantial risks to human health and the environment; and ultimately, PFAS would be difficult and costly to remove.

299.  Defendants were untruthful about their products, hid relevant information, and failed to disclose or were otherwise unforthcoming with relevant information about the characteristics and dangers of their PFAS Products.

60

300.    Despite the fact that Defendants knew or should have known that PFAS are toxic, persistent, mobile in the environment, and cause injury to human health and the environment, Defendants negligently designed, manufactured, marketed, distributed, and/or sold PFAS Products.

301.    These and other negligent acts by Defendants were a direct and proximate cause of widespread PFAS contamination in Connecticut and as a result the State's damages include without limitation damages to natural resources, wildlife, and property in Connecticut. Additionally, the State has incurred and will continue to incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

**COUNT IV**
**(Conn. Gen. Stat. § 22a-16 – CONNECTICUT ENVIRONMENTAL PROTECTION ACT)**

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count IV as if fully set forth herein.

296.    The General Assembly has found and declared that "there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same" and further "that it is in the public interest to provide all persons with an adequate remedy to protect the air, water and other natural resources from unreasonable pollution, impairment or destruction." Conn. Gen. Stat. § 22a-15.

297.    The Attorney General may "maintain an action in the superior court . . . for declaratory and equitable relief . . . for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction." Conn. Gen. Stat. § 22a-16.

61

298.    In such an action maintained by the Attorney General, the court may also order defendants to: "provide for the restoration of any natural resource or the investigation, remediation or mitigation of any environmental pollution on or at any real property which resource or property are unrelated to such action"; "provide for any other project approved by the Commissioner of Energy and Environmental Protection for the enhancement of environmental protection or conservation of natural resources"; or make a financial contribution to an environmental research project or to a State remediation fund. Conn. Gen. Stat. § 22a-16a.

299.    The natural resources of the State of Connection have been polluted and impaired with PFAS, including but not limited to, its air, soils, sediments, biota, surface water, estuaries, submerged lands, wetlands, groundwater, and drinking water.

300.    Defendants, through their acts and omissions as alleged herein, have unreasonably polluted, impaired, and/or destroyed the State's air, soil, sediment, biota, surface water, estuaries, submerged lands, wetlands, groundwater, drinking water, and other natural resources by releasing PFAS into the environment and allowing them to bioaccumulate, biomagnify, and persist in the State's natural resources.

301.    As a direct and proximate result of Defendants' acts and omissions as described herein, the State's natural resources have been unreasonably polluted, impaired, and/or destroyed.

302.    As a direct and proximate result of Defendants' acts and omissions as described herein, the State of Connecticut has incurred and will continue to incur substantial expenses and damages as set forth herein.

303.    The acts and omissions of the Defendants have caused PFAS contamination which amounts to unreasonable pollution, impairment, and/or destruction of the State's natural

resources, necessitating declaratory and equitable relief to protect the public trust under Conn. Gen. Stat. § 22a-16.

## COUNT V
### (Conn. Gen. Stat. § 22a-430 – DISCHARGE WITHOUT A PERMIT)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count V as if fully set forth herein.

296.  Under Conn. Gen. Stat. § 22a-430, "[n]o person or municipality shall initiate, create, originate or maintain any discharge of water, substance or material into the waters of the state without a permit for such discharge issued by the [CT DEEP] commissioner."

297.  "Waters" means "all tidal waters, harbors, estuaries, rivers, brooks, watercourses, waterways, wells, springs, lakes, ponds, marshes, drainage systems and all other surface or underground streams, bodies or accumulations of water, natural or artificial, public or private, which are contained within, flow through or border upon this state or any portion thereof." Conn. Gen. Stat. § 22a-423.

298.  Defendants, through their acts and omissions as alleged herein, have caused the discharge of PFAS into the waters of the state without a permit.

299.  As a result of Defendants' design, manufacturing, marketing, distribution, and/or sale of PFAS Products, highly mobile and polluting PFAS have been discharged into the waters of the State.

300.  As a result of Defendants' omissions, representations, and deceptions, highly mobile and polluting PFAS have been and continue to be discharged in the State of Connecticut either directly or indirectly into the waters of the state.

301.  As alleged herein, numerous waters of the state have been polluted and impaired by Defendants' PFAS.

302. Pursuant to Conn. Gen. Stat. § 22a-430(d), "[i]f the [CT DEEP] commissioner finds that any person or municipality has initiated, created or originated or is maintaining any discharge into the waters of the state without a permit . . . the commissioner may request the Attorney General to bring an action . . . to enjoin such discharge by such person or municipality until the person or municipality has received a permit from the commissioner or has complied with a permit which the commissioner has issued pursuant to this section, or for injunctive relief to remediate the effects of such discharge."

303. The Defendants have initiated, created, originated, or maintained a discharge to the waters of the State without a permit in violation of Conn. Gen. Stat. § 22a-430.

304. Pursuant to Conn. Gen. Stat. § 22a-438, any person who violates any provision of this chapter shall be assessed a civil penalty not to exceed twenty-five thousand dollars per day per violation to be fixed by the court, for each offense.

**COUNT VI**
**(Conn. Gen. Stat. § 22a-427 – POLLUTION OR DISCHARGE OF WASTES PROHIBITED)**

1-295. Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count VI as if fully set forth herein.

296. Under Conn. Gen. Stat. § 22a-427, "[n]o person or municipality shall cause pollution of any of the waters of the state or maintain a discharge of any treated or untreated wastes in violation of any provision of this chapter."

297. "Pollution" means "harmful thermal effect or the contamination or rendering unclean or impure or prejudicial to public health of any waters of the state by reason of any wastes or other material discharged or deposited therein by any public or private sewer or otherwise so as directly or indirectly to come in contact with any waters." Conn. Gen. Stat. § 22a-423.

298.     "Wastes" means "sewage or any substance, liquid, gaseous, solid or radioactive, which may pollute or tend to pollute any of the waters of the state." Conn. Gen. Stat. § 22a-423.

299.     "Waters" means "all tidal waters, harbors, estuaries, rivers, brooks, watercourses, waterways, wells, springs, lakes, ponds, marshes, drainage systems and all other surface or underground streams, bodies or accumulations of water, natural or artificial, public or private, which are contained within, flow through or border upon this state or any portion thereof." Conn. Gen. Stat. § 22a-423.

300.     Defendants, through their acts and omissions as alleged herein, have caused pollution of the waters of the state with PFAS from their PFAS Products.

301.     As a result of Defendants' design, manufacturing, marketing, distribution, and/or sale of PFAS Products, highly mobile and polluting PFAS have been discharged into the waters of the State.

302.     As a result of Defendants' omissions, representations, and deceptions, highly mobile and polluting PFAS have been and continue to be discharged in the State of Connecticut either directly or indirectly into the waters of the state.

303.     The discharge of PFAS into the waters of the state, or onto the lands of the state and from which the PFAS have traveled to the waters of the state, has contaminated and rendered various waters unclean and prejudicial to public health.

304.     As alleged herein, numerous waters of the state have been contaminated with PFAS.

305.     Pursuant to Conn. Gen. Stat. § 22a-438, any person who violates any provision of this chapter shall be assessed a civil penalty not to exceed twenty-five thousand dollars per day per violation, to be fixed by the court, for each offense.

## COUNT VII
### (Conn. Gen. Stat. § 22a-451 – LIABILITY FOR POLLUTION, CONTAMINATION, OR EMERGENCY)

1-295. Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count VII as if fully set forth herein.

296.     Under Conn. Gen. Stat. § 22a-451, "[a]ny person, firm, or corporation which directly or indirectly causes pollution and contamination of any land or waters of the state or indirectly causes an emergency through the maintenance, discharge, spillage, uncontrolled loss, seepage or filtration of . . . chemical liquids or solid, liquid or gaseous products or hazardous wastes or which owns any hazardous wastes deemed by the [CT DEEP] commissioner to be a potential threat to human health or the environment and removed by the commissioner shall be liable for all costs and expenses incurred in investigating, containing, removing, monitoring or mitigating such pollution and contamination, emergency or hazardous waste, and legal expenses and court costs incurred in such recovery."

297.     The cost and expenses which may be recovered under this section include "the administrative cost of such action calculated at ten per cent of the actual cost plus the interest on the actual cost at a rate of ten per cent per year thirty days from the date such costs and expenses were sought."

298.     Conn. Gen. Stat. § 22a-451 further provides that "if such pollution or contamination or emergency was negligently caused, such person, firm or corporation may, at the discretion of the court, be liable for damages equal to one-half times the cost and expenses incurred and provided further if such pollution or contamination or emergency was wilfully caused, such person, firm or corporation may, at the discretion of the court, be liable for damages equal to two times the cost and expenses incurred."

299.    As alleged herein, Defendants have caused pollution and contamination of the lands and waters of the State of Connecticut by PFAS.

300.    Defendants have created an emergency by directly and/or indirectly causing the maintenance, discharge, spillage, uncontrolled loss, seepage, or filtration of PFAS into or onto the lands and waters of the State of Connecticut.

301.    As alleged herein, there is widespread pollution and contamination of lands and water in the State by PFAS.

302.    The State has incurred and will continue to incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, as well as costs and expenses incurred responding to the PFAS pollution of non-State lands and waters.

303.    Defendants, through their acts and omissions, willfully caused the PFAS pollution and contamination and emergency. As alleged herein, Defendants had knowledge of the characteristics of PFAS and their PFAS Products and knew or reasonably should have known that the use of such products would injure the State and its citizens. Despite their knowledge, Defendants chose to conceal and misrepresent material facts about their PFAS Products and continued to supply those products to the State and others.

304.    As a consequence of Defendants' acts and omissions, Defendants are liable to the State under Conn. Gen. Stat. § 22a-451 for two times the cost and expenses incurred by the State responding to PFAS water pollution.

## COUNT VIII
## (Conn. Gen. Stat. § 22a-471(b)(4)B) – REIMBURSEMENT FOR PROVISION OF POTABLE DRINKING WATER)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count VIII as if fully set forth herein.

296.    Under Conn. Gen. Stat. § 22a-471(b)(4)(B), "any person or municipality responsible for pollution of the groundwaters" may be required to reimburse "the state, a water company, and any municipality" for "the expenses each incurred in providing potable drinking water to any person affected by such pollution."

297.    The cost and expenses which may be recovered under this section include "(i) the expenses each incurred in providing potable drinking water to any person affected by such pollution, provided the required reimbursement for such expenses shall not exceed the actual cost of short-term provision of potable drinking water and an amount equal to the reasonable cost of planning and implementing the most cost-effective long-term method of providing potable drinking water as determined by the [CT DEEP] commissioner and the Commissioner of Public Health; (ii) costs for recovering such reimbursement; (iii) interest on the expenses specified in (i) at a rate of ten per cent a year from the date such expenses were paid; and (iv) reasonable attorney's fees."

298.    Conn. Gen. Stat. § 22a-471(b)(5) further provides that "[f]or purposes of this section except . . . subparagraph (B)(ii) of subdivision (4) of this subsection, 'cost' includes only those costs that the [CT DEEP] commissioner determines are necessary and reasonable, including, but not limited to, the cost of plans and specifications, construction or installation and supervision thereof."

299.     As alleged herein, Defendants have caused pollution and contamination of groundwaters of the State of Connecticut by PFAS.

300.     Defendants have caused the incurrence, and continued incurrence, of costs for providing potable drinking water to persons affected by groundwater pollution, including but not limited to the short-term provision of potable drinking water, the planning and implementation of long-term methods of providing potable drinking water, and the construction or installation and supervision of methods for providing potable drinking water.

301.     As a consequence of Defendants' acts and omissions, Defendants are liable under Conn. Gen. Stat. § 22a-471 for all expenses of providing potable drinking water in response to polluted groundwater, including interest on those costs and attorney's fees.

## COUNT IX
## (Conn. Gen. Stat. § 42-110b – UNFAIR TRADE PRACTICES)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count IX as if fully set forth herein.

296.     Defendants' unfair acts and practices were in contravention of Connecticut's public policy, including but not limited to the policy set forth in Conn. Gen. Stat. § 22a-1, which states that "the policy of the state of Connecticut is to conserve, improve and protect its natural resources and environment and to control air, land, and water pollution in order to enhance the health, safety and welfare of the people of the state."

297.     Furthermore, Defendants' unfair acts and practices were in contravention of the State's public policy set forth in Conn. Gen. Stat. § 22a-15, which states "that there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same."

298.    Furthermore, Defendants' unfair acts and practices were in contravention of the State's public policy set forth in Conn. Gen. Stat. § 23-5a, which states that "carefully selected areas of land and water of outstanding scientific, educational, biological, geological, paleontological or scenic value be preserved."

299.    Furthermore, Defendants' unfair acts and practices were in contravention of the State's public policy, including but not limited to, as set forth in Conn. Gen. Stat. §§ 22a-16, 22a-427, 22a-430, 22a-451, and 22a-471.

300.    Defendants' unfair acts and practices – including, but not limited to, the following – were immoral, unethical, oppressive, and/or unscrupulous:

     a.     deceiving and concealing material information from Connecticut consumers about the health, safety, economic, and environmental effects of using PFAS Products; and

     b.     undermining and delaying the adoption of alternative products, driven by informed consumer choice, which could have avoided the most devastating effects of PFAS.

301.    Defendants' unfair acts and practices have directly and proximately caused substantial injury to consumers within the State of Connecticut by causing harmful pollutants to contaminate the lands, waters, and other natural resources of the State.

302.    The substantial injury to consumers by Defendants' unfair acts and practices is not outweighed by any countervailing benefits, but rather resulted in the stifling of an open marketplace for alternative products, thereby leaving consumers unable to reasonably avoid the detrimental consequences of using PFAS Products.

303.   Defendants' deceptive acts and concealment of material information about their business practices and their environmental impact constitute an unfair trade practice in violation of Conn. Gen. Stat. § 42-110b.

### COUNT X
### (Conn. Gen. Stat. § 42-110o – WILLFUL UNFAIR TRADE PRACTICES)

1-303.  Paragraphs 1 through 303 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 303 of this Count X as if fully set forth herein.

304.   Defendants engaged in the acts and practices alleged herein when they knew or should have known that their conduct was unfair, in violation of Conn. Gen. Stat. § 42-110b(a) and, therefore, are liable for civil penalties of up to $5,000 per willful violation pursuant to Conn. Gen. Stat. § 42-110o(b).

### COUNT XI
### (Conn. Gen. Stat. § 52-552e(a)(1) – Actual Fraudulent Transfer Related to the Chemours Spin-off)
### (Against the DuPont Defendants)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count XI as if fully set forth herein.

296.   Under Conn. Gen. Stat. § 52-552e(a)(1), a transaction is fraudulent if made by a debtor with "actual intent to hinder, delay, or defraud any creditor of the debtor."

297.   The actual intent of the debtor may be determined by considering statutorily enumerated badges of fraud, including, whether: (1) "[t]he transfer or obligation was to an insider"; (2) "[t]he transfer or obligation was disclosed or concealed"; (3) "[b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit"; (4) "[t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred"; (5) "[t]he debtor was insolvent or

became insolvent shortly after the transfer was made or the obligation was incurred"; and (6) "[t]he transfer occurred shortly before or after a substantial debt was incurred."

298.    Under Conn. Gen. Stat. § 52-552b, a "creditor" means "a person who has a claim." §52-552b(4). A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." §52-552b(3).

299.    Where a transfer is found to have been fraudulent, a creditor may bring an action to: (1) avoid the transfer as to the creditor's claim; (2) to attach the creditor's claim against assets transferred or other property of the transferee; or (3) after obtaining judgment on a claim against the debtor, and if the court orders, levy execution on the asset transferred or its proceeds.

300.    The State is and was a creditor of Old DuPont at all relevant times. After the 2015 Chemours Spin-off, the State became a creditor of Chemours.

301.    Old Dupont transferred the Performance Chemicals Business to Chemours in 2015 and executed the Chemours Spin-off with the intent to hinder, delay, or defraud creditors that held claims related to environmental and human health damages from Old DuPont's PFAS-containing fluorochemical products.

302.    During the Chemours Spin-off, Chemours assumed $4 billion of debt and significant liabilities under the Separation Agreement, while simultaneously transferring valuable assets to Old DuPont, including the $3.9 billion dividend.

303.    Through the transfer of assets and liabilities as part of the Chemours Spin-off, Old DuPont limited the availability of assets to cover its PFAS liabilities, to the detriment of existing creditors, such as the State of Connecticut.

304. The exchange of assets and liabilities in the Chemours Spin-off was made to benefit, or for the benefit of, Old DuPont.

305. At the time of the Chemours Spin-off, Old DuPont was in a position to control, and did control, Chemours.

306. Old DuPont and Chemours acted with the actual intent to hinder, delay, and defraud creditors such as the State.

307. The actual fraudulent intent of the Defendants is evidenced by statutorily enumerated badges of fraud present in the Chemours Spin-off. *See* Conn. Gen. Stat. § 52-552e(b).

308. At the time of the Chemours Spin-off, Old DuPont and Chemours were mutual insiders. *See* Conn. Gen. Stat. § 52-552e(b)(1). The assumption of PFAS liabilities by Chemours, the transfer of the dividend to Old DuPont, and the approval of the Chemours Spin-off occurred while Chemours was under the control of Old Dupont, through its ownership and agents.

309. The Chemours Spin-off concealed the liabilities actually assumed by Chemours. *See* Conn. Gen. Stat. § 52-552e(b)(3). Old DuPont and Chemours acted to conceal information about the 2015 Spin-off, including withholding information from Chemours management designees, withholding the schedules to the Chemours Separation Agreement from the public, and requiring confidential mediation of all disputes related to the transaction, under terms that favored Old DuPont.

310. The Chemours Spin-off occurred at a time when Old DuPont and the business line that Chemours would come to own had been sued or threatened with suit related to environmental liabilities. *See* Conn. Gen. Stat. § 52-552e(b)(4). By the 2015 Spin-off, Old DuPont had been sued, threatened with suit, and had knowledge of the likelihood of future litigation regarding Old DuPont's liabilities for PFAS contamination.

311.    Chemours did not receive reasonably equivalent consideration in the Spin-off. *See* Conn. Gen. Stat. § 52-552e(b)(8). Chemours received consideration which was not reasonably equivalent to the actual obligations incurred by Chemours under the Separation Agreement and the transfer of the dividend to Old Dupont.

312.    Chemours was insolvent or became insolvent shortly after the Chemours Spin-off. *See* Conn. Gen. Stat. § 52-552e(b)(9). The Connecticut Uniform Fraudulent Transfer Act (UFTA) recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation, or when a debtor is generally not paying debts as they become due. *See* Conn. Gen. Stat. § 52-552c(a), (b). Chemours was balance-sheet insolvent at the time of the Chemours Spin-off. Additionally, the trading prices for Chemours's debt reflect insolvency as of the date the Chemours Spin-off closed and spiraled downhill in the immediate aftermath of the Chemours Spin-off. Further, as a result of the Chemours Spin-off, Chemours could not pay its debts as they became due.

313.    The Chemours Spin-off occurred shortly before or shortly after a substantial debt was incurred. *See* Conn. Gen. Stat. § 52-552e(b)(10). As part of the Chemours Spin-off, Chemours incurred significant obligations, including the Chemours Assumed Environmental Liabilities (as defined in the Chemours Separation Agreement) and the indemnification obligations under Section 6.3 of the Chemours Separation Agreement. Additionally, Chemours incurred a $4 billion loan to transfer the dividend to Old DuPont.

314.    The State has been harmed by this transaction, which was designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

315.    Under Conn. Gen. Stat. § 52-552, the State is entitled to void the Chemours Spin-off and to recover property or value transferred to Old DuPont.

316.    Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Old Dupont and the incurrence of obligations to Old DuPont in the Chemours Spin-off, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold the DuPont Defendants liable for any damages or other remedies that may be awarded through this lawsuit.

317.    Upon information and belief, New DuPont, New Dow, and Corteva have assumed Old DuPont's liability described above.

318.    New DuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the dividend, to Old DuPont in the Chemours Spin-off, and later to New DuPont, New Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the dividend, the fraudulent intent underlying the Chemours Spin-off, and/or Chemours's insolvency.

**Count XII**
**(Conn. Gen. Stat. § 52-552e(a)(2) – Constructive Fraudulent Transfer Related to the Chemours Spin-off)**
**(Against the DuPont Defendants)**

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count XII as if fully set forth herein.

296.    Under UFTA's constructive fraudulent transfer provisions, a transaction made by a debtor is fraudulent as to a creditor if the debtor made the transfer:

> [W]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor…was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or…intended to incur, or believed or reasonably should have believed that [the debtor] would incur, debts beyond [the debtor's] ability to

pay as they became due. Conn. Gen. Stat. § 52-552e(a)(2).

297.    At all relevant times, the State is and was a creditor of Old DuPont. After the 2015 Spin-off, the State became a creditor of Chemours.

298.    The exchange of assets and liabilities in the Chemours Spin-off was made to benefit, or for the benefit of, Old DuPont.

299.    At the time this transaction was made, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

300.    Chemours did not receive reasonably equivalent value in return for the assumption of Chemours Spin-off related obligations, including the transfer of the dividend. Old DuPont and Chemours acted without providing a reasonably equivalent value in exchange for the transfer or obligation, and Old DuPont believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

301.    At the time of the Chemours Spin-off, Chemours was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to its business, and/or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

302.    At the time of the Chemours Spin-off, Old DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries from Old DuPont's design, manufacturing, marketing, distribution, and/or sale of PFAS Products and other PFAS, including those damages and injuries caused by the business line that Chemours would come to own.

303.     At the time of the Chemours Spin-off, and at all times relevant to this Complaint, Chemours has been balance-sheet insolvent.

304.     On information and belief, New DuPont, New Dow, and Corteva have assumed Old DuPont's liability described above.

305.     The State has been harmed by this transaction, which was designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

306.     Under Conn. Gen. Stat. § 52-552, the State is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

307.     Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Old Dupont and the incurrence of obligations to Old DuPont in the Chemours Spin-off, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold the DuPont Defendants liable for any damages or other remedies that may be awarded through this lawsuit.

308.     New DuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the dividend, to Old DuPont in the Chemours Spin-off, and later to New DuPont, New Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the dividend, the fraudulent intent underlying the Chemours Spin-off, and/or Chemours's insolvency.

## COUNT XIII
### (Conn. Gen. Stat. § 52-552f(a) – Constructive Fraudulent Transfer Related to the Chemours Spin-off)
### (Against the DuPont Defendants)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count XIII as if fully set forth herein.

296.    Under UFTA's constructive fraudulent transfer provisions, a transaction made by a debtor is fraudulent as to a creditor if the debtor made the transfer "without receiving a reasonably equivalent value" and if "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Conn. Gen. Stat. §52-552f(a).

297.    At all relevant times, the State is and was a creditor of Old DuPont. After the 2015 Spin-off, the State became a creditor of Chemours.

298.    The exchange of assets and liabilities in the Chemours Spin-off was made to benefit, or for the benefit of, Old DuPont.

299.    At the time this transaction was made, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

300.    Chemours did not receive reasonably equivalent value in return for the assumption of Chemours Spin-off related obligations, including the transfer of the dividend.

301.    Chemours was insolvent as a result of the Chemours Spin-off. Chemours was balance-sheet insolvent at the time of the Chemours Spin-off. Additionally, debt trading prices reflected insolvency as of the date the Chemours Spin-off closed and spiraled downhill in the immediate aftermath of the Chemours Spin-off. Further, as a result of the Chemours Spin-off, Chemours could not pay its debts as they became due.

302.    On information and belief, New DuPont, New Dow, and Corteva have assumed Old DuPont's liability described above.

303.    The State has been harmed by this transaction, which was designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

304.    Under Conn. Gen. Stat. § 52-552, the State is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

305.    Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Old Dupont and the incurrence of obligations to Old DuPont in the Chemours Spin-off, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold the DuPont Defendants liable for any damages or other remedies that may be awarded through this lawsuit.

306.    New DuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the dividend, to Old DuPont in the Chemours Spin-off, and later to New DuPont, New Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the dividend, the fraudulent intent underlying the Chemours Spin-off, and/or Chemours's insolvency.

**COUNT XIV**
**(Conn. Gen. Stat. § 52-552e(a)(1) – Actual Fraudulent Transfer Related to the DowDuPont Merger and the DowDuPont Separation)**
**(Against Old DuPont, New DuPont, New Dow, and Corteva)**

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count XIV as if fully set forth herein.

296.    Under Conn. Gen. Stat. § 52-552e(a)(1), a transaction is fraudulent if made by a debtor with "actual intent to hinder, delay, or defraud any creditor of the debtor."

297.   The actual intent of the debtor may be determined by considering statutorily enumerated badges of fraud, including, whether: (1) "[t]he transfer or obligation was to an insider"; (2) "[t]he transfer or obligation was disclosed or concealed"; (3) "[b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit"; (4) "[t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred"; (5) "[t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred"; and (6) "[t]he transfer occurred shortly before or after a substantial debt was incurred."

298.   Under Conn. Gen. Stat. § 52-552b, a "creditor" means "a person who has a claim." §52-552b(4). A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." §52-552b(3).

299.   Where a transfer is found to have been fraudulent, a creditor may bring an action to: (1) avoid the transfer as to the creditor's claim; (2) to attach the creditor's claim against assets transferred or other property of the transferee; or (3) after obtaining judgment on a claim against the debtor, and if the court orders, levy execution on the asset transferred or its proceeds. The Court may also appoint a receiver to take charge of the assets transferred or other property, issue an injunction against further disposition of the assets, or provide such other relief as the circumstances may require. *See* Conn. Gen. Stat. § 52-552h.

300.   At all relevant times, the State is and was a creditor of Old DuPont and New DuPont.

301.   Through its participation in the DowDuPont Merger and the DowDuPont Separation, Old DuPont transferred valuable assets and business lines to New DuPont, New Dow, and Corteva.

302.     The DowDuPont Merger and DowDuPont Separation were for the benefit of New DuPont, New Dow, and/or Corteva and were made to the detriment of Old DuPont's creditors.

303.     The transactions resulted in Old DuPont transferring significant assets to New DuPont, New Dow, and Corteva, totaling roughly $20 billion.

304.     At the time the sales and transfers were made, New DuPont was in a position to control, and did control, Old DuPont, New Dow, and Corteva.

305.     At the time of these transactions, Old DuPont, New DuPont, New Dow, and Corteva intended and expected Old DuPont to incur debts beyond its ability to pay as they became due or should reasonably have expected that Old DuPont would incur debts beyond its ability to pay as they became due.

306.     Old DuPont, New DuPont, New Dow, and Corteva acted with the actual intent to hinder, delay, and defraud current and future creditors of Old DuPont, including the State.

307.     The actual fraudulent intent of the Defendants is evidenced by statutorily enumerated badges of fraud present in the Separation Transfers. *See* Conn. Gen. Stat. § 52-552e(b).

308.     In connection with the DowDuPont Separation, New DuPont divided up Old DuPont's assets and obligations among entities it controlled, namely New DuPont, New Dow, and Corteva. *See* Conn. Gen. Stat. § 52-552e(b)(1). Upon information and belief, certain obligations were assumed by New DuPont, New Dow, and Corteva, including Old DuPont's PFAS-related liabilities, as well as the indemnification obligations under Article VIII of the DowDuPont Separation Agreement. The transfer of these obligations from Old DuPont to New DuPont, then certain of them from New DuPont to New Dow and Corteva, occurred at a time that New DuPont controlled New Dow and Corteva through New DuPont's Board members, New DuPont employees, and New DuPont agents. New DuPont was an insider of Old DuPont,

New Dow, and Corteva, throughout the DowDuPont Separation. *See* Conn. Gen. Stat. § 52-552b(1).

309.    The DowDuPont Separation concealed the liabilities actually assumed by New DuPont, New Dow, and Corteva. *See* Conn. Gen. Stat. § 52-552e(b)(3). The true scope of the obligations that were to be assumed by New DuPont, New Dow, and Corteva in the DowDuPont Separation Agreement were concealed and the schedules to the DowDuPont Separation Agreement were not publicly filed.

310.    The DowDuPont Separation occurred at a time when Old DuPont and New DuPont had been sued or threatened with suit related to environmental liabilities. *See* Conn. Gen. Stat. § 52-552e(b)(4). Prior to and throughout the DowDuPont Separation, Old DuPont and New DuPont had been sued, had been threatened with suit, and had knowledge of the likelihood of future litigation regarding Old DuPont's and New DuPont's liabilities for PFAS contamination.

311.    Old DuPont did not receive consideration from New DuPont, New Dow, and Corteva reasonably equivalent to the value of the assets exchanged. *See* Conn. Gen. Stat. § 52-552e(b)(8). After the transactions, Old DuPont was left with assets that Old DuPont, New DuPont, New Dow, and Corteva knew were insufficient to pay its extensive environmental liabilities, including the State's claims.

312.    Old DuPont was insolvent or became insolvent shortly after the DowDuPont Separation. *See* Conn. Gen. Stat. § 52-552e(b)(9). UFTA recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. *See* Conn. Gen. Stat. § 52-552c(a). Old DuPont was balance-sheet insolvent at the time of the DowDuPont Separation.

313.    Finally, the DowDuPont Separation occurred shortly before or shortly after a substantial debt was incurred. *See* Conn. Gen. Stat. § 52-552e(b)(10). As part of the DowDuPont Separation, Old DuPont incurred $4 billion in indebtedness to Corteva.

314.    The State has been harmed by these transactions, which were designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

315.    Under Conn. Gen. Stat. § 52-552, the State is entitled to void these transactions and to recover property or value transferred from Old DuPont to New DuPont, New Dow, and Corteva.

316.    Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to New DuPont, New Dow, and Corteva and the incurrence of obligations to New DuPont, New Dow, and Corteva in the DowDuPont Merger and DowDuPont Separation, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold Old DuPont, New DuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

317.    New DuPont, New Dow, and Corteva are not good-faith transferees of the assets transferred through the DowDuPont Merger and DowDuPont Separation to New DuPont, New Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the DowDuPont Merger and DowDuPont Separation and/or the insolvency of Old DuPont.

## COUNT XV
### (Conn. Gen. Stat. § 52-552e(a)(2) – Constructive Fraudulent Transfer Related to the DowDuPont Merger and the DowDuPont Separation)
### (Against Old DuPont, New DuPont, New Dow, and Corteva)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as

Paragraphs 1 through 295 of this Count XV as if fully set forth herein.

296.    Under UFTA's constructive fraudulent transfer provisions, a transaction made by a

debtor is fraudulent as to a creditor if the debtor made the transfer:

> [W]ithout receiving a reasonably equivalent value in exchange for the transfer or
> obligation, and the debtor…was engaged or was about to engage in a business or a
> transaction for which the remaining assets of the debtor were unreasonably small in
> relation to the business or transaction; or…intended to incur, or believed or reasonably
> should have believed that [the debtor] would incur, debts beyond [the debtor's] ability to
> pay as they became due. Conn. Gen. Stat. § 52-552e(a)(2).

297.    At all relevant times, the State is and was a creditor of Old DuPont and New DuPont.

298.    The exchange of assets and liabilities in the DowDuPont Separation were made to

benefit, or for the benefit of, New DuPont, New Dow, and/or Corteva.

299.    At the time these transactions were made, New DuPont was in a position to control,

and did control, Old DuPont, New Dow, and Corteva.

300.    Old DuPont did not receive consideration from New DuPont, New Dow, and Corteva

reasonably equivalent to the value of the assets exchanged. After the transactions, Old DuPont

was left with assets that Old DuPont, New DuPont, New Dow, and Corteva knew or should have

known were insufficient to pay its extensive environmental liabilities, including the State's

claims.

301.    At the time of the DowDuPont Separation, Old DuPont was engaged or was about to

engage in a business for which its remaining assets were unreasonably small in relation to its

business.

302.    At the time of the DowDuPont Separation, Old DuPont, New DuPont, New Dow, and Corteva believed or reasonably should have believed that Old DuPont would incur debts beyond its ability to pay as they became due.

303.    At the time of the DowDuPont Separation, Old DuPont and New DuPont had been sued, threatened with suit, and had knowledge of the likelihood of litigation to be filed regarding Old DuPont's and New DuPont's liability for damages and injuries from Old DuPont's design, manufacturing, marketing, distribution, and sale of PFAS Products.

304.    At the time of the DowDuPont Separation, and at all times relevant to this Complaint, Old DuPont has been insolvent because its debts were greater than the fair valuation of its assets.

305.    The State has been harmed by these transactions, which were designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

306.    Under Conn. Gen. Stat. § 52-552, the State is entitled to void these transactions and to recover property or value transferred from Old DuPont to New DuPont, New Dow, and Corteva.

307.    Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to New DuPont, New Dow, and Corteva and the incurrence of obligations to New DuPont, New Dow, and Corteva in the DowDuPont Merger and DowDuPont Separation, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold Old DuPont, New DuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

308.    New DuPont, New Dow, and Corteva are not good-faith transferees of the assets transferred through the DowDuPont Merger and DowDuPont Separation to New DuPont, New

Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the DowDuPont Merger and DowDuPont Separation and/or the insolvency of Old DuPont.

## COUNT XVI
### (Conn. Gen. Stat. § 52-552f(a) – Constructive Fraudulent Transfer Related to the DowDuPont Merger and the DowDuPont Separation) (Against Old DuPont, New DuPont, New Dow, and Corteva)

1-295.  Paragraphs 1 through 295 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 295 of this Count XVI as if fully set forth herein.

296.    Under UFTA's constructive fraudulent transfer provisions, a transaction made by a debtor is fraudulent as to a creditor if the debtor made the transfer "without receiving a reasonably equivalent value" and if "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Conn. Gen. Stat. §52-552f(a).

297.    At all relevant times, the State is and was a creditor of Old DuPont and New DuPont.

298.    The exchange of assets and liabilities in the DowDuPont Separation was made to benefit, or for the benefit of, New DuPont, New Dow, and/or Corteva.

299.    At the time these transactions were made, New DuPont was in a position to control, and did control, Old DuPont, New Dow, and Corteva.

300.    Old DuPont did not receive consideration from New DuPont, New Dow, and Corteva reasonably equivalent to the value of the assets exchanged.

301.    Old DuPont was insolvent as a result of the DowDuPont Separation. Old DuPont was balance-sheet insolvent at the time of the DowDuPont Separation. Further, as a result of the DowDuPont Separation, Old DuPont could not pay its debts as they became due.

302.    The State has been harmed by this transaction, which was designed to shield assets from creditors, such as the State, that have been damaged by Old DuPont's conduct.

303. Under Conn. Gen. Stat. § 52-552, the State is entitled to void these transactions and to recover property or value transferred from Old DuPont to New DuPont, New Dow, and Corteva.

304. Pursuant to Conn. Gen. Stat. § 52-552h(a)(2), the State also seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to New DuPont, New Dow, and Corteva and the incurrence of obligations to New DuPont, New Dow, and Corteva in the DowDuPont Merger and DowDuPont Separation, or the proceeds of such assets now held by New DuPont, New Dow, and Corteva, or other property of Old DuPont, New DuPont, New Dow, and Corteva, and/or to hold Old DuPont, New DuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

305. New DuPont, New Dow, and Corteva are not good-faith transferees of the assets transferred through the DowDuPont Merger and DowDuPont Separation to New DuPont, New Dow, and Corteva because each of Old DuPont, New DuPont, New Dow, and Corteva knew or should have known of the fraudulent intent underlying the DowDuPont Merger and DowDuPont Separation and/or the insolvency of Old DuPont.

**PRAYER FOR RELIEF**

WHEREFORE, in accordance with applicable law, including but not limited to Conn. Gen. Stat. §§ 22a-16, 22a-438, 22a-451, 22a-471, 42-110m, 42-110o, and 52-552h, the State of Connecticut requests the following relief:

1. Injunctive relief to address past, present, and future PFAS pollution, including, without limitation:

    a. an order compelling Defendants to abate all PFAS pollution in the State of Connecticut;

    b. an order compelling Defendants to implement a program of public outreach with information about the harms of PFAS, the status of investigation and remediation activities, and resources available to assist with abatement and remediation;

    c. an order compelling Defendants to implement a program of information sharing with local and state government agencies concerning investigation and remediation activities; and

    d. an order compelling Defendants to disclose all research and studies in their possession, including such research and studies previously conducted directly or indirectly by them, their respective agents, affiliates, servants, officers, directors, employees, and all persons acting in concert with them, that relates to the human health and environmental effects of PFAS;

2. Compensatory damages arising from PFAS pollution of State natural resources and property, including surface waters, groundwaters, public and private drinking water supply wells, soils and sediments, biota, wildlife including fish, and all other public trust resources and State property, according to proof, including, without limitation:

    a.   past and future costs of investigation, testing, and monitoring;

    b.   past and future costs of providing water from alternate sources;

    c.   past and future costs of installing and maintaining wellhead treatment;

    d.   past and future costs of installing and maintaining a wellhead protection program;

    e.   past and future costs of installing and maintaining early warning systems to detect PFAS before it reaches wells;

    f.   past and future costs of implementing biomonitoring programs;

    g.   past and future costs of remediating PFAS from natural resources, including groundwater, surface waters, soils, sediments, and other natural resources;

    h.   past and future costs of implementing educational outreach in communities where natural resources have become contaminated with PFAS;

    i.   past and future costs of collecting, replacing, and safely disposing of PFAS;

    j.   past and future costs of remediating PFAS contamination at release sites; and

    k.   natural resource damages;

3.   An order compelling Defendants to pay all other damages sustained by the State in its public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of Defendants' acts and omissions alleged herein with respect to PFAS Products;

4.   Any and all temporary and permanent equitable relief and such conditions upon Defendants as are needed to prevent further pollution, impairment, and destruction of the natural resources and property of Connecticut;

5.   A finding that by the acts alleged herein, Defendants have unreasonably polluted, impaired, and destroyed public trust resources in the State of Connecticut in violation of the Connecticut Environmental Protection Act, Conn. Gen. Stat. § 22a-16;

6. Equitable relief pursuant to Conn. Gen. Stat. § 22a-16a for past, present, and future pollution, impairment, and/or destruction of public trust resources;

7. An order pursuant to Conn. Gen. Stat. § 22a-438 directing Defendants to pay a civil penalty of $25,000 per day per violation of Conn. Gen. Stat. § 22a-430;

8. An order pursuant to Conn. Gen. Stat. § 22a-438 directing Defendants to pay a civil penalty of $25,000 per day per violation of Conn. Gen. Stat. § 22a-427;

9. An order pursuant to Conn. Gen. Stat. § 22a-451 directing Defendants to pay the State two times the costs and expenses incurred in responding to PFAS water pollution;

10. An order pursuant to Conn. Gen. Stat. § 22a-471 directing Defendants to pay the State for all expenses incurred in providing potable drinking water in response to groundwater pollution;

11. A finding that by the acts alleged herein, Defendants engaged in unfair acts and practices in the course of engaging in trade or commerce within the State of Connecticut in violation of the Connecticut Unfair Trade Practices Act;

12. An injunction pursuant to Conn. Gen. Stat. § 42-110m permanently enjoining Defendants from engaging in any acts that violate the Connecticut Unfair Trade Practices Act, including, but not limited to, the unfair acts and practices alleged herein;

13. An order pursuant to Conn. Gen. Stat. § 42-110o directing Defendants to pay a civil penalty of $5,000 for each and every willful violation of the Connecticut Unfair Trade Practices Act;

14. An order for equitable relief pursuant to Conn. Gen. Stat. § 42-110m for past and ongoing unfair acts and practices associated with PFAS, including but not limited to relief for remediation and mitigation;

15. An order for any and all other equitable relief authorized under Conn. Gen. Stat. § 42-110m, including but not limited to restitution and disgorgement, that is appropriate to rectify the unlawful behavior complained of herein;

16. An order voiding the fraudulent transfers of assets among the DuPont Defendants and recovering the property or value fraudulently transferred among these Defendants to put the State in the position in which it would have been had these fraudulent transfers not occurred;

17. An order enjoining the DuPont Defendants from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont and/or impose a constructive trust over any proceeds from the sale of Old DuPont assets for the benefit of the State;

18. Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

19. Punitive damages;

20. Prejudgment interest; and

21. Such other relief as the Court may deem just and equitable.

PLAINTIFF
STATE OF CONNECTICUT


By: _____

WILLIAM M. TONG
Juris No. 440323
Attorney General
MATTHEW I. LEVINE
Juris No. 414845
Deputy Associate Attorney General
CHRISTOPHER PATRICK KELLY
Juris No. 444375
Assistant Attorney General
MICHAEL W. LYNCH
Juris No. 435586
Assistant Attorney General
JULIA R. SUESSER
Juris No. 445210
Special Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5250
Fax: (860) 808-5386
christopher.kelly@ct.gov

RETURN DATE: MARCH 5, 2024                     SUPERIOR COURT

STATE OF CONNECTICUT                           JUDICIAL DISTRICT
                                               OF HARTFORD
v.

EIDP, INC.; DUPONT DE NEMOURS,                 AT HARTFORD
INC.; THE CHEMOURS COMPANY; THE
CHEMOURS COMPANY FC, LLC;
CORTEVA, INC.; and 3M COMPANY                  JANUARY 23, 2024

## STATEMENT OF AMOUNT IN DEMAND

The Plaintiff states that the amount in demand is greater than Fifteen Thousand Dollars

($15,000), exclusive of interest and costs.

                              PLAINTIFF
                              STATE OF CONNECTICUT


                    By: _____
                              WILLIAM M. TONG
                              Juris No. 440323
                              Attorney General
                              MATTHEW I. LEVINE
                              Juris No. 414845
                              Deputy Associate Attorney General
                              CHRISTOPHER PATRICK KELLY
                              Juris No. 444375
                              Assistant Attorney General
                              MICHAEL W. LYNCH
                              Juris No. 435586
                              Assistant Attorney General
                              JULIA R. SUESSER
                              Juris No. 445210
                              Special Assistant Attorney General
                              Office of the Attorney General
                              165 Capitol Avenue
                              Hartford, CT 06106
                              Tel: (860) 808-5250
                              Fax: (860) 808-5386
                              christopher.kelly@ct.gov

# CIVIL SUMMONS
## CONTINUATION OF PARTIES
JD-CV-2  Rev. 9-12

STATE OF CONNECTICUT
**SUPERIOR COURT**

First named Plaintiff *(Last, First, Middle Initial)*

**State of Connecticut**

First named Defendant *(Last, First, Middle Initial)*

**EIDP, Inc.**

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 03 |
| | | 04 |
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| The Chemours Company FC, LLC | 1007 Market Street, Wilmington, DE 19801 | 05 |
| | Agent for Service: C T Corporation System, 67 Burnside Ave, East Hartford, CT 06108 | 06 |
| DuPont de Nemours, Inc. | 974 Centre Road, Wilmington, DE 18805 | 07 |
| | Agent for Service: Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 | 08 |
| Corteva, Inc. | 974 Centre Road, Wilmington, DE 18805 | 09 |
| | Agent for Service: C T Corporation System, 67 Burnside Ave, East Hartford, CT 06108 | 10 |
| 3M Company | 3M Center, Saint Paul, MN 55144 | 11 |
| | Agent for Service: Corporation Service Company, 225 Asylum Street, 20th Floor, Hartford, CT 06103 | 12 |
| | | 13 |
| | | 14 |

FOR COURT USE ONLY - File Date

Docket number

CIVIL SUMMONS-Continuation

STATE OF CONNECTICUT}
                                    } SS: GLASTONBURY,        JANUARY 23, 2024
COUNTY OF HARTFORD  }

Then and by virtue hereof, on the 23ʳᵈ day of January, 2024, I made due and legal service on the within named Defendant, **EIDP, INC.,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **EIDP, Inc. C/O The Secretary,** 974 Centre Road, Wilmington, DE 19805.

Also, on the 23ʳᵈ day of January, 2024, I made due and legal service on the within named Defendant, **THE CHEMOURS COMPANY,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **The Chemours Company, C/O The Secretary,** 1007 Market Street, Wilmington, DE 19801.

Also, on the 23ʳᵈ day of January, 2024, I made due and legal service on the within named Defendant, **THE CHEMOURS COMPANY FC, LLC,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **The Chemours Company FC, LLC, C/O The Secretary,** 1007 Market Street, Wilmington, DE 19801.

Also, on the 23ʳᵈ day of January, 2024, I made due and legal service on the within named Defendant, **DUPONT DE NEMOURS, INC.,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **DuPont De Nemours, Inc, C/O The Secretary,** 974 Centre Road, Wilmington, DE 19805.

Also, on the 23ʳᵈ day of January, 2024, I made due and legal service on the within named Defendant, **DUPONT DE NEMOURS, INC.,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **DuPont De Nemours, Inc, C/O The Corporation Trust Company, Corporation Trust Center,** 1209 Orange Street, Wilmington, DE 19801.

Also, on the 23ʳᵈ day of January, 2024, I made due and legal service on the within named Defendant, **CORTEVA, INC.,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **Corteva, Inc, C/O The Secretary,** 974 Centre Road, Wilmington, DE 19805.

Also, on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **3M COMPANY,** by depositing at the Post Office in Glastonbury, postage paid and certified, return receipt requested, a verified true and attested copy of the within original, **Summons, Complaint, and Statement of Amount In Demand,** with my doings thereon endorsed, addressed to the within named Defendant, **3M Company, C/O The Secretary,** 3M Center, Saint Paul, MN 55144.

Afterwards on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **EIDP, INC.,** by leaving a verified true and attested copy of the within **Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Gary Scappini, duly authorized to accept service for CT Corporation System, Agent For Service for said Defendant, at 67 Burnside Avenue, in the Town of East Hartford.

Also on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **THE CHEMOURS COMPANY,** by leaving a verified true and attested copy of the within **Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Gary Scappini, duly authorized to accept service for CT Corporation System, Agent For Service for said Defendant, at 67 Burnside Avenue, in the Town of East Hartford.

Also on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **THE CHEMOURS COMPANY FC, LLC,** by leaving a verified true and attested copy of the within **Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Gary Scappini, duly authorized to accept service for CT Corporation System, Agent For Service for said Defendant, at 67 Burnside Avenue, in the Town of East Hartford.

Also on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **CORTEVA, INC.,** by leaving a verified true and attested copy of the within **Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Gary Scappini, duly authorized to accept service for CT Corporation System, Agent For Service for said Defendant, at 67 Burnside Avenue, in the Town of East Hartford.

Afterwards on the 23rd day of January, 2024, I made due and legal service on the within named Defendant, **3M COMPANY,** I left a verified true and attested copy of the within original **Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Shelley Kurpaska, duly authorized to accept for Corporation Service Company, Agent For Service for said Defendant, at 225 Asylum Street, 20th Floor, in the City of Hartford.

## SUPPLEMENTAL RETURN TO FOLLOW

The within is the original **Summons, Complaint, and Statement of Amount in Demand,** with my doings hereon endorsed.

FEES:

| | |
|---|---|
| Pages | $ 900.00 |
| Endorsements | 18.50 |
| Service | 330.00 |
| Travel | 12.00 |
| Postage | 66.00 |
| | |
| Total | $ 1326.50 |

ATTEST:

ALEX J. RODRIGUEZ
STATE MARSHAL
HARTFORD COUNTY

EXHIBIT 2

⚠️ Caution
As of: April 8, 2024 8:59 PM Z

## *Ayo v. 3M Co.*

United States District Court for the Eastern District of New York

September 30, 2018, Decided; September 30, 2018, Filed

18-CV-0373(JS)(AYS)

**Reporter**
2018 U.S. Dist. LEXIS 170996 *

BARBARA AYO and SOLOMON AYO; BETTY GORDON and GEORGE GORDON; DIANNE LOFTON and DUKE LOFTON; ERIN ROCHA and ANTONIO ROCHA; JAMES GREEN, as proposed administrator of the estate of HATTIE GREEN; JANET CELIK and AVNI CELIK; CONSTANCE BATTS, as proposed administrator of the estate of JULIUS BROOKS; KAREN MORENCY; LISA TERRY and ANDREW TERRY; JAMES GREEN, as proposed administrator of the estate of MAMIE GREEN; MELVIN KENNEDY; THERESA RIVERA and VINCENT RIVERA; WENDY GREEN and JAMES GREEN; ALAN PATTERSON; ALAN PATTERSON, as proposed administrator of the estate of MARION PATTERSON; CHESTER MORRIS; CHESTER MORRIS, as proposed administrator of the estate of OLIVER MORRIS; and CHESTER MORRIS, as proposed administrator of the estate of SERA MORRIS, Plaintiffs, -against- THE 3M COMPANY, f/k/a Minnesota Mining and Manufacturing, Co.; TYCO FIRE PRODUCTS L.P., successor in interest to the Ansul Company; BUCKEYE FIRE PROTECTION CO.; CHEMGUARD; NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC., f/k/a Chubb National Foam, Inc., f/k/a National Foam, Inc., individually and as successor in interest to National Foam, Inc.; KIDDE PLC, INC., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., individually and as successor in interest to National Foam, Inc.; KIDDE-FENWAL, INC., individually and as successor in interest to National Foam, Inc.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC., f/k/a GE Interlogix, Inc.; ENTERRA CORPORATION; and COUNTY OF SUFFOLK, Defendants.

**Subsequent History:** Transferred by *In re Aqueous Film-Forming Foams Prods. Liab. Litig., 357 F. Supp. 3d 1391, 2018 U.S. Dist. LEXIS 206582, 2018 WL 6427189 (J.P.M.L., Dec. 7, 2018)*

Related proceeding at *In re Aqueous Film-Forming Foams Prods. Liab. Litig., 2022 U.S. Dist. LEXIS 47146 (D.S.C., Feb. 17, 2022)*

## Core Terms

Manufacturing, products, specifications, military, Foam, Defendants', federal official, chemical, contractor, colorable, Plaintiffs', Removal, contamination, formulations, fluorinated, conform, warn, removal statute, surfactants, Sur-Reply, firefighting, government contractor, design defect, fire fighting, regulations, compliance, discretionary, qualification, inspection, Air

**Counsel: [*1]** For Plaintiffs: Frederick Eisenbud, Esq., Scott D. Middleton, Esq., Campolo, Middleton & McCormick, LLP, Ronkonkoma, NY; Hunter J. Shkolnik, Esq., Paul J. Napoli, Esq., Tate J. Kunkle, Esq., Napoli Shkolnik PLLC, New York, NY.

For The 3M Company, Defendants: Andrew J. Calica, Esq., Jordan D. Sagalowsky, Esq., Michael A. Olsen, Esq., Richard F. Bulger, Esq., Mayer Brown LLP, New York, NY.

For Tyco Fire Products, L.P. and Chemguard, Defendants: David S. Weinraub, Esq., Katherine A. Armstrong, Esq., Douglas E. Fleming, Esq., Dechert LLP, New York, NY.

For Buckeye Fire Protection Co., Defendants: Ellen Nunno Corbo, Esq., Taylor Colicchio LLP, Princeton, NJ; Lisa A. Pieroni, Esq., Kirschstein, Israel, Schiffmiller & Pieroni, P.C., New York, NY; Michael L. Carpenter, Esq., Gray, Layton, Kersh, Solomon, Furr & Smith, P.A., Gastonia, NC.

For National Foam, Inc., Defendants: Keith E. Smith, Esq., Greenberg Traurig, LLP, Philadelphia, PA.

For Kidde Fire Fighting, Inc., Defendants: No appearances.

For Kidde PLC, Inc., Kidde-Fenwal, Inc., and UTC Fire & Security Americas Corporation, Inc., Defendants: Jonathan S. Zelig, Esq., John W. Cerretta, Esq., Jonathan I. Handler, Esq., Day Pitney LLP, Boston, **[*2]** MA.

2018 U.S. Dist. LEXIS 170996, *2

For Enterra Corporation, Defendants: No appearances.

For County of Suffolk, Defendants: Andrew Scott Kazin, Esq., Brian A. Lacoff, Esq., David R. Ehrlich, Esq., Thomas E. Stagg, Esq., Stagg, Terenzi, Confusione & Wabnik LLP, Garden City, NY.

**Judges:** Joanna Seybert, United States District Judge.

**Opinion by:** Joanna Seybert

# Opinion

MEMORANDUM & ORDER

SEYBERT, District Judge:

On December 11, 2017, Plaintiffs filed this action against defendants The 3M Company, f/k/a Minnesota Mining and Manufacturing, Co. ("3M"); Tyco Fire Products L.P., successor in interest to the Ansul Company ("Tyco"); Buckeye Fire Protection Co. ("Buckeye"); Chemguard; National Foam, Inc. ("National Foam"); Kidde PLC, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., individually and as successor in interest to National Foam, Inc. ("Kidde PLC"); Kidde-Fenwal, Inc., individually and as successor in interest to National Foam, Inc. ("Kidde-Fenwal"); UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc. ("UTC"); Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam, Inc., individually and as successor in interest to National Foam, Inc. ("Kidde Fire Fighting"); Enterra Corporation ("Enterra," **[*3]** and collectively, "Manufacturing Defendants"); and the County of Suffolk (the "County," and together with Manufacturing Defendants, "Defendants") in the Supreme Court of the State of New York, County of Suffolk ("State Court"), claiming injuries stemming from the alleged contamination of their water supply by Manufacturing Defendants' products. (Compl., Docket Entry 1-1, at ECF pp. 6-72.) On January 18, 2018, Tyco removed the action to this Court pursuant to the federal officer removal statute, _28 U.S.C. §§ 1442(a)(1)._ (Notice of Removal, Docket Entry 1.)

Currently pending before the Court is Plaintiffs' motion to remand the case to State Court, (Remand Mot., Docket Entry 16), and Manufacturing Defendants' motion for leave to file a sur-reply in opposition to Plaintiff's motion to remand, (Sur-Reply Mot., Docket

Entry 31).[1] For the reasons that follow, Plaintiffs' motion to remand is DENIED and Manufacturing Defendants' motion for leave to file a sur-reply is DENIED.

BACKGROUND[2]

I. The Alleged Contamination of Plaintiffs' Water

Plaintiffs are current and former residents of communities in the Westhampton, Westhampton Beach, and Quiogue areas of eastern Suffolk County, Long Island, New York (the "Communities"). **[*4]** (Compl. ¶ 40.) According to the Complaint, a sole source aquifer[3] supplies water to the Communities (the "Aquifer"). (Compl. ¶ 1.)

The Communities are close to and downgradient of the Gabreski Air National Guard Base (the "Base"), which is part of the Francis S. Gabreski Airport (the "Airport," and together with the Base, "Gabreski") owned and operated by the County. (Compl. ¶¶ 2, 33.) Plaintiffs allege that the County leases 88.5 acres of the Airport to the New York Air National Guard ("NYANG"),[4] and that for decades, the NYANG has used a half-acre Airport Fire Training Area located at the Airport. (Compl. ¶¶ 34-35.)

Plaintiffs aver that aqueous film-forming foam ("AFFF")-- "a Class-B fire-fighting foam that is mixed with water and used to extinguish fires that are difficult to fight, including those involving hydrocarbon fuels such as petroleum or other flammable liquids"--has been used at

---

[1] Two Manufacturing Defendants--Enterra and Kidde Fire Fighting--have not appeared or participated in this action. For ease of reference, the Court will not distinguish between those Manufacturing Defendants that have appeared and those that have not.

[2] The following facts are drawn from the Complaint, Tyco's Notice of Removal and the exhibits attached thereto, and materials the parties submitted with their briefs.

[3] According to the U.S. Environmental Protection Agency ("EPA"), a sole source aquifer is one that "supplies at least 50 percent of the drinking water for its service area" where "[t]here are no reasonably available alternative drinking water sources should the aquifer become contaminated." U.S. EPA, Overview of the Drinking Water Sole Source Aquifer Program, https://www.epa.gov/dwssa/overview-drinking-water-sole-source-aquifer-program.

[4] The Air National Guard is the Reserve Component of the U.S. Air Force. National Guard, How We Began, http://www.nationalguard.mil/About-the-Guard/How-We-Began/.

Gabreski since 1970.[5] (Compl. ¶¶ 37, 152.) AFFF products are created synthetically by combining fluorine-free hydrocarbon foaming agents with highly fluorinated surfactants--agents that lower water's surface tension. (Aug. 2004 Report, Fleming Decl. Ex. D-7, Docket Entry 22-8, at 2; Compl. ¶ 154.) The [*5] fluorinated surfactants, or fluorosurfactants, in AFFF at issue in this case are perfluorinated chemicals ("PFCs"),[6] including specifically perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"). (Compl. ¶¶ 4, 5, 10, 165, 170, 220.)

According to Plaintiffs, PFOA and PFOS are resistant to breakdown and can move through air and soil and into groundwater. (Compl. ¶¶ 171, 174.) Additionally, Plaintiffs allege that PFCs, including PFOA and PFOS, are toxic and that they bioaccumulate in humans and animals. (Compl. ¶¶ 172, 175-76.) Specifically, Plaintiffs claim that studies concerning PFOA and PFOS have shown that exposure to the chemicals is associated with the development of serious medical conditions, including kidney and testicular cancer, ulcerative colitis, and thyroid disease, among others. (Compl. ¶¶ 9, 12, 195.) Further, Plaintiffs allege that PFOA and PFOS are "presumed to be an immune hazard to humans." (Compl. ¶ 18 (internal quotations marks omitted).)

Plaintiffs aver that Manufacturing Defendants designed, manufactured, and sold AFFF that was used at Gabreski. (Compl. ¶ 160.) They allege that the AFFF products contained PFOS, PFOA, and/or other PFCs that degrade [*6] into PFOS or PFOA.[7] (Compl. ¶ 23.)[8]

---

[5] AFFF is more effective than ordinary water at extinguishing hydrocarbon-fuel fires because it forms an aqueous film that spreads along the surface of hydrocarbon fuels, "essentially smothering the fire." (See Compl. ¶¶ 153-54.)

[6] A perfluorinated chemical is "fully fluorinated," meaning that "all the carbon-hydrogen bonds in a chain have been replaced by carbon-fluorine ones." (Cheremisinoff Aff., Kunkle Decl. Ex. B, Docket Entry 16-5, at 3 ¶ 5.)

[7] According to Plaintiffs, 3M produced the fluorosurfactants for its AFFF by a patented process called electrochemical fluorination, which resulted in a PFOS-based AFFF product (though some PFOS degrades into PFOA). (Compl. ¶ 164.) Plaintiffs allege that 3M was the only company to synthesize PFOS-based AFFF and that the other Manufacturing Defendants produced AFFF using PFOA. (Compl. ¶¶ 165, 170.)

[8] Plaintiffs name 3M, Tyco, National Foam, Buckeye, Chemguard, and Angus Fire as "Manufacturing Defendants," and omit Kidde Fire Fighting, Kidde PLC, Kidde-Fenwal, UTC,

Plaintiffs claim that Manufacturing Defendants knew or should have known that PFCs are highly soluble in water, highly mobile, highly persistent in the environment, and highly likely to contaminate water supplies if released into the environment, and that using PFCs in AFFF "presented an unreasonable risk to human health, ground and surface water, and the environment." (Compl. ¶¶ 23, 27.) According to Plaintiffs, Manufacturing Defendants marketed and sold their AFFF products knowing that they would be used at airports and bases, including Gabreski, in a way that would release PFCs into the environment and contaminate the air, soil, and groundwater. (Compl. ¶¶ 24-29.) Plaintiffs allege that Manufacturing Defendants failed to warn the U.S. Department of Defense ("DoD"), the U.S. Air Force, Gabreski, municipal water suppliers, and residents of the Communities of the dangers posed by their AFFF products. (Compl. ¶ 30.)

Plaintiffs aver that the decades of use, storage, and disposal of Manufacturing Defendants' PFC-based AFFF products at Gabreski have caused the chemicals to enter the groundwater and contaminate the Aquifer. (Compl. ¶¶ 6, 8, 198-203, 206-209.) [*7] They claim that PFOA has been detected in the Communities and Aquifer in levels exceeding the EPA's current health advisory limit of seventy parts per trillion for the combined concentrations of PFOA and PFOS.[9] (Compl. ¶¶ 7, 14.) For instance, Plaintiffs allege that a groundwater-monitoring well near Gabreski was found to contain PFOS at a concentration of 14,300 parts per trillion. (Compl. ¶ 208.) Plaintiffs allege that because of the contamination, they have suffered personal injury, bioaccumulation of PFOA and other PFCs, increased risk and fear of developing health conditions, and property damage. (Compl. ¶¶ 39-41, 210-213; see Compl. ¶¶ 51-116.)

## II. AFFF and PFCs

The U.S. Naval Research Laboratory ("NRL") developed aqueous film-forming firefighting foams in the 1960s. (Oct. 2009 NRL Press Release, Notice of Removal Ex. D, Docket Entry 1-4, at 3.) However, a 2006 NRL

---

and Enterra from the definition. (Compl. ¶ 23.) Though Plaintiffs later define National Foam to include these Defendants, (Compl. ¶ 150), they have not named Angus Fire as a defendant. The Court assumes that the reference to Angus Fire was in error.

[9] According to Plaintiffs, the EPA's health advisory limit identifies the concentration of PFOA or PFOS in drinking water at or below which health effects are not expected to occur over a lifetime of exposure. (Compl. ¶ 192.)

2018 U.S. Dist. LEXIS 170996, *7

Memorandum Report recognizes the private sector's contribution to the development of AFFF, providing that while "NRL was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in [*8] formulations." (NRL Mem. Report, Fleming Decl. Ex. D-2, Docket Entry 22-3, at 37.) NRL acknowledges 3M specifically, stating that it "contributed considerably to the success of the development of AFFF." (NRL Mem. Report at 37.)

According to Plaintiffs, AFFF was introduced commercially in the mid-1960s, but "AFFF sold to the United States military"--"[u]nlike commercial AFFF formulations"--"must conform to the military-specific performance and quality control measurements as prescribed by the military specification ("Mil-Spec") Mil-F-24385." (Compl. ¶¶ 156-57.) As explained in a 2004 report prepared for the Fire Fighting Foam Coalition, the general difference between Mil-Spec and non-Mil-Spec AFFF is as follows: "Essentially all AFFF procured in the U.S. is specified to conform to either a foam standard of Underwriters Laboratory (UL) or a more stringent military specification (MilSpec). Generally speaking, MilSpec AFFFs contain more fluorosurfactant and more fluorine than UL agents." (Aug. 2004 Report, Fleming Decl. Ex. D-7, Docket Entry 22-8, at 2.) However, Plaintiffs highlight an affidavit prepared by their putative expert, Nicholas P. Cheremisinoff ("Cheremisinoff"), which provides [*9] that AFFF sold commercially often conforms to the Mil-Spec:

> AFFF products that were marketed and sold into non-military and other non-federal agencies were identical to those sold to the U.S. Military. It is wrong to assert or assume that AFFF products were made exclusively for and under the direction of the U.S. Military or that these products were any different or made to any different specifications for other customers. Most if not all AFFF manufacturer[]s['] Material Safety Data Sheets (MSDSs) carry a claim that their product meets the U.S. Mil Specs in terms of fire fighting performance . . . .

(Cheremisinoff Aff., Kunkle Decl. Ex. B, Docket Entry 16-5, at 6 ¶ 12.)

A. Military Specification for AFFF Products

MIL-F-24385(NAVY), which was promulgated by the U.S. Navy's Naval Sea Systems Command ("NAVSEA") on November 21, 1969, addresses the military's requirements for AFFF. (MIL-F-24385(NAVY), Notice of Removal Ex. F, Docket Entry 1-6, § 1.1.) It does not compel AFFF manufacturers to use PFOA or PFOS, but requires that AFFF concentrate "consist of fluorocarbon surfactants plus other compounds as required to conform to the requirements specified hereinafter." (Compl. ¶ 158; Notice of Removal [*10] ¶ 8; MIL-F-24385(NAVY) § 3.2.). The Mil-Spec has since been amended and revised, most recently on September 7, 2017. (See Mil-Spec 24385 Revisions, http://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270.) The current revision, MIL-PRF-24385F(SH), like the 1969 version, requires that AFFF products include fluorocarbon surfactants. (MIL-PRF-24385F(SH), Notice of Removal Ex. H, Docket Entry 1-8, § 3.2.) Unlike the 1969 version, however, it specifically sets maximum limits on PFOS and PFOA content and explains that "[i]n the short term, the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of . . . PFOS and PFOA." (See MIL-PRF-24385F(SH) §§ 3.3, 6.6 and Table I.)

The Mil-Spec provides that AFFF furnished to the military must be "qualified for listing on the applicable Qualified Products List" ("QPL") and calls for "qualification" and "quality conformance" inspections with respect to a number of product characteristics. (E.g., MIL-PRF-24385F(SH) §§ 3.1, 3.3, 4 and Tables I, II, and III.) While "the contractor is responsible for the performance of all inspection requirements," "[t]he Government reserves the right to perform any of the inspections set forth in the specification where [*11] such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements." (MIL-PRF-24385F(SH) § 4.1.) Manufacturing Defendants submitted with their opposition the Declaration of Philip Novac, who served as Global Director of Foam Systems for Tyco or its affiliates. (Novac Decl., Docket Entry 22-21, ¶¶ 1-2.) According to Novac, DoD "has tested military specification AFFF products of Tyco [ ] and other military specification AFFF manufacturers." (Novac Decl. ¶ 10.)

The Mil-Spec refers to DoD document SD-6, "Provisions Governing Qualification," which provides that generally, the agency that prepared the specification--here, NAVSEA--"is responsible for qualification." (SD-6, Notice of Removal Ex. G, Docket Entry 1-7, at 3; Mil-Spec 24385 Revisions ("Preparing Activity: SH Naval Sea Systems Command (Ship Systems)"); e.g., MIL-PRF-24385F(SH) § 6.4.) SD-6 defines "qualification" as the process of "examin[ing], test[ing], and approv[ing]" products "to be in conformance with specification requirements" and approving them for inclusion on the

QPL. (SD-6 at 1.) All products on the AFFF QPL must be compatible with one another. (E.g., MIL-PRF-24385F(SH) § 3.3.3.) At various times [*12] from 1976 through 2017, all Manufacturing Defendants were on the QPL as manufacturers certified to sell AFFF under the Mil-Spec. (Compl. ¶ 159.)

B. Awareness of Issues with PFCs

1. Manufacturing Defendants

According to Plaintiffs, 3M began producing PFOA in 1947 and began researching the toxicity of PFCs in 1950. (Compl. ¶¶ 168, 234.) Plaintiffs aver that as early as the mid-1950s, 3M knew that PFCs accumulate in humans and animals. (Compl. ¶ 235.) Plaintiffs claim that by the early 1960s, 3M knew that PFOS and PFOA were "stable, persistent in the environment, and did not degrade," and "that PFCs were potentially toxic to humans and the environment." (Compl. ¶¶ 173, 233.) Further, Plaintiffs aver that 3M studies from the 1970s concluded that PFCs were "even more toxic" than previously believed. (Compl. ¶¶ 176.) They allege that 3M knew that after consumption or inhalation, PFOA is absorbed by and accumulates in the body--primarily in the blood stream, kidneys, and liver. (Compl. ¶ 177.) Plaintiffs claim that by the 1970s, 3M knew that PFOA and PFOS were "widely present in the blood of the general U.S. population" and that 3M concealed that knowledge from the public, government regulators, [*13] and the officials responsible for buying AFFF and supplying it to Gabreski. (Compl. ¶ 178.) For example, Plaintiffs claim that internal 3M documents disclosed by a whistleblower to the EPA in 1998 revealed that 3M was "perpetuating the myth" to regulators and customers that PFCs were biodegradable, when 3M knew that they were not. (Compl. ¶ 232.) Further, Plaintiffs claim that 3M began monitoring its employees' blood for PFCs as early as 1976 and confirmed that they bioaccumulate: PFC levels were found to increase over time and remain in blood for long periods. (Compl. ¶ 238.) Additionally, Plaintiffs allege that in approximately 1977, Tyco was aware of the environmental and toxic effects of AFFF and studied whether it could create an AFFF product that had a less substantial impact on the environment.[10] (Compl. ¶ 179.) Plaintiffs allege that "[t]hereafter[,] all

---

[10] The Cheremisinoff Affidavit contains a number of specific allegations with respect to 3M's and Tyco's claimed knowledge and concealment of the properties and effects of PFCs in AFFF. (Cheremisinoff Aff., at 9-14, ¶¶ 1-24.) Because they largely overlap with or elaborate on the allegations above, the Court does not discuss them here.

remaining Defendants came to know what 3M knew: that their own AFFF did not biodegrade, persisted in the environment, and bioaccumulated in human blood." (Compl. ¶ 239.)

According to Plaintiffs, "[i]n an attempt to limit liability," 3M stopped producing PFOS in 2002 "because it was aware of the widespread contamination and the [*14] health effects on the American public associated with exposure to the contamination." (Compl. ¶ 166.) Plaintiffs aver that in 2006, in light of PFOA's toxicity, eight major PFOA producers agreed to participate in the EPA's "PFOA Stewardship Program," pursuant to which the companies voluntarily committed to reduce product content and facility emissions of PFOA and related chemicals by ninety-five percent by no later than 2010. (Compl. ¶ 180.)

2. The U.S. Government

Manufacturing Defendants highlight several documents evidencing the government's awareness of risks posed by fluorocarbon surfactants in AFFF products. (Mfg. Def.s' Opp., Docket Entry 22, at 20-22.) For example, they point to a 1980 report prepared with the support of components of the U.S. Navy, Air Force, and Army, which provides that "[a]ll of the constituents resulting from fire fighting exercises [using fluorocarbon-based AFFF] are considered to have adverse effects environmentally." (Oct. 1980 Report, Fleming Decl. Ex. D-12, Docket Entry 22-13, at 1.) Additionally, the report notes that "[f]ire fighting training exercises at military installation[s] consume large quantities of water and fire fighting chemical agents," [*15] which "results in intermittent discharges of waste streams containing high strength of potentially toxic pollutants." (Oct. 1980 Report at 17.) The 1980 report also states that "[w]astewater generated from fire fighting exercises ha[s] an adverse effect upon the receiving stream and resist[s] biodegradation." (Oct. 1980 Report at 3.) Further, according to a 2001 letter from the DoD's Assistant Deputy Under Secretary of Defense,

> The application of AFFF in firefighting is inherently dispersive and results in the distribution of AFFF's chemical components on the surface and in the groundwater. Concern about this distribution prompted Military Service Departments to investigate the biodegradation, possible remediation, toxicity, fate and transport of many of AFFF's components. These studies date back to 1983 or earlier and are on going. . . . My assertion that PFOA is more toxic than PFOS is based on these data. . . .

(2001 Letter, Fleming Decl. Ex. D-16, Docket Entry 22-

2018 U.S. Dist. LEXIS 170996, *15

17, at 1.)

According to documents submitted by Manufacturing Defendants, DoD views PFCs as necessary components of AFFF. As described in a 2017 U.S. Government Accountability Office ("GAO") Report to Congressional Committees [*16] on DoD's handling of emerging drinking-water contaminants, the AFFF Mil-Spec requires the use "of 'fluorocarbon surfactants,' which the Navy interprets as synonymous with PFCs." (2017 GAO Report, Fleming Decl. Ex. D-10, Docket Entry 22-11, at 1-4, 17 n.46.) Additionally, the report provides that "[a]ccording to DOD, at present there is no PFC-free firefighting foam that meets DOD's performance and compatibility requirements. As a result, the Navy has no plans to remove the requirement for firefighting foam to contain PFCs at this time." (2017 GAO Report at 19.) Thus, the current AFFF Mil-Spec explains:

> The DoD's goal is to acquire and use a non-fluorinated AFFF formulation or equivalent firefighting agent to meet the performance requirements for DoD critical firefighting needs. The DoD is funding research to this end, but a viable solution may not be found for several years. In the short term, the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of two particular per- and PFAS; specifically PFOS and PFOA.

(MIL-PRF-24385F(SH) § 6.6.)

PROCEDURAL HISTORY

On December 11, 2017, Plaintiffs filed this action in State Court, and on January 18, 2018, Tyco removed it to [*17] this Court. Plaintiffs assert claims for (1) Negligence, (Compl. ¶¶ 243-62); (2) "Failure to Warn (as against [the County])," (Compl. ¶¶ 263-78); (3) "Products Liability, Failure to Warn (as against the Manufacturing Defendants)," (Compl. ¶¶ 279-96); (4) "Strict Product Liability - Defective Design (as against the Manufacturing Defendants)," (Compl. ¶¶ 297-315); (5) "Trespass (as against [the County])," (Compl. ¶¶ 316-26); and (6) "Private Nuisance ([b]y Plaintiffs Betty Gordon, George Gordon, Lisa Terry, Andrew Terry, Theresa Rivera, Vincent Rivera, and Alan Patterson)," (Compl. ¶¶ 327-44). Plaintiffs seek declaratory and injunctive relief; "general, compensatory, exemplary, consequential, nominal, and punitive damages"; attorneys' fees and costs; and pre- and post-judgment interest. (Compl. at 60-66.)

On February 20, 2018, Plaintiffs filed a motion to remand, which Defendants opposed on March 6, 2018. (See Remand Mot.; Mfg. Def.s' Opp.; County's Opp., Docket Entry 23). Plaintiffs filed a reply brief on March 13, 2018, (Pl.s' Reply, Docket Entry 24), and on March 20, 2018, Manufacturing Defendants filed a motion for leave to file a sur-reply, which they attached to their motion. (Sur-Reply [*18] Mot.; Sur-Reply Br., Docket Entry 31-1.) On March 27, 2018, Plaintiffs filed an opposition to Manufacturing Defendants' request. (Sur-Reply Opp., Docket Entry 37.)

Defendants' time to answer or otherwise respond to the Complaint has been extended to thirty days after the Court rules on Plaintiffs' motion to remand. (See Feb. 2, 2018 Elec. Order; Consent Mot., Docket Entry 11.)

DISCUSSION

I. Plaintiffs' Motion to Remand

Tyco removed this action from State Court pursuant to the federal officer removal statute, *28 U.S.C. § 1442(a)(1)*, to have its federal government contractor defense adjudicated in a federal forum. (Not. of Removal ¶ 1.) Plaintiffs ask the Court to remand this case to State Court pursuant to *28 U.S.C. § 1447*, arguing that Manufacturing Defendants do not satisfy the elements of the federal officer removal statute and are not entitled to the government contractor defense. (Pl.s' Br., Docket Entry 16-1, at 1-2.)

The federal officer removal statute allows a case to be removed from state court to federal court when it was commenced against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act [*19] under color of such office." *28 U.S.C. § 1442(a)(1)*. The statute insulates the U.S. Government and its agents from state "interference with its 'operations'" by shielding it from "'local prejudice'" and providing "a federal forum in which to assert federal immunity defenses." *Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 150, 127 S. Ct. 2301, 2306, 168 L. Ed. 2d 42 (2007)* (quoting *Willingham v. Morgan, 395 U.S. 402, 406, 89 S. Ct. 1813, 1815, 23 L. Ed. 2d 396 (1969)*; *Maryland v. Soper, 270 U.S. 9, 32, 46 S. Ct. 185, 190, 70 L. Ed. 449 (1926)*) (citations omitted). The burden to show that removal is proper rests with the removing defendant. *Veneruso v. Mount Vernon Neighborhood Health Ctr., 586 F. App'x 604, 607 (2d Cir. 2014)* (citing *United Food & Comm. Workers Union v. CenterMark Props. Meriden*

Kelly Christopher

*Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994)).* However, the federal officer removal statute "must be liberally construed."[11] *Isaacson v. Dow Chemical Co, 517 F.3d 129, 136 (2d Cir. 2008)* (citing *Watson, 551 U.S. at 147, 127 S. Ct. at 2304-05*). Therefore, while removal under the general removal statute, *28 U.S.C. § 1441*, is generally disfavored, removal under the federal officer removal statute "is favored in the interest of public policy." *Albrecht v. A.O. Smith Water Prods., No. 11-CV-5990, 2011 U.S. Dist. LEXIS 125100, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011)* (citing *Jefferson Cty. v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 2075, 144 L. Ed. 2d 408 (1999))*; see also *Gordon v. Air & Liquid Sys. Corp., 990 F. Supp.2d 311, 316 (E.D.N.Y. 2014)* (quoting *Willingham, 395 U.S. at 407, 89 S. Ct. at 1816*) (explaining that characterization of defendant's burden as "heavy" "misse[d] the distinction between the general removal statutes, which are to be strictly construed, and federal-officer removal, which 'should not be frustrated by a narrow, grudging interpretation.'"). Accordingly, the Court views the facts in the light most favorable to the defendants. *Albrecht, 2011 U.S. Dist. LEXIS 125100, 2011 WL 5109532, at *3* (citing *Hagen v. Benjamin Foster Co., 739 F. Supp. 2d 770, 783 (E.D. Pa. 2010)*; *Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1249 (9th Cir. 2006))*.

A defendant other than the United States or a federal agency or officer must satisfy three elements to effect removal **[*20]** under the statute: (1) "[I]t must show that it is a 'person' within the meaning of the statute"; (2) "it must establish that it was 'acting under' a federal officer, which subsumes the existence of a 'causal connection' between the charged conduct and asserted official

---

[11] Citing two out-of-circuit cases, *Freiberg v. Swinerton & Walberg Property Services, Inc., 245 F. Supp. 2d 1144, 1152 n.6 (D. Colo. 2002)*, and *Weese v. Union Carbide Corp., No. 07-CV-0581, 2007 U.S. Dist. LEXIS 73970, 2007 WL 2908014, at *3 (S.D. Ill. Oct. 3, 2007)*, Plaintiffs contend that the statute must be read narrowly when the liability of private companies, rather than that of the U.S. Government or its agencies or officers, is at stake. (Pl.s' Br. at 5.) However, the Second Circuit drew no such distinction when discussing the statute's application to private chemical companies in *Isaacson, 517 F.3d at 136* (noting that "the statute as a whole must be liberally construed"), nor did the Supreme Court when discussing its applicability to a private cigarette manufacturer in *Watson, 551 U.S. at 147, 127 S. Ct. at 2304-05* (noting that the Supreme Court "has made clear that the statute must be 'liberally construed.'"). The Court declines to adopt a narrow reading of the statute here.

authority"[12]; and (3) it "must raise a colorable federal defense." *Veneruso, 586 F. App'x at 607* (citing *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 488 F.3d 112, 124 (2d Cir. 2007)* ("In re MTBE Prods. Liab. Litig."); *Isaacson, 517 F.3d at 135*. Plaintiffs do not dispute that Manufacturing Defendants are "person[s]" for purposes of *28 U.S.C. § 1442*, (Pl.s' Br. at 6), but they argue that Manufacturing Defendants were not "acting under" an officer of the United States in producing AFFF with PFCs, (Pl.s' Br. at 7-10), and that they have no colorable federal defense, (Pl.s' Br. at 10-15).

A. "Acting Under" a Federal Officer and Causal Connection

For a private entity to show that it is "acting under" a federal officer, it must "demonstrate that the assistance it provides to a federal officer 'goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks.'" *Veneruso, 586 F. App'x at 607* (quoting *Watson, 551 U.S. at 153, 127 S. Ct. at 2308*); see also *Isaacson, 517 F.3d at 137* ("[A]n entity 'act[s] under' a federal officer when it 'assist[s], or . . . help[s] carry out, the duties or tasks of the federal superior.'") (quoting **[*21]** *Watson, 551 U.S. at 152, 127 S. Ct. at 2307*) (emphasis, ellipsis, and second, third, and fourth alterations in original). "The words 'acting under' are to be interpreted broadly, and the statute as a whole must be liberally construed." *Isaacson, 517 F.3d at 136* (citing *Watson, 551 U.S. at 147, 127 S. Ct. at 2304-05*). However, "compliance (or noncompliance) with federal laws, rules, and regulations" is not enough, "'even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.'" *Veneruso, 586 F. App'x at 607* (quoting *Watson, 551 U.S. at 153, 127 S. Ct. at 2308*).

The additional need for a "causal connection" between the charged conduct and the purported official action is satisfied if "the act that is the subject of [the p]laintiffs' attack . . . occurred while [d]efendants were performing their official duties." *Isaacson, 517 F.3d at 137-38* (citations omitted) (emphasis in original). "'Critical under the statute is to what extent defendants acted under federal direction at the time they were engaged in conduct now being sued upon.'" *Veneruso, 586 F. App'x*

---

[12] In *Isaacson*, the Second Circuit noted that the statutory requirement that the defendants' actions were taken "'under color of [federal] office'" "has come to be known as the causation requirement." *Isaacson, 517 F.3d at 137* (quoting *28 U.S.C. § 1442(a)(1)*) (alteration in original) (citation omitted).

*at 607* (quoting *In re MTBE Prods. Liab. Litig., 488 F.3d at 124-25*). The Court must "credit [d]efendants' theory of the case" in resolving this inquiry. *Isaacson, 517 F.3d at 137* (citing *Acker, 527 U.S. at 432, 119 S. Ct. at 2075*). Several cases illustrate these principles.

In Watson, the Supreme Court held that the defendant Philip Morris Companies did not properly effect removal under the statute because it was not "acting under" **[*22]** a federal officer or agency when advertising and testing its cigarettes pursuant to the Federal Trade Commission's ("FTC") detailed rules and regulations. *Watson, 551 U.S. at 157, 127 S. Ct. at 2310*. Distinguishing private contractors that assist the government from entities subject to detailed regulation, the Supreme Court explained:

> [A] private contractor . . . is helping the Government to produce an item that it needs. The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks. In the context of Winters,[13] for example, Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.

*Id. at 153-54, 127 S. Ct. at 2308*. The Supreme Court concluded that Philip Morris' compliance with FTC's detailed regulations did not establish the "special relationship" required by the "acting under" prong. *Id. at 157, S. Ct. at 2310* (emphasis in original).

In Isaacson, the Second Circuit affirmed the district court's denial of plaintiffs' motion to remand after the defendants--chemical **[*23]** companies that contracted with the United States to manufacture Agent Orange for military use in the Vietnam War--removed the case pursuant to the federal officer removal statute. *Isaacson, 517 F.3d at 133*. Distinguishing *Watson*, the *Isaacson* Court found that defendants were "acting under" a federal officer when they "contracted with the Government to provide a product that the Government was using during war--a product that, in the absence of

Defendants, the Government would have had to produce itself." *Id. at 137*. The defendants "received delegated authority" and had a "special relationship" with the government; they were not merely "regulated by federal law." Id. Additionally, the Second Circuit found that the statute's causation requirement was met because the defendants' production of the toxic chemical dioxin "occurred because of what they were asked to do by the Government." *Id. at 137-38* (emphasis in original). Specifically, under the defendants' theory of the case, the government dictated Agent Orange's method of formulation and knew that it contained dioxin, so the production of dioxin "naturally would have occurred during the performance of these government-specified duties." Id.

Similarly, in *Gordon*, Judge Bianco of this **[*24]** Court denied the plaintiff's motion to remand a case removed pursuant to *28 U.S.C. § 1442(a)(1)*. *Gordon, 990 F. Supp. 2d at 314*. Judge Bianco found that defendants, manufacturers of asbestos-containing products used aboard U.S. Navy vessels, were "acting under" a federal officer in building "Navy ship components that are of the same necessary character [as the Agent Orange in Isaacson], especially when considering the vital role of warships in our nation's defense." *Id. at 317*. The Court found there to be colorable evidence that the defendants acted under the U.S. Navy "by working hand-in-hand with naval authorities to ensure compliance with exacting technical demands." Id. Further, Judge Bianco held that by introducing evidence that they "made their products because the Navy agreed to procure them," the defendants cleared the low hurdle erected by the causation requirement. *Id. at 318*.

Here, for purposes of Plaintiffs' motion to remand, there is evidence that Manufacturing Defendants were "acting under" the DoD when producing Mil-Spec AFFF. First, an NRL document shows that the government asked the chemical industry to help it produce and improve AFFF, specifically, by "synthesiz[ing] the fluorinated intermediates" in the products. (NRL Mem. Report at **[*25]** 37 ("Although NRL was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations. . . . 3M [ ] contributed considerably to the success of the development of AFFF.").) A firm that helps the government develop a product at the government's request does more than "simply comply[ ] with the law." Cf. *Watson, 551 U.S. at 152-53, 127 S. Ct. at 2307-08* (emphasis in original).

---

[13] In *Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387 (5th Cir. 1998)*, the Fifth Circuit held that private manufacturers of Agent Orange were entitled to removal under the federal officer removal statute. *Id. at 396-401*.

Second, AFFF is a "mission-critical" and life-saving product that--like the Agent Orange in Isaacson or the ship components in Gordon--"the Government would have had to produce itself" in the absence of private contractors. See *Isaacson, 517 F.3d at 137*; *Gordon, 990 F. Supp. 2d at 317*; (Nov. 2017 DoD Report to Congress, Fleming Decl. Ex. D-5, Docket Entry 22-6, at 1 (describing AFFF as a "mission critical product [that] saves lives and protects assets"); Oct. 2009 NRL Press Release at 3 ("Following the destructive fires aboard the USS Forrestal and USS Enterprise, the Navy pursued new firefighting agents. NRL responded to this need by developing AFFF. In the military, AFFF is now on all Navy ships and submarines, and is used by all branches of the U.S. armed forces and NATO **[*26]** members."); NRL Mem. Report at 37 (describing the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety")). Through contracts with the government, Manufacturing Defendants formulated, produced, and supplied these essential AFFF products to the military. See *Isaacson, 517 F.3d at 137*; (Compl. ¶ 215 (alleging that Manufacturing Defendants "regularly contract with . . . the DOD, the [U.S. Air Force], specific installations, and/or third-party logistic intermediaries, to sell and deliver AFFF to bases throughout the country, including to Gabreski"); MIL-PRF-24385F(SH) § 6.4 ("[M]anufacturers are urged to arrange to have the products that they propose to offer to the Federal Government tested for qualification in order that they may be eligible to be awarded contracts or orders for the products covered by this specification."). Thus, Manufacturing Defendants "'assist[ed]' and 'help[ed] carry out[ ] the duties or tasks of' officers at the" DoD and "had the 'special relationship' with the Government required by the 'acting under' prong."[14] See *Isaacson, 517 F.3d at 137* (alterations in original) (quoting *Watson,*

---

[14] Plaintiffs also maintain that since Manufacturing Defendants "were free to develop their own products with their own chemical manufacturing specifications, utilizing whatever chemicals and ingredients it or they desired," they were not "acting under" a federal officer when manufacturing Mil-Spec AFFF products. (Pl.s' Br. at 8.) Additionally, they argue that Mil-Spec AFFF is a "stock" or "off-the-shelf" product that cannot have been made "under" a federal officer for purposes of the federal officer removal statute. (Pl.s' Br. at 8-9.) The Court addresses these arguments *infra*, within the context of whether Manufacturing Defendants have asserted a colorable federal defense. See *Albrecht, 2011 U.S. Dist. LEXIS 125100, 2011 WL 5109532, at *5* ("The acting under and causal connection prongs of § 1442 . . . often turn on much of the same evidence as the colorable federal defense prong.") (citations omitted).

*551 U.S. at 152, S. Ct. at 2307*).

Additionally, there is evidence of a "causal connection" between the use of PFCs in AFFF and **[*27]** the design and manufacture of AFFF for the government. See *Isaacson, 517 F.3d at 137-38*. To satisfy the causation requirement, Manufacturing Defendants need only show that the conduct at issue occurred during their performance of the government-directed action, even if the government did not call for the complained-of act. See id. ("[E]ven if Plaintiffs were to prove that the dioxin contamination occurred because of an act not specifically contemplated by the government contract, it is enough that the contracts gave rise to the contamination."). Despite Plaintiffs' argument to the contrary, Manufacturing Defendants need not show that there is a "link between the Defendants choosing PFOA and PFOS as their preferred fluorinated surfactant, of which there are thousands, in their AFFF and any federal officer ordering those chemicals to be added." (Pl.s' Br. at 9.) Crediting Manufacturing Defendants' theory of the case, the use of PFCs "occurred because of what they were asked to do by the Government"--to design and manufacture Mil-Spec AFFF products--and that is enough regardless of whether the Mil-Spec or any contract called for the use of PFCs. See *Isaacson, 517 F.3d at 137-38* (emphasis in original) (citations omitted).

### B. Colorable Federal **[*28]** Defense

Having found that the "acting under" and causation requirements are satisfied, the Court turns to the remaining prong of the federal officer removal statute, whether Manufacturing Defendants have raised a colorable federal defense. At this stage of the litigation, Manufacturing Defendants need only show that their defense is "colorable." *Willingham, 395 U.S. at 406-07, 89 S. Ct. at 1816*. "Because a core purpose of the statute is to let the 'validity of the [federal] defense' be 'tried in federal court,' a defendant seeking removal need not 'virtually . . . win his case,' nor must his defense even be 'clearly sustainable' on the facts." *Cuomo v. Crane Co., 771 F.3d 113, 115-16 (2d Cir. 2014)* (internal citations omitted) (alterations in original). "[T]he district court's role . . . is not to resolve whether the defendant has established the federal [ ] defense or to resolve factual disputes, but only to ensure the existence of some competent evidence supporting a 'colorable' federal defense." *Id. at 117*. Like the threshold for asserting a colorable defense at this stage, Manufacturing Defendants' burdens of production and persuasion are low. Id.; *Gordon, 990 F. Supp. 2d at 318*.

Here, Manufacturing Defendants intend to assert the government contractor defense, which was recognized by the Supreme Court in *Boyle v. United Techs. Corp., 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988)*. This defense **[\*29]** provides that a contractor may not be held liable under state law for design defects in equipment produced for the government "when: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle, 487 U.S. at 512, 108 S. Ct. at 2518*; see *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 88 (2d Cir. 2008)*. The defense overrides duties imposed by state law to protect "the government's discretionary authority over areas of significant federal interest such as military procurement." *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 90-91*; *Boyle, 487 U.S. at 511, 108 S. Ct. at 2518* ("We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function . . . ."); see also *Gordon, 990 F. Supp. 2d at 318* (noting that the defense is not meant "'to protect the contractor as a contractor'") (quoting *McCue v. City of New York, 521 F.3d 169, 194 (2d Cir. 2008)* (internal quotation marks omitted)).

### 1. Approval of Reasonably Precise Specifications

Key to the determination of whether the government has approved reasonably precise specifications is whether it "made a discretionary determination about the material it obtained that relates to the defective design feature at issue" such that the government **[\*30]** is the "'agent'[ ] of decision.'" *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 90-91* (quoting *In re Joint E. & S. Dist. New York Asbestos Litig., 897 F.2d 626, 630 (2d Cir. 1990))*. For this requirement to be satisfied, "the government's discretionary actions with respect to the allegedly defective design and the alleged state law tort duty [must] conflict." *Id. at 92-93* (emphasis removed).

Defendants may establish that the government approved reasonably precise specifications in several ways short of showing that the government independently prepared them. See *id. at 91* ("'[I]t is necessary only that the government approve, rather than create, the specifications. . . .'") (quoting *Carley v. Wheeled Coach, 991 F.2d 1117, 1125, 28 V.I. 310 (3d Cir. 1993)* (alteration and ellipsis in original)). For instance, even if the defendants contributed significantly "in suggesting specifications," "[t]he government

exercises adequate discretion over the contract specifications to invoke the defense if it independently and meaningfully reviews the specifications." See *id. at 91* (citing *Harduvel v. Gen. Dynamics Corp., 878 F.2d 1311, 1320 (11th Cir. 1989)* (citations omitted)). Similarly, the Eleventh Circuit has held that the requirement is satisfied where "the contractor incorporated government performance specifications into a design that the government subsequently reviewed and approved" and the design was the result of a "continuous back and forth" between the government and the contractor. *Harduvel, 878 F.2d at 1320* (citations **[\*31]** and internal quotation marks omitted). A party may also meet this requirement by demonstrating that the government reordered the product with knowledge of the alleged design defect. *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 95-96*. Additionally, the Seventh Circuit has held that the government approves reasonably precise specifications when it, among other things, issues performance requirements that significantly constrain the contractor's design choices. *Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 999 (7th Cir. 1996)*. However, "[w]here the government 'merely rubber stamps a design, . . . or where the [g]overnment merely orders a product from stock without a significant interest in the alleged design defect,' the government has not made a discretionary decision in need of protection, and the defense is therefore inapplicable." *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 90* (alteration and ellipsis in original) (quoting *Lewis v. Babcock Indus., Inc., 985 F.2d 83, 87 (2d Cir. 1993))*.

Plaintiffs contend that the government never approved "reasonably precise specifications" since the AFFF Mil-Spec sets out only "performance specifications," not "manufacturing or product specifications." (Pl.s' Br. at 11-13.) Specifically, Plaintiffs argue that though the AFFF Mil-Spec calls for a "fluorinated surfactant," there are thousands of such ingredients, and each manufacturer was free to choose which of them **[\*32]** it would use in its AFFF formulation. (Pl.s' Br. at 11-12; see Cheremisinoff Aff. at 4, ¶ 3.) They cite *Trevino v. General Dynamics Corp., 865 F.2d 1474 (5th Cir. 1989)*, (Pl.'s Br. at 12), for the proposition that there is no government approval of reasonably precise specifications when a contractor follows general performance standards that leave the design at issue to the contractor's discretion and there is no meaningful review of the design by the government. *Id. at 1486*.

For purposes of Plaintiffs' motion to remand, this argument fails. "Although the evidence provided by

[Manufacturing Defendants] may ultimately prove insufficient to support its defense on the merits, the Court finds that [p]laintiffs overestimate the demands of § 1442 at this stage of the proceedings." Albrecht, 2011 U.S. Dist. LEXIS 125100, 2011 WL 5109532, at *4. That is, while a fully developed record may reveal that the Mil-Spec left all design decisions--including the selection of fluorocarbon surfactants other than PFCs--to Manufacturing Defendants' discretion, or that the government merely "rubber stamped" Manufacturing Defendants' formulations, Manufacturing Defendants have submitted colorable evidence to the contrary.

Under the Mil-Spec, to be eligible to sell AFFF products to the military, Manufacturing Defendants not only have to design and [*33] produce them in compliance with standards regarding materials, compatibility with other AFFF formulations, and chemical, physical, and performance characteristics, but also need to have their products tested, qualified, and placed on the QPL by the DoD. (E.g., MIL-PRF-24385F(SH) §§ 3.1, 3.3-3.4, 4, 6.4 and Tables I, II, and III.) Similarly, Novac--Global Director of Foam Systems for Tyco or its affiliates--stated in his declaration that "[t]he military sets detailed specifications for [Mil-Spec AFFF] . . . products" related to AFFF's "performance, . . . quality, physical properties, labeling, and content," and that DoD "has tested military specification AFFF products of Tyco [ ] and other military specification AFFF manufacturers." (Novac Decl. ¶¶ 2-5, 10.) Novac also explains that the Mil-Spec's requirement that AFFF products on the QPL be compatible with one another "necessarily limits the design and content" of Mil-Spec AFFF formulations. (Novac Decl. ¶ 8); see Oliver, 96 F.3d at 999 (finding that the Marine Corps approved reasonably precise specifications where, inter alia, performance requirements "cabined significantly" the design feature at issue). Additionally, a Federal Aviation Administration Report on AFFF suggests [*34] that the Mil-Spec is more than solely a performance specification. Specifically, it provides that the AFFF Mil-Spec

> is a procurement specification as well as a performance specification. As a result, there are also requirements for packaging, initial qualification inspection, and quality conformance inspection. Equipment designs unique to the military . . . also impact on the specification requirements. . . . [The Mil-Spec] addresses . . . important chemical and physical properties as well.

(1994 FAA Report, Fleming Decl. Ex. D-9, Docket Entry 22-10, at 23.) Moreover, there is evidence rebutting Plaintiffs' contention that the government played little or no role in the development of these products. For instance, according to the 2004 Fire Fighting Foam Coalition report, "[b]ecause of the quantities of flammable liquids and the unique hazard of military operations, DOD agencies have always played a major role in the development and deployment of fire fighting foams." (See Aug. 2004 Report at 5.)

Significantly, viewing the facts in the light most favorable to Manufacturing Defendants, the Mil-Spec compels manufacturers to include PFCs in their formulations, which is the alleged design [*35] defect at the heart of this case. See In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 90 ("Defendants asserting the defense must demonstrate that the government made a discretionary determination about the material it obtained that relates to the defective design feature at issue."). For example, a 2017 GAO Report provides that the Mil-Spec calls for fluorocarbon surfactants, which the U.S. Navy interprets as requiring "PFCs." (2017 GAO Report at 17 n.46.) In fact, the GAO Report states that "at present there is no PFC-free firefighting foam that meets DOD's performance and compatibility requirements. As a result, the Navy has no plans to remove the requirement for firefighting foam to contain PFCs at this time." (2017 GAO Report at 19.) In line with that report, the current revision of the Mil-Spec expressly contemplates the use of PFOS and PFOA in AFFF, setting maximum content levels for the chemicals. (MIL-PRF-24385F(SH) §§ 3.2, 3.3, 6.6, and Table I.) And according to Novac's Declaration, to his knowledge, Mil-Spec-compliant AFFF products must contain PFCs, "including those that either contain or may break down to at least some level of PFOA and/or PFOS." (Novac Decl. ¶¶ 6-8.) That the DoD knows of the alleged risks of PFC-based AFFF products [*36] but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design. See In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 95-96 (2d Cir. 2008) ("Although the [Boyle] Court used the term 'reasonably precise specifications,' we think that . . . reordering the same product with knowledge of its relevant defects plays the identical role in the defense as listing specific ingredients, processes, or the like."); (2017 GAO Report at 19 (noting that the Navy currently requires PFCs but that DoD has also been working to address "PFOS and PFOA levels that exceeded EPA's health advisory levels for drinking water"). Therefore, the evidence before the Court suggests that the DoD "made a discretionary determination about the material it obtained"--AFFF--"that relates to the defective design feature at issue"--the use of PFCs--and that as a result, DoD is the

"'agent[ ] of decision.'" *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 90-91* (quoting *In re Joint E. & S. Dist. New York Asbestos Litig., 897 F.2d at 630*).

Plaintiffs also argue that Manufacturing Defendants were simply selling "stock," "off-the-shelf" AFFF products, and that as a result, Manufacturing Defendants may not avail themselves of the government contractor defense.[15] (Pl.s' Br. at 13.) According to Plaintiffs, Manufacturing Defendants used **[*37]** the same formulation for products sold to private companies and the DoD. (Pl.s' Br. at 9.) Plaintiffs also highlight the Cheremisinoff Affidavit, which provides that approximately fifty-five percent of AFFF products that contained fluorinated surfactants were sold to agencies outside of the federal government. (Pl.s' Br. at 13; Cheremisinoff Aff. at 6 ¶ 11.)

"If the government buys a product 'off-the-shelf'--'as-is'-- the seller of that product cannot be heard to assert that it is protected from the tort-law consequences of the product's defects." *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 90*. However, that a government-procured product incorporates commercially available elements "says nothing about whether the finished product resulted from the exercise of governmental discretion as to its design." Id.

At this stage of the litigation, there is colorable evidence that Mil-Spec AFFF is not a stock product. First, the allegations and evidence suggest that AFFF produced for commercial purposes is not identical to that produced pursuant to the Mil-Spec. Plaintiffs' Complaint distinguishes between the two: "Unlike commercial AFFF formulations, AFFF sold to the United States military must conform to the military-specific **[*38]** performance and quality control measurements as prescribed by the military specification ('Mil-Spec') Mil-F-24385." (Compl. ¶ 157.) Additionally, according to evidence submitted by Manufacturing Defendants, Mil-Spec AFFF generally "contain[s] more fluorosurfactant and more fluorine than [non-Mil-Spec] UL agents." (Aug. 2004 Report at 2.) Further, there is evidence that the

majority of AFFF in the federal sector is Mil-Spec AFFF and that "UL listed AFFFs would be in the majority in all other use sectors." (Aug. 2004 Report at 25.) Given that Plaintiffs seek to hold Manufacturing Defendants responsible for their use of fully fluorinated chemicals, the differences in fluorosurfactant and fluorine content are significant. See *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 90-91* (finding that Agent Orange was not a "stock" product even though it incorporated commercially available elements because the finished product was the result of government discretion, evidenced in part by higher concentration of chemical at issue).

Second, that Manufacturing Defendants may have sold Mil-Spec AFFF to non-federal agencies is not determinative; the critical question is whether the government exercised discretion with respect to the allegedly defective **[*39]** design element. See *id. at 90*. Viewing the facts in the light most favorable to Manufacturing Defendants, the government required the use of PFCs in Mil-Spec AFFF products, which are commercialized only after qualification and approval for listing on the QPL. (E.g., MIL-PRF-24385F(SH) §§ 3.1, 3.2.) Because the government contractor defense "protects government contractors from the specter of liability when the operation of state tort law would significantly conflict with the government's contracting interest," it follows that PFC-based AFFF sold to the government pursuant to the Mil-Spec fits within the defense even if it is also later sold to non-governmental entities. See *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 88* (citing *Boyle, 487 U.S. at 507, 108 S. Ct. at 2515-16*); *Boyle, 487 U.S. at 509, 108 S. Ct. at 2517* ("Here the state-imposed duty of care that is the asserted basis of the contractor's liability . . . is precisely contrary to the duty imposed by the Government contract . . . ."). Concerns over interference with the government's ability to contract for products it needs remain even if private parties later purchase those products. The examples of stock products that Plaintiffs cite in support of their argument--readily available helicopters ordered by the military "by model number," *Boyle, 487 U.S. at 509, 108 S. Ct. at 2517*, and ordinary toothpaste in its **[*40]** usual commercial packaging sold to the government, *In re "Agent Orange" Prod. Liab. Litig., 304 F. Supp. 2d 404, 434 (E.D.N.Y. 2004)*, aff'd sub nom. *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76 (2d Cir. 2008)*--do not compel a different result: Both examples contemplate the government's procurement of a product that already existed, the design of which the government did not influence. (See Pl.s' Br. at 13.)

---

[15] While Plaintiffs raise this argument within the context of whether Manufacturing Defendants have complied with reasonably precise specifications, the Court addresses it as part of whether the government has approved such specifications. See *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 90-91* (holding that use of commercially available components in Agent Orange did not preclude conclusion that the government approved reasonably precise specifications for it).

In sum, there is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products. Because Plaintiffs allege that the inclusion of these chemicals in AFFF violates state law and the government views AFFF as essential to its military mission, the precise conflict contemplated by the government contractor defense exists:

> The first Boyle requirement is designed to ensure that "a conflict with state law exists." We have observed that, therefore, "answering the question whether the [g]overnment approved reasonably precise specifications for the design feature in question necessarily answers the question whether the federal contract conflicts with state law." If such specifications are present, the contractor's federal contractual duties will inevitably [*41] conflict with alleged state tort duties to the contrary because complying with the federal contract will prevent compliance with state tort law as the plaintiffs have alleged that it exists.

In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 93 (internal citations omitted) (alterations in original); see also id. at 96-97 ("[T]he federal interest implicated by the lawsuits here is . . . the ability to pursue American military objectives--in this case, protection of American troops against hostile fire."). Thus, at this stage of the litigation, sufficient evidence supports that the government approved reasonably precise specifications for Manufacturing Defendants' AFFF products.

### 2. Compliance with Specifications

There is also colorable evidence supporting the second requirement of the government contractor defense--that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications. They submitted evidence that pursuant to the Mil-Spec, the government inspected and approved their AFFF formulations for listing on the QPL. (See, e.g., MIL-PRF-24385F(SH) §§ 3.1, 6.4; Mil-F-24385 QPL/QPD History for Type 3 AFFF, Fleming Decl. Ex. D-3, Docket Entry 22-4 (listing Manufacturing Defendants' AFFF products on QPL); Mil-F-24385 QPL/QPD [*42] History for Type 6 AFFF, Fleming Decl. Ex. D-4, Docket Entry 22-5 (same); Compl. ¶ 159 (alleging that Manufacturing Defendants "were all on the DOD [QPL] as manufacturers certified to sell AFFF under Mil-F-24385 at various times from 1976 through 2017"); see also

Novac Decl. ¶ 10 ("I am aware that the [DoD] has tested [Mil-Spec] AFFF products of Tyco [ ] and other [Mil-Spec] AFFF manufacturers, including with regard to among other things, PFOA and/or PFOS content and levels.").) Thus, the evidence suggests that the government "would not have accepted [their products] had [they] not conformed to th[e] specifications." See Cuomo, 771 F.3d at 117.

### 3. Warning the Government of Unknown Dangers

Defendants can satisfy the third government contractor defense requirement—that they warned the government of unknown dangers--by showing either that (1) they informed the government of known, relevant dangers that are "'substantial enough to influence the military decision' made," or (2) they did not need to warn the government because it was already aware of the information, In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 99 (quoting In re "Agent Orange" Prod. Liab. Litig. MDL No. 381, 818 F.2d 187, 193 (2d Cir. 1987)) (citation omitted).

Plaintiffs argue that "[Manufacturing] Defendants did not inform the DOD that purchased their products of their understanding [*43] of the contaminating nature of their surfactant ingredients (PFOA and PFOS), extreme solubility, persistence in the environment, mobility through soil, and mobility through groundwater." (Pl.s' Br. at 14.) Moreover, they maintain that "[Manufacturing] Defendants took affirmative steps to mislead the DOD and ignore the risks created from the normal handling and use of their products." (Pl.s' Br. at 15.) Specifically, Plaintiffs aver that since as early as the 1960s, 3M and Tyco concealed or failed to inform the government of the known dangers of their PFC-based AFFF products. (See Compl. ¶¶ 173-79; Cheremisinoff Aff. at 9-14, ¶¶ 1-24.)

In response, Manufacturing Defendants contend that they submitted colorable evidence supporting the fact that "[t]he United States has long understood that AFFF may contain or break down into PFOS and/or PFOA, that AFFF constituents can migrate through the soil and potentially reach groundwater, and that this may raise environmental or health issues." (Mfg. Def.s' Opp. at 20.) In support, they point to seven government documents prepared between 1980 and 2002, which suggest that the government was aware of various risks posed by PFC-containing AFFF. (Mfg. Def.s' Opp. at 20-22.)

Plaintiffs point out that while Manufacturing [*44] Defendants were able to find instances, beginning in

2018 U.S. Dist. LEXIS 170996, *44

1980, where the government acknowledged environmental issues with AFFF products, Manufacturing Defendants began selling AFFF to the government in 1967. (Pl.s' Reply at 4.) Thus, they argue, the evidence shows that Manufacturing Defendants should have warned the government prior to 1980. (See Pl.s' Reply at 4.) However, Manufacturing Defendants note that Plaintiffs' allegations concern only a subset of Manufacturing Defendants. (Mfg. Def.s' Opp. at 22-24.) They underscore the fact that Chemguard's AFFF products were first listed on an AFFF QPL in 1998. (Mfg. Def.s' Opp. at 24; Mil-F-24385 QPL/QPD History for Type 3 AFFF.) Therefore, Manufacturing Defendants contend, Chemguard was not required to warn the government of risks known to the military since 1980. (See Mfg. Def.s' Opp. at 20-24; Oct. 1980 Report at 1, 3, 17.)

The Court agrees that there is colorable evidence that Chemguard, at least, was not required to warn the government of the alleged defects of PFC-based AFFF products. Specifically, evidence suggests that the DoD was aware of PFCs' potential hazards before Chemguard began selling AFFF to the government, and "the government did not need the warnings because it already possessed the information." (Mfg. Def.s' Opp. at 20-24); see *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d at 99*; see also **[*45]** *Gordon, 990 F. Supp. 2d at 319* (citations omitted) ("Where the government has an informational advantage, Boyle's third prong does not require evidence that defendants warned the government."). Thus, Manufacturing Defendants have supported this requirement with evidence sufficient to prevent remand. See *Richard Breaux Gulf Stream Coach, Inc., No. 08-CV-0893, 2009 U.S. Dist. LEXIS 6807, 2009 WL 152109, at *2 (citation omitted) (E.D. La. Jan. 21, 2009)* ("The federal officer removal statute confers jurisdiction only if at least one of the [d]efendants" satisfies its requirements.); see also *Albrecht, 2011 U.S. Dist. LEXIS 125100, 2011 WL 5109532, at *3*.

In light of the foregoing, Plaintiff's motion to remand is DENIED.[16] However, the Court notes that Manufacturing Defendants have merely provided

colorable evidence sufficient to support its government contractor defense at this stage, which says nothing of whether the defense will succeed. See *Cuomo, 771 F.3d at 117*.

II. Manufacturing Defendants' Motion for Leave to File a Sur-Reply

In light of the resolution of Plaintiffs' motion to remand, Manufacturing Defendants' motion for leave to file a sur-reply is DENIED AS MOOT. In any event, the Court notes that Manufacturing Defendants' proposed sur-reply is an unhelpful rehash of the arguments in their opposition.

CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Remand (Docket Entry 16) and Manufacturing **[*46]** Defendants' Motion to Leave to File Sur-Reply (Docket Entry 31) are DENIED. Defendants shall answer or otherwise respond to the Complaint within thirty (30) days of the date of this Memorandum and Order. Pursuant to the Court's July 30, 2018 Electronic Order, should Defendants wish to move to dismiss the Complaint, they are not required to submit pre-motion conference requests, but may file their motions within the thirty-day (30) period. Plaintiffs' opposition shall be filed within thirty (30) days thereafter, and Defendants shall have fourteen (14) days from the date of the opposition to file reply briefs.

SO ORDERED.

/s/ JOANNA SEYBERT

Joanna Seybert, U.S.D.J.

Dated: September 30, 2018

Central Islip, New York

---

[16] In light of Magistrate Judge Anne Y. Shields' September 12, 2018 Electronic Scheduling Order, which provides that "all discovery will go forward in its entirety," (see, Sept. 2018 Elec. Sched. Order), the Court declines Plaintiffs' alternative request for "a short period of discovery limited to the issue of the government contractor defense," (see Pl.'s Br. at 17).

 Positive

As of: April 8, 2024 8:59 PM Z

## *Connecticut v. Exxon Mobil Corp.*

United States District Court for the District of Connecticut

June 2, 2021, Decided; June 2, 2021, Filed

CIVIL CASE NO. 3:20-cv-1555 (JCH)

**Reporter**

2021 U.S. Dist. LEXIS 111334 *; 51 ELR 20098; 2021 WL 2389739

STATE OF CONNECTICUT, Plaintiff, v. EXXON MOBIL CORPORATION, Defendant.

**Subsequent History:** Affirmed by *Connecticut v. Exxon Mobil Corp., 83 F.4th 122, 2023 U.S. App. LEXIS 25513 (2d Cir. Conn., Sept. 27, 2023)*

## Core Terms

removal, federal common law, preemption, fossil, fuels, federal court, federal law, well-pleaded, courts, deceptive, federal issue, consumers, argues, state claims, cases, cause of action, state law, federal statute, climate, costs, court concludes, district court, federal enclaves, unfair practice, decisions, parties, Notice, doctrine of preemption, federal jurisdiction, consumer protection

## Case Summary

### Overview

HOLDINGS: [1]-In an unfair trade practices suit brought by the State of Connecticut against an oil company, Connecticut's motion to remand was granted because it only asserted claims under the *Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110b*, and the court had no power to rewrite the complaint to substitute other claims other than those asserted under CUTPA; [2]-Ultimately, the court found that Connecticut's claims did not necessarily raise a federal issue.

### Outcome

Connecticut's motion to remand granted; Connecticut's request for costs and fees denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Removal > Specific Cases Removed > Federal Questions

Evidence > Burdens of Proof > Allocation

**HN1**[⤓] **Specific Cases Removed, Federal Questions**

The federal removal statute permits removal of any civil action that includes a claim arising under the Constitution, laws, or treaties of the United States. 28 U.S.C.S. § 1441(c). Defendants bear the burden of proving that removal is proper. The right of removal is entirely a creature of statute and a suit commenced in state court must remain there until cause is shown for its transfer under some act of the United States Congress.

Civil Procedure > ... > Removal > Specific Cases Removed > Diversity of Citizenship

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

Civil Procedure > ... > Removal > Elements for Removal > Removability

Civil Procedure > ... > Removal > Specific Cases Removed > Federal Questions

Civil Procedure > ... > Diversity Jurisdiction > Citizenship > Individuals

**HN2**[⤓] **Specific Cases Removed, Diversity of Citizenship**

28 U.S.C.S. § 1441(a) authorizes removal of a civil

2021 U.S. Dist. LEXIS 111334, *111334

action brought in a State court of which the district courts of the United States have original jurisdiction. 28 U.S.C.S. § 1441(a). The Supreme Court has described this provision as limiting removal to state-court actions that originally could have been filed in federal court. Thus, according to the Court, in the absence of diversity jurisdiction federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. This rule is known as the well-pleaded complaint rule.

Civil Procedure > ... > Removal > Specific Cases Removed > Federal Questions

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

Civil Procedure > ... > Removal > Elements for Removal > Removability

Civil Procedure > ... > Removal > Elements for Removal > Federal Venue

*HN3*[⬇] **Specific Cases Removed, Federal Questions**

As the United States Supreme Court has explained, it is settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated by the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue. Thus, unless a defendant can show that a recognized exception to the well-pleaded complaint rule applies, a defendant's argument that a case involves an issue of federal law--even a dispositive issue of federal law--is not sufficient to remove a case under 28 U.S.C.S. § 1441(a). Second, it also well settled that the well-pleaded complaint rule makes the plaintiff the master of the claim. This principle is no mere abstraction: the Supreme Court has expressly observed that a plaintiff may avoid federal jurisdiction by exclusive reliance on state law. In other words, section 1441(a) afford plaintiffs a degree of strategic control over whether a case will be litigated in state or federal court.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Claims

Torts > Business Torts > Unfair Business Practices > Elements

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Scope

*HN4*[⬇] **State Regulation, Claims**

A deceptive practice claim under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, requires a plaintiff to allege (1) a representation, omission, or other practice likely to mislead consumers; (2) that is interpreted reasonably under the circumstances by a consumer; (3) and that is material, i.e., likely to affect consumer decisions or conduct. Under this approach, a plaintiff must allege that a practice (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous: (3) or causes substantial injury to consumers. As the Connecticut Supreme Court has explained, a practice may be unfair because of the degree to which it meets one of these criteria or because to a lesser extent it meets all three.

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > Preemption

Constitutional Law > Supremacy Clause > Federal Preemption

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

*HN5*[⬇] **Federal Common Law, Preemption**

Under the complete pre-emption doctrine, the preemptive force of a federal statute can be so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule. In other words, once an area of state law has been completely pre-empted, any claim purportedly based on that preempted state law is considered, from its inception, a federal claim, and therefore arises under federal law.

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > Applicability

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

*HN6*[⬇] **Federal Common Law, Applicability**

In Sam L. Majors Jewelers v. ABX, Inc., the Fifth Circuit states that, notwithstanding the well-pleaded complaint rule, removal is proper if a cause of action arises under federal common law principles.

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

Constitutional Law > Supremacy Clause > Federal Preemption

*HN7*[⬇] **Federal Questions, Well Pleaded Complaint Rule**

This power of federal courts to convert a claim pleaded under state law into a federal claim is the essence of the complete preemption exception to the well-pleaded complaint rule. Extraordinary preemptive power is required to convert an ordinary state common law complaint into one stating a federal claim for the purposes of the well-pleaded complaint rule. In other words, the complete preemption doctrine permits courts to look past a plaintiff's labeling of a claim only in limited circumstances; it is a narrow exception to the general rule that the plaintiff--and not the defendant or the court--is the master of the claim.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

*HN8*[⬇] **Complaints, Requirements for Complaint**

The well-pleaded complaint rule does in fact exist. Through this rule, the United States Supreme Court has given substantial weight to the principle that the plaintiff is the master of the claim.

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > Preemption

Constitutional Law > Supremacy Clause > Federal Preemption

Civil Procedure > ... > Jurisdiction on Certiorari > Considerations Governing Review > State Court Decisions

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

*HN9*[⬇] **Federal Common Law, Preemption**

Given the availability of a petition for a writ of certiorari from a state court of last resort, a defendant's ability to have a federal defense reviewed by a federal court is narrowed, but it is not extinguished. 28 U.S.C.S. § 1257(a). The complete preemption doctrine bypasses this arrangement, but only when the pre-emptive force of a federal statute is extraordinary. A different system would be constitutionally permissible, but this court must respect and enforce the federal-state balance approved by the United States Congress. Although the Supreme Court has not expressly addressed whether a defendant may remove a case on the ground that purported state claims actually arise under federal common law, the Supreme Court's articulation of the complete preemption standard suggests that the Court views congressional intent, in relation to the text of a specific federal statute, as an essential prerequisite for overcoming the principle that a plaintiff is the master of a complaint.

Civil Procedure > ... > Removal > Specific Cases Removed > Federal Questions

Constitutional Law > Supremacy Clause > Federal Preemption

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

2021 U.S. Dist. LEXIS 111334, *111334

## HN10[⬇] Specific Cases Removed, Federal Questions

The United States Supreme Court in Beneficial National Bank v. Anderson provides the following formulation: A state claim may be removed to federal court in only two circumstances--when Congress expressly so provides, such as in the Price-Anderson Act, or when a federal statute wholly displaces the state-law cause of action through complete pre-emption. When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law.

Banking Law > Bank Activities > Loans > Interest on Loans

Contracts Law > Defenses > Usury

Banking Law > ... > National Banks > Interest & Usury > Usury Litigation
Business & Corporate Compliance > Banking & Finance > National Banks > Usury Litigation

Business & Corporate Compliance > Banking & Finance > Federal Acts > National Bank Act
Banking Law > Federal Acts > National Bank Act

Banking Law > ... > National Banks > Interest & Usury > Rate & Recovery of Interest

## HN11[⬇] Loans, Interest on Loans

The National Bank Act, 12 U.S.C.S. § 85, caps the rates of interest that banks with national operations may charge. 12 U.S.C.S. § 85. 12 U.S.C.S. § 86 of the National Bank Act goes beyond capping interest rates. This provision establishes a private cause of action on the part of any person who pays a rate of interest greater than is allowed by section 85. 12 U.S.C.S. § 86. The Supreme Court held that sections 85 and 86 together permit removal because they evidenced congressional intent to supersede both the substantive and remedial provisions of state usury laws. As a result, there is, in short, no such thing a state-law claim of usury against a national bank.

Antitrust & Trade Law > Regulated Industries > Communications > Telecommunication

s Act

Communications Law > Federal Acts > Telecommunications Act > Federal Preemption

Constitutional Law > Supremacy Clause > Federal Preemption

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > Preemption

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

## HN12[⬇] Communications, Telecommunications Act

The Second Circuit concludes: Thus, after Metropolitan Life, it is clear that the complete preemption doctrine applies only where Congress has clearly manifested an intent to disallow state law claims in a particular field. Given the narrow scope of the complete preemption doctrine after Metropolitan Life, absent some express statement or other clear manifestation from Congress that it intends the complete preemption doctrine to apply, we believe that federal common law does not completely preempt state law claims in the area of interstate telecommunications.

Civil Procedure > ... > Removal > Specific Cases Removed > Federal Questions

Constitutional Law > Supremacy Clause > Federal Preemption

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > Preemption

## HN13[⬇] Specific Cases Removed, Federal Questions

For the purposes of removal, there is a material difference between a state claim that a federal preemption defense unquestionably defeats and a state claim that has been replaced by a federal cause of action with extraordinary preemptive force: only the latter suffices for removal. The United States Supreme Court has directed courts to scrutinize congressional

intent and statutory text to distinguish between these two situations. Federal common law provides no criteria by which a court can discern whether a federal cause of action carries the extraordinary, degree of preemption needed for removal.

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

Constitutional Law > Supremacy Clause > Federal Preemption

## HN14[🔽]   Federal Questions, Well Pleaded Complaint Rule

The United States Supreme Court has held that a mere complete federal defense, as contrasted with complete preemption, does not justify removal.

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > Applicability

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

## HN15[🔽]   Federal Common Law, Applicability

The strongest argument for altering this framework in the context of federal common law is the principle that defendants should be able to receive prompt review of dispositive issues of federal law, but the Supreme Court has made quite clear that the well-pleaded complaint rule can frustrate this principle. It is settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated by the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue. Thus, although the Supreme Court's decisions pertaining to the well-pleaded complaint rule have not squarely addressed federal common law, the approach it has crafted in cases involving federal statutes is inconsistent with removal of purported state claims merely on the ground that federal common law has displaced such claims.

Civil Procedure > ... > Removal > Specific Cases Removed > Federal Questions

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

Civil Procedure > ... > Removal > Elements for Removal > Removability

## HN16[🔽]   Specific Cases Removed, Federal Questions

Under the so-called Grable doctrine, removal is proper if a federal issue is embedded within a state law claim. The embedded federal issue must be (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress. All four of these elements must be met in order to establish federal jurisdiction. The Second Circuit has also referred to this doctrine as the substantial federal question exception to the well-pleaded complaint rule.

Civil Procedure > ... > Removal > Specific Cases Removed > Federal Questions

Governments > Courts > Authority to Adjudicate

## HN17[🔽]   Specific Cases Removed, Federal Questions

Federal jurisdiction only exists under the Grable doctrine if all four requirements are met.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Scope

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Antitrust & Trade Law > Regulated Practices > Private Actions > State Regulation

## HN18[🔽]   Trade Practices & Unfair Competition, State Regulation

With respect to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110b(b), to be guided by interpretations is not the same as being bound by

them. Conn. Gen. Stat. § 42-110b(b).

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > Well Pleaded Complaint Rule

**HN19**[🔻]  **Federal Questions, Well Pleaded Complaint Rule**

This court understands the artful pleading doctrine as coextensive with Grable, i.e., the artful pleading doctrine prevents a plaintiff from avoiding Grable jurisdiction by omitting, from the plaintiff's statement of a state-law claim, an essential element of the claim that necessarily raises a federal issue that is substantial, actually disputed, and capable of resolution without disrupting the federal-state balance approved by Congress. Compare and.

Civil Procedure > ... > Removal > Specific Cases Removed > Cases Involving Federal Officers

**HN20**[🔻]  **Specific Cases Removed, Cases Involving Federal Officers**

28 U.S.C.S. § 1442(a)(1) authorizes removal of cases involving claims against any officer (or any person acting under that officer) of the United States or of any agency thereof. 28 U.S.C.S. § 1442(a)(1). In contrast to the general removal statute, which must be strictly construed, both [section] 1442 and especially its acting under provision must be read broadly. Private parties that seek removal on the basis of section 1442 must show that (1) they are persons within the meaning of statute who acted under a federal officer, (2) they performed the actions for which they are being sued under color of federal office, and (3) they raise a colorable federal defense.

Civil Procedure > ... > Removal > Specific Cases Removed > Cases Involving Federal Officers

**HN21**[🔻]  **Specific Cases Removed, Cases Involving Federal Officers**

The paradigmatic example of a private party that may avail itself of the federal officer removal statute is a private company acting pursuant to a contract with the federal government.

Civil Procedure > ... > Removal > Specific Cases Removed > Cases Involving Federal Officers

**HN22**[🔻]  **Specific Cases Removed, Cases Involving Federal Officers**

A party must show not merely that it has acted under a federal agency or officer but also that it performed the actions for which it is being sued under color of federal office. The Second Circuit has observed the hurdle erected by this requirement is quite low: a defendant need not show that a plaintiff's claims are for the very acts the defendant performed under color of federal office. Further, a court must credit a defendant's theory of the case when analyzing this prong of the federal officer removal test. Nevertheless, under this causation requirement non-governmental corporate defendants must demonstrate that the acts for which they are being sued occurred because of what they were asked to do by the Government. Thus, although the strength of the connection between acts performed by a defendant under color of federal office and the acts for which the defendant is sued may be quite low, the nature of this connection must be causal.

Admiralty & Maritime Law > Maritime Workers' Claims > Outer Continental Shelf Lands Act

Workers' Compensation & SSDI > Outer Continental Shelf Lands Act
Business & Corporate Compliance > Workers' Compensation > Outer Continental Shelf Lands Act

**HN23**[🔻]  **Maritime Workers' Claims, Outer Continental Shelf Lands Act**

In construing the meaning of 43 U.S.C.S. § 1349(b), the Fifth Circuit has concluded that the term operation contemplates the doing of some physical act on the Outer Continental Shelf.

Constitutional Law > Congressional Duties & Powers > District of Columbia & Federal Property

Copyright Law > Constitutional Copyright Protections > Copyright Clause

Constitutional Law > Congressional Duties &

Case 3:24-cv-00239-SRU   Document 41-1   Filed 04/08/24   Page 152 of 277

Page 7 of 20

2021 U.S. Dist. LEXIS 111334, *111334

Powers > War Powers Clause

## HN24[⬇] Congressional Duties & Powers, District of Columbia & Federal Property

U.S. Const. art. I, § 8 authorizes the United States Congress to exercise exclusive Legislation in all Cases whatsoever over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-yards, and other needful Buildings. U.S. Const. art. I, § 8.

Civil Procedure > ... > Diversity Jurisdiction > Citizenship > Individuals

Constitutional Law > ... > Jurisdiction > Subject Matter Jurisdiction > Amount in Controversy

Civil Procedure > ... > Diversity Jurisdiction > Alienage Jurisdiction > Jurisdictional Requirements

## HN25[⬇] Citizenship, Individuals

28 U.S.C.S. § 1332(a)(1) vests district courts with original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. 28 U.S.C.S. § 1332(a)(1). There is no question that a State is not a citizen for purposes of diversity jurisdiction. However, courts must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy.

Civil Procedure > Parties > Real Party in Interest > Subrogees

## HN26[⬇] Real Party in Interest, Subrogees

Courts have developed two competing approaches for determining whether a state is a real party in interest: the claim-by-claim approach and the whole-complaint approach. Courts applying the former approach analyze whether a state is the real party in interest with respect to each type of relief sought, while courts applying the latter approach look at the lawsuit as a whole. Although the Second Circuit has not definitively adopted the whole-complaint approach, it has strongly suggested that it prefers this approach. The claim-by claim

approach has been roundly criticized, and the whole-complaint approach has emerged as the majority rule.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Civil Procedure > ... > Removal > Postremoval Remands > Motions for Remand

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

## HN27[⬇] Judges, Discretionary Powers

28 U.S.C.S. § 1447(c) provides that an order remanding the case may require payment of just costs and any actual expenses, incurred as a result of the removal. 28 U.S.C.S. § 1447(c). Absent unusual circumstances, courts may award attorney's fees under section 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. The Supreme Court has instructed that, in applying this rule, district courts retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case.

**Counsel:** [*1] For Exxon Mobil Corporation, Defendant: Justin Anderson, LEAD ATTORNEY, Paul Weiss Rifkind Wharton & Garrison LLP, Washington, DC; Tadhg Dooley, LEAD ATTORNEY, Wiggin & Dana-NH, New Haven, CT; Patrick J Conlon, Exxon Mobil Corportation, Spring, TX; Kevin M. Smith, LEAD ATTORNEY, Wiggin & Dana, New Haven, CT; Theodore V. Wells Jr, Daniel J. Toal, LEAD ATTORNEYS, Paul Weiss Rifkind Wharton & Garrison LLP, New York, NY; Robert M. Langer, LEAD ATTORNEY, Wiggin & Dana-Htfd, Hartford, CT.

For State of Connecticut, by its Attorney General William M. Tong, Plaintiff: William Morten Tong, Matthew I. Levine, LEAD ATTORNEYS, Daniel Matthew Salton, Benjamin Cheney, Jonathan E Harding, CT, Office of the Attorney General, Hartford, CT.

**Judges:** Janet C. Hall, United States District Judge.

**Opinion by:** Janet C. Hall

# Opinion

2021 U.S. Dist. LEXIS 111334, *1

**RULING ON MOTION TO REMAND (DOC. NO. 36)**

## I. INTRODUCTION

Plaintiff, the State of Connecticut, has moved for an order remanding the case to the Superior Court of Connecticut and awarding costs and attorneys' fees. See Pl.'s Mot. to Remand to Superior Court and for Costs and Fees ("Pl.'s Mot.") (Doc. No. 36). Defendant, Exxon Mobil Corporation ("ExxonMobil") opposes this Motion. See Br. of Def. in Opp'n to Pl.'s Mot. **[*2]** to Remand ("Def.'s Opp'n") (Doc. No. 37). The court heard argument in connection with the Motion on May 21, 2021. See Min. Entry (Doc. No. 51).

For the reasons stated below, the court grants the Motion to Remand and denies Connecticut's request for costs and fees.

## II. BACKGROUND

A. Allegations in the Complaint

ExxonMobil is a "multinational energy and chemicals company" incorporated in New Jersey, with its principal place of business in Texas. Ex. 12, Notice of Removal ("Compl.") (Doc. 1-2 at 34-78) ¶ 47.[1] ExxonMobil manufactures, transports, and sells a variety of fossil fuels, such as crude oil, natural gas, and petroleum products. Id. ¶¶ 53-54. ExxonMobil has sold substantial quantities of fossil fuels in Connecticut, including through gas stations. Id. ¶¶ 59-60.

At least as early as 1957, ExxonMobil has been aware of research indicating that the combustion of fossil fuels causes dangerous changes to the Earth's climate. Id. ¶¶ 63-95. This research includes materials created by Exxon's own employees warning that emissions attributable to fossil fuels "would cause climate variations including a mean temperature increase." Id. ¶¶ 64, 68-70.

In an effort to resist potential decreases in its **[*3]** revenue that might result from widespread acceptance of the conclusion ExxonMobil itself understood--the causal connection between the combustion of fossil fuels and climate change--ExxonMobil published statements casting doubt on this connection. Id. ¶¶ 96-

167. These statements took various forms, including advertisements, interviews, and research papers. Id. ¶¶ 100-03. For example, between 1972 and 2001, ExxonMobil published advertisements in the New York Times, a newspaper circulated to tens of thousands of Connecticut residents, nearly every week. Id. ¶¶ 137-39. One such advertisement, published in 1984, disparaged a scientific theory linking fossils fuels to melting polar ice caps and rising sea levels as "[l]ies they tell our children" and a "myth of the 1960s and 1970s." Id. ¶ 144(a). Another, published in 1997, warned readers that efforts to respond to the threat of climate change were based on "speculation" and not on "science." Id. ¶ 144(h).

B. Procedural Background

Connecticut, through its Office of the Attorney General, filed its Complaint in the Superior Court of Connecticut on September 24, 2020. See Compl. The Complaint asserts eight claims under the Connecticut Unfair Trade Practices Act ("CUTPA"). Id. at 38-43.[2]

Count **[*4]** One alleges that ExxonMobil made false and/or misleading statements likely to deceive Connecticut consumers, in order to increase its profits, in violation of *section 42-110b of the Connecticut General Statutes*. Id. at 36-38. Count Three alleges that ExxonMobil's statements, by "stifling [ ] an open marketplace for renewable energy, [and] thereby leaving consumers unable to reasonably avoid the detrimental consequences of fossil fuel combustion", contravened Connecticut's public policy and constituted an unfair trade practice, also in violation of *section 42-110b*. Id. at 38-40. Counts Five and Seven assert that a subset of the statements that ExxonMobil made, which Connecticut labels as "greenwashing", i.e., "deceptive [ ] campaigns to portray the company as environmentally conscious", constituted deceptive (Count Five) and unfair (Count Seven) practices, again in violation of *section 42-110b*. Id. at 40-43. Counts Two, Four, Six, and Eight allege that ExxonMobil's conduct was willful, triggering penalties under *section 42-110o*. Id. at 38, 40-43. Connecticut seeks damages, disgorgement of revenues and profits, and multiple forms of injunctive relief, including an order requiring ExxonMobil to "fund a corrective education campaign to remedy the harm inflicted by decades of disinformation." **[*5]** Id. at 44-45.

---

[1] The Complaint uses the label "ExxonMobil" to refer to both Exxon Mobil Corporation and its predecessor entities. Compl. ¶¶ 50-51.

[2] The Complaint repeats certain paragraph numbers. The court cites to page numbers in the Complaint when necessary to avoid confusion.

On October 14, 2020, ExxonMobil filed its Notice of Removal. See Notice of Removal. In addition to listing several grounds for removal, the Notice of Removal asserts that, "[w]hile purportedly brought under state law and in the name of consumer protection, this lawsuit . . . is the latest product of a multi-year plan . . . to change federal climate and energy policy." Id. at 1-2.

Connecticut filed its Motion to Remand on December 2, 2020.[3] See Pl.'s Mot. ExxonMobil filed its Opposition on January 18, 2021. See Def.'s Opp'n. Connecticut filed a Reply on February 8, 2021. See Pl.'s Reply in Supp. of Mot. to Remand ("Pl.'s Reply") (Doc. No. 38). In addition, the parties have filed Notices of Additional Authority, in which they bring to the court's attention decisions by other district courts granting motions to remand in cases involving overlapping issues, as well as a recent decision by the Second Circuit concerning preemption of state nuisance claims pertaining to climate change. See Notices (Docs. Nos. 39, 41, 42, 46, 47).

## III. STANDARD OF REVIEW

HN1[⬆] The federal removal statute permits removal of any "civil action [that] includes . . . a claim arising under the Constitution, [*6] laws, or treaties of the United States." 28 U.S.C. § 1441(c). Defendants bear the burden of proving that removal is proper. O'Donnell v. AXA Equitable Life Ins. Co., 887 F.3d 124, 128 (2d Cir. 2018) (citation omitted); see Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 32, 123 S. Ct. 366, 154 L. Ed. 2d 368 (2002) ("The right of removal is entirely a creature of statute and a suit commenced in state court must remain there until cause is shown for its transfer under some act of Congress." (citation and internal quotation marks omitted)).

## IV. DISCUSSION

### A. The Well-Pleaded Complaint Rule

ExxonMobil argues that removal of this case is proper, because "federal common law necessarily and exclusively governs claims for interstate and international pollution." Def.'s Opp'n at 16-17. Underlying ExxonMobil's primary arguments for removal

is an insistence that Connecticut's claims in this case, though labeled as claims for deceptive and unfair practices under CUTPA, are not all that they seem. In effect, ExxonMobil asks the court to view Connecticut's claims as more akin to nuisance claims that seek to regulate emissions of pollutants through common-law tort liability rules.

This request for the court to look past Connecticut's characterization of its own Complaint is in tension with Supreme Court precedents concerning removal. HN2[⬆] Section 1441(a) of title 28 authorizes removal of a "civil action brought in [*7] a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). The Supreme Court has described this provision as limiting removal to "state-court actions that originally could have been filed in federal court." Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987). Thus, according to the Court, in the" [a]bsen[ce] [of] diversity [jurisdiction] . . . federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Id. This rule is known as the "well-pleaded complaint rule." Id.

Two aspects of the well-pleaded complaint rule have significant implications for this case. First, it is beyond dispute that the well-pleaded complaint rule can prevent removal of cases that involve dispositive questions of federal law. HN3[⬆] As the Supreme Court has explained, "it is [ ] settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated by the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." Id. at 393 (citation omitted). Thus, unless a defendant can show that a recognized exception to the well-pleaded [*8] complaint rule applies, a defendant's argument that a case involves an issue of federal law--even a dispositive issue of federal law--is not sufficient to remove a case under section 1441(a).

Second, it also well settled that "[t]he well-pleaded complaint] rule makes the plaintiff the master of the claim." Id. at 392. This principle is no mere abstraction: the Supreme Court has expressly observed that a plaintiff "may avoid federal jurisdiction by exclusive reliance on state law." Id. In other words, section 1441(a) afford plaintiffs a degree of strategic control over whether a case will be litigated in state or federal court. Such strategic considerations do not amount to nefarious gamesmanship; they are a direct and

---

[3] ExxonMobil filed a Motion to Dismiss for Lack of Personal Jurisdiction on November 13, 2020. See Mot. to Dismiss (Doc. No. 35). This Ruling does not address that Motion.

recognized result of the text of _section 1441(a)_, as interpreted by the Supreme Court.

With these principles in mind, the court briefly comments on the nature of Connecticut's claims, before discussing the recognized exceptions to the well-pleaded complaint rule, which are also referred to as corollaries to the rule. Connecticut's Complaint asserts claims for deceptive and unfair practices under CUTPA. See Compl. at 36-43. The claims are asserted pursuant to _section 42-110b of the Connecticut General Statutes_, and they comprise distinct elements. _HN4_[⬆] A deceptive practice claim **[*9]** requires a plaintiff to allege (1) "a representation, omission, or other practice likely to mislead consumers"; (2) that is interpreted "reasonably under the circumstances" by a consumer"; (3) and that is material, _i.e._, "likely to affect consumer decisions or conduct." _Langan v. Johnson & Johnson Consumer Cos., Inc., 95 F. Supp. 3d 284, 288 (D. Conn. 2015)_ (quoting _Smithfield Assocs., LLC v. Tolland Bank, 86 Conn. App. 14, 28, 860 A.2d 738 (2004)_). With regard to unfair practice claims, Connecticut courts have adopted the "cigarette rule" articulated by the Federal Trade Commission ("FTC"). _Ulbrich v. Groth, 310 Conn. 375, 409, 78 A.3d 76 (2013)_ (citation omitted). Under this approach, a plaintiff must allege that a practice (1) "offends public policy as it has been established by statutes, the common law, or otherwise"; (2)" is immoral, unethical, oppressive, or unscrupulous: (3) or "causes substantial injury to consumers." Id. As the Connecticut Supreme Court has explained, "[a] practice may be unfair because of the degree to which it meets one of the[se] criteria or because to a lesser extent it meets all three." Id. (citation omitted).

These causes of action regulate the manner by which business interact with consumers. Consistent with the nature of these claims, Connecticut's claims seek redress for the allegedly deceptive and unfair manner by which ExxonMobil interacted with Connecticut consumers. **[*10]** See supra at 2-3. In short, Connecticut alleges that ExxonMobil lied to Connecticut consumers, and that these lies affected the behavior of those consumers.

The fact that the alleged lies were _about_ the impacts of fossil fuels on the Earth's climate does not empower the court to rewrite the Complaint and substitute other claims for Connecticut's CUTPA claims.[4] Nor does the

possibility that Connecticut might have considered including other claims, but declined to do so, permit the court to rewrite the Complaint to add such claims. The court is aware that other states have asserted common-law nuisance and trespass claims against ExxonMobil and other producers of fossil fuels. See, e.g., _City of New York v. Chevron, 993 F.3d 81, 88 (2d Cir. 2021)_. But Connecticut has not asserted such claims in this case. Unless one of the recognized exceptions discussed below applies, 'the plaintiff [is] the master of the claim." See _Caterpillar Inc., 482 U.S. at 392_.

1. Federal Common Law and Complete Preemption

_HN5_[⬆] Under the "'complete pre-emption' doctrine," the "preemptive force of a [federal] statute" can be "so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" _Caterpillar Inc., 482 U.S. at 393_ (quoting _Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 65, 107 S. Ct. 1542, 95 L. Ed. 2d 55 (1987)_). In other words, **[*11]** "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that preempted state law is considered, from its inception, a federal claim, and therefore arises under federal law." Id. (citing _Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. 1, 24, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983)_).

ExxonMobil's argument "that federal common law necessarily and exclusively governs claims for interstate and international pollution", Def.'s Opp'n at 17, parallels the complete preemption doctrine. See _Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 11, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003)_ ("Because _[sections] 85_ and _86_ provide the exclusive cause of action for usury claims, there is, in short, no such thing as a state-law claim of usury against a national bank."). However, perhaps recognizing that the Supreme Court has only applied complete preemption to claims arising under federal statutes, and that the Second Circuit has indicated that the only case in which it ever determined that federal

---

4 During oral argument, the parties raised the broad language of Connecticut's fifth request for of relief: "An order pursuant to

_Conn. Gen. Stat. § 42-110m_ directing ExxonMobil to pay restitution to the State for all expenditures attributable to ExxonMobil that the State has made and will have to make to combat the effects of climate change." See Compl. at 44. The court construes this request for relief as seeking restitution only for expenditures attributable to ExxonMobil's allegedly deceptive and unfair practices in marketing its products, as alleged in the Complaint. Plainly, the court cannot award relief corresponding with conduct that goes beyond the claims in the Complaint.

common law can give rise to complete preemption is no longer good law, ExxonMobil insists that its "invocation of federal common law . . . is not an argument for complete preemption." See Def.'s Opp'n at 17 n.21 (emphasis added). Thus, ExxonMobil's argument raises the issue of whether federal common law can convert state claims into federal claims in the same manner as complete **[\*12]** preemption under federal statutes.

ExxonMobil's Opposition to the Motion to Remand cites scant authority in support of this proposition.[5] See Def.'s Opp'n at 16-18. *HN6*[⬆] In *Sam L. Majors Jewelers v. ABX, Inc., 117 F.3d 922 (5th Cir. 1997)*, the Fifth Circuit stated that, notwithstanding the well-pleaded complaint rule, removal is proper if a "cause of action arises under federal common law principles." *Id. at 924*. However, the Fifth Circuit failed to identify any authority for that proposition. See id. Instead, the Fifth Circuit relied on decisions recognizing that federal question jurisdiction exists when a complaint filed in federal court asserts causes of action under federal common law. See *id. at 926* (citing *Illinois v. City of Milwaukee, 406 U.S. 91, 100, 92 S. Ct. 1385, 31 L. Ed. 2d 712 (1972)*) (other citations omitted).

Left undiscussed in Sam. L Majors Jewelers was the proposition, critical to ExxonMobil's argument in the current case, that a court may look past a complaint's labeling of a claim as arising under state law, despite the Supreme Court's declaration that the well-pleaded complaint rule "makes the plaintiff the master of the claim." See *Caterpillar Inc., 482 U.S. at 392*. *HN7*[⬆] This power of federal courts to "convert" a claim pleaded under state law into a federal claim is the essence of the complete preemption exception to the well-pleaded complaint rule. See *Metro. Life Ins. Co., 481 U.S. at 65* (observing that **[\*13]** "extraordinary preemptive power" is required to "convert [ ] an ordinary state common law complaint into one stating a federal claim for the purposes of the well-pleaded complaint rule"). In other words, the complete preemption doctrine permits courts

to look past a plaintiff's labeling of a claim only in limited circumstances; it is a narrow exception to the general rule that the plaintiff--and not the defendant or the court--is "the master of the claim." See *Caterpillar Inc., 482 U.S. at 392*.

The second case relied on by ExxonMobil, *Associated X-Ray Corp. v. Federal Express Corp., No. 3:93-CV-2209 (AVC), 1994 U.S. Dist. LEXIS 21571, 1994 WL 897156 (D. Conn. July 22, 1994)*, observed that, "[w]hen federal law preempts state law, the court may allow removal . . . even though the complaint appears to allege state law claims," and that district courts have "original jurisdiction over civil actions arising under federal common law." *1994 U.S. Dist. LEXIS 21571, [WL] at \*3*. However, as in Sam. L. Majors Jewelers, the court did not cite any decisions holding that federal courts may disregard plaintiffs' characterizations of their claims in cases involving federal common law. See id.

In a world without the well-pleaded complaint rule, ExxonMobil's position would be straightforward: federal courts should have jurisdiction over important issues of federal law. The problem for ExxonMobil is that *HN8*[⬆] the well-pleaded complaint **[\*14]** rule does in fact exist. Through this rule, the Supreme Court has given substantial weight to the principle that "the plaintiff [is] the master of the claim." *Caterpillar Inc., 482 U.S. at 392*. Again, it is beyond dispute that the well-pleaded complaint rule can prevent removal in cases that involve dispositive issues of federal law. *Id. at 393*. *HN9*[⬆] In such cases, given the availability of a petition for a writ of certiorari from a state court of last resort, a defendant's ability to have a federal defense reviewed by a federal court is narrowed, but it is not extinguished. *28 U.S.C. § 1257(a)*. The complete preemption doctrine bypasses this arrangement, but only when the "pre-emptive force of a [federal] statute . . . [is] 'extraordinary.'" *Caterpillar Inc., 482 U.S. at 393*. A different system would be constitutionally permissible, but this court must respect and enforce "the federal-state balance approved by Congress." See *Gunn v. Minton, 568 U.S. 251, 258, 133 S. Ct. 1059, 185 L. Ed. 2d 72 (2013)*.

Although the Supreme Court has not expressly addressed whether a defendant may remove a case on the ground that purported state claims actually arise under federal common law, the Supreme Court's articulation of the complete preemption standard suggests that the Court views congressional intent, in relation to the text of a specific federal statute, as an essential **[\*15]** prerequisite for overcoming the principle

_____

[5] The two Supreme Court decisions cited by ExxonMobil are inapposite. In *City of Milwaukee v. Illinois, 451 U.S. 304, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981)*, the Complaint had been filed in federal court, *id. at 310*, and removal was therefore not an issue. In *Standard Fire Insurance Co. v. Knowles, 568 U.S. 588, 133 S. Ct. 1345, 185 L. Ed. 2d 439 (2013)*, the Court addressed whether a plaintiff can evade the scope of the Class Action Fairness Act of 2005 by stipulating that the plaintiff "will not seek damages that exceed $5 million in total." *Id. at 590*.

that a plaintiff is the master of a complaint. In Metropolitan Life Insurance Co. and Caterpillar Inc., the Supreme Court justified permitting courts to look past plaintiffs' characterizations of claims on the ground that specific federal statutes evidenced clear congressional intent to impose "extraordinary preemptive power." *Metro. Life Ins. Co., 481 U.S. at 65*; *Caterpillar Inc., 482 U.S. at 393*. **HN10**[↑] More recently, in *Beneficial National Bank v. Anderson, 539 U.S. 1, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003)*, the Supreme Court provided the following formulation:

> [A] state claim may be removed to federal court in only two circumstances--when Congress expressly so provides, such as in the Price-Anderson Act, or when a federal statute wholly displaces the state-law cause of action through complete pre-emption. When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law.

Id. at 8 (emphasis added) (internal citation omitted).

The Supreme Court's analysis of the particular claims at issue in Beneficial National Bank is also instructive for the current dispute. In that case, the defendant sought removal of state usury claims. Id. at 9. The Supreme Court examined whether either **[\*16]** of two sections of the National Bank Act justified removal of the state usury claims. Id. **HN11**[↑] The first provision at issue, *section 85 of the National Bank Act*, caps the rates of interest that banks with national operations may charge. See *12 U.S.C. § 85*. The Supreme Court observed that this provision "unquestionably pre-empts any common-law or [state] statutory rule that would treat [ ] rates [below the statutory limit] as usurious." *Beneficial Nat'l Bank, 539 U.S. at 9*. However, because *section 85* would merely "provide the petitioners with a complete federal defense," *section 85* alone "would not justify removal." Id. (citations omitted).

*Section 86 of the National Bank Act* goes beyond capping interest rates. This provision establishes a private cause of action on the part of any person who pays "a rate of interest greater than is allowed by *section 85*." *12 U.S.C. § 86*. The Supreme Court held that *sections 85* and *86* together permit removal because they evidenced congressional intent to "supersede both the substantive and remedial provisions of state usury laws." *Beneficial Nat'l Bank, 539 U.S. at 9-11*. As a result, "there is, in short, no such

thing a state-law claim of usury against a national bank." *Id. at 11*.

The Second Circuit, for its part, once recognized federal common law as a basis for removal under the complete preemption doctrine, but the Second Circuit later reconsidered this principle after the **[\*17]** Supreme Court's decision in Metropolitan Life Insurance Co. In *Nordlicht v. New York Telephone Co., 799 F.2d 859 (2d Cir. 1986)*, the Second Circuit held that removal of state-law fraud claims challenging a pricing scheme for phone calls was appropriate, because such claims "necessarily ar[o]se under federal common law." *Id. at 862*.

However, twelve years later, in *Marcus v. AT&T Corp., 138 F.3d 46 (2d Cir. 1998)*, the Second Circuit rejected an argument that federal common law permitted removal of state-law claims relating to telecommunications, noting that the Supreme Court's decision in Metropolitan Life Insurance Co. "sharply circumscribed the availability of removal based on complete preemption." *Id. at 54*. **HN12**[↑] The Second Circuit concluded:

> Thus, after Metropolitan Life, it is clear that the complete preemption doctrine applies only where Congress has clearly manifested an intent to disallow state law claims in a particular field.

> Given the narrow scope of the complete preemption doctrine after Metropolitan Life, absent some express statement or other clear manifestation from Congress that it intends the complete preemption doctrine to apply, we believe that federal common law does not completely preempt state law claims in the area of interstate telecommunications.

Id.

Shortly thereafter, in *Fax Telecommunications Inc. v. AT&T, 138 F.3d 479 (2d Cir. 1998)*, the Second Circuit again **[\*18]** rejected an argument that federal common law enabled removal of state claims. *Id. at 486-87*. Moreover, the Second Circuit provided the following description of its holding in Marcus:

> In Marcus, we reconsidered Nordlicht in light of the Supreme Court's opinion in Metropolitan Life, which limited the availability of complete preemption removal to "the very narrow range of cases where 'Congress has clearly manifested an intent' to make specific action within a particular area removable."

*Id. at 486* (quoting *Marcus, 138 F.3d at 54*). In this way,

the Second Circuit made clear that its only decision squarely recognizing federal common law as a basis for removal no longer is good law.[6] Further, the Second Circuit gave a clear indication that courts should apply complete preemption analysis to arguments for removal relating to federal common law.

Here, by arguing that "federal common law necessarily and exclusively governs" Connecticut's claims, Def.'s Opp'n at 17, ExxonMobil asks the court to conclude that there is no such thing as a CUTPA deceptive or unfair practice claim targeting the marketing interactions between a seller of fossil fuels and Connecticut [*19] consumers. ExxonMobil argues that "interstate and international pollution" is an area of law that is so saturated with federal interests and regulation that Connecticut's claims are therefore also "federal in nature." See Def.'s Opp'n at 17. *HN13*[↑] However, for the purposes of removal, there is a material difference between a state claim that a federal preemption defense "unquestionably" defeats and a state claim that has been replaced by a federal cause of action with extraordinary preemptive force: only the latter suffices for removal.[7] See *Beneficial Nat'l Bank, 539 U.S. at 9-*

---

[6] In *Republic of Philippines v. Marcos, 1986 U.S. App. LEXIS 34155, 806 F.2d 344 (2d Cir. 1986)*, the Second Circuit stated that it was "probably" possible for "federal common law in the area of foreign affairs [to be] so 'powerful', or important as to displace a purely private cause of action of constructive trust." *Id. at 354*. However, acknowledging that it might be "wrong on this point", the Second Circuit ultimately rested its decision in that case on its determination that plaintiff's state-law claim "raises, as a necessary element," an issue of federal law. i.e., what has come to be known as Grable jurisdiction. See id. The Second Circuit's discussion of federal common law as a basis for removal in *Republic of Philippines* was thus dicta. See *Baraket v. Holder, 632 F.3d 56, 59 (2d Cir. 2011)* ("[I]t is not substantive discussion of a question or lack thereof that distinguishes holding from dictum, but rather whether resolution of the question is necessary for the decision of the case."). Given the Second Circuit's reconsideration of Nordlicht, this court finds the dicta in *Republic of Philippines* concerning federal common law to be unpersuasive.

The parties have not identified, and the court has also been unable to find, any decision by the Second Circuit after Nordlicht holding that federal common law can provide a basis for removal.

[7] Indeed, the Second Circuit recently commented on the consequences of this distinction for other lawsuits that have been filed by states against producers of fossil fuels. See *City of New York, 993 F.3d at 94*. In that case, the Second Circuit,

---

*11*. The Supreme Court has directed courts to scrutinize congressional intent and statutory text to distinguish between these two situations. See *id. at 9* ("Only if Congress intended *[section] 86* to provide the exclusive cause of action for usury claims against national banks would the statute be comparable to the provisions we construed in the Avco and Metropolitan Life cases."). Federal common law provides no criteria by which a court can discern whether a federal cause of action carries the "extraordinary", *Caterpillar, 482 U.S. at 393*, degree of preemption needed for removal.

*HN15*[↑] The strongest argument for altering this framework in the context of federal common law is the principle that defendants [*20] should be able to receive prompt review of dispositive issues of federal law, but the Supreme Court has made quite clear that the well-pleaded complaint rule can frustrate this principle. *Caterpillar Inc., 482 U.S. at 393* ("[I]t is [ ] settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated by the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue."). Thus, although the Supreme Court's decisions pertaining to the well-pleaded complaint rule have not squarely addressed federal common law, the approach it has crafted in cases involving federal statutes is inconsistent with removal of

---

which possessed diversity jurisdiction, held that certain state nuisance and trespass claims are preempted by federal common law. *Id. at 90-94*. After articulating this decision, the Second Circuit "pause[d] [ ] to reconcile [its] conclusion with the parade of recent opinions holding that state-law claims for public nuisance brought against fossil fuel producers do not arise under federal law." *Id. at 93* (brackets, citations, and quotation marks omitted).

The Second Circuit observed that, "[t]he single issue before each of those federal courts was thus whether the defendants' anticipated defense could singlehandedly create federal-question jurisdiction under [section] 1331 in light of the well-pleaded complaint rule." *Id. at 94* (citing *Caterpillar Inc., 482 U.S. at 398*). While the Second Circuit only mentioned these cases in passing, its description of these cases as concerning the effect of an "anticipated federal defense" suggests that the Second Circuit would not view the complete preemption doctrine as applicable in a similar case. *HN14*[↑] As explained above in this Ruling, the Supreme Court has held that a mere "complete federal defense", as contrasted with complete preemption, does "not justify removal." *Beneficial Nat'l Bank, 539 U.S. at 9* (citations omitted). The court also notes that the Second Circuit's decision did not address state consumer protection claims.

2021 U.S. Dist. LEXIS 111334, *20

purported state claims merely on the ground that federal common law has displaced such claims. Therefore, the court concludes that ExxonMobil has not shown that federal common law justifies removal of this case.

2. Grable Jurisdiction

ExxonMobil also argues that the doctrine recognized by the Supreme Court in *Grable & Sons Metals Products, Inc. v. Darue Engineering & Manufacturing, 2005 U.S. LEXIS 4659, 545 U.S. 308 (2005)*, justifies removal of this case. *HN16*[↑] Under the so-called Grable doctrine,[8] removal is proper if a federal issue is "embedded" within a state law claim. See *id. at 314*. The **[\*21]** embedded federal issue must be "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn, 568 U.S. at 258* (citing *Grable, 545 U.S. at 313-14*). All four of these elements must be met in order to establish federal jurisdiction. Id.

ExxonMobil's primary arguments for Grable jurisdiction concern the potential impact of Connecticut's claims on federal policymaking. See Def.'s Opp'n at 18-20. According to ExxonMobil, Connecticut's claims amount to an "attempt to countermand federal energy and environmental policy." Id. at 18. ExxonMobil argues that the relief sought by Connecticut would disrupt the "careful balance between energy production and environmental protection" that "Congress has already struck." Id. at 19. In addition, ExxonMobil contends that the Complaint's allegations necessarily imply that the federal government was among the victims of ExxonMobil's alleged deception. Id. at 19.

Whether a state claim relates to issues of national concern may demonstrate that an embedded federal issue is "substantial," i.e., the third element for Grable jurisdiction, but such an argument does not address the first **[\*22]** Grable element, that is, whether a state claim "necessarily raise[s]" an issue of federal law. See *Grable, 545 U.S. at 314*. In Grable, the respondent purchased real property that the IRS had seized from the petitioner in satisfaction of a federal tax delinquency. *Id. at 310*. Five years after the purchase, the petitioner contested ownership of the property through a state quiet title action. Id. The basis for the petitioner's state

quiet title claim was an allegation that "the IRS had failed to notify [the petitioner] of its seizure of the property in the exact manner required by [section] 6335(a)" of title 26 of the U.S. Code. *Id. at 311*. Under the applicable state law, the petitioner was required to "specify the facts establishing the superiority of [its] claim." *Id. at 314* (citation and internal quotation marks omitted).

The Supreme Court held that the petitioner's state quiet title claim necessarily raised a federal issue, because "[w]hether [the petitioner] was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim." *Id. at 315*. The Supreme Court also justified its holding on the ground that "[t]he meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal **[\*23]** court." *Id. at 315*. However, it only progressed to this second segment of its analysis after concluding that the federal issue was necessarily raised by the petitioner's state claim. See *id. at 314-15*. *HN17*[↑] As explained above, federal jurisdiction only exists under the Grable doctrine if "all four . . . requirements are met." *Gunn, 568 U.S. at 258*.

The requirement that a state claim "necessarily raise" an issue of federal law is underscored by the Second Circuit's decision in *New York v. Shinnecock Indian Nation, 686 F.3d 133 (2d Cir. 2012)*. That case involved a dispute between the State of New York and the Shinnecock Indian Nation over the development of a casino. *686 F.3d at 135-36*. The district court conducted a bench trial and issued a permanent injunction prohibiting construction of the casino, unless the Shinnecock Indian Nation complied with state and local laws. *Id. at 135*. As the Second Circuit observed, whether "federal Indian law [ ] preclude[d] the application of state and local law to the Tribe's activities . . . was essentially the only issue in dispute at trial." *Id. at 139*.

Nevertheless, the Second Circuit concluded that New York's claim did not necessarily raise a federal issue, and that the district court therefore lacked jurisdiction over the claim. *Id. at 140-41*. As the court explained, "if the Shinnecock were to have established **[\*24]** that their construction of the casino complied with state and local law, the court could have resolved the case without reaching the federal issues." *Id. at 140*.

Here, Connecticut's Complaint asserts claims for defective and unfair acts and practices under CUTPA. Compl. at 38-43. The only argument ExxonMobil makes

---

[8] The Second Circuit has also referred to this doctrine as "the substantial federal question exception to the well-pleaded complaint rule." *New York v. Shinnecock Indian Nation, 686 F.3d 133, 141 (2d Cir. 2012)*.

that pertains to the first element of <u>Grable</u> jurisdiction, <u>i.e.</u>, the requirement that a state claim "necessarily raise" an issue of federal law, is that CUTPA looks to the Federal Trade Commission's definition of unfair or deceptive acts for guidance. See Def.'s Opp'n at 20. <u>Section 42-110b(b)</u> codifies "the intent of the [Connecticut] legislature that in construing CUTPA, "the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act." <u>Conn. Gen. Stat. § 42-110b(b)</u>. <u>Section 42-110b(c)</u> authorizes the Commissioner of Connecticut's Department of Consumer Protection to issue regulations implementing CUTPA but requires that "[s]uch regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the federal courts in interpreting the provisions of the Federal Trade Commission Act." <u>Conn. Gen. Stat. § 42-110b(c)</u>.

<u>HN18</u>[⬆] With respect to <u>section 42-110b(b)</u>, to "be guided by [*25] interpretations" is not the same as being bound by them. See <u>Conn. Gen. Stat. § 42-110b(b)</u>. As the Connecticut Appellate Court has explained, "[a]lthough the guidance provided by federal law will often be enlightening, federal law is not a straightjacket. . . . In other words, federal law sets a floor for Connecticut law, but not a ceiling." <u>Johnson Elec. Co., Inc. v. Salce Contracting Assocs., Inc., 72 Conn. App. 342, 352, 805 A.2d 735 (2002)</u>. Further, although Connecticut courts have adopted the framework of analysis embodied by the federal "cigarette rule", this rule requires courts to look to public policy, as announced in Connecticut statutes and common law. See <u>Ulbrich, 310 Conn. at 409</u>; <u>see also Artie's Auto Body, Inc. v. Hartford Fire Ins. Co., 317 Conn. 602, 623-27, 119 A.3d 1139 (2015)</u> (referring to a Connecticut statute and regulatory scheme to determine whether plaintiffs could prevail on their unfair practice claim). Thus, CUTPA claims do not necessarily raise federal issues by operation of this provision, because a court reviewing a CUTPA claim is not required to apply federal law. Rather, a court refers to federal law for guidance in applying Connecticut law. As for <u>section 42-110b(c)</u>, it is not helpful for ExxonMobil because the Complaint does not allege that ExxonMobil violated a regulation issued by the Commissioner of the Department of Consumer Protection. See Compl. at 36-42. Therefore, Connecticut's claims do not necessarily **[*26]** raise a federal issue.

Further, even assuming for the sake of argument that, on account of either of these provisions, Connecticut's

CUTPA claims necessarily raise <u>a</u> federal issue, it is not the federal issue on which ExxonMobil focuses. ExxonMobil makes absolutely no argument that "interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act," <u>Conn. Gen. Stat. § 42-110b(b)</u>, are actually disputed or substantial. See Def.'s Opp'n at 20. In other words, with respect to any federal issue involving the FTCA, ExxonMobil has not satisfied the remaining elements of <u>Grable</u> jurisdiction, <u>i.e.</u>, that an issue is substantial, actually disputed, and capable of resolution without disrupting the federal-state balance approved by Congress. Therefore, ExxonMobil has failed to show that this issue can support federal jurisdiction under the <u>Grable</u> doctrine.

The majority of the remainder of ExxonMobil's arguments in support of <u>Grable</u> jurisdiction are different forms of its argument that Connecticut's claims relate to issues of national concern. See Def.'s Opp'n at 20-23. For example, ExxonMobil argues that Connecticut "seeks to impose one state's energy policy on the rest of the country." Id. at 21. ExxonMobil also **[*27]** contends that, because the U.S. Army Corps of Engineers has exercised its delegated authority to regulate . . . issues of sea level rise", Connecticut's claims "ask this court to second-guess the efficacy of the Corps' programs." Id. Although ExxonMobil seeks to fit these arguments into the first element of <u>Grable</u> jurisdiction, <u>see</u> Def.'s Opp'n at 18-22, arguments of this nature address whether an issue is substantial but not whether an issue is necessarily raised. See <u>Grable, 545 U.S. at 314</u>.[9]

Finally, ExxonMobil briefly contends that Connecticut's claims necessarily raise federal issues because they implicate ExxonMobil's free speech rights under the <u>First Amendment</u>. See Def.'s Opp'n at 22. However, the cases on which ExxonMobil relies address the constitutional limits on defamation and libel claims. See <u>Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 52, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988)</u>; <u>Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, 774-75, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986)</u>; <u>N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)</u>. ExxonMobil fails to cite any authority for the proposition that these limits apply to consumer protection claims, nor for the proposition that these

_____

[9] ExxonMobil also repeats its argument concerning federal common law and the well-pleaded complaint rule. See Def.'s Opp'n at 21-22. The court has already addressed why this argument does not justify removal. See supra at 8-16

limits would apply to such claims in a manner that would embed any *First Amendment* issues within state law claims--as opposed to providing ExxonMobil with a federal defense. Further, ExxonMobil does not address the "subordinate position in the scale of *First Amendment* values" that the **[*28]** Supreme Court and the Second Circuit have assigned to commercial speech. See *Vugo, Inc. v. City of New York, 931 F.3d 42, 49 (2d Cir. 2019)* (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 477 (1989)*). Therefore, the court concludes that ExxonMobil has not shown that Connecticut's claims necessarily raise *First Amendment* issues for the purposes of the <u>Grable</u> doctrine.

Accordingly, for all of the above reasons, the court concludes that ExxonMobil has failed to show that the <u>Grable</u> doctrine justifies removal.[10]

---

[10] During oral argument, counsel for ExxonMobil repeatedly emphasized the "artful pleading doctrine." The court notes that the phrase "artful pleading doctrine" is absent from both ExxonMobil's 58-page Notice of Removal and 56-page Opposition to the Motion to Remand. See Notice of Removal; Def.'s Opp'n. The phrases "artful pleading" and "artfully pleaded" each appear once on the first page of the Opposition to the Motion to Remand, but without any citation to a specific court decision. See Def.'s Opp'n at 1.

The Supreme Court once appeared to use the term "artful pleading doctrine" as a synonym for complete preemption. See *Rivet v. Regions Bank of Louisiana, 522 U.S. 470, 475, 118 S. Ct. 921, 139 L. Ed. 2d 912 (1998)* ("The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim."). However, the Supreme Court also appeared to describe this doctrine as the "principle that 'a plaintiff may not defeat removal by omitting to plead <u>necessary</u> federal questions.'" Id. (emphasis added).

In <u>Marcus v. AT&T Corp.</u>, the Second Circuit analyzed complete preemption and the artful pleading doctrine separately. See *138 F.3d at 53-56*. With respect to artful pleading, the Second Circuit concluded that a breach of contract claim was removable, because it was based on a "tariff [ ] filed with the FCC pursuant to the FCA", and, therefore, "the breach of warranty claim necessarily raise[d] a substantial federal question." *Id. at 56*. The <u>Marcus</u> decision predated the Supreme Court's decision in <u>Grable</u>, which, as discussed above, clarified when a state law claim is removable on account of an embedded issue of federal law. See *Grable, 545 U.S. at 314*. Subsequently, in *Sullivan v. American Airlines, Inc., 424 F.3d 267 (2d Cir. 2005)*, which was decided three months after <u>Grable</u>, the Second Circuit noted that "[t]he precise scope of the artful-pleading doctrine is not entirely clear" and acknowledged only that the doctrine "has been relied upon to support federal-court jurisdiction . . . where a

## B. Federal Officer Removal Statute

ExxonMobil next argues for removal on the basis of the federal officer removal statute. *HN20*[⬆] *Section 1442(a)(1)* authorizes removal of cases involving claims against "any officer (or any person acting under that officer) of the United States or of any agency thereof." *28 U.S.C. § 1442(a)(1)*. In contrast to "the general removal statute[, which] must be strictly construed, both *[section] 1442* and especially its 'acting under' provision must be read broadly." *Agyin v. Razman, 986 F.3d 168, 175 (2d Cir. 2021)* (citations omitted). Private parties that seek removal on the basis of *section 1442* must show that (1) "they are person[s] within the meaning of statute who act[ed] under [a federal] officer", (2) "they performed the actions for which they are being sued under color of [federal] office", and (3) **[*29]** "they [ ] raise a colorable federal defense." *Isaacson v. Dow Chem. Co., 517 F.3d 129, 135 (2d Cir. 2008)* (citation and quotation marks omitted).

*HN21*[⬆] ] The paradigmatic example of a private party that may avail itself of the federal officer removal statute is "a private company acting pursuant to a contract with the federal government." See *Agyin, 986 F.3d at 175*. ExxonMobil argues that it fits this description perfectly, given that it has supplied the federal government with fossil fuels for decades. See Def.'s Opp'n at 24-30. As ExxonMobil details in its Opposition, through various arrangements for the production of fossil fuels, the federal government has at times exercised a significant degree of control and direction over ExxonMobil's operations. See id.

*HN22*[⬆] ] However, ExxonMobil must show not merely that it has acted under a federal agency or officer but also that it "performed <u>the actions for which [it] is being sued</u> 'under color of [federal] office." *Isaacson, 517 F.3d at 135* (emphasis added) (citation omitted). The Second Circuit has observed "[t]he hurdle erected by this

---

plaintiff's state-law contract claims were construed as asserting rights arising only under federal tariffs." *Id. at 272 n.4* *HN19*[⬆] ] (citing *Marcus, 138 F.3d at 55-56*).

This court understands the artful pleading doctrine as coextensive with <u>Grable</u>, i.e., the artful pleading doctrine prevents a plaintiff from avoiding <u>Grable</u> jurisdiction by omitting, from the plaintiff's statement of a state-law claim, an essential element of the claim that necessarily raises a federal issue that is substantial, actually disputed, and capable of resolution without disrupting the federal-state balance approved by Congress. Compare *Marcus, 138 F.3d at 55-56*, and *Grable, 545 U.S. at 314*.

requirement is quite low": a defendant need not show that a plaintiff's claims are "for the very acts" the defendant performed under color of federal office. See _id. at 137_. Further, a court must "credit [a defendant's] theory of the [*30] case" when analyzing this prong of the federal officer removal test. See id.

Nevertheless, under this "causation requirement . . . non-governmental corporate defendants . . . must demonstrate that the acts for which they are being sued . . . occurred <u>because of</u> what they were asked to do by the Government." Id. Thus, although the strength of the connection between acts performed by a defendant under color of federal office and the acts for which the defendant is sued may be "quite low", the nature of this connection must be causal. See id.; see also _Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, 996 F.3d 243, 2021 WL 1726106, *9 (4th Cir. 2021)_ (holding that causal connection was sufficient for removal, where pharmacy defendants "were legally bound to follow [the Department of Defense]'s formulary when administering" a mail-order pharmacy program "and had no discretion to deviate from the DOD contract's requirements").

Here, ExxonMobil provides no explanation as to how the allegedly deceptive statements that form the basis of Connecticut's consumer protection claims have any causal connection to the production of fossil fuels for or under the direction of the federal government. See Def.'s Opp'n at 30-31. Thus, although Connecticut's allegations that ExxonMobil misrepresented the [*31] dangers of fossil fuels for the Earth's climate relate to ExxonMobil's production of fossil fuels, ExxonMobil has not shown why the alleged misrepresentations "occurred <u>because of</u> what [it] was asked to do by the Government." See _Isaacson, 517 F.3d at 137_. Nowhere does ExxonMobil allege that its contracts with the government required it to publish the advertisements and other misrepresentations alleged by Connecticut. ExxonMobil does not assert, or even suggest, that the federal government directed ExxonMobil to make these allegedly deceptive statements. See Notice of Removal ¶¶ 71-108. As a result, the court's obligation to credit ExxonMobil's theory of the case, see _Isaacson, 517 F.3d at 137_, does not benefit ExxonMobil with respect to this requirement.

Therefore, even assuming that ExxonMobil can satisfy the first and third prongs of the federal officer removal test, ExxonMobil has failed to satisfy the causation requirement. The court concludes that ExxonMobil has not shown that the federal officer removal statute applies to Connecticut's claims.

## C. Outer Continental Shelf Lands Act

Next, ExxonMobil argues that the court possesses jurisdiction on account of the Outer Continental Shelf Lands Act ("OCSLA"). See Def.'s Opp'n at 23-25. _Section 1349(b)(1) of title 43 of the U.S. Code_ provides that

> the district courts of the [*32] United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter.

_43 U.S.C. § 1349(b)(1)_. The parties have not brought to the court's attention any decisions by the Second Circuit or the Supreme Court discussing the limits of this jurisdictional grant, and the court has not identified any such authority. Instead the parties both cite to decisions of the Fifth Circuit, which appears to have more familiarity with the OCSLA than other Courts of Appeals. HN23[⬆] In construing the meaning of _section 1349(b)_, the Fifth Circuit has concluded that "the term 'operation' contemplate[s] the doing of some physical act on the [Outer Continental Shelf]." _EP Operating Ltd. P'ship v. Placid Oil Co., 26 F.3d 563, 567 (5th Cir. 1994)_. For example, in _Barker v. Hercules Offshore, Inc., 713 F.3d 208 (5th Cir. 2013)_, the Fifth Circuit concluded that OCSLA jurisdiction existed because a workplace accident occurred on a "jack-up rig attached to the Outer Continental Shelf." _Id. at 213_.

ExxonMobil's argument on this issue fails because the [*33] claims Connecticut has chosen to bring in this case seek redress for deceptive and unfair practices relating to ExxonMobil's interactions with consumers in Connecticut--not for harms that might result from the manufacture or use of fossil fuels, let alone from ExxonMobil's operations on the Outer Continental Shelf.[11] See Compl. at 36-43. As explained above, see

---

[11] ExxonMobil submitted voluminous exhibits that suggest Connecticut may have been motivated to bring the current suit as part of a broader strategy among multiple states' attorneys general to seek redress for harms directly caused by climate change. See Exs. 1-8, Notice of Removal (Doc. No. 1-1 at 1-

2021 U.S. Dist. LEXIS 111334, *33

supra at 6-8, although the Complaint details the harms caused by combustion of fossil fuels in order to explain why ExxonMobil's statements violate CUTPA, these are not the harms that underlie Connecticut's claims in this case.

Therefore, the court concludes that ExxonMobil has failed to show that OCSLA justifies removal of this case.[12]

## D. Federal Enclave Jurisdiction

ExxonMobil also contends that the court possesses jurisdiction on the ground that some of the injuries alleged by Connecticut must have occurred on federal enclaves. See Def.'s Opp'n at 34-36. *HN24*[↑] *Section 8 of Article I of the U.S. Constitution* authorizes Congress "[t]o exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-yards, and other needful [*34] Buildings." *U.S. Const. art. I, § 8*. Although "the issue is not entirely settled," some courts have construed this provision as "establish[ing] federal subject matter jurisdiction over tort claims occurring on federal enclaves, and have allowed such claims to proceed even when applying state law." *Jograj v. Enter. Servs., LLC, 270 F. Supp. 3d 10, 16 (D.D.C. 2017)* (citing *Akin v. Ashland Chem. Co. 156 F.3d 1030, 1034 (10th Cir. 1998)*, and *Federico v. Lincoln Military Hous., 901 F. Supp. 2d 654, 656 (E.D. Va. 2012)*).

ExxonMobil argues that federal jurisdiction is present in the current case because "climate change harms . . . [n]ecessarily impact [ ] . . . multiple federal enclaves within Connecticut, including military installations . . .

national parks . . . and federal prisons." See Def.'s Opp'n at 35. ExxonMobil also argues that, "by targeting ExxonMobil's oil and gas operations and their alleged impacts, this action necessarily sweeps in those operations that occur on military bases and other federal enclaves." See id. at 36.

ExxonMobil's argument is premised on its characterization of Connecticut's claims as targeting pollution. However, as the court has already explained, Connecticut's claims seek redress for the manner by which ExxonMobil has interacted with consumers in Connecticut, not the impacts of climate change. See supra at 6-8. Further, given that national parks, federal prisons, and military [*35] installations are located throughout the country, ExxonMobil's interpretation of federal enclave jurisdiction would appear to give rise to federal jurisdiction in any case involving injuries that occur throughout a state, no matter how minor the injuries occurring on federal enclaves are in relation to the claims at issue. ExxonMobil cites no authority in support of what would amount to a sweeping change to the balance between the jurisdiction of state and federal courts.

Therefore, the court concludes that ExxonMobil has failed to show that removal is proper on account of federal enclave jurisdiction.[13]

## E. Diversity Jurisdiction

Finally, ExxonMobil argues that the court possesses diversity jurisdiction because Connecticut is not the real party in interest. See Def.'s Opp'n at 37-39. *HN25*[↑] *Section 1332(a)(1) of title 28* vests district courts with "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." *28 U.S.C. § 1332(a)(1)*. "There is no question that a State is not a 'citizen' for purposes of [ ] diversity jurisdiction." *Moor v. Alameda*

---

95; Doc. No. 1-2 at 1-3); Exs. 1-5, Def.'s Opp'n (Docs. Nos. 37-2, 37-3, 37-4, 37-5, 37-6). Even assuming that ExxonMobil is correct about Connecticut's motivations, this does not change the fact that Connecticut has chosen, in this case, to bring claims seeking redress for deceptive and unfair practices relating to the manner by which ExxonMobil has interacted with consumers in Connecticut.

---

12 Although OCSLA jurisdiction is not a familiar issue within the Second Circuit, the court notes that other district courts have rejected similar arguments to those raised by ExxonMobil in this case. See, e.g., *Minnesota v. Am. Petroleum Inst., No. 20-CV-1636 (JRT/HB), 2021 U.S. Dist. LEXIS 62653, 2021 WL 1215656, at *10-11 (D. Minn. Mar. 31, 2021)* (concluding that OCSLA jurisdiction was not present, because "the State's claims are rooted not in the Defendants' fossil fuel production, but in its alleged misinformation campaign").

---

13 As with ExxonMobil's arguments in connection with the OCSLA, although authority on the applicability of federal enclaves jurisdiction is sparse, the court notes that other district courts have rejected similar arguments to those raised by ExxonMobil in this case. See, e.g., *Minnesota, 2021 U.S. Dist. LEXIS 62653, 2021 WL 1215656, at *11* ("While the various injuries alleged in the complaint may be felt on federal enclaves as much as they are felt anywhere, the Court requires a more substantive and explicit relationship between the actual claims alleged and a specific federal enclave to exercise jurisdiction.").

2021 U.S. Dist. LEXIS 111334, *35

_Cty., 411 U.S. 693, 717, 93 S. Ct. 1785, 36 L. Ed. 2d 596 (1973)_. However, "courts must disregard nominal or formal parties and rest jurisdiction **[*36]** only upon the citizenship of real parties to the controversy." _Purdue Pharma L.P. v. Kentucky, 704 F. 3d 208, 218 (2d Cir. 2013)_ (citation and internal quotation marks omitted).

**HN26**[⬆] Courts have developed two competing approaches for determining whether a state is a real party in interest: the "claim-by-claim approach" and the "whole-complaint" approach. _Id. at 218-19_. Courts applying the former approach analyze whether a state is the real party in interest "with respect to each type of relief sought," while courts applying the latter approach "look[ ] at the lawsuit as a whole." See _id._ Although the Second Circuit has not definitively adopted the whole-complaint approach, it has strongly suggested that it prefers this approach. See _id. at 219_ ("[W]e note that the 'claim-by claim' approach has been roundly criticized, and the 'whole-complaint' approach has emerged as the majority rule."). Accordingly, the court will apply the whole-complaint rule in this case. See _In re Standard & Poor's Rating Agency Litig., 23 F. Supp. 3d 378, 402 (S.D.N.Y. 2014)_ ("[A]lthough the Second Circuit did not formally reach the question in _Purdue Pharma_, it is difficult to view that decision as anything but a thumb firmly on the whole-complaint side of the scale.").

In _Connecticut v. Moody's Corp., No. 3:10-CV-546 (JBA), 2011 U.S. Dist. LEXIS 780, 2011 WL 63905 (D. Conn. Jan. 2011)_, the court held that Connecticut was the real party in interest in a suit alleging widespread violations of CUTPA **[*37]** by credit ratings agencies, because it "has a statutory interest under CUTPA 'to protect the public from unfair practices in the conduct of any trade or commerce.'" _Id. at *3_ (quoting _Eder Bros., Inc. v. Wine Merchants of Conn., Inc., 275 Conn. 363, 380 (2005), 880 A.2d 138_). The court also noted that Connecticut did not seek "restitution [ ] on behalf of specific individuals", but instead sought a restitution order, pursuant to _section 42-110m of the Connecticut General Statutes_, "without specifying beneficiaries of that restitution, which the State argues may be ordered paid to the Connecticut Department of Consumer Protection[ ] . . . to fund positions and other related expenses for the enforcement of Department of Consumer Protection licensing and registration laws." Id.

Reviewing the Complaint as a whole, the court concludes that Connecticut is suing to protect a quasi-sovereign interest and is therefore a real party in interest. Connecticut seeks redress not simply for the deception allegedly caused by each of ExxonMobil's statements but rather for a decades-long campaign of alleged disinformation that resulted in "the stifling of an open marketplace for renewable energy." See Compl. at 39, ¶ 193. Further, as in Moody's Corp., Connecticut seeks a restitution order under CUTPA that would fund efforts to respond to ExxonMobil's **[*38]** allegedly deceptive and unfair practices generally, rather than providing compensation to specific individuals. See id. at 78 (seeking "[a]n order that ExxonMobil fund a corrective education campaign to remedy the harm inflicted by decades of disinformation, to be administered and controlled by the State or such other independent third party as the Court may deem appropriate"); _Moody's Corp., 2011 U.S. Dist. LEXIS 780, 2011 WL 63905, at *3_.

Therefore, the court concludes that Connecticut is a real party in interest, and that the court does not possess diversity jurisdiction.

F. Fees and Costs

**HN27**[⬆] The plaintiffs seek costs and attorneys' fees pursuant to _section 1447(c) of title 28 the U.S. Code_, which provides that "[a]n order remanding the case may require payment of just costs and any actual expenses, incurred as a result of the removal." _28 U.S.C. § 1447(c)_. "Absent unusual circumstances, courts may award attorney's fees under _[section] 1447(c)_ only where the removing party lacked an objectively reasonable basis for seeking removal." _Martin v. Franklin Capital Corp., 546 U.S. 132, 141, 126 S. Ct. 704, 163 L. Ed. 2d 547 (2005)_. The Supreme Court has instructed that, "[i]n applying this rule, district courts retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case." _Id._ Here, Connecticut argues that an award of costs and fees is warranted because ExxonMobil's arguments **[*39]** for removal have been "roundly rejected by district and circuit courts across the country." See Pl.'s Mem. at 28.

As the court has noted throughout this Ruling, however, several of the issues raised by ExxonMobil are novel within the Second Circuit. Further, although it is true that multiple district courts have rejected similar arguments for removal, those courts are located in different circuits, and many relevant portions of their rulings were not subject to appellate review until very recently. See BP P.L.C. v. Mayor & City Council of Baltimore, No. 19-1189, slip. op. at 6 (U.S. May 17, 2021) (holding that _section 1447(d) of title 28 of the U.S. Code_ "permits appellate review of [a] district court's remand order--

2021 U.S. Dist. LEXIS 111334, *39

without any further qualification"). Given these circumstances, the court concludes, albeit with some reservation, that ExxonMobil did not lack an objectively reasonable basis for removal. Connecticut's request for costs and fees is denied.

## V. CONCLUSION

For the reasons discussed above, the court grants Connecticut's Motion to Remand (Doc. No. 36) and denies Connecticut's request for costs and fees. The Clerk is directed to remand the case to the Superior Court of Connecticut.

**SO ORDERED**.

Dated this 2nd day of June 2021, at New Haven, Connecticut.

/s/ Janet C. Hall

Janet C. Hall

United States District Judge

---

**End of Document**

 Caution
As of: April 8, 2024 9:00 PM Z

## *Dougherty v. A.O. Smith Corp.*

United States District Court for the District of Delaware

July 16, 2014, Decided; July 16, 2014, Filed

Civil Action No. 13-1972-SLR-SRF

**Reporter**
2014 U.S. Dist. LEXIS 96290 *; 2014 WL 3542243

FRANCIS J. DOUGHERTY AND ELIZABETH F. DOUGHERTY, Plaintiffs, v. A O SMITH CORPORATION, et al., Defendants.

**Subsequent History:** Adopted by, Objection overruled by, Remanded by *Dougherty v. A.O. Smith Corp., 2014 U.S. Dist. LEXIS 125302 (D. Del., Sept. 8, 2014)*

## Core Terms

disclaimer, Navy, removal, Plaintiffs', federal official, colorable, valves, warnings, specifications, government contractor, manufactured, federal court, cross-claims, asbestos, ships, district court, asbestos exposure, contractor, exposure, vessels, cause of action, removal statute, military, products, post-removal, injuries, design defect, state court, jobsites, damages

**Counsel: [*1]** For Francis J. Dougherty, Elizabeth F. Dougherty, Plaintiffs: Yvonne Takvorian Saville, LEAD ATTORNEY, Weiss & Saville P.A., Wilmington, DE.

For Armstrong International Inc., Defendant: Robert Alexander Ranieri, LEAD ATTORNEY, Dickie McCamey & Chilcote, P.C., Wilmington, DE.

For Burnham LLC, Defendant: Robert S. Goldman, LEAD ATTORNEY, Phillips, Goldman & Spence, P.A., Wilmington, DE.

For Certain-Teed Corporation, Union Carbide Corporation, General Electric Company, Foster Wheeler Energy Corp., Defendants: Beth E. Valocchi, LEAD ATTORNEY, Swartz Campbell LLC, Wilmington, DE.

For Crane Co., Defendant: Nicholas E. Skiles, LEAD ATTORNEY, Shawn Edward Martyniak, Swartz Campbell LLC, Wilmington, DE.

For Grinnell LLC, Defendant: Kelly A. Costello, LEAD ATTORNEY, Morgan Lewis & Bockius LLP, Wilmington, DE.

For Honeywell International Inc., Individually successor

in interest to AlliedSignal Inc, successor in interest to Bendix Corporation, Defendant: Joelle Florax, LEAD ATTORNEY, Rawle & Henderson LLP, Wilmington, DE.

For ITT Corporation, Defendant: David A. Bilson, Robert S. Goldman, LEAD ATTORNEYS, Phillips, Goldman & Spence, P.A., Wilmington, DE.

For John Crane Inc., Defendant: Jonathan L. Parshall, **[*2]** Murphy, Spadaro & Landon, Wilmington, DE.

For Peerless Industries Inc., formerly known as Peerless Heater Company, Defendant: Nicholas E. Skiles, LEAD ATTORNEY, Swartz Campbell LLC, Wilmington, DE.

For Riley Power Inc., Defendant: Joel M. Doner, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE.

For Spirax Sarco Inc., Defendant: Paul A. Bradley, LEAD ATTORNEY, Antoinette D. Hubbard, Maron Marvel Bradley & Anderson LLC, Wilmington, DE.

For Superior Boiler Works Inc., Defendant: Eileen M. Ford, Megan Trocki Mantzavinos, LEAD ATTORNEYS, Marks, O'Neill, O'Brien, Doherty & Kelly, P.C., Wilmington, DE.

For Warren Alloy Valve & Fitting Company L.P., Defendant: Brian Tome, Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE.

For Weil-Mclain Company, Defendant: Matthew P. Donelson, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE.

For York International Corporation, Defendant: Peter S. Murphy, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE.

For 84 Lumber Company, Defendant: Robert Alexander Ranieri, Dickie McCamey & Chilcote, P.C., Wilmington, DE.

For John Crane Inc., Cross Claimant: Jonathan L. Parshall, Murphy, Spadaro & Landon, Wilmington,

[*3] DE.

For Burnham LLC, Cross Defendant: Robert S. Goldman, LEAD ATTORNEY, Phillips, Goldman & Spence, P.A., Wilmington, DE.

For Certain-Teed Corporation, Union Carbide Corporation, General Electric Company, Foster Wheeler Energy Corp., Cross Defendants: Beth E. Valocchi, LEAD ATTORNEY, Swartz Campbell LLC, Wilmington, DE.

For Crane Co., Cross Defendant: Nicholas E. Skiles, LEAD ATTORNEY, Shawn Edward Martyniak, Swartz Campbell LLC, Wilmington, DE.

For Elizabeth F. Dougherty, Francis J. Dougherty, Cross Defendants: Yvonne Takvorian Saville, LEAD ATTORNEY, Weiss & Saville P.A., Wilmington, DE.

For Grinnell LLC, Cross Defendant: Kelly A. Costello, LEAD ATTORNEY, Morgan Lewis & Bockius LLP, Wilmington, DE.

For Riley Power Inc., Cross Defendant: Joel M. Doner, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE.

For Spirax Sarco Inc., Cross Defendant: Paul A. Bradley, LEAD ATTORNEY, Maron Marvel Bradley & Anderson LLC, Wilmington, DE.

For Superior Boiler Works Inc., Cross Defendant: Eileen M. Ford, LEAD ATTORNEY, Marks, O'Neill, O'Brien, Doherty & Kelly, P.C., Wilmington, DE.

For York International Corporation, Cross Defendant: Peter S. Murphy, LEAD ATTORNEY, Eckert Seamans Cherin & [*4] Mellott, LLC, Wilmington, DE.

For Superior Boiler Works Inc., Cross Claimant: Eileen M. Ford, Megan Trocki Mantzavinos, LEAD ATTORNEYS, Marks, O'Neill, O'Brien, Doherty & Kelly, P.C., Wilmington, DE.

For Superior Boiler Works Inc., Cross Defendant: Eileen M. Ford, Megan Trocki Mantzavinos, LEAD ATTORNEYS, Marks, O'Neill, O'Brien, Doherty & Kelly, P.C., Wilmington, DE.

For 84 Lumber Company, Cross Defendant: Robert Alexander Ranieri, Dickie McCamey & Chilcote, P.C., Wilmington, DE.

For Armstrong International Inc., Cross Defendant: Robert Alexander Ranieri, LEAD ATTORNEY, Dickie McCamey & Chilcote, P.C., Wilmington, DE.

For Grinnell LLC, Cross Defendant: Kelly A. Costello, LEAD ATTORNEY, Morgan Lewis & Bockius LLP,

Wilmington, DE; Cross Defendant, Honeywell International Inc., Individually; Joelle Florax, LEAD ATTORNEY, Rawle & Henderson LLP, Wilmington, DE.

For ITT Corporation, Cross Defendant: David A. Bilson, LEAD ATTORNEY, Phillips, Goldman & Spence, P.A., Wilmington, DE.

For John Crane Inc., Cross Defendant: Jonathan L. Parshall, Murphy, Spadaro & Landon, Wilmington, DE.

For Spirax Sarco Inc., Cross Defendant: Paul A. Bradley, LEAD ATTORNEY, Antoinette D. Hubbard, Maron Marvel Bradley & [*5] Anderson LLC, Wilmington, DE.

For Weil-Mclain Company, Cross Defendant: Matthew P. Donelson, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE.

For York International Corporation, Cross Defendant: Peter S. Murphy, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE; Cross Defendant, Honeywell International Inc., Individually.

For ITT Corporation, Cross Claimant: David A. Bilson, LEAD ATTORNEY, Phillips, Goldman & Spence, P.A., Wilmington, DE.

**Judges:** Sherry R. Fallon, United States Magistrate Judge.

**Opinion by:** Sherry R. Fallon

# Opinion

**REPORT AND RECOMMENDATION**

**I. INTRODUCTION**

Presently before the court in this asbestos-related personal injury action is a Motion to Remand (the "Motion to Remand" or "Motion") filed by the Plaintiffs, Francis J. Dougherty and Elizabeth F. Dougherty ("Plaintiffs"), in response to the notice of removal filed by Defendant Crane Company ("Crane") pursuant to _28 U.S.C. § 1442(a)(1)_. (D.I. 14) Plaintiffs contend that remand is appropriate because they disclaimed any causes of action that could provide a basis for federal subject matter jurisdiction and, alternatively, that Crane has not met the requirements for removal under _Section 1442(a)(1)_. (D.I. 14 at 2) [*6] Crane opposes Plaintiffs' Motion. (D.I. 22) For the reasons that follow, I

2014 U.S. Dist. LEXIS 96290, *6

recommend that the court GRANT Plaintiffs' Motion to Remand.

## II. BACKGROUND

Plaintiffs filed this action against Crane and other defendants on October 4, 2013, in the Superior Court of Delaware. (D.I. 1, Ex. 1) The Complaint alleges that Francis J. Dougherty ("Mr. Dougherty") developed mesothelioma, among other injuries, as a result of his exposure to asbestos-containing products manufactured by, sold by, distributed by, or otherwise associated with the defendants, including Crane. (*Id.*, Ex. 1 ¶¶ 1-6) Mr. Dougherty was allegedly exposed to such asbestos-containing products while working as a plumber in the U.S. Navy from 1945 to 1946, as a plumber and pipefitter in Wilmington, Delaware from 1950 to 1993, and as a volunteer fireman in New Castle County, Delaware. (*Id.* ¶ 2)

Plaintiffs' Complaint includes the following disclaimer:

> 3. Plaintiffs hereby disclaim any cause of action or claim for recovery that could give rise to federal subject matter jurisdiction under either *28 U.S.C. § 1331* (federal question) or *28 U.S.C. § 1442, subdivision (a)(1)* (federal officer). Specifically, Plaintiffs disclaim any cause of action **[*7]** or claim for recovery based on any exposure to asbestos on land that is, or was, a "federal enclave" pursuant to *Article I, section 8, clause 17 of the United States Constitution*. Plaintiffs also disclaim any cause of action or claim for recovery based on any exposure to asbestos caused by any person or entity acting under the authority of a federal officer or agency.

(*Id.* ¶ 3)

On November 25, 2013, Crane removed the action to this court, pursuant to *28 U.S.C. § 1442(a)(1)*, the federal officer removal statute. (D.I. 1) Plaintiffs filed the pending Motion to Remand on December 20, 2013. (D.I. 14) Briefing on the Motion was completed by January 2014. (*See* D.I. 27)

In their papers filed in support of remand, Plaintiffs assert, among other things:

> "Plaintiffs have disclaimed **and hereby waive as the basis for any relief in this case" "exposures that may have occurred during Mr. Dougherty's service in the United States Navy from 1945-1947."** (D.I. 14 at 2 (emphasis added))

> "To the extent necessary, **Plaintiffs also hereby waive all claims against Crane stemming from Mr. Dougherty's asbestos exposure from any federal government job site, and aboard Navy ships or any other military vessel."** (D.I. **[*8]** 15 at 4)

## III. LEGAL STANDARD

The federal officer removal statute permits removal of a state court action to federal court when, *inter alia*, such action is brought against "[t]he United States or an agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office." *28 U.S.C. § 1442(a)(1)*. The party removing an action to federal court bears the burden of proving that removal is appropriate. *See Boyer v. Snap-On Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990)*. In the Third Circuit, the provisions of the federal officer removal statute are to be "broadly construed."[1] *Sun Buick, Inc. v. Saab Cars USA, Inc., 26 F.3d 1259, 1262 (3d Cir. 1994)*. The Supreme Court has explained that "the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of *§ 1442(a)(1)*.'" *Arizona v. Manypenny, 451 U.S. 232, 242, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981)* (citation omitted).

To properly establish removal under *Section 1442(a)(1)*, a defendant must show the following:

> (1) it is a "person" within the meaning of the statute;
>
> (2) the plaintiff's claims are based upon the defendant's conduct "acting under" a federal office;
>
> (3) it raises a colorable federal defense; and
>
> (4) there is a causal nexus between the claims and the conduct performed under color of a federal office.

———————————————

[1] The Third Circuit draws a distinction between the removal provisions of *Section 1441*, which "'are to **[*9]** be strictly construed against removal and all doubts should be resolved in favor of remand,'" *Boyer, 913 F.2d at 111* (quoting *Steel Valley Auth. v. Union Switch & Signal Div., 809 F.2d 1006, 1010 (3d Cir. 1987))*, and the provisions of the federal officer removal statute, which are to be "broadly construed." *Sun Buick, Inc. v. Saab Cars USA, Inc., 26 F.3d 1259, 1262 (3d Cir. 1994)*.

2014 U.S. Dist. LEXIS 96290, *9

*Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 127 (3d Cir. 1998)* (citing *Mesa v. California, 489 U.S. 121, 129, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)*).

As to the first element of the statute, this court has held that "defendants, as corporations, are 'persons' within the meaning of *[Section 1442(a)(1)*]*." *In re Asbestos Litig. (Seitz), 661 F. Supp. 2d 451, 454 (D. Del. 2009)* (citing *Good v. Armstrong World Indus., Inc., 914 F. Supp. 1125, 1128 (E.D. Pa. 1996)).* **[*10]** *See also Kirks v. GE, 654 F. Supp. 2d 220, 223 (D. Del. 2009).*

To satisfy the second element, the defendant "must demonstrate that a 'federal office' was the source of the specific act for which the contractor now faces suit." *In re Asbestos Litig. (Seitz), 661 F. Supp. 2d at 454.* "The second factor has been described as requiring 'a showing that the acts forming the basis of the state suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations.'" *Id.* (quoting *Good, 914 F. Supp. at 1128*).

The third element "requires a moving defendant to demonstrate that there is a colorable defense to a plaintiff's claims." *Id.* (citing *Megill v. Worthington Pump, Inc., 1999 U.S. Dist. LEXIS 4433, 1999 WL 191565, at *3 (D. Del. Mar. 26, 1999)).* The colorable defense asserted here is the federal common law government contractor defense. According to the Supreme Court, a federal contractor will not be liable for design defects in equipment under state tort laws when:

(1) the United States approved reasonably precise specifications;

(2) the equipment conformed to those specifications; and

(3) the supplier warned the United States about the dangers in the use of the equipment that were known to **[*11]** the supplier but not to the United States.

*Boyle v. United Techs. Corp., 487 U.S. 500, 512, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988).*

Although the *Boyle* Court applied the government contractor defense to a design defect products liability claim, federal courts have subsequently recognized the applicability of the defense to state law failure to warn claims. *See, e.g., MacQueen v. Union Carbide Corp., 2013 U.S. Dist. LEXIS 179733, 2013 WL 6571808, at *3 (D. Del. Dec. 13, 2013),* report and recommendation adopted, *2014 U.S. Dist. LEXIS 2888, 2014 WL 108535 (D. Del. Jan. 9, 2014); Walkup v. Air & Liquid Sys.*

*Corp., 2013 U.S. Dist. LEXIS 138272, 2013 WL 5448623, at *2 (D. Del. Sept. 26, 2013),* report and recommendation adopted, *2013 U.S. Dist. LEXIS 153283, 2013 WL 5798701 (D. Del. Oct. 24, 2013); In re Asbestos Litig. (Seitz), 661 F. Supp. 2d at 454; Kirks, 654 F. Supp. 2d at 224-25.* "However, because 'design defect and failure to warn claims differ practically as well as theoretically,' courts have required the government approval to 'transcend rubber stamping' for the defense to shield a government contractor from failure to warn liability."[2] *Hagen, 739 F. Supp. 2d at 783* (quoting *Tate v. Boeing Helicopters, 55 F.3d 1150, 1156-57 (6th Cir. 1995)*). Consequently, in cases involving failure to warn claims, federal courts have tailored the *Boyle* **[*12]** elements as follows:

(1) the United States exercised its discretion and approved the warnings, if any;

(2) the contractor provided warnings that conformed to the approved warnings; and

(3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not.

*MacQueen, 2013 U.S. Dist. LEXIS 179733, 2013 WL 6571808, at *4* (quoting *Hagen,* 739 F. Supp. 2d at 783). *See also Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003-04 (7th Cir. 1996); Tate, 55 F.3d at 1157.*

The final requirement for removal under *Section 1442(a)(1)* is that the defendant demonstrate a causal nexus between the conduct being supervised by the federal office and the conduct **[*13]** deemed offensive in the plaintiff's complaint. *See In re Asbestos Litig. (Seitz), 661 F. Supp. 2d at 455.* "To do so, a defendant seeking removal must 'by direct averment exclude the possibility that [the defendant's action] was based on acts or conduct of his not justified by his federal duty.'" *Hagen,* 739 F. Supp. 2d at 785 (alteration in original) (quoting *Mesa, 489 U.S. at 132*).

_____

2 This court has previously explained that in actions involving allegations of failure to warn of the dangers of asbestos, the removing defendant "must show that whatever warnings accompanied a product resulted from a determination of a government official, . . . and thus that the government itself 'dictated' the content of the warnings meant to accompany the product." *In re Asbestos Litig. (Seitz), 661 F. Supp. 2d at 455* (quoting *In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626, 630 (2d Cir. 1990)).*

Kelly Christopher

## IV. DISCUSSION

I recommend that the court grant Plaintiffs' Motion to Remand. In reaching this determination, however, two related points are noted from the outset. Specifically, Plaintiffs' disclaimer in paragraph three of the Complaint (the "jurisdictional disclaimer") has no effect on Crane's right of removal, and Crane has asserted a colorable federal defense to certain of Plaintiffs' claims. Thus, Crane's removal of this action was proper. Nevertheless, remand is appropriate, pursuant to _28 U.S.C. § 1367(c)_, based on Plaintiffs' post-removal disclaimer of any claims relative to Mr. Dougherty's alleged exposure to asbestos during his service in the U.S. Navy and on any federal jobsites and vessels (the "claim disclaimer").

### A. Plaintiffs' Jurisdictional Disclaimer in Paragraph Three of the Complaint

Plaintiffs **[\*14]** contend that Crane's removal of this action was improper because they "expressly disclaimed in their Complaint any claims or relief attributable to Mr. Dougherty's service in the United States Navy." (D.I. 14 at 2) Plaintiffs' contention is without merit, for two reasons.

First, Plaintiffs' jurisdictional disclaimer is inconsistent with the allegations of the Complaint, rendering the disclaimer ambiguous. Paragraph three of the Complaint provides, in pertinent part:

> 3. Plaintiffs hereby disclaim any cause of action or claim for recovery that could give rise to federal subject matter jurisdiction under either _28 U.S.C. § 1331_ (federal question) or _28 U.S.C. § 1442, subdivision (a)(1)_ (federal officer). Specifically, Plaintiffs disclaim any cause of action or claim for recovery based on any exposure to asbestos on land that is, or was, a "federal enclave" . . . . Plaintiffs also disclaim any cause of action or claim for recovery based on any exposure to asbestos caused by any person or entity acting under the authority of a federal officer or agency.

(D.I. 1, Ex. 1 ¶ 3) In the immediately preceding paragraph, however, Plaintiffs claim that Mr. Dougherty was exposed to asbestos while serving **[\*15]** in the Navy (i.e., on a federal jobsite and/or vessel). Specifically, Plaintiffs assert:

> a. Plaintiff Francis Dougherty experienced occupational exposure to asbestos while serving as

a plumber in the United States Navy from 1945-1946. He inhaled, ingested and otherwise absorbed asbestos-containing fibers emanating from various products including, but not limited to, gaskets, packing from equipment including pumps, valves and other equipment.

(_Id._ ¶ 2(a)) Thus, the disclaimer is ambiguous. On the one hand, Plaintiffs seek to hold Crane liable for the alleged asbestos exposure relating to Mr. Dougherty's work for the Navy; on the other, Plaintiffs claim that Crane has no right to remove on the basis of a colorable federal defense. See _Despres v. Ampco-Pittsburgh Corp., 577 F. Supp. 2d 604, 608 (D. Conn. 2008)_. "Plaintiffs cannot have it both ways." _Id._

Second, and more importantly, the majority of federal courts have found that jurisdictional disclaimers in complaints, like the one in Plaintiffs' Complaint, are ineffective to avoid federal officer removal jurisdiction. _See infra_ pp. 8-9.

Courts have identified two related reasons why jurisdictional disclaimers are ineffective. "First, . **[\*16]** . . the presumption under the federal officer removal statute favors removal, for the benefit of the federal officer involved the case." _In re Asbestos Prods. Liab. Litig. (No. VI), 770 F. Supp. 2d 736, 741 (E.D. Pa. 2011)_. "[O]ne of the most important reasons for [federal officer] removal is to have the validity of the defense of official immunity tried in a federal court." _Willingham v. Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969)_.

Second, federal officers may remove a case based on the existence of a federal defense that is not apparent from the claims alleged in the complaint, because the well-pleaded complaint rule applicable to federal question removal does not apply to federal officer removal. _In re Asbestos Prods. Liab. Litig. (No. VI), 770 F. Supp. 2d at 741-42_ (citing _Jefferson County v. Acker, 527 U.S. 423, 430-32, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999))_. In _Jefferson County,_ the Supreme Court explained:

> It is the general rule that an action may be removed from state court to federal court only if a federal district court would have original jurisdiction over the claim in suit. To remove a case as one falling within federal-question jurisdiction, the federal question ordinarily must appear on the face of a properly pleaded **[\*17]** complaint; an anticipated or actual federal defense generally does not qualify a

2014 U.S. Dist. LEXIS 96290, *17

case for removal. *Suits against federal officers are exceptional in this regard. Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal question element is met if the defense depends on federal law.*

*Id., 527 U.S. at 430-31* (emphasis added) (citations omitted). In other words, "[b]ecause the claim giving rise to federal jurisdiction is ordinarily a state-law claim that only assumes a federal character when the defendant invokes a colorable federal defense, neither the court nor the parties can identify and exclude at the outset of the case those claims that might ultimately give rise to federal jurisdiction." *Joyner v. A.C. & R. Insulation Co., 2013 U.S. Dist. LEXIS 79402, 2013 WL 2460537, at *4 (D. Md. June 6, 2013)* (citing *In re Asbestos Prods. Liab. Litig. (No. VI), 770 F. Supp. 2d at 742*).[3]

Thus, asbestos plaintiffs' attempts at artful pleading to circumvent federal officer removal by the use of jurisdictional disclaimers have generally failed. *See, e.g., In re Asbestos Prods. Liab. Litig. (No. VI), 770 F. Supp. 2d at 742* (holding that the plaintiffs' disclaimer purporting to exclude any claims "'caused by the acts or omissions of defendants committed at the specific and proven direction of an officer of the United States government acting in his official capacity,'" was "not effective to defeat Defendant's entitlement to a federal forum for the adjudication of the federal defense proffered"); *O'Connell v. Foster Wheeler Energy Corp., 544 F. Supp. 2d 51, 54 n.6 (D. Mass. 2008)* (denying remand notwithstanding disclaimer of "any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party committed at the direction of an officer of the United States Government"); *Marley v. Elliott Turbomachinery Co., 545 F. Supp. 2d 1266, 1274-75 (S.D. Fla. 2008)*[4] ("[P]laintiffs can[not] defeat a

government **[*19]** contractor's right to remove by disclaiming any claim arising from any act or omission compelled by a government agency. Such a circular disclaimer would defeat the purpose of *§ 1442(a)(1)* as it would force federal contractors to prove in state court that they were acting under the direction of the government."); *Machnik v. Buffalo Pumps Inc., 506 F. Supp. 2d 99, 103 n.1 (D. Conn. 2007)* (denying motion to remand because "even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction"); *Ballenger v. Agco Corp., 2007 U.S. Dist. LEXIS 47042, 2007 WL 1813821, at *2 (N.D. Cal. June 22, 2007)* (denying motion to remand despite plaintiffs' disclaimer of "any claim arising from any act or omission of the United States, . . . or a claim against any other person or entity that is based on an act that was performed under specific direction of the United States, any agency thereof or any Officer of the United States").

Consequently, Plaintiffs' jurisdictional disclaimer in paragraph three of the Complaint is ineffective to defeat federal officer removal jurisdiction.

**B. Crane's Notice of Removal and Government Contractor Defense**

As an alternative basis for remand, Plaintiffs contend that Crane has failed to submit sufficient evidence to establish a colorable federal defense or satisfy the requirements for removal under *Section 1442(a)(1)*. (D.I. 15 at 7-18) Crane counters that its affidavits and supporting materials demonstrate that the Navy exercised control over Crane's manufactured products and accompanying written materials and, consequently, the government contractor defense precludes liability under state law for Plaintiffs' claims **[*21]** of defective product design and failure to warn. (D.I. 22 at 9-16; *see also* D.I. 1 at 2-5)

As this court has observed in several recent cases, there is a split in authority concerning the applicable standard for assessing the colorability of a proffered government contractor defense. *See Hicks v. Boeing Co., 2014 U.S. Dist. LEXIS 34160, 2014 WL 1051748,*

---

[3] In *In re Asbestos Prods. Liab. Litig.*, Judge Robreno further explained that "[r]ecognizing [a jurisdictional] disclaimer would deprive the federal officer of the right to have the adequacy of the threshold determination [-] whether there is federal subject **[*18]** matter jurisdiction under the federal officer removal statute [-] made by a federal court." *Id., 770 F. Supp. 2d at 742-43*.

[4] In *Marley*, the Court observed that jurisdictional disclaimers are "circular" because their applicability depends on a determination of the core question in a given case: whether a defendant's purported acts or omissions were required or caused by its contractual relationship **[*20]** with an

agency/officer of the federal government. *Id., 545 F. Supp. 2d at 1274*. If the acts or omissions were required by the agency, the disclaimer applies and the plaintiff's claims fail as a matter of law. *Id.* If the acts or omissions were not required by the agency, then the disclaimer does not apply. *Id.* "The problem with this argument is that [] defendants have the right to have this question decided in federal court." *Id.* (citing *Jefferson County, 527 U.S. at 432*).

2014 U.S. Dist. LEXIS 96290, *21

at *4 (D. Del. Mar. 17, 2014), report and recommendation adopted, 2014 U.S. Dist. LEXIS 48537, 2014 WL 1391104 (D. Del. Apr. 8, 2014); MacQueen, 2013 U.S. Dist. LEXIS 179733, 2013 WL 6571808, at *5-7; Walkup, 2013 U.S. Dist. LEXIS 138272, 2013 WL 5448623, at *3-5. In short, the split "'boils down to an argument over what a defendant must proffer to defeat a plaintiff's motion for remand.'" Walkup, 2013 U.S. Dist. LEXIS 138272, 2013 WL 5448623, at *4 (quoting Hagen, 739 F. Supp. 2d at 777).[5]

Consistent with the line of reasoning of this court in Hicks, MacQueen, and Walkup, and "the trend in this Circuit to broadly construe the federal officer removal statute," Walkup, 2013 U.S. Dist. LEXIS 138272, 2013 WL 5448623, at *4 (citing Kirks, 654 F. Supp. 2d at 225-26), Crane's removal of this action should be sustained if Crane "identifies facts which, viewed in the light most favorable to [Crane], would establish a complete defense at trial." Hagen, 739 F. Supp. 2d at 783.

In order to properly establish removal under Section 1442(a)(1), Crane must show the following:

(1) it is a "person" within the meaning of the statute;
(2) the plaintiff's claims are based upon the defendant's conduct "acting under" a federal office;

(3) it raises a colorable federal defense; and

(4) there is a causal nexus between the claims and the conduct performed under color of a federal office.

Feidt, 153 F.3d at 127 (citing Mesa, 489 U.S. at 129).

There is no dispute that Crane, as a corporation, is a "person" within the meaning of the statute. See Kirks, 654 F. Supp. 2d at 223.

---

[5] In Walkup, this court explained:

On one side of the split, "the colorable defense standard is not an onerous one to satisfy." For example, some courts require only that a colorable defense be plausible in order to meet the requirements for removal under Section 1442(a)(1). "Yet other courts . . . [—] albeit not explicitly — apply a heightened standard at the remand stage that requires courts to 'carefully weigh the plausibility of the proffered defense.'"

Walkup, 2013 U.S. Dist. LEXIS 138272, 2013 WL 5448623, at *4 (quoting [*22] Hagen, 739 F. Supp. 2d at 780).

With respect to the second element, Crane has shown that Plaintiffs' design defect and failure to warn claims associated with Mr. [*23] Dougherty's naval service are based upon Crane's conduct "acting under" a federal office. Plaintiffs allege that Mr. Dougherty was exposed to asbestos "from various products including, but not limited to, gaskets, packing from equipment including pumps, valves and other equipment," while serving as a plumber in the U.S. Navy from 1945-1946. (D.I. 1, Ex. 1 ¶ 2(a)) Plaintiffs further allege that these products "were mixed, mined, manufactured, applied, sold, distributed, removed, installed or used" by the defendants,[6] including Crane. (Id. ¶ 5) In response, Crane has submitted the affidavits of Anthony D. Pantaleoni ("Mr. Pantalieoni"), who has served as the Vice-President of Environment, Health, and Safety for Crane since 1989 (Id., Ex. 2), and retired U.S. Navy Rear Admiral David P. Sargent, Jr. ("Admiral Sargent"), who served in the Navy from 1967 to 1999 (Id., Ex. 3), to demonstrate that the acts forming the basis of Plaintiffs' claims were performed pursuant to direct orders or comprehensive and detailed regulations of the office of the Navy and its officers. See In re Asbestos Litig. (Seitz), 661 F. Supp. 2d at 454.

Mr. Pantaleoni's affidavit indicates that Crane manufactured and supplied equipment, including valves, for Navy ships under contracts between Crane and the Navy, and that "[a]ll equipment supplied by Crane to the Navy was built in accordance with [] Navy specifications." (D.I. 1, Ex. 2 ¶¶ 4-6) Mr. Pantaleoni explained that the Navy specifications "governed all aspects of a piece of equipment, such as a valve's[] design and construction and specified the materials to be used, including materials such as gaskets and packing." (Id. ¶ 5)

Admiral Sargent's affidavit indicates that the Navy provided equipment manufacturers such as Crane with precise specifications "as to the nature of any markings, communication or directions affixed to or made a part of any equipment [they] supplied . . . for ultimate use aboard Navy ships." (Id., Ex. 3 ¶ 58) Based on the content of these specifications, as well as the actual practice as it evolved in the field, Admiral Sargent explained that the manufacturers "would not have been permitted . . . to vary or to deviate in any respect from the Navy specifications in supplying equipment,

---

[6] Plaintiffs' Complaint expressly excludes from this allegation [*24] defendant Metropolitan Life Insurance Company. (See D.I. 1, Ex. 1 ¶ 5)

2014 U.S. Dist. LEXIS 96290, *24

[*25] including affixing any type of warning or caution statement to equipment intended for installation in a Navy ship." (*Id.*)

The Navy similarly had precise specifications with respect to the instruction books and technical manuals accompanying such equipment. (*Id.* ¶ 59) According to Admiral Sargent, the Navy did not permit equipment manufacturers such as Crane to "include any type of warning or caution statement in instruction books or technical manuals, beyond those required and approved by the Navy without prior discussion and approval by the Navy." (*Id.* ¶ 60) Admiral Sargent stated that the Navy reviewed and approved the contents of all technical manuals, including any cautionary language or emphasis, "in an exacting manner," often making extensive line-by-line edits to such manuals and their included warnings. (*Id.*) Admiral Sargent further explained that these detailed specifications were necessary because uniformity was critical to naval operation, and inconsistent warnings would have resulted "[i]f every equipment [] manufacturer were allowed to decide on the need for, and provide its own safety and health warnings [including those related to asbestos]." (*Id.* ¶ 62)

Based upon his [*26] knowledge and experience in the field, Admiral Sargent concluded that the Navy would not have permitted equipment suppliers such as Crane to affix asbestos-related warnings on packaging or containers for valves or related parts, or in any related literature, supplied to the Navy during the relevant timeframe. (*Id.* ¶¶ 64-67)

Based on the above affidavits, Crane has satisfied its burden to show that Plaintiffs' claims associated with Mr. Dougherty's naval service are based upon Crane's conduct "acting under" the office of the Navy and its officers.

With respect to the third element of removal jurisdiction under *Section 1442(a)(1)*, Crane has raised a colorable federal defense to Plaintiffs' claims, namely, the government contractor defense. The government contractor defense displaces state tort law where:

(1) the United States approved reasonably precise specifications;

(2) the equipment conformed to those specifications; and

(3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle, 487 U.S. at 512*. "However, because 'design defect and failure to warn claims differ practically as well as theoretically,' [*27] courts have required the government approval to 'transcend rubber stamping' for the defense to shield a government contractor from failure to warn liability." *Hagen,* 739 F. Supp. 2d at 783 (quoting *Tate, 55 F.3d at 1156-57*)

The government contractor defense inquiry "is undertaken whilst viewing the facts in the light most favorable to [Crane], and does not address the merits of the defense." *Id.* at 783-84.

In the present case, the evidence offered by Crane is adequate on its face to make a plausible showing that the Navy approved reasonably precise specifications, and exercised direction and control, over the design, manufacture, and accompanying manuals and warnings of the equipment supplied by Crane. For example, Mr. Pantaleoni's affidavit indicates that all of the equipment supplied by Crane to the Navy was manufactured pursuant to the Navy's "extensive . . . standards and specifications," which "governed all aspects" of the equipment, including the design and internal materials. (D.I. 1, Ex. 2 ¶¶ 4-6)

Additionally, Admiral Sargent's affidavit demonstrates that the Navy provided Crane with precise specifications concerning written materials, such as product warnings and product manuals, [*28] which accompanied Crane's equipment for use aboard Navy ships. (*Id., Ex.* 3 ¶ 58) According to Admiral Sargent, Crane "would not have been permitted . . . to vary or to deviate in any respect from the Navy specifications in supplying equipment, including affixing any type of warning or caution statement to equipment intended for installation in a Navy ship." (*Id.*)

Consequently, the evidence is sufficient to plausibly show that the Navy was responsible for the design and manufacture of Crane's products, and exercised control that "transcend[ed] rubber stamping" over accompanying product manuals and warnings. *Hagen,* 739 F. Supp. 2d at 783.

The evidence is likewise adequate to show that Crane's products conformed to the specifications of the Navy. Indeed, Admiral Sargent stated that Crane's "[e]quipment could not have been installed aboard Navy vessels unless it was first determined by the Navy to be in conformity with all applicable Navy specifications." (D.I. 1, Ex. 3 ¶ 29) Admiral Sargent's affidavit further demonstrates that Crane acted in accordance with Navy specifications by not providing warnings because Crane

was not permitted to do so without prior discussion and approval by the **[\*29]** Navy. (*Id.* ¶¶ 60, 64-67)

Crane's evidence also satisfies the third element of the government contractor defense, which requires a contractor to have "warned the United States about the dangers in the use of the equipment that were known to the [contractor] but not to the United States." *Boyle, 487 U.S. at 512*. Notably, as the language of the third prong indicates, "a contractor is not required to warn the United States of hazards of which the United States was already aware." *Walkup, 2013 U.S. Dist. LEXIS 138272, 2013 WL 5448623, at \*7*. The affidavit of Samuel A. Forman, M.D. ("Dr. Forman") (D.I. 1, Ex. 4), submitted by Crane, addresses this point directly.

Dr. Forman served in the Navy as a medical officer from 1977 through 1983, and as a civilian employee of the Navy until 1986. (*Id.* ¶ 3) He currently practices as a specialist in preventative and occupational medicine, and is part of a team responsible for reviewing government documents for production in asbestos litigation. (*Id.* ¶¶ 1, 9-11) Through these experiences, Dr. Forman has acquired extensive knowledge regarding the Navy's awareness about the dangers of asbestos. In his affidavit, Dr. Forman summarized the Navy's knowledge of those dangers. (*Id.* ¶¶ 26-55) **[\*30]** According to Dr. Forman, the Navy recognized such health hazards as early as 1922, and by the 1940s had outlined steps to prevent exposure to asbestos. (*Id.* ¶¶ 27, 30-31) Dr. Forman explained that while the Navy was advised of the hazards associated with asbestos, it rejected offers for assistance with those hazards due to other concerns. (*Id.* ¶¶ 32-35)

This evidence, viewed in the light most favorable to Crane, constitutes a plausible showing that the Navy was already familiar with the dangers of asbestos, such that Crane was not obligated to apprise the Navy of those risks. Thus, Crane has satisfied the third element of the government contractor defense and, consequently, has established a colorable federal defense under *Section 1442(a)(1)*.

As to the final element of federal officer removal jurisdiction, Crane has shown a causal nexus between Plaintiffs' claims and Crane's conduct performed under color of a federal office.[7] The design defect claim arises

directly from the specifications that the Navy provided to Crane. The failure to warn claim arises directly out of the alleged involvement of the Navy in determining what warnings could be included with, or placed upon, equipment manufactured **[\*31]** by Crane. Consequently, a causal nexus exists because Crane's liability arises from its official duties, performed in accordance with government contracts. Therefore, Crane has met the requirements of the federal officer removal statute.[8]

## C. Plaintiffs' Evidence and Evidentiary Objections

In support of their Motion to Remand, Plaintiffs contend that Crane's evidence is insufficient to invoke the federal officer defense because it consists of "self-serving affidavits containing entirely untested hypotheticals." (D.I. 15 at 12) Plaintiffs also present their own contradictory evidence that, they contend, establishes that Crane was not prohibited from providing asbestos warnings with its equipment. (*Id.* at 9-18) This evidence includes the affidavit of Arnold P. Moore ("Captain Moore"), a retired Navy Captain with naval engineering experience who has been employed in the private sector for over twenty-five years as an engineer for a number of naval defense contractors. (*Id.,* Ex. 3) Captain Moore's affidavit indicates, among other things, that the Navy "relied heavily upon its manufacturers and vendors to identify hazards associated with their products" and "to provide warnings" for such hazards. (*Id.* ¶¶ 11-12)

---

government contractor is the defendant because both elements require the defendant [to] show that it acted at the federal government's command." Accordingly, . . . "the causal nexus analysis 'is essentially the same as [that associated with] the colorable defense requirement.'"

*Id., 2013 U.S. Dist. LEXIS 179733, 2013 WL 6571808, at \*12* (alterations in original) (quoting *Hagen,* 739 F. Supp. 2d at 785).

[8] This conclusion is supported by a number of cases, including one from this District, where Crane established federal officer removal jurisdiction based on affidavits of Admiral Sargent, Mr. Pantaleoni, and Dr. Forman that were similar or identical to those proffered here. *See, e.g., MacQueen, 2013 U.S. Dist. LEXIS 179733, 2013 WL 6571808, at \*7-12; Joyner v. A.C. & R. Insulation Co., 2013 U.S. Dist. LEXIS 31549, 2013 WL 877125, at \*2-9 (D. Md. Mar. 7, 2013); Leite v. Crane Co., 868 F. Supp. 2d 1023, 1031-34, 1038-42 (D. Haw. 2012)*, **[\*32]** *aff'd, 749 F.3d 1117 (9th Cir. 2014)*.

---

[7] In *MacQueen,* this court explained that

the causal nexus element "is closely related to evidence supporting a colorable federal defense where a

Although Plaintiffs' evidence certainly calls into question the assertions made in the affidavits submitted by Crane, this is not the time for the court to "'dissect the facts stated **[\*33]** . . . [or to] determine credibility, weigh the quantum of evidence or discredit the source of the defense.'" *MacQueen, 2013 U.S. Dist. LEXIS 179733, 2013 WL 6571808, at \*10* (quoting *Hagen*, 739 F. Supp. 2d at 782). *See also* *Walkup, 2013 U.S. Dist. LEXIS 138272, 2013 WL 5448623, at \*8* ("Given that [the defendant] has satisfied the removal requirements under *Section 1442(a)(1)*, consideration of the Plaintiffs' Evidentiary Objections is not warranted at this early stage of the proceeding[]" because a federal officer is not required to "'win his case before he can have it removed.'" (quoting *Willingham, 395 U.S. at 407*)). Rather, the court's job "is merely to analyze, as a threshold matter, whether [Crane's] defense is *colorable*. And it is." *MacQueen, 2013 U.S. Dist. LEXIS 179733, 2013 WL 6571808, at \*10*.

## D. Plaintiffs' Post-Removal Claim Disclaimer

Following Crane's removal of this action, Plaintiffs made the following averments in support of their Motion to Remand:

"Plaintiffs have disclaimed **and hereby waive as the basis for any relief in this case** "**exposures that may have occurred during Mr. Dougherty's service in the United States Navy from 1945-1947.**" (D.I. 14 at 2 (emphasis added))

"To the extent necessary, **Plaintiffs also hereby waive all claims against Crane stemming from  [\*34] Mr. Dougherty's asbestos exposure from any federal government job site, and aboard Navy ships or any other military vessel.**" (D.I. 15 at 4)

Plaintiffs contend that the "disclaimer [in the Complaint], coupled with [their] further explicit waiver [] of any causes of action relating to Mr. Dougherty's work in the Navy, is sufficient to defeat defendant Crane's removal under the federal officer removal statute." (D.I. 15 at 2)

It is unclear whether Plaintiffs offer these statements in order to clarify the jurisdictional disclaimer in the Complaint, or as an additional, separate waiver. Nevertheless, the court rejects the proposition that Plaintiffs' post-removal statements should be considered in conjunction with the jurisdictional disclaimer in the Complaint for purposes of evaluating the propriety of Crane's removal. *See generally Rosa v. Resolution*

*Trust Corp., 938 F.2d 383, 392 n.12 (3d Cir. 1991)* ("It is a firmly established rule that subject matter jurisdiction is tested as of the time of the filing of the complaint." (citations omitted)).

In the court's view, Plaintiffs' post-removal assertions are substantively distinct from the jurisdictional disclaimer and, as such, are construed **[\*35]** collectively as a separate, post-removal claim disclaimer. Contrary to Plaintiffs' argument, the claim disclaimer is not sufficient to "defeat" Crane's removal under the federal officer statute because it was asserted *after* Crane filed its notice of removal and through a motion to remand. However, the claim disclaimer's substantive effect on this case warrants further discussion.

While courts in this Circuit have not previously addressed express claim disclaimers (as contrasted with jurisdictional disclaimers, see *In re Asbestos Prods. Liab. Litig. (No. VI), 770 F. Supp. 2d at 740-43*[9] in the context of asbestos actions, a number of federal courts in other circuits have considered the issue. A review of the relevant case authorities reveals that courts recognize a distinction between artful pleading for purposes of circumventing federal officer jurisdiction, and express disclaimers of the claims that serve as the grounds for removal under *Section 1442(a)(1)*. In the latter case, federal courts have consistently granted motions to remand where the plaintiff expressly disclaimed the claims upon which federal officer removal was based.

---

[9] In the present case, Plaintiffs' claim disclaimer purports  **[\*36]** to exclude any claims arising out of Mr. Dougherty's asbestos exposure on federal jobsites, Navy ships, and military vessels — irrespective of whether the claims could give rise to a federal defense, and irrespective of whether the exposure was caused by any person or entity acting under the authority of a federal officer or agency. (*See* D.I. 14 at 2; D.I. 15 at 4) Furthermore, Plaintiffs assert that their claims are premised on exposures at non-federal, private locations. (*See* D.I. 15 at 13) In contrast, the plaintiffs' disclaimer in *In re Asbestos Prods. Liab. Litig. (No. VI)* purported to exclude any claims of asbestos exposure "'caused by the acts or omissions of defendants committed at the specific and proven direction of an officer of the United States government acting in his official capacity.'" *Id., 770 F. Supp. 2d at 740* (citation omitted). This disclaimer is far more limited and is contingent on the Navy's contractual limitations and specifications. Additionally, the only claims asserted against the defendant were based exclusively on asbestos exposure at federal jobsites. *Id. at 742*.

2014 U.S. Dist. LEXIS 96290, *36

For example, in *Westbrook v. Asbestos Defendants (BHC), 2001 U.S. Dist. LEXIS 11575, 2001 WL 902642 (N.D. Cal. July 31, 2001)*, **[*37]** the U.S. District Court for the Northern District of California granted the plaintiffs' motion to remand, in part, based on a written claim disclaimer. *2001 U.S. Dist. LEXIS 11575, [WL] at *3*. The action had initially been removed by a defendant asserting the government contractor defense in response to allegations in the complaint that the plaintiff was exposed to asbestos on Navy ships while working at the defendant's facility, among other locations. *2001 U.S. Dist. LEXIS 11575, [WL] at *1-2*.

In granting the plaintiffs' motion to remand, the court reasoned:

> . . . [P]laintiffs have asserted, in writing in the state court action, that: "Plaintiff's claims against [the removing defendant], exclude plaintiffs asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels." To the extent this "stipulation" (as plaintiffs call it) is binding, [the defendant's] ground for removal is eviscerated. If plaintiffs' claims arise only from work done on private ships, not under the direction of any federal officers, [the defendant's] military contractor defense is unavailable.
>
> The question then is whether plaintiffs' written waiver is sufficient. . . . The court sees no reason not to hold plaintiffs in this case to their waiver **[*38]** of claims arising out of work done on federal jobsites and vessels. This waiver, therefore, justifies remand. If plaintiffs later attempt to reverse course, and are allowed to do so by the state court despite their express waiver, [the defendant] can always file for removal once again.

*2001 U.S. Dist. LEXIS 11575, [WL] at *2-3* (citations omitted).

Similarly, in *Hopkins v. Buffalo Pumps, Inc., 2009 U.S. Dist. LEXIS 111521, 2009 WL 4496053 (D.R.I. Dec. 1, 2009)*, the U.S. District Court for the District of Rhode Island granted the plaintiffs' motion to remand because it determined that the removing defendant could not assert a federal defense to claims of asbestos exposure that the plaintiffs deliberately chose not to pursue. *2009 U.S. Dist. LEXIS 111521, [WL] at *6*. There, the plaintiffs' complaint had limited their causes of action to asbestos exposure that occurred on two non-federal

jobsites.[10] *2009 U.S. Dist. LEXIS 111521, [WL] at *1, 5*. Prior to removal, however, plaintiffs served defendants with discovery responses that included an exposure chart. *2009 U.S. Dist. LEXIS 111521, [WL] at *1*. The chart indicated that the plaintiff "was exposed to asbestos-containing products while employed with New York Shipbuilding in Camden, New Jersey from 1942 to 1944," and "generally identified] the products in issue (including boilers, insulation, **[*39]** pumps, turbines, etc.) and name[d] four Naval combat ships (cruisers and carriers) he worked on at New York Shipbuilding by name, hull code and number." *2009 U.S. Dist. LEXIS 111521, [WL] at *5*.

One of the defendants removed the case, asserting the government contractor defense on the basis that it manufactured boilers and other equipment for use on Navy ships, including those ships identified in the plaintiffs' exposure chart, pursuant to contracts and specifications executed by the Navy. *2009 U.S. Dist. LEXIS 111521, [WL] at *1, 5-6*. The plaintiffs filed a motion to remand, arguing that they expressly excluded from the complaint "any claims for exposure while working with [the removing defendant's] products on Naval ships at New York Shipbuilding from 1942 to 1944." *2009 U.S. Dist. LEXIS 111521, [WL] at *6*.

In granting remand, the court cited **[*40]** *Westbrook* and explained:

> Plaintiffs here, as in *Westbrook*, disclaimed claims against [the removing defendant] arising out of work on Navy ships. [The defendant] is correct that the focus should be on the existence of a colorable federal defense and not on Plaintiffs' Complaint. However, [the defendant] premised removal on the assumption that Plaintiffs were suing, at least in part, for claimed exposure to asbestos for work on Navy ships at New York Shipbuilding. Plaintiffs' Complaint makes clear that their claim is limited to specific locations other than New York Shipbuilding. Thus, Plaintiffs are not pursuing a claim against which [the defendant] has shown the existence of a colorable federal defense. As noted by the Court in

---

[10] Specifically, the complaint alleged that one of the plaintiffs "'was exposed to various asbestos containing products through the use of products manufactured, sold or distributed by the named defendants with such exposure as these named defendants' products occurring as a laborer and maintenance worker at Mobil Oil from 1946-1966 and Tucson Gas & Electric . . . from 1966-1979.'" *Hopkins, 2009 U.S. Dist. LEXIS 111521, 2009 WL 4496053, at *1* (alteration in original).

*Westbrook,* if Plaintiffs reverse course in the future and attempt to assert a claim based on claimed exposure at New York Shipbuilding, [the defendant] can file a renewed notice of removal under *28 U.S.C. § 1442* at that time.

*Hopkins, 2009 U.S. Dist. LEXIS 111521, 2009 WL 4496053, at *7* (citations omitted).

In *Frawley v. Gen. Elec. Co., 2007 U.S. Dist. LEXIS 18404, 2007 WL 656857 (S.D.N.Y. Mar. 1, 2007)*, a husband and wife sought damages from a number of defendants for injuries caused by the husband's alleged exposure **[*41]** to asbestos. *2007 U.S. Dist. LEXIS 18404, [WL] at *1*. One of the defendants, GE, removed the case under the federal officer removal statute after learning that the husband was allegedly exposed to asbestos while working as a civilian employee for the Navy. *Id.* The husband had worked on two ships, "both of which carried asbestos-containing steam turbines built by GE pursuant to government contract." *Id.* Shortly after removal, the plaintiffs amended their complaint as a matter of right, pursuant to *Fed. R. Civ. P. 15(a)*, to delete all allegations against GE relative to the husband's naval exposure, and filed a motion to remand. *Frawley, 2007 U.S. Dist. LEXIS 18404, 2007 WL 656857, at *2*.

GE opposed the motion, arguing that remand was precluded because its initial removal of the case was proper. *2007 U.S. Dist. LEXIS 18404, [WL] at *3*. GE further argued that it was subject to potential cross-claims from co-defendants seeking contribution on the theory that GE's products were responsible for the plaintiffs' injuries, which "would insert the issue of GE's federal contractor immunity right back into the case." *2007 U.S. Dist. LEXIS 18404, [WL] at *4*.

The court rejected both arguments. The court reasoned that, "[c]ontrary to GE's assertion, . . . a properly removed case *can* be remanded to the state court after **[*42]** the complaint is amended to remove the allegations that made removal proper." *2007 U.S. Dist. LEXIS 18404, [WL] at *3* (citing *Carnegie-Mellon University v. Cohill, 484 U.S. 343, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988))*. The court further explained:

. . . [T]he potential for cross-claims that will be subject to a government contractor defense does not necessarily mean that this court ought to retain jurisdiction over what is essentially a state court matter. In other contexts, defenses and counterclaims to state law causes of action, and even cross-claims between various defendants,

present issues of federal law. But removal is not available to deal with federal issues that arise in counterclaims and cross-claims. As a result, state courts deal with issues of federal law all the time.

Federal actor removal represents an exception to the usual rule that the existence of a federal defense does not confer federal jurisdiction. But once the plaintiffs' claim against a government contractor is out of the case, it stretches the principle for a federal court to retain the case against the possibility that cross-claims will be pled. If plaintiff had not originally pleaded failure to warn and to maintain a safe workplace claims against GE arising out of his **[*43]** work for the Navy, GE could not have removed the case to this court pursuant to the federal officer removal statute, even though the potential for cross-claims implicating federal interests would have existed. GE would have had to assert its government contractor defense to those cross claims in the state court.

*2007 U.S. Dist. LEXIS 18404, [WL] at *4* (citation omitted). Ultimately, the court determined that remand was appropriate and granted the plaintiffs' motion.[11] *2007 U.S. Dist. LEXIS 18404, [WL] at *5-6*.

In *Joyner v. A.C. & R. Insulation Co., 2013 U.S. Dist. LEXIS 31549, 2013 WL 877125 (D. Md. Mar. 7, 2013)*, *reconsideration denied, 2013 U.S. Dist. LEXIS 79402, 2013 WL 2460537 (D. Md. June 6, 2013)*, the U.S. District Court for the District of Maryland **[*44]** granted the plaintiff's motion to remand based on the plaintiff's post-removal waiver of claims. *Id., 2013 U.S. Dist. LEXIS 79402, 2013 WL 2460537, at *1*.

Initially, the complaint asserted claims for exposure to asbestos-containing products, including valves, during the plaintiff's service in the U.S. Coast Guard, and gaskets, during his employment as a civilian electrician. *Id., 2013 U.S. Dist. LEXIS 31549, 2013 WL 877125, at *1-3*. Some of the valves and gaskets were allegedly

---

[11] Because Plaintiffs' disclaimer excluded only the claims against GE, the court deferred remand for a short period of time in order to allow other defendants to notify the court if they intended to assert a government contractor defense to the plaintiffs' claims. *Frawley, 2007 U.S. Dist. LEXIS 18404, 2007 WL 656857, at *6*. The court reasoned that "considerations of fairness would weigh heavily in favor of retaining this case if there are other government contractor defendants, because those defendants have by now lost their right to remove the case due to the passage of time." *Id.*

2014 U.S. Dist. LEXIS 96290, *44

manufactured by defendant Crane (the same defendant here). *Id.* The complaint, however, "expressly disclaimed 'any federal cause of action or any claim that would give rise to federal jurisdiction.'" *2013 U.S. Dist. LEXIS 31549, [WL] at *1* (citation omitted).

Crane removed the action pursuant to the federal officer removal statute, claiming it was entitled to the government contractor defense because it designed, manufactured and supplied its valves "pursuant to precise contracts and specifications approved by the Navy" for use by the Coast Guard. *2013 U.S. Dist. LEXIS 31549, [WL] at *2*. The plaintiff filed a motion to remand. *2013 U.S. Dist. LEXIS 31549, [WL] at *1, 2*. The court found that Crane had established a colorable federal defense under *Section 1442(a)(1)* and, thus, denied remand as to Crane.[12] *2013 U.S. Dist. LEXIS 31549, [WL] at *9, 11*.

The plaintiff subsequently filed a "notice of abandonment of claims [related to Crane's valves] and request for remand." *Id., 2013 U.S. Dist. LEXIS 79402, 2013 WL 2460537, at *1*. In response to procedural objections by Crane, the plaintiff also proposed the following amendment to paragraph two of the complaint:

> Plaintiff makes no claims for recovery nor asserts any theories of liability against Crane Co. for its valves. Plaintiff's . . . claims against Crane Co. are confined to its manufacture, sale, distribution and marketing of [] gaskets.

*2013 U.S. Dist. LEXIS 31549, [WL] at *4*. Crane opposed the amendment, arguing that it was "a bald attempt 'to disclaim any facts or claims that might invoke federal jurisdiction.'" *Id.* (citation omitted). According to Crane, the provision was no more effective than the initial disclaimer the plaintiff's complaint, which purported to renounce any claims that could give rise to federal jurisdiction. *Id.*

The court rejected Crane's argument, finding "significant **[*46]** differences[] . . . between the jurisdictional disclaimer [initially asserted] and the [proposed] claim disclaimer in paragraph two." *Id.* The court reasoned:

> . . . Here, a federal court has already deemed

Crane Co.'s federal defense with respect to its valves to be colorable, and that determination has led [the plaintiff] to drop the valve claim. Crane Co. cannot reasonably maintain that it will suffer prejudice if [the plaintiff] elects not to seek damages for injuries that Crane Co. allegedly caused. The claim disclaimer also will not shift Crane Co.'s damages onto the other defendants. Even if [the plaintiff] is permitted to disclaim any damages related to Crane Co.'s valves, the other defendants may argue to the state-court jury that those valves caused or contributed to [the plaintiff's] mesothelioma. The jury would then be charged with determining the extent to which the valves caused his injuries, and [the plaintiff] would not be entitled to any monetary damages for the valve-related injuries. In other words, the claim disclaimer would simply prevent [the plaintiff] from collecting any damages caused by his exposure to Crane Co. valves.

. . . .

The validity of Crane Co.'s federal **[*47]** defense with respect to the valves therefore would be immaterial, as Crane Co. would no longer face liability related to its valves. And because Crane Co.'s co-defendants/cross-claimants cannot seek contribution from Crane Co. for injuries caused by its valves if no damages are awarded for those injuries, the validity of Crane Co.'s federal defense would be immaterial to the cross-claims as well.

*2013 U.S. Dist. LEXIS 31549, [WL] at *5*. Consequently, the court granted the plaintiff's "notice of abandonment of claims," which was "treated as a motion to amend the complaint," and granted the plaintiff's motion to remand. *2013 U.S. Dist. LEXIS 31549, [WL] at *7*.

The authorities discussed above represent only a portion of a larger group of asbestos cases in which courts have given effect to express claim disclaimers. *See, e.g., Phillips v. Asbestos Corp. Ltd., 2014 U.S. Dist. LEXIS 24792, 2014 WL 794051, at *2 (N.D. Cal. Feb. 26, 2014)* ("[Plaintiff has expressly disclaimed and waived any claim arising out of or related to any asbestos exposure aboard federal jobsites and navy vessels. This removes any claims to which military contractor immunity might act as a defense."); *Schulz v. Crane Co., 2014 U.S. Dist. LEXIS 9198, 2014 WL 280361, at *1-2 (E.D. Cal. Jan. 23, 2014)* (holding that plaintiff's waiver **[*48]** of claims "arising out of or related to asbestos exposure to or on military or federal government aircraft" precluded federal officer removal);

---

[12] The plaintiff had also filed a motion **[*45]** to sever in addition to the motion to remand. *Joyner, 2013 U.S. Dist. LEXIS 31549, 2013 WL 877125, at * 1*. The court granted the motion to sever the plaintiff's claims against Crane from his claims against the other defendants and, thus, remanded the case as to those defendants. *2013 U.S. Dist. LEXIS 31549, [WL] at *10*.

*Lara v. CBS Corp., 2013 U.S. Dist. LEXIS 128265, 2013 WL 4807168, at *1 (C.D. Cal. Sept. 6, 2013)* (granting remand over defendant's objection that the plaintiffs' claim disclaimer was non-binding because "[t]he form of plaintiffs' post-removal waiver [did] not undercut its effectiveness"); *Kuhnau v. Allied Packing & Supply, Inc., 2013 U.S. Dist. LEXIS 87691, 2013 WL 3187650, at *1 (N.D. Cal. June 21, 2013)* (granting remand, conditioned upon the plaintiffs' filing of a proposed disclaimer that waived all claims arising out of "exposure to asbestos at any military and/or federal government jobsites, including, but not limited to exposure which occurred aboard any United States Navy Vessels and/or United States Navy Shipyards"); *Lockwood v. Crane Co., 2012 U.S. Dist. LEXIS 57986, 2012 WL 1425157, at * 1-2 (C.D. Cal. Apr. 25, 2012)* (holding that plaintiff's waiver of any claims "relating to or arising out of plaintiff's asbestos exposure at military and federal government jobsites or from U.S. military or other government vessels," filed shortly after removal, was sufficient to justify remand); *Pratt v. Asbestos Corp. Ltd., 2011 U.S. Dist. LEXIS 108217, 2011 WL 4433724, at *1-2 (N.D. Cal. Sept. 22, 2011)* **[*49]** ("Plaintiff's waiver has rendered any federal defenses moot. There must be claims against which a federal defense is cognizable, and Plaintiff's waiver has removed any such claims."); *Powers v. Allis-Chalmers Corp. Prod. Liab. Trust, 2010 U.S. Dist. LEXIS 83278, 2010 WL 2898287, at *2 (N.D. Cal. July 21, 2010)* (holding that the plaintiff's signed declaration waiving claims "arising out of or related to asbestos exposure to or on military or federal government aircraft" precluded federal officer removal); *Madden v. A.H. Voss Co., 2009 U.S. Dist. LEXIS 101680, 2009 WL 3415377, at *2 (N.D. Cal. Oct. 21, 2009)* (granting remand based on the plaintiff's claim disclaimer, and request to dismiss a particular defendant, relative to allegations of "asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels"); *Debrocke v. Allis-Chalmers Corp. Prod. Liab. Trust, 2009 U.S. Dist. LEXIS 46699, 2009 WL 1464153, at *2 (N.D. Cal. May 26, 2009)* (granting remand where the plaintiffs "expressly disclaimed and waived [in the complaint] any claim arising out of or related to any asbestos exposure aboard federal jobsites and navy vessels").

Notably, the parties have not identified, nor is the court aware of, any case in which a federal court has rejected on the **[*50]** merits an express disclaimer of claims relating to asbestos exposure on federal jobsites and military vessels/aircrafts.

The only case that could be construed as contrary authority is *Morgan v. Bill Vann Co., Inc., 2011 U.S. Dist. LEXIS 140394, 2011 WL 6056083 (S.D. Ala. Dec. 6, 2011)*. But *Morgan* is distinguishable. There, the plaintiff in an asbestos action sought remand because he had disclaimed in the complaint "any claim arising from an act or omission . . . by any officer of the United States or any agency or person acting under him/her under color of such office." *2011 U.S. Dist. LEXIS 140394, [WL] at *9*. The U.S. District Court for the Southern District of Alabama found that the jurisdictional disclaimer was "legally ineffective to extinguish the defective design claims" in the complaint, which had given rise to the federal officer defenses asserted by the removing defendants. *Id.*

However, in the plaintiff's reply brief in support of remand — which the court noted was "filed some two months post-removal" — the plaintiff "announce[d] a present intent to disclaim all design defect claims against [the removing defendants]." *2011 U.S. Dist. LEXIS 140394, [WL] at *9 n.14*. The court rejected the plaintiff's attempt to waive such claims in order to avoid federal jurisdiction, **[*51]** explaining:

> Under any reasonable reading of [the notice of removal], the removing defendants were predicating removal on the existence of a colorable federal defense to plaintiff's defective design claims. Thus, at the time he filed his Motion to Remand, plaintiff knew of the central importance of the defective design issue to the removal petition, yet he remained silent as to his purported disclaimer until filing his reply brief, long after the fact.
>
> . . . .
>
> . . . Far from evincing a disclaimer of design defect claims against [the removing defendants], plaintiff's Motion to Remand and incorporated brief unequivocally expressed his intent to pursue exactly that category of claims against those removing defendants, notwithstanding their invocation of the federal officer removal statute. Having emphatically committed himself in his Motion to Remand to proceeding on a design defect theory against [the removing defendants], [the plaintiff] cannot be heard to argue in his reply brief that the disclaimer in his Complaint confirms that he was never pursuing such claims against these defendants in the first place.[13]

_____

[13] The court in *Morgan* further reasoned that the plaintiff had **[*52]** "effectively announced a 'gotcha' on defendants by disclaiming any intent to bring design defect claims against

2011 U.S. Dist. LEXIS 140394, [WL] at *10 & n.15.

Accordingly, *Morgan* is an inapposite because it was based not on the merits of the plaintiff's disclaimer, but instead on "[b]asic principles of equity and fairness [that] preclude[d] plaintiff from proceeding in such fashion." 2011 U.S. Dist. LEXIS 140394, [WL] at * 10 n. 16. As a related point, it should be noted that district courts in Alabama have suggested in other asbestos cases that they would grant remand if presented with a proper claim disclaimer. *See, e.g.,* Kite v. Bill Vann Co., Inc., 2011 U.S. Dist. LEXIS 112267, 2011 WL 4499345, at *2 (S.D. Ala. Sept. 29, 2011) (denying remand, but noting that, "[h]ad the plaintiff disclaimed any claim arising from exposure aboard a Navy vessel or while on a military installation, he might well have prevailed on his [disclaimer] argument. . . . The plaintiff's disclaimer, **[\*53]** however, is much more limited."); Corley v. Long-Lewis, Inc., 688 F. Supp. 2d 1315, 1335-36 (N.D. Ala. 2010) (same).

Here, Plaintiffs' post-removal claim disclaimer is substantially similar (and in some instances, identical) to the disclaimers that were determined to be effective in the cases discussed above. Although the means by which Plaintiffs assert the claim disclaimer lack the procedural formality of Federal Rules of Civil Procedure 15 & 41,[14] Crane has not asserted any procedural objections to Plaintiffs' attempt to abandon their claims.[15] *Cf.* Joyner, 2013 U.S. Dist. LEXIS 79402, 2013 WL 2460537, at *2-5.[16] Consequently, under the

them in the first place, *after* forcing defendants to address the merits of § 1442(a)(1) removal of those design defect claims at great length in their opposition brief. Basic principles of equity and fairness preclude plaintiff from proceeding in such fashion." Morgan, 2011 U.S. Dist. LEXIS 140394, 2011 WL 6056083, at *10 n.16 (citation omitted).

[14] Indeed, Plaintiffs simply insert the claim disclaimer into briefs filed in support of the pending Motion (*see* D.I. 14 at 2; D.I. 15 at 4), rather than seeking leave to amend the Complaint, filing a stipulation or limited voluntary dismissal, or otherwise.

[15] Crane does not discuss Plaintiffs' post-removal disclaimer at length, and simply argues: "In addition to the 'disclaimer' in the complaint, Plaintiffs' **[\*54]** memorandum includes an additional waiver, which is also ineffective." (D.I. 22 at 6)

[16] In *Joyner,* Crane objected to the plaintiff's "notice of abandonment" on the grounds that it was procedurally improper, among other things. Id., 2013 U.S. Dist. LEXIS 79402, 2013 WL 2460537, at *2. Crane's argument ultimately led the plaintiff to propose an amendment to the complaint

facts of this case, the court finds no reason to depart from the rationale behind numerous rulings of district courts in other circuits finding such claim disclaimers effective.

## E. Whether Remand is Appropriate

Having determined that Plaintiffs' post-removal claim disclaimer effectively waives any claims of asbestos exposure attributable to Mr. Dougherty's naval service, the court must decide whether remand is appropriate. A post-removal claim disclaimer does not compel automatic remand. As the Court in *Frawley* explained, "whether to retain a removed case after post-removal dismissal of all claims that made the case properly removable presents an entirely different issue than whether removal was proper in the first place — an issue that is decided in accordance with entirely different principles." Id., 2007 U.S. Dist. LEXIS 18404, 2007 WL 656857, at *3 (citation omitted).

The relevant authority addressing this issue is 28 U.S.C. § 1367, which governs the court's exercise of supplemental jurisdiction. **[\*55]** Under Section 1367, federal courts with original jurisdiction over a federal claim have supplemental jurisdiction over state-law claims that form "part of the same case or controversy." 28 U.S.C. § 1367(a). A district court may, however, decline to exercise supplemental jurisdiction over state-law claims if "the district court has dismissed all claims over which it has original jurisdiction."[17] 28 U.S.C. § 1367(c)(3). In this regard, the Third Circuit has instructed that, "'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (quoting Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir.

pursuant to Fed. R. Civ. P. 15. Joyner, 2013 U.S. Dist. LEXIS 79402, 2013 WL 2460537, at *4-5.

[17] *See also* New Rock Asset Partners, L.P. v. Preferred Entity Advancements, 101 F.3d 1492, 1508 (3d Cir. 1996) **[\*56]** (explaining that dismissal of the jurisdiction-granting claim "triggers a discretionary decision on whether jurisdiction over a state law claim should be declined pursuant to § 1367(c)(3)").

1995)).[18] *See also Carnegie-Mellon, 484 U.S. at 351* (explaining that, where the federal claims are eliminated early in a case, "the District Court ha[s] a powerful reason to choose not to continue to exercise jurisdiction").

In the present case, original jurisdiction was established when the court determined that Crane had a colorable federal defense to the claims traceable to Mr. Dougherty's naval service. *See Mesa, 489 U.S. at 136.*[19] Once the court exercised original jurisdiction over those claims, the court also had supplemental jurisdiction over Plaintiffs' state-law claims because all of the claims are clearly "so related" as to be "part of the same controversy." *28 U.S.C. § 1367(a).* Plaintiffs, however, have waived the claims underlying the court's original jurisdiction. Consequently, the court must decline **[*57]** to decide the remaining state-law claims "unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" *Hedges, 204 F.3d at 123* (quoting *Borough of W. Mifflin, 45 F.3d at 788*).

Plaintiffs have requested remand in order to litigate their causes of action in state court rather than federal court. Crane, on the other hand, asserts a number of affirmative justifications for keeping the case in federal court, of which two remain relevant.[20]

---

[18] "While *§ 1367(c)* does not specify what disposition the district court is to make of state claims it decides not to hear, based on the teachings of [the Supreme Court], we believe that in a case that has been removed from a state court, *a remand to that court is a viable alternative to a dismissal without prejudice.*" *Borough of W. Mifflin, 45 F.3d at 788* (emphasis added) (citing *Carnegie-Mellon, 484 U.S. at 343*).

[19] In *Mesa,* the Supreme Court explained that *Section 1442(a)* does not furnish an independent ground for federal jurisdiction absent some federal question implicated either in the claim or by way of a defense:

It is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes. The removal statute itself merely serves to overcome the "well-pleaded complaint" rule which would otherwise preclude removal even if a federal defense were alleged.

*Mesa, 489 U.S. at 136* (citations omitted).

[20] Crane's affirmative justifications for keeping this action in federal court are directed, **[*58]** in large part, to arguments

Crane contends that the purpose of Plaintiffs' disclaimer is "jurisdictional manipulation." (D.I. 22 at 1) Crane further argues that it could face cross-claims from co-defendants seeking contribution for damages traceable to Mr. Dougherty's naval exposure — notwithstanding Plaintiffs' claim disclaimer — and "because Crane [] has a colorable federal defense [to such claims], it would raise that defense to all-cross claims filed in state court, which could lead to a cycle of removals and further attempts to remand." (*Id.* at 18; *see also id.* at 4)

Neither of Crane's arguments are compelling. As to jurisdictional manipulation, the Supreme Court in *Carnegie-Mellon* explained that, in addition to considerations of judicial economy, convenience, and fairness to the parties:

A district court can consider whether the plaintiff has engaged in any manipulative tactics when it decides whether to remand a case. If the plaintiff has attempted to manipulate the forum, the court should take this behavior into account in determining whether the balance of factors to be considered **[*59]** under the pendent jurisdiction doctrine support a remand in the case.

*Carnegie-Mellon, 484 U.S. at 357. See also Trans Penn Wax Corp. v. McCandless, 50 F.3d 217, 233 (3d Cir. 1995).* However, "*Carnegie-Mellon* [] does not suggest that a plaintiff's desire to avoid a federal forum prevents a district court from exercising its discretion to remand pendant claims. Instead, it requires only that the plaintiff's forum-manipulating motivation be considered in weighing the factors relevant to remand." *Datto v. Thomas Jefferson Univ., 2009 U.S. Dist. LEXIS 18696, 2009 WL 577458, at *3 (E.D. Pa. Mar. 4, 2009).*

Contrary to Crane's assertion, it is not clear that the purpose of Plaintiffs' disclaimer is jurisdictional manipulation. Crane has not pointed to any evidence of an improper motive, and the facts do not support such a conclusion. Indeed, Plaintiffs filed their Motion to Remand less than one month after Crane filed its notice of removal. (*See* D.I. 14) Furthermore, Plaintiffs have maintained from the outset that they never made a claim subject to federal jurisdiction.[21] (*See* D.I. 14 at 2; D.I. 15

---

against severing Plaintiffs' federal claims from their state claims. (See D.I. 22 at 1-4, 16-18)

[21] *Cf. Morgan, 2011 U.S. Dist. LEXIS 140394, 2011 WL 6056083, at *10 & nn.15-16* (rejecting the plaintiff's disclaimer as an unfair, "gotcha" argument, because plaintiff sought to abandon particular claims *after* he "unequivocally expressed

2014 U.S. Dist. LEXIS 96290, *59

at 4, 13) While the court ultimately found that Plaintiffs' legal position was not correct, it does not necessarily follow **[*60]** that seeking remand via claim disclaimer was impermissible forum manipulation. *See Ortiz v. Univ. of Med. & Dentistry of N.J., 2009 U.S. Dist. LEXIS 63220, 2009 WL 2194782, at *3 (D.N.J. July 23, 2009).* *See also Zokaites v. Equifax Info. Servs., LLC, 2012 U.S. Dist. LEXIS 39491, 2012 WL 993269, at *3 (W.D. Pa. Mar. 22, 2012)* ("Although plaintiff's conduct could be attributable to improper motives, it is equally plausible that he has simply made the sensible decision not to pursue a meritless federal claim.").

Crane's argument concerning cross-claims is similarly unpersuasive for the reasons identified in *Joyner*, where the same argument — also asserted by Crane — was rejected:

> . . . Crane Co. also submit[s] that the defendants' cross-claims give rise to federal jurisdiction. On this view, [the plaintiff's] abandonment of his valve claim against Crane Co. does not extinguish the co-defendants' cross-claims against Crane Co. with respect to its valves. Yet this argument reflects a fundamental **[*61]** misunderstanding of the nature of a claim for contribution. The defendants' cross-claims for contribution are derivative of [the plaintiff's] suit and, ultimately, the damages, if any, that he recovers; a defendant may only seek contribution for damages imposed on that defendant. In other words, if [the plaintiff] never recovers damages for injuries caused by Crane Co.'s valves, neither Crane Co. nor the other defendants can maintain a cross-claim for contribution related to those injuries. And because [the plaintiff] has dropped his valve claim and therefore cannot recover damages for any injuries caused by Crane Co.'s valves, it follows that [plaintiff's] disclaimer of all such damages necessarily extinguishes all cross-claims that are derivative of those injuries.

*Joyner, 2013 U.S. Dist. LEXIS 79402, 2013 WL 2460537, at *7.*[22] *See also Frawley, 2007 U.S. Dist. LEXIS 18404, 2007 WL 656857, at *4* ("If plaintiff had

---

his intent to pursue exactly that category of claims").

[22] *See also Joyner, 2013 U.S. Dist. LEXIS 79402, 2013 WL 2460537, at *5* (explaining **[*62]** that, "because Crane Co.'s co-defendants/cross-claimants cannot seek contribution from Crane Co. for injuries caused by its valves if no damages are awarded for those injuries, the validity of Crane Co.'s federal defense would be immaterial to the cross-claims as well.").

not originally pleaded . . . claims against GE arising out of his work for the Navy, GE could not have removed the case to this court pursuant to the federal officer removal statute, even though the potential for cross-claims implicating federal interests would have existed.").

In the present case, the facts and circumstances weigh heavily in favor of remand. This litigation is in its early stages and there has been relatively little time and resources expended in federal court. There is no indication that it would be inconvenient to resolve this matter in state court. Additionally, Plaintiffs' remaining claims fall under state law, favoring remand. If Plaintiffs later attempt to reverse course, and are allowed to do so by the state court despite their express claim disclaimer, Crane can seek removal once again. *See Westbrook, 2001 U.S. Dist. LEXIS 11575, 2001 WL 902642, at *3.* Consequently, the court "must decline to decide the pendent state claims," and Plaintiffs' Motion to Remand should be granted. *Borough of W. Mifflin, 45 F.3d at 788.*

## V. CONCLUSION

For the foregoing reasons, I recommend that the court grant Plaintiffs' Motion to Remand.

This Report and Recommendation is filed pursuant to *28 U.S.C. § 636(b)(1)(B)*, *Fed. R. Civ. P. 72(b)(1)*, **[*63]** and *D. Del. LR 72.1.* The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. *Fed. R. Civ. P. 72(b)(2).* The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart, 171 F. Appx. 924, 925 n.1 (3d Cir. 2006); Henderson v. Carlson, 812 F.2d 874, 878-79 (3d Cir. 1987).*

The parties are directed to the court's Standing Order For Objections Filed Under *Fed. R. Civ. P. 72*, dated October 9, 2013, a copy of which is available on the court's website, *http://www.ded.uscourts.gov.*

Dated: July, 16 2014

/s/ Sherry R. Fallon

Sherry R. Fallon

2014 U.S. Dist. LEXIS 96290, *63

United States Magistrate Judge

---

**End of Document**

 Positive
As of: April 8, 2024 9:02 PM Z

# *Hayden v. 3M Co.*

United States District Court for the Eastern District of Louisiana

August 10, 2015, Decided; August 10, 2015, Filed

CIVIL ACTION NO. 15-2275 SECTION "N" (3)

**Reporter**
2015 U.S. Dist. LEXIS 104534 *; 2015 WL 4730741

THOMAS HAYDEN AND JAQUELINE HAYDEN
VERSUS 3M COMPANY, et al

**Subsequent History:** Related proceeding at *Hayden v. 3M Co., 2016 U.S. Dist. LEXIS 81835 (E.D. La., June 22, 2016)*

## Core Terms

exposure, removal, disclaimer, asbestos, federal official, cause of action, blowers, grounds, manufactured, deposition, aboard

**Counsel:** **[*1]** For Thomas H. Hayden, Jacqueline S. Hayden, Plaintiff: Mickey P. Landry, LEAD ATTORNEY, Amanda Jones Ballay, Frank J. Swarr, Matthew C. Clark, Philip C Hoffman, Landry & Swarr, LLC, New Orleans, LA.

For Carrier Corporation, Defendant: Joseph M. Guillot, LEAD ATTORNEY, Patrick Ryan Plummer, Christovich & Kearney, LLP, New Orleans, LA.

For Air & Liquid Systems Corporation, as successor by merger to Buffalo Pumps Inc., Defendant: Stacey Leigh Strain, LEAD ATTORNEY, Hubbard, Mitchell, Williams & Strain, PLLC, Ridgeland, MS.

For Aurora Pump Company, Defendant: Jennifer E. Adams, William Claudy Harrison, Jr., LEAD ATTORNEYS, Arthur Wendel Stout, III, Barbara Bourgeois Ormsby, Marc John Bitner, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA.

For Caterpillar Inc, Defendant: Robert S. Emmett, LEAD ATTORNEY, Baker Donelson Bearman Caldwell & Berkowitz (New Orleans), New Orleans, LA; Stephanie Noriea Murphy, Baker Donelson Bearman Caldwell & Berkowitz (New Orleans), New Orleans, LA.

For CBS Corporation, individually and as successor-in-interest to BF Sturtevant, formerly known as Viacom Inc, formerly known as Westinghouse Electric Corporation, Defendant: John Joseph Hainkel, III, LEAD **[*2]**

ATTORNEY, Frilot L.L.C., New Orleans, LA; Angela M. Bowlin, Frilot L.L.C., New Orleans, LA; James H. Brown, Jr., Frilot L.L.C., New Orleans, LA; Kelsey A. Eagan, Frilot L.L.C., New Orleans, LA; Meredith K. Keenan, Frilot L.L.C., New Orleans, LA; Peter R. Tafaro, Frilot L.L.C., New Orleans, LA.

For Champlain Cable Corporation, as successor in interest to Haveg Industries Inc., formerly known as Hercules Inc, Defendant: Christopher O. Massenburg, LEAD ATTORNEY, Manion Gaynor & Manning, LLP, New Orleans, LA; Brandie Mendoza Thibodeaux, Manion Gaynor & Manning, LLP, New Orleans, LA; Glenn L.M. Swetman, Manion Gaynor & Manning, LLP, New Orleans, LA; Kevin R. Sloan, Manion Gaynor & Manning, LLP, New Orleans, LA; Meaghan M. Donovan, Manion Gaynor & Manning, LLP, New Orleans, LA.

For Crane Company, individually and as successor in interest to Chapman Valve Company, Jenkins Valve, and Cochrane Corporation, Defendant: Barry C. Campbell, LEAD ATTORNEY, Dogan & Wilkinson, PLLC (Metairie), Metairie, LA.

For DAP Products Inc., Defendant: Leigh Ann Tschirn Schell, LEAD ATTORNEY, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Joseph Henry Hart, IV, Kuchler Polk Schell Weiner **[*3]** & Richeson, LLC (New Orleans), New Orleans, LA; Lori Allen Waters, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Magali Ann Puente-Martin, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Thomas A. Porteous, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA.

For Deere & Company, Defendant: Deborah DeRoche Kuchler, LEAD ATTORNEY, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Amber B. Barlow, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Janika D. Polk, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Lee Blanton Ziffer, Kuchler Polk Schell Weiner & Richeson, LLC (New

Orleans), New Orleans, LA.

For Eagle, Inc., Defendant: Susan Beth Kohn, LEAD ATTORNEY, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA; Douglas Kinler, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA; James R. Guidry, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA; Janice M. Culotta, Simon, Peragine, Smith and Redfearn, LLP, New Orleans, LA.

For Ford Motor Company, Defendant: Janika D. Polk, LEAD ATTORNEY, Kuchler Polk Schell Weiner & Richeson, **[*4]** LLC (New Orleans), New Orleans, LA; Amber B. Barlow, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Deborah DeRoche Kuchler, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Lee Blanton Ziffer, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Monique M. Weiner, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA.

For General Electric Company, Defendant: John Joseph Hainkel, III, LEAD ATTORNEY, Frilot L.L.C., New Orleans, LA; Angela M. Bowlin, Frilot L.L.C., New Orleans, LA; James H. Brown, Jr., Frilot L.L.C., New Orleans, LA; Kelsey A. Eagan, Frilot L.L.C., New Orleans, LA; Meredith K. Keenan, Frilot L.L.C., New Orleans, LA; Peter R. Tafaro, Frilot L.L.C., New Orleans, LA.

For Genuine Parts Company, Defendant: John Joseph Hainkel, III, LEAD ATTORNEY, Frilot L.L.C., New Orleans, LA; Angela M. Bowlin, Frilot L.L.C., New Orleans, LA; James H. Brown, Jr., Frilot L.L.C., New Orleans, LA; Kelsey A. Eagan, Frilot L.L.C., New Orleans, LA; Meredith K. Keenan, Frilot L.L.C., New Orleans, LA; Peter R. Tafaro, Frilot L.L.C., New Orleans, LA.

For Georgia-Pacific LLC, Defendant: Gary A. Bezet, LEAD **[*5]** ATTORNEY, Kean Miller (Baton Rouge), Baton Rouge, LA; Alexandra E. Rossi, Kean Miller (Baton Rouge), Baton Rouge, LA; Barrye Panepinto Miyagi, Kean Miller (Baton Rouge), Baton Rouge, LA; Gayla M. Moncla, Kean Miller (Baton Rouge), Baton Rouge, LA.

For Goodrich Corporation, Defendant: James K. Sticker, III, LEAD ATTORNEY, Leefe, Gibbs, Sullivan, Dupre & Aldous, Metairie, LA; Michael R. Gelder, Leefe, Gibbs, Sullivan, Dupre & Aldous, Metairie, LA; Richard K. Leefe, Leefe, Gibbs, Sullivan, Dupre & Aldous, Metairie, LA.

For IMO Industries, Inc., individually and as successor

in interest to DeLaval Turbine Inc, Defendant: Leigh Ann Tschirn Schell, LEAD ATTORNEY, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Joseph Henry Hart, IV, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Lori Allen Waters, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Magali Ann Puente-Martin, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Thomas A. Porteous, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA.

For J-M Manufacturing Company, Inc., Defendant: Gayla M. Moncla, Kean Miller **[*6]** (Baton Rouge), Baton Rouge, LA; Jay Morton Jalenak, Jr., Kean Miller (Baton Rouge), Baton Rouge, LA; Melanie Moreland Hartmann, Kean Miller (Baton Rouge), Baton Rouge, LA; Sean J Whittington, Kean Miller (Baton Rouge), Baton Rouge, LA.

For Maremont Corporation, Defendant: Jennifer E. Adams, LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; William Claudy Harrison, Jr., LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Arthur Wendel Stout, III, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Barbara Bourgeois Ormsby, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Marc John Bitner, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA.

For Metropolitan Life Insurance Company, Defendant: Jay Morton Jalenak, Jr., LEAD ATTORNEY, Kean Miller (Baton Rouge), Baton Rouge, LA; Patrick Dale Roquemore, Kean Miller (Baton Rouge), Baton Rouge, LA.

For Nash Engineering Company, Defendant: Paul D. Palermo, LEAD ATTORNEY, Blue Williams, LLP (Metairie), Metairie, LA; Craig V. Sweeney, Blue Williams, LLP (Metairie), Metairie, LA.

For Navistar, Inc., formerly known as International Harvester Corporation, Defendant: **[*7]** Kay Barnes Baxter, LEAD ATTORNEY, Cosmich Simmons & Brown, PLLC (New Orleans), New Orleans, LA; Ashley A. Edwards, Cosmich Simmons & Brown, PLLC (New Orleans), New Orleans, LA; Georgia Noble Ainsworth, Cosmich Simmons & Brown, PLLC (New Orleans), New Orleans, LA; Margaret Adams Casey, Cosmich Simmons & Brown, PLLC (New Orleans), New Orleans, LA; Martin James Dempsey, Jr., Cosmich Simmons & Brown, PLLC (New Orleans), New Orleans, LA.

For Reilly-Benton Company, Inc., Defendant: Thomas L. Cougill, LEAD ATTORNEY, Willingham Fultz & Cougill

(Houston), Houston, TX; Jamie M Zanovec, Willingham, Fultz & Cougill (Baton Rouge), Baton Rouge, LA; Jeanette Seraile-Riggins, Willingham Fultz & Cougill (Houston), Houston, TX; Jennifer D. Zajac, Willingham Fultz & Cougill (Houston), Houston, TX.

For Riley Power, Inc., formerly known as Riley Stoker Corporation, formerly known as D.B. Riley, Inc., Defendant: Jennifer E. Adams, LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; William Claudy Harrison, Jr., LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Arthur Wendel Stout, III, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Barbara [*8] Bourgeois Ormsby, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Marc John Bitner, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA.

For Velan Valve Corporation, Defendant: Forrest Ren Wilkes, LEAD ATTORNEY, Forman, Perry, Watkins, Krutz & Tardy, LLP (New Orleans), New Orleans, LA.

For Warren Pumps, LLC, Defendant: Lori Allen Waters, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA.

For OneBeacon America Insurance Company, as the Liability Insurers of Eagle, formerly known as Commercial Union Insurance Company, Defendant: Samuel Milton Rosamond, III, LEAD ATTORNEY, Taylor, Wellons, Politz & Duhe, APLC (New Orleans), New Orleans, LA; Adam Devlin deMahy, Taylor, Wellons, Politz & Duhe, APLC (New Orleans), New Orleans, LA.

For Carlisle Industrial Brake & Friction Inc., formerly known as Motion Control Industries Inc, Defendant: John Joseph Hainkel, III, LEAD ATTORNEY, Frilot L.L.C. New Orleans, LA; Angela M. Bowlin, Frilot L.L.C., New Orleans, LA; James H. Brown, Jr., Frilot L.L.C., New Orleans, LA; Kelsey A. Eagan, Frilot L.L.C., New Orleans, LA; Meredith K. Keenan, Frilot L.L.C., New Orleans, LA; Peter R. Tafaro, Frilot L.L.C., New [*9] Orleans, LA.

For Dana Companies LLC, Defendant: Jennifer E. Adams, LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; William Claudy Harrison, Jr., LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Arthur Wendel Stout, III, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Barbara Bourgeois Ormsby, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Marc John Bitner, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA.

For Goodyear Tire & Rubber Company, Defendant: Robert S. Emmett, LEAD ATTORNEY, Baker Donelson Bearman Caldwell & Berkowitz (New Orleans), New Orleans, LA; Gregory E. Bodin, Baker Donelson Bearman Caldwell & Berkowitz (New Orleans), New Orleans, LA; Joseph A. Atiyeh, Baker Donelson Bearman Caldwell & Berkowitz (New Orleans), New Orleans, LA.

For McCarty Corporation, formerly known as McCarty-Branton Inc, Defendant: Susan Beth Kohn, LEAD ATTORNEY, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA; Douglas Kinler, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA; James R. Guidry, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA; Janice M. Culotta, Simon, Peragine, [*10] Smith and Redfearn, LLP, New Orleans, LA.

For McCord Corporation, Defendant: Jennifer Moran Young, LEAD ATTORNEY, Page, Mannino, Peresich & McDermott, PLLC (Biloxi), Biloxi, MS.

For Meritor Inc, as successor-in-interest to Rockwell International Automotive Products, formerly known as Arvinmeritor, Inc., Defendant: Jennifer E. Adams, LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; William Claudy Harrison, Jr., LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Arthur Wendel Stout, III, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Barbara Bourgeois Ormsby, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Marc John Bitner, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA.

For Pneumo Abex LLC, individually and as successor in interest to Abex Corporation, Defendant: Jennifer E. Adams, LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; William Claudy Harrison, Jr., LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Arthur Wendel Stout, III, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Barbara Bourgeois Ormsby, [*11] Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Marc John Bitner, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA.

For Tasco Auto Color Corporation, Defendant: Kirk A. Patrick, III, LEAD ATTORNEY, Donohue, Patrick & Scott, Baton Rouge, LA; Blake Anthony Altazan, Donohue, Patrick & Scott, Baton Rouge, LA; Grant T. Herrin, Donohue, Patrick & Scott, Baton Rouge, LA.

For Avondale Industries, Inc., formerly known as Northrop Grumman Ship Systems, Inc., also known as Huntington Ingalls Incorporated, Defendant: Gary Allen

Lee, LEAD ATTORNEY, Lee, Futrell & Perles, LLP, New Orleans, LA; Anita Ann Cates, Lee, Futrell & Perles, LLP, New Orleans, LA; Daphne M. Lancaster, Lee, Futrell & Perles, LLP, New Orleans, LA; Michael Scott Minyard, Barfield & Associates (New Orleans), New Orleans, LA; Michael Kevin Powell, Lee, Futrell & Perles, LLP, New Orleans, LA; Richard Marshall Perles, Lee, Futrell & Perles, LLP, New Orleans, LA.

For BASF Corporation, Defendant: Gary A. Bezet, LEAD ATTORNEY, Kean Miller (Baton Rouge), Baton Rouge, LA; Alexandra E. Rossi, Kean Miller (Baton Rouge), Baton Rouge, LA; Barrye Panepinto Miyagi, Kean Miller (Baton Rouge), Baton Rouge, LA; Gayla [*12] M. Moncla, Kean Miller (Baton Rouge), Baton Rouge, LA.

For Exxon Mobil Corporation, Defendant: David Mark Bienvenu, Jr., LEAD ATTORNEY, Bienvenu, Bonnecaze, Foco, Viator & Holinga, APLLC, Baton Rouge, LA; Lexi T. Holinga, Bienvenu, Bonnecaze, Foco, Viator & Holinga, APLLC, Baton Rouge, LA.

For Fluor Corporation, Defendant: John Dennis Person, LEAD ATTORNEY, Aaron & Gianna, PLC, New Orleans, LA; Lee M. Rudin, Aaron & Gianna, PLC, New Orleans, LA; Lezly L. Petrovich, Aaron & Gianna, PLC, New Orleans, LA; Omar Khalid Mason, Aaron & Gianna, PLC, New Orleans, LA.

For Shell Oil Company, Defendant: Gary A. Bezet, LEAD ATTORNEY, Kean Miller (Baton Rouge), Baton Rouge, LA; Alexandra E. Rossi, Kean Miller (Baton Rouge), Baton Rouge, LA; Barrye Panepinto Miyagi, Kean Miller (Baton Rouge), Baton Rouge, LA; Gayla M. Moncla, Kean Miller (Baton Rouge), Baton Rouge, LA.

For Wyeth Holdings Corporation, formerly known as American Cyanamid Company, Defendant: Erin Fury Parkinson, LEAD ATTORNEY, McGlinchey Stafford, PLLC (New Orleans), New Orleans, LA; Shannon Suggs Sale, McGlinchey Stafford, PLLC (New Orleans), New Orleans, LA.

For Foster Wheeler LLC, improperly named as Foster Wheeler USA Corporation, Defendant: [*13] John Joseph Hainkel, III, LEAD ATTORNEY, Frilot L.L.C., New Orleans, LA; Angela M. Bowlin, Frilot L.L.C., New Orleans, LA; James H. Brown, Jr., Frilot L.L.C., New Orleans, LA; Kelsey A. Eagan, Frilot L.L.C., New Orleans, LA; Meredith K. Keenan, Frilot L.L.C., New Orleans, LA; Peter R. Tafaro, Frilot L.L.C., New Orleans, LA.

For Atwood & Morrill, Defendant: Jennifer E. Adams, LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP

(New Orleans), New Orleans, LA; William Claudy Harrison, Jr., LEAD ATTORNEY, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Arthur Wendel Stout, III, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Barbara Bourgeois Ormsby, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA; Marc John Bitner, Deutsch, Kerrigan & Stiles, LLP (New Orleans), New Orleans, LA.

For Union Carbide Corporation, Defendant: Deborah DeRoche Kuchler, LEAD ATTORNEY, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Francis Xavier deBlanc, III, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; McGready Lewis Richeson, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Michael H. Abraham, [*14] Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA; Milele N. St. Julien, Kuchler Polk Schell Weiner & Richeson, LLC (New Orleans), New Orleans, LA.

For Huntington Ingalls Incorporated, Defendant: Gary Allen Lee, LEAD ATTORNEY, Lee, Futrell & Perles, LLP, New Orleans, LA; Michael Kevin Powell, LEAD ATTORNEY, Lee, Futrell & Perles, LLP, New Orleans, LA; Richard Marshall Perles, Lee, Futrell & Perles, LLP, New Orleans, LA.

**Judges:** KURT D. ENGELHARDT, United States District Judge.

**Opinion by:** KURT D. ENGELHARDT

# Opinion

## ORDER & REASONS

Now before the Court is Plaintiffs Thomas Hayden and Jaqueline Hayden's (collectively "the Haydens") "Motion to Remand" (Rec. Doc. 6). Defendant Carrier Corporation ("Carrier") filed a response in opposition (Rec. Doc. 25). Defendant Wyeth Holdings Corporation, formerly known as American Cyanamid Company, ("ACC") filed an opposition as well (Rec. Doc. 26). The Haydens filed a reply (Rec. Doc. 41). ACC filed a sur-reply (Rec. Doc. 97). For the reasons stated herein, the Motion to Remand is hereby **GRANTED**.

**I. Background**

2015 U.S. Dist. LEXIS 104534, *14

The Haydens alleged in their Petition that Thomas Hayden suffers from mesothelioma due to exposure to asbestos or asbestos-containing products that occurred **[*15]** during his lifetime. (Rec. Doc. 6-1). The Haydens brought suit in the Civil District Court for the Parish of Orleans against seventy-eight (78) different defendants alleging strict liability and negligence that resulted in Thomas Hayden's alleged exposure to asbestos. (Rec. Doc. 1-1). Among the seventy-eight defendants are alleged miners, manufacturers, sellers, suppliers, and/or distributors of asbestos or asbestos-containing products, as well as employers and premises owners, and an insurer. (*Id.*). In their Petition, the Haydens included the following language:

> Plaintiffs, in this case only, disclaim any and all causes of action for any exposures of any kind to asbestos dust while Thomas Hayden was enlisted in or serving in the United States Navy aboard ship, in port, or in any federal enclave. Plaintiff further disclaims any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave. Plaintiff also disclaims any cause of action or recovery for any injuries resulting from any exposure to asbestos dust caused by any acts or omission of a party committed at the direction of an officer of the United States Government.

(Rec. **[*16]** Doc. 1-1 at p. 7).

Thomas Hayden's deposition was taken on May 28, 2015. During that deposition, Thomas Hayden discussed, at length, his potential exposure to asbestos during his time with the U.S. Navy. Specifically, Mr. Hayden expounded on his exposure aboard the USS EDSON to dust potentially containing asbestos that resulted from contact with "force draft blowers," which Thomas Hayden indicated in his testimony were manufactured by Carrier and another defendant, Air & Liquid Systems Corporation, successor to Buffalo Pumps, Inc. (Rec. Doc. 1-2 at p. 3). Based on this deposition testimony, Carrier removed the case from Louisiana state court on the grounds that the testimony constitutes an allegation against Carrier for asbestos exposure resulting from his work around the "force draft blowers." In particular, Carrier alleges that removal was proper pursuant to federal officer removal jurisdiction, *28 U.S.C. § 1442(a)(1)*, because the "forced draft blowers" were specifically designed and manufactured for, and at the direction of, the United States Government. (Rec. Doc. 1 at p. 2). The Haydens moved to remand on June 25, 2015. (Rec. Doc. 6).

## II. Law and Analysis

Federal courts are courts of limited jurisdiction, **[*17]** and removal statutes are to be strictly construed. *Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941)*. The removing party bears the burden of establishing federal jurisdiction over the controversy at issue. *Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 397 (5th Cir. 1998)*. Carrier has invoked federal jurisdiction on the grounds that federal officer removal jurisdiction, *28 U.S.C. § 1442(a)(1)*, applies here. "Because of its broad language and unique purpose, the federal officer removal statute has been interpreted to operate somewhat differently than the general removal provision. Unlike the general removal statute, which must be strictly construed in favor of remand, the federal officer removal provision's broad language must be liberally interpreted." *St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC, 809 F. Supp. 2d 524, 529-30 (E.D. La. 2011)* (citing *Manguno v. Prudential Property & Casualty Ins. Co., 276 F.3d 720, 723 (5th Cir.2002))*.

*Section 1442(a)(1)* provides for federal officer removal jurisdiction when a defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue." Federal officer removal is justified when (1) the defendant is a "person" within the meaning **[*18]** of the statute, (2) the defendant acted pursuant to a federal officer's direction when committing the alleged acts that give rise to the injury, and (3) the defendant can assert a colorable defense. *Willingham v. Morgan, 395 U.S. 402, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969)*.

Carrier removed the case to this Court on the grounds that Thomas Hayden's testimony indicates the intent to pursue a claim against Carrier for exposure resulting from contact with the "force draft blowers" while Thomas Hayden served aboard the USS EDSON. Carrier argues that it can assert a colorable defense of government contractor immunity because Carrier was acting at the specific direction and control of the U.S. Government when designing and manufacturing the "force draft blowers." Thus, Carrier avers, federal officer removal jurisdiction is appropriate here.

In their motion, the Haydens argue that they have specifically disclaimed any claim against the defendants "for anything that a federal officer or agency may have compelled defendants to do." (Rec Doc. 6-1 at p. 2) Moreover, the Haydens aver that they are not seeking to recover "from Carrier... or anyone else for anything they [Carrier] supplied the U.S. Navy or to which Mr. Hayden was exposed to in the U.S. Navy." (*Id.*) (emphasis **[*19]** in original). The Haydens assert that they are only pursuing claims against Carrier and the other defendants for Mr. Hayden's exposure while working at the refineries and other land-based industrial sites. (*Id.*). Therefore, the Haydens contend, federal jurisdiction is improper because there is no valid defense for a cause of action that they have explicitly disclaimed.

In response, Carrier argues that the disclaimer cannot defeat this Court's subject matter jurisdiction because the disclaimer is illusory and circular. (Rec. Doc. 25 at p. 4-5). Similarly, Carrier asserts that it is incongruous and disingenuous to disclaim any causes of action arising from Mr. Hayden's term with the Navy while simultaneously eliciting testimony to support those claims. (*Id.* at p. 5). In addition, co-defendant ACC argues, in its response, that the Haydens have effectively revoked the disclaimer by eliciting testimony relating to Thomas Hayden's exposure while serving in the Navy. (Rec. Doc. 26 at p. 1). ACC also contends, in the alternative, that federal officer removal jurisdiction is appropriate because ACC has raised the government contractor defense when it pled the affirmative defense of comparative fault attributable **[*20]** to any defendants who supplied, manufactured, produced, or provided the Navy with asbestos or asbestos containing products to which Mr. Hayden was exposed. (*Id.*).

The Court finds that the disclaimer at issue in this case is similar to those seen in *Phillips v. Asbestos Corp. Ltd., 2014 U.S. Dist. LEXIS 24792, 2014 WL 794051, at *2 (N.D. Cal. Feb. 26, 2014)*, *Dougherty v. A.O. Smith Corp., No. CV 13-1972, 2014 U.S. Dist. LEXIS 125302, 2014 WL 4447293 (D. Del. Sept. 8, 2014)*, and *Frawley v. Gen. Elec. Co., 2007 U.S. Dist. LEXIS 18404, 2007 WL 656857 (S.D.N.Y. Mar. 1, 2007)*. In each of those cases, the court found remand appropriate where the plaintiff expressly renounced the pursuit of any causes of action related to the plaintiff's exposure while in the military or working on a government work site. *Id.* Each court found that the disclaimers at issue explicitly renounced claims of a specific nature and thus were dissimilar from other invalid disclaimers that merely attempted circumvent federal jurisdiction. *See id.*

After considering the parties' submissions, the relevant case law, and the Haydens' original Petition, the Court agrees with the Haydens and finds that remand is appropriate here. In their Petition, the Haydens expressly limited their claims to exclude any causes of action for exposure while Thomas Hayden was "enlisted or serving in the United States Navy aboard ship, in port, or in any federal enclave." (Rec. Doc. 1-1 at p. 7). The disclaimer **[*21]** at issue disavows the pursuit of damages that may have resulted from asbestos exposure during Thomas Hayden's time in the Navy. Carrier's only asserted ground for removal is the May 28th deposition testimony pertaining to Mr. Hayden's potential exposure while working around "forced draft blowers" on the USS EDSON. However, the Petition explicitly denies a cause of action based on these facts. Moreover, the Haydens re-affirmed, in their motion, that they are not pursuing any claims against defendants for exposure during Thomas Hayden's service in the military, but only for exposure that occurred while he worked at "refineries and other land-based industrial sites" around Louisiana. (Rec. Doc. 6-2 at p. 2). The Court sees no reason to disbelieve the Haydens' explicit renunciation of any claims arising from Thomas Hayden's military service.

In essence, the Court finds that Carrier does not have a valid government contractor defense, and thereby removal authority, for a claim that is not alleged in the Petition nor pursued by the plaintiffs. Based on Plaintiffs pleading and representations in their motion, the Haydens are not alleging a claim for asbestos exposure resulting from contact **[*22]** with the "forced draft blowers."

Additionally, the Court finds that the cases cited by Defendants in support of removal are inapposite due to the fact the Haydens' disclaimer eliminates any cause of action related to exposure while Mr. Hayden was in the Navy and the only valid grounds for removal relate to that specific time period. On the other hand, the Court agrees with Defendants that, should the Haydens *actually pursue* claims for exposure to which federal officer removal jurisdiction may apply, this Court is the proper venue for such a determination. However, the facts, as developed thus far, do not support removal at this time. The Court rejects the finding that, by eliciting deposition testimony relating to potential exposure while aboard a naval vessel, the Haydens have revoked the clear and express disclaimer contained in the Complaint and re-affirmed in their motion to remand, upon which the Court relies herein.

2015 U.S. Dist. LEXIS 104534, *22

The Court also finds ACC's alternative argument, that ACC's assertion of comparative fault cross-claims based on the government contractor defense provides a sufficient basis for federal officer removal jurisdiction under _28 U.S.C. 1442(a)(1)_, is without merit. _See e.g., Dougherty 2014 U.S. Dist. LEXIS 125302, 2014 WL 4447293_; **[\*23]** _Lara v. CBS Corp., No. CV 13-5569, 2013 U.S. Dist. LEXIS 128265, 2013 WL 4807168, at \*2 (C.D. Cal. Sept. 6, 2013)_ (finding comparative fault insufficient to establish jurisdiction because the removal statute requires defendant to raise a colorable "defense" to a "claim"). Moreover, notice of removal must be filed within thirty (30) days "after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." _28 U.S.C. § 1446(b)_. Therefore, ACC's removal grounds have been untimely asserted under the statute.[1] Accordingly, remand is appropriate. However, nothing in this Court's Order precludes a party from arguing comparative fault in the state court proceeding or from seeking future removal should the appropriate grounds arise during discovery or otherwise.

### III. Conclusion

For the reasons stated herein, the Court does not find that removal was appropriate under the circumstances. Consequently, the Court hereby **GRANTS** Plaintiffs Motion for Remand (Rec. Doc. 6), and the case is **REMANDED** to the Civil District Court for the Parish of Orleans, State of Louisiana, each party to bear its own costs.

New Orleans, Louisiana, this 10th day of August 2015.

/s/ Kurt D. Engelhardt

**KURT D. ENGELHARDT**

---

[1] Although the Court finds the grounds for removal asserted by ACC to be without merit, the Court additionally finds that, if the opposite were true, i.e. pleading comparative fault against other parties and non-parties is sufficient to give rise to removal jurisdiction under _28 U.S.C. § 1442_, ACC's removal would have been untimely because the "pleading, motion, order or other paper from which it may first be ascertained **[\*24]** that the case is one which is or has become removable" would have been the Petition filed on April 20, 2015. Thus, the 30-day removal window would have expired on May 20, 2015. The instant removal proceeding was initiated on June 22, 2015, and ACC did not raise the comparative fault argument until July 8, 2015.

**United States District Judge**

---

**End of Document**

Kelly Christopher

 Caution
As of: April 8, 2024 9:02 PM Z

## *Illinois ex rel. Raoul v. 3M Co.*

United States District Court for the Central District of Illinois, Rock Island Division

September 21, 2023, Decided; September 21, 2023, Filed

Case No. 4:22-cv-04075-SLD-JEH

**Reporter**

2023 U.S. Dist. LEXIS 168231 *; __ F.Supp.3d __

PEOPLE OF THE STATE OF ILLINOIS, ex. rel. KWAME RAOUL, Attorney General of the State of Illinois, Plaintiff, v. 3M COMPANY, Defendant.

**Subsequent History:** Appeal filed, 10/20/2023

## Core Terms

contamination, removal, federal official, federal government, contractor, quotation, marks, removal statute, color, military, manufactured, products, specifications, alleges, federal authority, attorney's fees, levels, state court, disclaimed, damages

**Counsel:** **[*1]** For People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois, Plaintiff: Adam J Levitt, Amy E Keller, Daniel Rock Flynn, LEAD ATTORNEYS, DICELLO LEVITT GUTZLER LLP, Chicago, IL; Stephen J Sylvester, LEAD ATTORNEY, OFFICE OF THE ILLINOIS ATTORNEY GENERAL, Chicago, IL; Gregory Michael Utter, Joseph M. Callow, Jr, CALLOW & UTTER, LLC, Cincinnati, OH.

For 3M Company, a Delaware Corporation, Defendant: Daniel L. Ring, Richard F Bulger, MAYER BROWN LLP, Chicago, IL.

**Judges:** SARA DARROW, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** SARA DARROW

## Opinion

ORDER

Before the Court is Plaintiff People of the State of Illinois, *ex. rel.* Kwame Raoul, Attorney General of the State of Illinois's Motion to Remand, ECF No. 3. For the following reasons, the motion is GRANTED.

BACKGROUND

On March 16, 2022, Plaintiff filed a complaint in Illinois state court against Defendant 3M Company. Compl., ECF No. 1-1 at 5-69. According to the complaint, Defendant is a manufacturing company which operates throughout the United States. *Id.* at 10. Since the 1970s, it has operated a manufacturing facility on the banks of the Mississippi River in Cordova, Illinois (the "Cordova Facility"). *Id.* Defendant produces numerous **[*2]** chemical products at this facility, some of which contain perfluoroalkyl and polyfluoroalkyl substances ("PFAS"). *Id.* at 11-12.

PFAS are toxic chemicals that are harmful to public health, safety, and welfare, as well as to the environment. *Id.* at 3. The United States Environmental Protection Agency ("US EPA") has established a lifetime health advisory level for certain PFAS compounds. *Id.* at 12. The Illinois Environmental Protection Agency ("Illinois EPA") has also established health advisories containing health-based guidance levels for several PFAS. *Id.* Defendant "has detected PFAS in wastewater at, from, and around the Cordova Facility at levels injurious to public health and welfare and to the environment." *Id.* These levels are "thousands of times higher" than the levels established by the US EPA and the Illinois EPA. *Id.* at 13. The US EPA has also detected levels of PFAS in wastewater from the Cordova Facility that exceed its and the Illinois EPA's established levels. *Id.*

Plaintiff claims that "[o]n information and belief, [Defendant] manufactured and disposed of PFAS and/or PFAS-containing products at the Cordova Facility in a manner that caused PFAS to be released into Illinois' **[*3]** environment." *Id.* at 12. Explicitly excluded from the definition of PFAS as used in the complaint are "any PFAS that have contaminated Illinois' environment or natural resources from aqueous film-forming foams

Kelly Christopher

2023 U.S. Dist. LEXIS 168231, *3

("AFFF") containing . . . PFAS compound[s]." *Id.* at 8. Plaintiff alleges that Defendant "negligently operated [the] Cordova Facility such that it allowed the discharge, emission, placement, disposal, leakage, spillage, and/or abandonment of PFAS" and that, despite knowing that PFAS are toxic and pose substantial risks to health and the environment, it "persistently and intentionally hid this information from Illinois and the public." *Id.* at 19. Plaintiff brings claims for violation of the *Illinois Environmental Protection Act, 415 ILCS 5/1-5/58.17* (Counts I, II, III, IV, and V); violation of the *Illinois Fish and Aquatic Life Code, 515 ILCS 5/1-1-5/50-1*, and *Wildlife Code, 520 ILCS 5/1.1-5/4.4* (Count VI); negligence (Count VII); trespass (Count VIII); common law public nuisance (Count IX); and common law prohibition on unjust enrichment (Count X). Compl. 38-60. It seeks compensatory damages for the PFAS contamination and the costs of remediation; injunctive relief to address past, present, and future PFAS contamination; and statutory penalties, as well as attorney's fees, costs, and prejudgment interest. *Id.* at 61-63.

On April **[*4]** 21, 2022, Defendant removed this action to the Central District of Illinois. Not. Removal, ECF No. 1. It cites the federal officer removal statute, *28 U.S.C. § 1442(a)(1)*, as the basis for federal jurisdiction. *Id.* at 3. As the suit "seeks damages for all Illinois natural resources allegedly contaminated with PFAS from the Cordova Facility—including downstream areas of the Mississippi River," Defendant argues that the alleged contamination for which Plaintiff alleges Defendant is responsible "plausibly may encompass and overlap with PFAS contamination" from other sources, specifically, the use, storage, and/or disposal of AFFF ("MilSpec AFFF") by the U.S. Military at the Rock Island Arsenal, twenty-five miles downstream from the Cordova Facility. *Id.* at 2. Defendant states that because it developed and sold MilSpec to the U.S. Military, some of which was stored and used at the Rock Island Arsenal, it intends to assert the federal government contractor defense, entitling it to a federal forum. *Id.* at 2, 8, 14.

Plaintiff now moves to remand this case back to state court, arguing that the federal officer removal statute is not a basis for removal because Plaintiff does not seek to hold Defendant liable for **[*5]** contamination from any MilSpec AFFF released from the Rock Island Arsenal but rather only for PFAS discharged specifically from the Cordova Facility. Mem. Supp. Mot. Remand 1-2, ECF No. 4.

## DISCUSSION

## I. Removal

### A. Legal Standard

"The federal officer removal statute permits a defendant to remove to federal court a state-court action brought against the 'United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office.'" *Watson v. Philip Morris Cos., 551 U.S. 142, 145, 127 S. Ct. 2301, 168 L. Ed. 2d 42 (2007)* (emphasis omitted) (quoting *28 U.S.C. § 1442(a)(1)*). A plaintiff may move to remand the case to state court for lack of subject matter jurisdiction at any time before final judgment. *28 U.S.C. § 1447(c)*. "The party seeking removal bears the burden of proving the grounds for its motion." *Ruppel v. CBS Corp., 701 F.3d 1176, 1180 (7th Cir. 2012)*.

A defendant need not submit evidence in support of its notice of removal under the federal officer removal statute. *Betzner v. Boeing Co., 910 F.3d 1010, 1016 (7th Cir. 2018)*. Rather, "[j]urisdictional allegations control unless it is legally impossible for them to be true." *Id. at 1014* (alteration in original) (quotation marks omitted). Courts will review "allegations in support of removal under the federal pleading standards, asking whether **[*6]** they are facially plausible." *Baker v. Atl. Richfield Co., 962 F.3d 937, 941 (7th Cir. 2020)*.

### B. Analysis

The central purpose of the federal officer removal statute is to protect the federal government and its operations from potential interference by the states through proceedings in state court. *Watson, 551 U.S. at 150*. Because such proceedings "may reflect local prejudice against unpopular federal laws or federal officials" and may deprive federal officials of a federal forum in which to assert federal immunity defenses, it is important for a federal forum to be available. *Id.* (quotation marks omitted). The same considerations apply to a private person who acts with or for federal officers or agents in executing duties under federal law. *Id. at 151*.

For a defendant to remove a case pursuant to the

statute, it "must show it was a (1) 'person' (2) 'acting under' the United States, its agencies, or its officers (3) that has been sued 'for or relating to any act under color of such office,' and (4) has a colorable federal defense to the plaintiff's claim." *Ruppel, 701 F.3d at 1180-81* (quoting *28 U.S.C. § 1442(a)*). The statute thus operates as an exception to the well-pleaded complaint rule: whereas an action may generally only be removed to federal court under federal question jurisdiction if "the federal question . . . appear[s] on the face of [the] properly pleaded complaint," under the federal officer removal statute, "the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker, 527 U.S. 423, 430-31, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)*. At this stage, the court will credit the removing party's theory of the case, even if both sides "have reasonable theories." *See Baker, 962 F.3d at 947*. The concern is "with who makes the ultimate determination, not what that determination will be." *Id.* (quotation marks omitted). The Supreme Court "has made clear that courts must liberally construe" the statute. *Id. at 941* (quotation marks omitted); *see also Arizona v. Manypenny, 451 U.S. 232, 242, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981)* (noting that "the policy favoring removal [under the federal officer removal statute] should not be frustrated by a narrow, grudging interpretation of *§ 1442(a)(1)*" (quotation marks omitted)); *Ruppel, 701 F.3d at 1180* ("[T]he federal officer removal statute is not narrow or limited." (quotation marks omitted)).

The Court will examine whether Defendant has satisfied each requirement of the statute.

### i. Person Within Meaning of Statute

Corporations are persons for purposes of the federal officer removal statute. *See Ruppel, 701 F.3d at 1181*. Defendant states that it is a corporation, Not. Removal 11; *see also* Compl. 10 (alleging that Defendant is a corporation), so the person requirement is satisfied.

### ii. [*8] Acting Under the United States

Courts consider government contractors to be "acting under" the United States, its agencies, or its officers when they "assist, or . . . help carry out, the duties or tasks of the federal superior," *Watson, 551 U.S. at 152* (emphases omitted), such as "help[ing] the [g]overnment to produce an item that it needs," *Baker, 962 F.3d at 942* (quotation marks omitted); *see, e.g.,*

*Betzner, 910 F.3d at 1015* (finding that the defendant "plausibly alleged that it acted under federal officers when it contracted to manufacture heavy bomber aircraft for the United States Air Force, and that it acted under the military's detailed and ongoing control"). "Acting under" may include situations in which a defendant "work[s] hand-in-hand with the federal government to achieve a task that furthers an end of the federal government" or in which "the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Ruppel, 701 F.3d at 1181*. However, mere compliance with the law—even where compliance is overseen by the government—is not sufficient. *Watson, 551 U.S. at 152*.

In the notice of removal, Defendant alleges that for over three decades, it manufactured MilSpec AFFF for sale to the U.S. military. Not. Removal 8. It notes that "MilSpec [*9] AFFF is a mission critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself" and that "the military has long depended upon outside contractors like [Defendant] to manufacture and supply AFFF." *Id.* at 12. Moreover, it asserts, "[i]n designing, manufacturing and supplying MilSpec AFFF products, [Defendant] acted . . . in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling." *Id.* at 13. Because Defendant has thus plausibly alleged that it assisted the federal government in producing a necessary item under the military's observation and control, a task the government would otherwise have had to use its own agents to complete, it has satisfied the "acting under" requirement of the federal officer removal statute. *See Nessel v. Chemguard, Inc., No. 1:20-cv-1080, 2021 U.S. Dist. LEXIS 39175, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021)* (finding that the defendants, private contractors, were "acting under" a federal officer by producing MilSpec AFFF because that "is a product that the [g]overnment would have had to create if [the] [d]efendants did not exist").

### iii. Colorable Federal Defense

A defendant [*10] must also allege a "colorable or plausible federal defense." *See Hammer v. U.S. Dep't of Health & Hum. Servs., 905 F.3d 517, 528 (7th Cir. 2018)* (quotation marks omitted). Defendant has stated it intends to assert the federal government contractor

defense as to MilSpec AFFF. *See* Not. Removal 15. This defense "immunizes government contractors from state tort law when the government had a hand in a defendant's allegedly defective design." *Ruppel, 701 F.3d at 1183*. It "applies where (1) the federal government approved reasonably precise specifications, (2) the manufactured equipment conformed to the government's specifications, and (3) the contractor warned the federal government about the equipment's dangers that were unknown to the government." *Betzner, 910 F.3d at 1016* (citing *Boyle v. United Techs. Corp., 487 U.S. 500, 512, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988)*). The defense need only be "colorable," not "clearly sustainable." *Ruppel, 701 F.3d at 1182* (quotation marks omitted).

Defendant states that the U.S. government has approved rigorous specifications for the manufacture and sale of MilSpec AFFF, which were created and administrated by Naval Sea Systems Command, namely, that,

> [a]ll MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement. Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with **[\*11]** specification requirements. . . . After a product is added to the Qualified Products List, [c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status.

Not. Removal 7 (third alteration in original) (footnote omitted) (quotation marks omitted). It notes that "the current MilSpec expressly contemplates that AFFF formulations will contain [PFAS compounds]." *Id.* at 8. Defendant further alleges that the MilSpec AFFF it manufactured conformed to the government's specifications. *See id.* at 16 ("[Defendant's] products appeared on the DOD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec [specifications]."). And it claims that "the government was adequately informed regarding alleged product-related dangers" of MilSpec AFFF through "testing protocols and requirements for toxicity, chemical oxygen, and biological demand." *Id.* at 17 (quotation marks omitted) ("[I]t is clear that the United States has long understood that AFFF contain PFAS and may contain or break down into [PFAS compounds]; that AFFF constituents can migrate through **[\*12]** the soil and potentially reach groundwater; and that it has been

reported that this may raise environmental or health issues."). Defendant points to government reports from 1980 and 2017 discussing the adverse environmental effects of AFFF to illustrate that the government was aware of the dangers of AFFF. *Id.* at 17-18; *see, e.g., Betzner, 910 F.3d at 1015-16* (finding that the defendant had adequately alleged the federal government contractor defense where it alleged that "the federal government was independently aware of the potential health hazards related to" the acts alleged in the complaint).

For damages related to MilSpec AFFF, Defendant has plausibly alleged each of the three elements of the federal government contractor defense, showing a colorable federal defense.

### iv. Under Color of Federal Authority

The outcome of Plaintiff's motion to remand thus hinges on the "under color of federal authority" requirement. That a defendant acted generally under a federal directive and would have a colorable defense for those actions is not sufficient to remove a case; the actions under federal directive must relate to the claims brought in the suit. *See Baker, 962 F.3d at 943*; *see Ruppel, 701 F.3d at 1181* (noting that the "under color of federal authority" requirement **[\*13]** "is distinct from the 'acting under' requirement in the same way a bona fide federal officer could not remove a trespass suit that occurred while he was taking out the garbage"). To satisfy this requirement, a defendant must plausibly allege that the action is "connected or associated[] with acts under color of federal office." *Baker, 962 F.3d at 943-44* (emphases omitted) (quotation marks omitted) (noting that this requirement is more inclusive than the previous requirement that there be a "causal connection" between the suit and acts done under governmental authority).

A removing defendant need not claim that the alleged harm arose entirely from acts done under federal authority; all that is needed is an allegation that "at least some of the [alleged harm] arose from the federal acts." *Id. at 945*; *see also id.* ("[R]emoval need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case." (quotation marks omitted)). Nor must the defendant prove conclusively that such a connection or association exists; provided that the allegations are sufficient, "whether the challenged act was outside the scope of [the] [d]efendants' official duties, or **[\*14]**

whether it was specifically directed by the federal [g]overnment, is [a question] for the federal—not state—courts to answer." *Id.* (quotation marks omitted); *see Acker, 527 U.S. at 432* (finding that "demanding an airtight case on the merits in order to show the required . . . connection" would "defeat the purpose of the removal statute").

In the complaint, Plaintiff seeks to recover for PFAS contamination to Illinois' environment and natural resources, including to the Mississippi River, caused by Defendant. *See* Compl. 1, 38-45, 51-54, 57-58. Defendant now alleges that this suit is connected to the MilSpec AFFF it manufactured for the U.S. military and which was stored at the Rock Island Arsenal—despite Plaintiff's explicit exemption of AFFF from the suit, *id.* at 8—because the alleged contamination to the Mississippi River for which Plaintiff is seeking damages "plausibly may encompass and overlap with PFAS contamination from the use, storage, and discharge of MilSpec AFFF at the Rock Island Arsenal." Not. Removal 2. Thus, Defendant argues, this suit is connected or associated with its actions as a federal contractor. Plaintiff counters that the supposed release of MilSpec AFFF from the Rock Island Arsenal **[*15]** "has nothing to do with a single allegation" in its complaint, as it "seek[s] relief exclusively" for non-AFFF PFAS contamination from Defendant's Cordova Facility. Mem. Supp. Mot. Remand 1-2 ("This case only concerns [Defendant's] release of pollutants from a specific . . . facility . . . .").

"[C]ourts have consistently granted motions to remand where the plaintiff expressly disclaimed the claims upon which federal officer removal was based." *Reinbold v. Advanced Auto Parts, Inc., Case No. 18-CV-605-SMY-DGW, 2018 U.S. Dist. LEXIS 102399, 2018 WL 3036026, at *2 (S.D. Ill. June 19, 2018)* (collecting cases finding remand appropriate because the plaintiff expressly disclaimed claims for asbestos exposure from military or other federal government locations). By renouncing all claims stemming from a contractor's work for the federal government, it no longer becomes necessary to assert the federal government contractor defense. Plaintiff only seeks relief for PFAS contamination from the Cordova Facility, not for PFAS contamination from other locations. *See* Compl. 1. It expressly defines PFAS as non-AFFF PFAS, *id.* at 8, and Defendant does not assert in its notice of removal that it produced MilSpec AFFF at the Cordova Facility. *See* Mem. Supp. Mot. Remand 3 ("[Defendant] does not contend that it produced or used MilSpec AFFF at its **[*16]** Cordova Facility." (emphasis omitted)). This indicates that Plaintiff has expressly disclaimed claims

for PFAS contamination stemming from anywhere other than the Cordova Facility—including the Rock Island Arsenal—and Defendant cannot be held liable for PFAS contamination from anywhere other than the Cordova Facility.

Defendant points to *Nessel* in support of its argument that it is entitled to raise "the production of MilSpec AFFF as a defense or an alternate theory' of causation" and then assert the federal government contractor defense as to contamination resulting from MilSpec AFFF. *See* Not. Removal 2 (quoting *Nessel, 2021 U.S. Dist. LEXIS 39175, 2021 WL 744683, at *3*). The complaint in *Nessel* was brought to remedy contamination from commercially available AFFF only; a separate case against the same defendants involved MilSpec AFFF. *Nessel, 2021 U.S. Dist. LEXIS 39175, 2021 WL 744683, at *1*. The defendants removed the suit to federal court, arguing that the injuries from commercially available AFFF and MilSpec were "indivisible," and so they intended to assert the federal government contractor defense. *Id.* The court found that removal was proper because the plaintiffs had failed to show that the injuries from the two sources would be "distinguishable" and that "[i]t wa]s entirely possible that **[*17]** [the] [p]laintiffs' injuries occurred from actions taken while [the] [d]efendants were acting under color of federal office: namely, MilSpec AFFF." *2021 U.S. Dist. LEXIS 39175, [WL] at *3*. It disregarded the plaintiffs' argument that they did not seek resolution of any claims related to MilSpec AFFF because they could not "decide what defense [the] [d]efendants might present." *Id.* The court elaborated:

> Consider, for example, a tort case: a plaintiff can allege that a defendant and only that defendant caused his injury, but a plaintiff cannot prevent a defendant from presenting an alternate theory of causation. Thus, while [the] [p]laintiffs attempt to surgically divide their complaints between [c]ommercial and MilSpec AFFF, they cannot prevent [the] [d]efendants from raising the production of MilSpec AFFF as a defense or an alternate theory, particularly when [the] [p]laintiffs admit that [the] [d]efendants produced MilSpec AFFF and that PFAS from AFFF spread contamination throughout the state.

*Id.* (emphases omitted).

This Court does not disagree that Defendant could point to PFAS contamination from the use and storage of MilSpec AFFF at the Rock Island Arsenal as an alternate source of the contamination that is the

basis **[*18]** of this suit. But even without asserting the federal government contractor defense as to that source of contamination, Defendant cannot be held liable for contamination from the Rock Island Arsenal. In other words, once Defendant shows that a certain portion of the contamination stemmed from MilSpec AFFF released from the Rock Island Arsenal, that contamination is eliminated from the case, whether or not that MilSpec AFFF was produced according to rigorous military specifications and the government was warned of any dangers of which it was unaware. *See supra* Section I(B)(iii); *see also New Hampshire v. 3M Co., Civil No. 22-cv-145-LM, 2023 U.S. Dist. LEXIS 53461, 2023 WL 2691376, at *8 (D.N.H. Mar. 29, 2023)* (finding that the court lacked removal jurisdiction under the federal officer removal statute in a suit brought for PFAS contamination where the plaintiff had "consistently disclaimed any recovery for contamination resulting from [the defendant's] production of AFFF" because the disclaimer eliminated the connection between the claims and the defendant's production of MilSpec AFFF for the U.S. military). Likewise, Defendant could point to another private company releasing PFAS into the Mississippi River from another facility as an alternate source of the contamination and be released from liability for **[*19]** that contamination, regardless of that company's status as a federal contractor.

Permitting Defendant to remove this suit under the federal officer removal statute when the federal government contractor defense is irrelevant to the eventual resolution of the case and any PFAS it produced as a military contractor is explicitly excluded from this suit would defeat the purpose of the statute. It is thus impossible for Defendant to be held liable for damages stemming from its actions under federal authority, and so the requisite connection or association is missing. Because the "under color of federal authority" requirement has not been met, federal jurisdiction is not proper. Plaintiff's motion to remand this case to state court is granted.

## II. Attorney's Fees

In the event that the Court granted its motion to remand, Plaintiff requests that Defendant be ordered to pay the attorney's fees Plaintiff incurred as a result of the removal. Mem. Supp. Mot. Remand 16. *28 U.S.C. § 1447(c)* permits an award of attorney's fees upon remand. The Supreme Court has held that there is no strong presumption in favor of a fee award. *Martin v.*

*Franklin Cap. Corp., 546 U.S. 132, 137, 126 S. Ct. 704, 163 L. Ed. 2d 547 (2005)*. "[C]ourts may award attorney's fees under *§ 1447(c)* only where the removing party lacked an objectively **[*20]** reasonable basis for seeking removal." *Id. at 141*. "Conversely, when an objectively reasonable basis exists, fees should be denied." *Id.* "[D]istrict courts retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case." *Id.*

The Court declines to use its discretion to order an award of fees in Plaintiff's favor. Unlike removal under *28 U.S.C. § 1441*, which "should be construed narrowly and against removal," *People of State of Ill. v. Kerr-McGee Chem. Corp., 677 F.2d 571, 576 (7th Cir. 1982)*, the Supreme Court has made clear that "the policy favoring removal [under *§ 1442(a)(1)*] should not be frustrated by a narrow, grudging interpretation of" the statute, *Manypenny, 451 U.S. at 242* (quotation marks omitted). Moreover, it appears that Defendant has successfully removed cases involving PFAS and/or AFFF under the federal officer removal statute on a number of other occasions. *See, e.g.,* Not. Removal 6 (collecting cases); Mem. Supp. Mot. Remand 1-2 n.1 (same). Plaintiff's request for attorney's fees is therefore denied.

## CONCLUSION

For the foregoing reasons, Plaintiff People of the State of Illinois, *ex. rel.* Kwame Raoul, Attorney General of the State of Illinois's Motion to Remand, ECF No. 3, is GRANTED. This suit is remanded back to the Circuit Court of the Fourteenth Judicial Circuit, **[*21]** Rock Island County.

Entered this 21st day of September, 2023.

/s/ Sara Darrow

SARA DARROW

CHIEF UNITED STATES DISTRICT JUDGE

---

**End of Document**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) ) ) | MDL No. 2:18-mn-2873-RMG<br><br>**ORDER**<br><br>**This Order Relates to**<br>**Case No. 2:19-cv-01022-RMG** |

     Before the Court is the State of New York's motion to remand its claims to New York state court. (Dkt. No. 71.) For the reasons set forth below, the motion is denied.

## I.    Background

     In June 2018, the State of New York ("New York") brought claims against 3M Company; Tyco Fire Products L.P.; Chemguard, Inc.; Buckeye Fire Equipment Company; National Foam, Inc.; and Kidde-Fenwall, Inc. (collectively, "Defendants") alleging that the aqueous film-forming foam ("AFFF") and related products designed, manufactured, marketed and sold by Defendants contaminated New York groundwater with the chemical compounds perfluorooctanoic acid/perfluorooctanoate ("PFOA") and perfluorooctane sulfonic acid/perfluorooctane sulfonate ("PFOS"), resulting in New York incurring costs to investigate, monitor, remediate and otherwise respond to the resulting public health risk and harm to New York's natural resources. (2:19-cv-01022-RMG, Dkt. No. 1-1 ¶¶ 1-4.) New York alleged that Defendants' AFFF products, containing PFOS/PFOA, were used by the Air National Guard and the United States Air Force on military bases and at civilian airports and firefighting training centers in New York, including (i) Stewart Air National Guard Base and Stewart International

Airport in Newburgh and New Windsor, (ii) Francis S. Gabreski Airport in Southampton, (iii) Plattsburgh Air Force Base in Plattsburgh, and (iv) Griffiss Air Force Base in Rome. (*Id.* ¶¶ 56-58, 64-103.)  New York brought four causes of action for public nuisance, strict products liability for defective design, strict products liability for failure to warn, and restitution. (*Id.* ¶¶ 106-32.)

In November 2018, Defendant Tyco Fire Products L.P. ("Tyco") removed the action to the District Court for the Northern District of New York on the basis of the federal officer removal statute, pursuant to 28 U.S.C. § 1442(a)(1), and federal enclave jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1441(a). (*Id.* Dkt. No. 1.)  In April 2019, the Judicial Panel on Multidistrict Litigation (the "Panel") transferred this matter under 28 U.S.C. § 1407 into these multidistrict litigation ("MDL") proceedings, finding that transfer serves the convenience of the parties and witnesses and promotes just and efficient litigation. (*Id.* Dkt. No. 39 at 3.)  Shortly thereafter, New York brought the instant motion to remand this action to Albany County New York State Supreme Court.

## II.    **Legal Standard**

As the party that invoked the Court's jurisdiction, Tyco bears the burden of establishing that the case was properly removed from state court. *Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148, 151 (4th Cir. 1994); *see also Bennett v. Bally Mfg. Corp.*, 785 F. Supp. 559, 560 (D.S.C. 1992).    The Court should strictly construe removal jurisdiction because it "raises significant federalism concerns." *Mulcahey*, 29 F.3d at 151 (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941)); *see also S.C. v. Boehringer Ingelheim Roxane, Inc.*, No. 3:07-cv-00665-CMC, 2007 WL 1232156, at *1 (D.S.C. Apr. 26, 2007).    Doubts as to the Court's jurisdiction should weigh in favor of remanding to state court. *Mulcahey*, 29 F.3d at 151.

2

III.    **Discussion**

The Court finds that Tyco properly removed this action to federal court both under the federal officer removal statute, on the basis of its government contractor immunity defense, and under federal enclave jurisdiction, on the basis of the tort claims alleged to have arisen on Griffiss Air Force Base in the 1970s through 1990s.

A.    **Removal Was Proper Under the Federal Officer Removal Statute**

The federal officer removal statute authorizes removal to federal court of any civil action or criminal prosecution commenced in state court against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Thus, a private defendant, such as a government contractor, who seeks to removal a case under § 1441(a)(1) must show (1) that it was a "person acting under" a federal officer, *see e.g.*, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209 (4th Cir. 2016); (2) that it has a "colorable federal defense," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999); and (3) that the charged conduct was carried out for or in relation to the asserted official authority, *see* 28 U.S.C. § 1442(a)(1). "In imposing these requirements, the statute aims to protect the Federal Government from interference with its 'operations,' primarily by providing 'a federal forum for a federal defense.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017) (quoting *Watson*, 551 U.S. at 147). In reviewing removal on a motion to remand, the Court should reject a "narrow, grudging interpretation of the statute, recognizing that one of the most important reasons for removal is to have the validity of the defense of official immunity tried in federal court." *Acker*, 527 U.S. at 431.

3

The Court finds these elements of § 1442(a)(1) are satisfied, entitling Tyco to have removed New York's tort claims and Tyco's federal defense to federal court. As an initial matter, Tyco is a "person" under § 1442(a)(1), which includes "companies, associations, firms [and] partnerships." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016). Next, the phrase "acting under" is "broad" and should be "liberally construed" in favor of the removing Defendant. *Watson*, 551 U.S. at 147. When a private entity is involved, the phrase "acting under" is interpreted to "contemplate a relationship where the government exerts some 'subjection, guidance, or control." *Sawyer*, 860 F.3d at 255 (quoting *Watson*, 551 U.S. at 151). The Court of Appeals for the Fourth Circuit has observed that "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer*, 860 F.3d at 255. Here, New York alleges that Tyco manufactured and sold AFFF products containing PFOS/PFOA to the U.S. military, which used and stored the products at certain sites. Because the U.S. military accepts and tests AFFF products against military specifications ("MilSpec") promulgated by Naval Sea Systems Command, including specifications that AFFF product formulations include the chemical class that includes PFOA/PFOS, Tyco has demonstrated that it was manufacturing the product under the U.S. military's guidance.

Second, Tyco has a "colorable" federal defense of government contractor immunity. To assert government contractor immunity to tort liability, Tyco must demonstrate that "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). "Removal need not be justified as to all claims asserted in the

4

plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case." *Sawyer*, 860 F.3d at 257. Tyco has demonstrated this colorable defense, where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications, which included specifications for the chemical class that includes PFOS/PFOA. As to whether Tyco adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, Tyco points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the Environmental Protection Agency's stated concerns with PFOS/PFOA in drinking water,[1] and the defense need not be "clearly sustainable" to justify removal as merely "colorable." *Acker*, 527 U.S. at 432 ("We therefore do not require the officer virtually to 'win his case before he can have it removed.'").

Last, Tyco has sufficiently demonstrated that it "engag[ed] in government-directed conduct causally related to the plaintiff['s] claims." *Sawyer*, 860 F.3d at 254. To satisfy this "causation requirement" necessary to justify removal on the basis of the federal officer statute, non-governmental corporate defendants such as Tyco "must demonstrate that the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (emphasis in original). This is satisfied where there is a "causal nexus between the allegedly tortious conduct and asserted official authority," which "has been interpreted broadly." *Brady v. XE Servs LLC*, No. 5:09-CV-449-BO, No. 5:09-CV-450-BO, 2010 WL 11566021, at *2 (E.D.N.C. May 18, 2010). For this, the Court looks to whether Tyco demonstrated that its alleged acts "occurred *while*" it was "performing [its] official duties." *Isaacson*, 517 F.3d at 137-38 (emphasis in original). Here,

---

[1] *See* Dep't of Defense, Aqueous Film Forming Foam Report to Congress, cleared for open publication Nov. 3, 2017, at 1-2, *available at https://www.denix.osd.mil/derp/home/documents/aqueous-film-forming-foam-report-to-congress/.*

New York's claims arise out of use of AFFF products that it claims Tyco manufactured and sold, and for which the U.S. military imposes MilSpec standards. The Court should "credit the [removing defendant's] theory of the case" and finds that the causation element of federal officer removal is satisfied here. *Acker*, 527 U.S. at 432.

The Court, therefore, finds that Tyco properly removed the claims against it to federal court pursuant to the federal officer removal statute.

**B.    Removal Was Proper Under Federal Enclave Jurisdiction**

The Court also finds that removal was proper under 28 U.S.C. § 1441(a).  The federal court has jurisdiction pursuant to 28 U.S.C. § 1331 over New York's tort claims relating to AFFF product use and contamination at Griffiss Air Force Base, a federal enclave, and has supplemental jurisdiction over the claims relating to the other alleged contamination sites.

The federal enclave doctrine arises out of Congress's constitutional authority to "exercise exclusive legislation" over the District of Columbia "and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." U.S. Const. art. I, § 8, cl. 17.  A federal enclave is a "portion of land over which the United States government exercises federal legislative jurisdiction." *Brookhaven Sci. Assocs., LLC v. Donaldson*, No. 04 Civ. 4013 (LAP), 2007 WL 2319141, at *5 (S.D.N.Y. Aug. 9, 2007); s*ee also Stokes v. Adair*, 265 F.2d 662, 666 (4th Cir. 1959).  Griffiss Air Force Base was a federal enclave from 1945, when it was deeded by New York to the United States, to 1995, when it was decommissioned as an air force base and began operation as a civilian airport.  New York alleges that "beginning in the 1970s through at least the 1990s," AFFF products manufactured and sold by Defendants that contained PFOS/PFOA were stored and used at Griffiss Air Force Base. (2:19-cv-01022-RMG,

6

Dkt. No. 1-1 ¶ 99.) "It has long been settled that where lands for such a purpose are purchased by the United States with the consent of the State legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction." *Surplus Trading Co. v. Cook*, 281 U.S. 647, 652 (1930). Because Griffiss Air Force Base was a federal enclave under federal jurisdiction at the time of the relevant conduct, the tort claims arising from that conduct on Griffiss Air Force Base are subject to the federal court's jurisdiction.

New York's tort claims arising out of AFFF product use and contamination at sites other than Griffiss Air Force Base, including Stewart Air National Guard Base, Stewart International Airport, Gabreski Airport and Plattsburgh Air Force Base, are subject to this Court's supplemental jurisdiction. "[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]" 28 U.S.C. § 1367(a). The Court may nonetheless decline to exercise its jurisdiction where the tort claims arising from these contamination sites "predominate" over the claim arising from Griffiss Air Force Base, or for other "compelling reasons." 28 U.S.C. § 1367(c). New York brings the same tort claims against the same Defendants for the same conduct alleged to have arisen on the Griffiss Air Force Base, as it does relating to the other contamination sites. The Court finds no compelling reason to sever and remand the tort claims relating to the other contamination sites, including where the Panel found that all claims in this action warranted consolidation into these MDL proceedings.

When the Panel ordered New York's action transferred into these MDL proceedings, it observed that, "Revealingly, [New York and Ohio] alternatively request that, should the Panel transfer these actions into the MDL, we direct the transferee court to prioritize discovery and

7

consideration of their objections to federal jurisdiction and the government contractor defense."
(2:18-mn-2873, Dkt. No. 384 at 3.) Denying New York's motion to remand and maintaining its
action in the MDL proceedings ensures that New York has the opportunity to engage in efficient
and centralized discovery of these significant issues of federal question that implicate the merits
of New York's claims.

**IV.** **Conclusion**

For the foregoing reasons, the State of New York's motion to remand (Dkt. No. 71) is
**DENIED**.

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

May 24, 2019
Charleston, South Carolina

8

RECEIVED USDC
CLERK, CHARLESTON, SC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA** 2019 SEP 27 PM 1:50
**CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG <br><br> **ORDER** <br><br> **This Order Relates to** <br> **Case No. 2:19-cv-02123-RMG** |

Before the Court is the State of New York's motion to remand its claims to New York state court. (Dkt. No. 230.) For the reasons set forth below, the motion is denied.

**I.  Background**

In February 2019, the State of New York ("New York") brought claims against 3M Company, Tyco Fire Products L.P., Chemguard, Inc., Buckeye Fire Equipment Company and National Foam, Inc. ("Defendants") alleging that the aqueous film-forming foam ("AFFF") and related products designed, manufactured, marketed and sold by Defendants contaminated New York groundwater with the chemical compounds perfluorooctanoic acid/perfluorooctanoate ("PFOA") and perfluorooctane sulfonic acid/perfluorooctane sulfonate ("PFOS"), resulting in New York incurring costs to investigate, monitor, remediate and otherwise respond to the resulting public health risk and harm to New York's natural resources. (2:19-cv-02123-RMG, Dkt. No. 1-1 ¶¶ 1-4.) New York alleges that the AFFF products designed or manufactured by Defendants, containing PFOS/PFOA, were stored or used at sites throughout New York, including certain civilian airports. (*Id.* at 30.) New York brought four causes of action for public

nuisance, strict products liability for defective design, strict products liability for failure to warn, and restitution. (*Id.* ¶¶ 131-57.)

In June 2019, Defendants Tyco Fire Products L.P. and Chemguard, Inc. ("Tyco/Chemguard") removed the action to the District Court for the Northern District of New York on the basis of the federal officer removal statute, 28 U.S.C. § 1442(a)(1). (*Id.* Dkt. No. 1.) The Judicial Panel on Multidistrict Litigation (the "Panel") then transferred this matter under 28 U.S.C. § 1407 into these multidistrict litigation proceedings, finding that transfer serves the convenience of the parties and witnesses and promotes just and efficient litigation. (*Id.* Dkt. No. 19.) New York initially opposed the transfer, but then withdrew its opposition. Shortly thereafter, New York brought the instant motion to remand this action to the New York Supreme Court in Albany County.

## II.    Legal Standard

As the parties that invoked the Court's jurisdiction, Tyco/Chemguard bear the burden of establishing that the case was properly removed from state court. *Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148, 151 (4th Cir. 1994); *see also Bennett v. Bally Mfg. Corp.*, 785 F. Supp. 559, 560 (D.S.C. 1992). The Court should strictly construe removal jurisdiction because it "raises significant federalism concerns." *Mulcahey*, 29 F.3d at 151 (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941)); *see also S.C. v. Boehringer Ingelheim Roxane, Inc.*, No. 3:07-cv-00665-CMC, 2007 WL 1232156, at *1 (D.S.C. Apr. 26, 2007). Doubts as to the Court's jurisdiction should weigh in favor of remanding to state court. *Mulcahey*, 29 F.3d at 151.

## III.    Discussion

The federal officer removal statute authorizes removal to federal court of any civil action or criminal prosecution commenced in state court against "any officer (or any person acting

2

under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Thus, a private defendant, such as a government contractor, who seeks to remove a case under § 1441(a)(1) must show (1) that it was a "person acting under" a federal officer, *see e.g.*, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209 (4th Cir. 2016); (2) that it has a "colorable federal defense," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999); and (3) that the charged conduct was carried out for or in relation to the asserted official authority, *see* 28 U.S.C. § 1442(a)(1). "In imposing these requirements, the statute aims to protect the Federal Government from interference with its 'operations,' primarily by providing 'a federal forum for a federal defense.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017) (quoting *Watson*, 551 U.S. at 147).

Here, Tyco/Chemguard is a "person" under § 1442(a)(1), which includes "companies, associations, firms [and] partnerships." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016). The phrase "acting under" is "broad" and should be "liberally construed" in favor of the removing Defendant. *Watson*, 551 U.S. at 147. When a private entity is involved, the phrase "acting under" is interpreted to "contemplate a relationship where the government exerts some 'subjection, guidance, or control.'" *Sawyer*, 860 F.3d at 255 (quoting *Watson*, 551 U.S. at 151). "[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer*, 860 F.3d at 255 (emphasis in original). New York alleges that Tyco/Chemguard defectively designed AFFF products containing PFOS/PFOA, which were then "stored and/or used" at various sites across the state, including certain civilian airports. The complaint does not allege how the AFFF products arrived to the sites, but New York's argument

3

for remand is primarily that because Tyco/Chemguard sold a portion of the AFFF products to civilian airports and a portion to the U.S. military, that Tyco/Chemguard were not "acting under" a federal officer when it designed the AFFF products. Designing AFFF products to military specifications ("MilSpec") promulgated by the Department of Defense, including that the products contain the chemical class to which PFOS/PFOA belong, as Tyco/Chemours allege, may constitute "acting under" the military's guidance. The Court should reject a "narrow, grudging interpretation of the [federal officer removal] statute, recognizing that one of the most important reasons for removal is to have the validity of the defense of official immunity tried in federal court." *Acker*, 527 U.S. at 431.

Second, and relatedly, Tyco/Chemguard have a "colorable" federal defense of government contractor immunity. To assert government contractor immunity to tort liability, Tyco/Chemguard must demonstrate that "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). "Removal need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case." *Sawyer*, 860 F.3d at 257. Tyco/Chemguard demonstrate this colorable defense where they contend that the AFFF products were manufactured according to MilSpec, which included specifications for the chemical class that includes PFOS/PFOA. The defense need not be "clearly sustainable" to justify removal as merely "colorable." *Acker*, 527 U.S. at 432 ("We therefore do not require the officer virtually to 'win his case before he can have it removed.'").

4

Last, Tyco/Chemguard sufficiently demonstrate that they "engag[ed] in government-directed conduct causally related to the plaintiff['s] claims." *Sawyer*, 860 F.3d at 254. To satisfy this "causation requirement" of removal on the basis of the federal officer statute, non-governmental corporate defendants such as Tyco/Chemguard "must demonstrate that the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (emphasis in original). This is met where there is a "causal nexus between the allegedly tortious conduct and asserted official authority," which "has been interpreted broadly." *Brady v. XE Servs LLC*, No. 5:09-CV-449-BO, No. 5:09-CV-450-BO, 2010 WL 11566021, at \*2 (E.D.N.C. May 18, 2010). For this, the Court looks to whether Tyco/Chemguard demonstrated that their alleged acts "occurred *while* [they] were performing their official duties." *Isaacson*, 517 F.3d at 137-38 (emphasis in original). New York's claims arise out of use of AFFF products that it claims Tyco/Chemguard designed, and for which the military imposes MilSpec standards. The Court should "credit the [removing defendant's] theory of the case" and finds that the causation element of federal officer removal is satisfied here. *Acker*, 527 U.S. at 432.

Because the elements of § 1442(a)(1) are satisfied, entitling Tyco/Chemguard to have removed New York's tort claims and Tyco/Chemguard's federal defense to federal court, New York's motion to remand must be denied.

## IV.  **Conclusion**

For the foregoing reasons, the State of New York's motion to remand (Dkt. No. 230) is **DENIED**.

**AND IT IS SO ORDERED.**

5

Richard Mark Gergel
United States District Court Judge

September 27, 2019
Charleston, South Carolina

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) ) ) | MDL No. 2:18-mn-2873-RMG<br><br>**ORDER**<br><br>**This Order Relates to**<br>**Case No. 2:19-cv-02198-RMG** |

Before the Court is Ridgewood Water's motion to remand its claims to the Superior Court of New Jersey. (Dkt. No. 264.) For the reasons set forth below, the motion is denied.

I.   **Background**

In February 2019, Ridgewood Water ("Ridgewood") brought suit in the Superior Court of New Jersey against 3M Company, E.I. Du Pont De Nemours & Company, the Chemours Company, Honeywell International Inc., Tyco Fire Products LP, Chemguard Inc., Buckeye fire Equipment Company, National Foam, Inc. and Does 1-50. Ridgewood alleges that its drinking water supply was contaminated by perfluorooctane sulfonic acid/perfluorooctane sulfonate and perfluorooctanoic acid/perfluorooctanoate ("PFOS/PFOA") substances, "including but not limited to fluoropolymers and aqueous film-forming foam ('AFFF')" and that the defendants "manufactured, marketed, sold, and/or promoted" PFOS/PFOA, products containing PFOS/PFOA, or products that would degrade to PFOS/PFOA. (2:19-cv-02198-RMG, Dkt. No. 1-2 ¶¶ 1-5.) Ridgewood brought four causes of action for defective design, failure to warn, negligence and trespass. (*Id.* ¶¶ 74-118.)

In April 2019, Defendants Tyco Fire Products L.P. and Chemguard, Inc. ("Tyco/Chemguard") removed the action to the District Court for the District of New Jersey on the basis of the federal officer removal statute, 28 U.S.C. § 1442(a)(1). (2:19-cv-02198-RMG, Dkt. No. 1.) In August 2019, the Judicial Panel on Multidistrict Litigation transferred this matter into these multidistrict litigation proceedings under 28 U.S.C. § 1407, finding that transfer serves the convenience of the parties and witnesses and promotes just and efficient litigation. (*Id.*, Dkt. No. 33.) The following month, Ridgewood Water brought the instant motion to remand this action to the Superior Court of New Jersey.

## II.   **Legal Standard**

As the parties that invoked federal jurisdiction, Tyco/Chemguard bear the burden of establishing that the case was properly removed from state court. *Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148, 151 (4th Cir. 1994); *see also Bennett v. Bally Mfg. Corp.*, 785 F. Supp. 559, 560 (D.S.C. 1992). The Court should strictly construe removal jurisdiction because it "raises significant federalism concerns." *Mulcahey*, 29 F.3d at 151 (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941)); *see also S.C. v. Boehringer Ingelheim Roxane, Inc.*, No. 3:07-cv-00665-CMC, 2007 WL 1232156, at *1 (D.S.C. Apr. 26, 2007). Doubts as to the Court's jurisdiction should weigh in favor of remanding to state court. *Mulcahey*, 29 F.3d at 151.

## III.   **Discussion**

Ridgewood argues that remand is necessary because its complaint "disclaimed" any injury by AFFF products by pleading that as of February 2019, Ridgewood "cannot identify any military or federally-regulated airport as a source of such PFAS contamination, and on that basis alleges that the PFAS contamination in its wells is not from such sources." (2:19-cv-02198-RMG, Dkt. No. 1-2 at ¶¶ 68-69.) Ridgewood now "affirmatively disclaims any injuries traceable

2

to federally mandated MilSpec AFFF" (2:18-mn-2873, Dkt. No. 317 at 5), but also contends that "to the extent AFFF is a cause of Ridgewood's injuries, it is limited to *commercial* AFFF use by *non-federal consumers* at fire readiness and suppression sites in Northern Bergen County, New Jersey" (*Id.*, Dkt. No. 264-1 at 9).[1]  Ridgewood argues that Teterboro Airport is "one federally regulated airport at which Milspec AFFF could have been used," but is insufficient to support Tyco/Chemguard's government contractor defense because Teterboro Airport is a "non-federal" customer of the product and, moreover, sits south of Ridgewood's water service area. (*Id.*, Dkt. No. 264-1 at 15, 24.)

The federal officer removal statute authorizes removal to federal court of any civil action or criminal prosecution commenced in state court against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1).  Thus, a private defendant, such as a government contractor, who seeks to remove a case under § 1441(a)(1) must show (1) that it was a "person acting under" a federal officer, *see e.g.*, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209 (4th Cir. 2016); (2) that it has a "colorable federal defense," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999); and (3) that the charged conduct was carried out for or in relation to the asserted official authority, *see* 28 U.S.C. § 1442(a)(1).  "In imposing these requirements, the statute aims to protect the Federal Government from interference with its 'operations,' primarily

---

[1] As the Judicial Panel on Multidistrict Litigation concluded when transferring the action into these proceedings: "plaintiff argues that it alleges multiple sources of contamination, only some of which stem from the use of AFFFs.  This argument is unpersuasive.  Plaintiff alleges that AFFF used by the Ridgewood Fire Department is a source of the [PFOS/PFOA] contamination. That plaintiff alleges additional sources of contamination does not convert *Ridgewood Water* into a 'non-AFFF' case of the type we excluded from the MDL in the initial centralization order." (2:19-cv-02198-RMG, Dkt. No. 33 at 2.)

3

by providing 'a federal forum for a federal defense.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017) (quoting *Watson*, 551 U.S. at 147).

Tyco/Chemguard is a "person" under § 1442(a)(1), which includes "companies, associations, firms [and] partnerships." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016). The phrase "acting under" is "broad" and should be "liberally construed" in favor of the removing Defendant. *Watson*, 551 U.S. at 147. When a private entity is involved, the phrase "acting under" is interpreted to "contemplate a relationship where the government exerts some 'subjection, guidance, or control.'" *Sawyer*, 860 F.3d at 255 (quoting *Watson*, 551 U.S. at 151). "[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer*, 860 F.3d at 255 (emphasis in original). Ridgewood characterizes the alleged injurious conduct here as "Defendants' design, manufacture, and sale of PFOA and PFOS products, including commercial AFFF to non-federal users." (*Id.*, Dkt. No. 264-1 at 23-24.) Designing AFFF products to military specifications promulgated by the Department of Defense, including that the products contain the chemical class to which PFOS/PFOA belong, as Tyco/Chemguard allege, may constitute "acting under" the military's guidance. The Court should reject a "narrow, grudging interpretation of the [federal officer removal] statute, recognizing that one of the most important reasons for removal is to have the validity of the defense of official immunity tried in federal court." *Acker*, 527 U.S. at 431.

Second, and relatedly, Tyco/Chemguard have a "colorable" federal defense of government contractor immunity. To assert government contractor immunity to tort liability, Tyco/Chemguard must demonstrate that "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned

4

the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). "Removal need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case." *Sawyer*, 860 F.3d at 257. Tyco/Chemguard demonstrate a colorable defense where they contend that the AFFF products were manufactured according to MilSpec, which included specifications for the chemical class that includes PFOS/PFOA. The defense need not be "clearly sustainable" to justify removal as merely "colorable." *Acker*, 527 U.S. at 432 ("We therefore do not require the officer virtually to 'win his case before he can have it removed.'").

Last, Tyco/Chemguard plausibly allege that they "engag[ed] in government-directed conduct causally related to the plaintiff['s] claims." *Sawyer*, 860 F.3d at 254. To demonstrate this "causation requirement" of removal on the basis of the federal officer statute, non-governmental corporate defendants such as Tyco/Chemguard "must demonstrate that the acts for which they are being sued . . . occurred *because of* what they were asked to do by the Government." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (emphasis in original). This is met where there is a "causal nexus between the allegedly tortious conduct and asserted official authority," which "has been interpreted broadly." *Brady v. XE Servs LLC*, No. 5:09-CV-449-BO, No. 5:09-CV-450-BO, 2010 WL 11566021, at \*2 (E.D.N.C. May 18, 2010). For this, the Court looks to whether Tyco/Chemguard demonstrated that their alleged acts "occurred *while* [they] were performing their official duties." *Isaacson*, 517 F.3d at 137-38 (emphasis in original). Ridgewood's claims arise out of use of AFFF products that it claims Tyco/Chemguard designed, and for which the military imposes MilSpec standards. The Court

should "credit the [removing defendant's] theory of the case" and finds that the causation element of federal officer removal is satisfied here. *Acker*, 527 U.S. at 432.

Because the elements of § 1442(a)(1) are satisfied, entitling Tyco/Chemguard to have removed Ridgewood's claims and Tyco/Chemguard's federal defense to federal court, Ridgewood's motion to remand must be denied.

## IV.    **Conclusion**

For the foregoing reasons, Ridgewood Water's motion to remand (Dkt. No. 264) is **DENIED**.

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

October 1, 2019
Charleston, South Carolina

6

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

IN RE: AQUEOUS FILM-FORMING FOAMS
PRODUCTS LIABILITY LITIGATION                    MDL No. 2873

## ORDER DENYING TRANSFER

    **Before the Panel:**[*] Defendants E.I. du Pont de Nemours and Company and The Chemours Company, LLC (collectively, DuPont) move under 28 U.S.C. § 1407(c) to transfer the eight Eastern District of New York actions listed on Schedule A to the District of South Carolina for inclusion in MDL No. 2873. Plaintiffs in those actions oppose the motion.

    MDL No. 2873 involves allegations that aqueous film-forming foams (AFFFs) used at airports, military bases, or other locations to extinguish liquid fuel fires caused the release of perfluorooctane sulfonate (PFOS) and/or perfluorooctanoic acid (PFOA) into local groundwater and contaminated drinking water supplies. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig. (In re AFFF)*, 357 F. Supp. 3d 1391, 1396 (J.P.M.L. 2018). The complaints in the eight New York actions on the motion to transfer contain no mention of AFFFs. Instead, plaintiffs—all of which are water authorities—assert claims against DuPont, 3M Company, and Dyneon LLC[1] for the alleged contamination of plaintiffs' drinking water supplies with PFOS and/or PFOA.

    In support of its motion to transfer, DuPont argues that, regardless of how plaintiffs' claims are constructed, the New York actions are AFFF actions. Specifically, DuPont argues that plaintiffs' claims arise out of the alleged discharge of PFOA and/or PFOS into the recharge area[2] for Long Island's aquifer system. This aquifer system is already the subject of an action in the MDL, which alleges that AFFF use contributed to the contamination of the aquifer. *See Suffolk County Water Authority v. 3M Company*, C.A. No. 2:18-03337 (D.S.C.). DuPont contends that plaintiffs' claims are nearly identical with those in *Suffolk County*, except that plaintiffs in the New York actions omit any mention of AFFFs. DuPont also points to various news and other reports of aviation and commercial accidents on Long Island in which AFFFs may have been used to extinguish fires.

    DuPont's arguments are not persuasive. The New York actions do not raise AFFF claims. Indeed, they contain no mention of AFFFs. Instead, these complaints focus on DuPont's and 3M's

---

[*] Judges Karen K. Caldwell and David C. Norton took no part in the decision of this matter.

[1] Dyneon LLC purportedly is a subsidiary of 3M Company.

[2] The "recharge area" is the area through which water enters and replenishes the aquifer.

-2-

manufacture, marketing, and sale of PFOA and PFOS. Some of this PFOA or PFOS may have been incorporated into AFFF products that contributed to the contamination of plaintiffs' groundwater supplies, but at this point the extent of AFFF involvement in these actions is speculative.[3]

Additionally, our past practice in this docket weighs against transferring these New York actions to MDL No. 2873. We have transferred several actions in which plaintiffs allege multiple sources of PFOS and PFOA contamination, including from the use of AFFFs. *See, e.g.*, Transfer Order at 2, *In re AFFF*, MDL No. 2873 (J.P.M.L. July 31, 2019), ECF No. 483. We have not, though, transferred to the MDL actions that do not contain *any* allegations or claims relating to AFFF use. Indeed, we recently denied transfer of an action, *Middlesex Water Company*, in which the claims were "directed at 3M and its manufacture, marketing, and sales of PFOS and PFOA, not its manufacture of AFFF products." *See* Order Denying Transfer at 1, *In re AFFF*, MDL No. 2873 (J.P.M.L. Dec. 18, 2019), ECF No. 541. In that order, we expressed our concern that broadening the scope of MDL No. 2873 beyond AFFFs could render the litigation unwieldy:

> [W]e have no desire to unnecessarily complicate the transferee judge's task in efficiently managing this litigation, which already involves a wide range of claims and parties. Given our continued concern about the manageability of this litigation, *a party seeking transfer of an action that does not on its face raise AFFF claims bears a significant burden to persuade us that transfer is appropriate and will not undermine the efficient progress of the AFFF MDL.*

*Id.* at 2 (emphasis added).

Like *Middlesex Water Company*, the New York complaints do not on their face raise AFFF claims, and defendants have not carried their "significant burden" to persuade us that transfer of these non-AFFF actions is appropriate. Defendants' prediction that discovery in these actions relating to AFFFs will substantially overlap with discovery conducted in the MDL is conjecture. DuPont has not yet responded to plaintiffs' complaints. To the extent there is any potential for duplicative discovery, such overlap is best minimized through coordination between the parties and the involved courts. And, should these New York actions evolve into AFFF cases, the parties or the court at that time can re-notice them as potential tag-alongs in MDL No. 2873.

---

[3] Similarly, DuPont's contention that PFOA or PFOS contamination of some portion of the Long Island aquifer system due to use of AFFFs necessarily means that any contamination of groundwater on Long Island stems from AFFF use remains uncertain at this point in the litigation.

-3-

IT IS THEREFORE ORDERED that the motion to transfer the actions listed on Schedule A to MDL No. 2873 is denied.

PANEL ON MULTIDISTRICT LITIGATION

_____
Ellen Segal Huvelle
Acting Chair

R. David Proctor        Catherine D. Perry
Nathaniel M. Gorton     Matthew F. Kennelly

**IN RE: AQUEOUS FILM-FORMING FOAMS**
**PRODUCTS LIABILITY LITIGATION**                                    MDL No. 2873

### SCHEDULE A

Eastern District of New York

WATER AUTHORITY OF WESTERN NASSAU COUNTY v. THE 3M COMPANY,
    ET AL., C.A. No. 2:19−04608
PORT WASHINGTON WATER DISTRICT v. THE 3M COMPANY, ET AL.,
    C.A. No. 2:19−04609
INCORPORATED VILLAGE OF MINEOLA v. THE 3M COMPANY, ET AL.,
    C.A. No. 2:19−04610
CARLE PLACE WATER DISTRICT v. THE 3M COMPANY, ET AL.,
    C.A. No. 2:19−04611
INCORPORATED VILLAGE OF GARDEN CITY v. THE 3M COMPANY, ET AL.,
    C.A. No. 2:19−04612
ROSLYN WATER DISTRICT v. THE 3M COMPANY, ET AL., C.A. No. 2:19−04613
WATER AUTHORITY OF GREAT NECK NORTH v. THE 3M COMPANY, ET AL.,
    C.A. No. 2:19−06613
GARDEN CITY PARK FIRE AND WATER DISTRICT v. THE 3M COMPANY,
    ET AL., C.A. No. 2:19−06615

 Positive
As of: April 8, 2024 9:11 PM Z

# *Kelleher v. A.W. Chesterton Co.*

United States District Court for the Southern District of Illinois

November 23, 2015, Decided; November 23, 2015, Filed

Case No. 15-CV-893-SMY-SCW

**Reporter**

2015 U.S. Dist. LEXIS 159783 *; 2015 WL 7422756

THOMAS KELLEHER, Plaintiff, vs. A.W. CHESTERTON COMPANY, et al., Defendants.

## Core Terms

disclaimer, exposure, military, exposure to asbestos, federal official, aircraft, mechanic, removal, asbestos

**Counsel:** **[*1]** For Thomas Kelleher, Plaintiff: Melissa Crowe Schopfer, LEAD ATTORNEY, Simmons Hanly Conroy, Alton, IL; Jean-Michel LeCointre, Simmons Hanly Conroy, Alton, IL.

For Boeing Company, Defendant: Greg M McMahon, LEAD ATTORNEY, Segal, McCambridge Singer & Mahoney, Ltd, Chicago, IL; Mark Coad Sampson, Segal, McCambridge et al., Chicago, IL.

For BASF Corporation, Defendant, Cross Claimant, Cross Defendant: Joseph A Kilpatrick, LEAD ATTORNEY, Husch Blackwell LLP, St. Louis, MO.

For Borgwarner Morse Tec Inc., as successor-by-merger to Borg-Warner Corporation, Defendant, Cross Defendant: James D. Maschhoff, Herzog Crebs LLP - St. Louis, MO, St. Louis, MO.

For CBS Corporation, a Delaware Corporation formerly known as Viacom Inc., Successor by Merger to CBS Corp., A Pennsylvania Corp., formerly known as Westinghouse Electric Corporation, Defendant: Michael R. Dauphin, Foley & Mansfield, PLLP, St. Louis, MO.

For Cleaver-Brooks Inc., Defendant, Cross Claimant, Cross Defendant: Meredith S Hudgens, O'Connell, Tivin, Miller & Burns L.L.C., Chicago, IL.

For Crane Co., Industrial Holdings Corporation, formerly known as The Carborundum Company, Ingersoll-Rand Company, Trane U.S. Inc., formerly known as American **[*2]** Standard Inc., Defendants: Benjamin J. Wilson, Carl J. Geraci, HeplerBroom LLC-St. Louis, St. Louis, MO.

For Eaton Aeroquip LLC, Eaton Corporation,

Defendants, Cross Claimants, Cross Defendants: Christopher J. Lang, LEAD ATTORNEY, Pitzer, Snodgrass, P.C., St. Louis, MO; Brian J. Connolly, Pitzer Snodgrass PC- Missouri, St. Louis, MO.

For General Electric Company, Hercules Incorporated, Defendants, Cross Claimants, Cross Defendants: Anita M. Kidd, Julie Fix Meyer, Melanie R. King, Raymond R. Fournie, Armstrong Teasdale LLP-St Louis, St. Louis, MO.

For Goodyear Tire & Rubber Co., United Technologies Corporation, Defendants: Kyler H. Stevens, LEAD ATTORNEY, Kurowski Shultz LLC, Swansea, IL.

For Henkel Corporation, Defendant, Cross Defendant: Jeffrey T. Bash, Justin S. Zimmerman, Lewis Brisbois Bisgaard & Smith LLP - Edwardsville, Edwardsville, IL.

For Hexcel Corporation, Defendant, Cross Defendant: Luke J. Mangan, LEAD ATTORNEY, Polsinelli PC - St. Louis, St. Louis, MO; Allison K. Sonneveld, Polsinelli Shughart PC - St Louis, St. Louis, MO; Kathleen Ann Hardee, Kirra N. Jones, Polsinelli PC - Kansas City, Kansas City, MO.

For Imo Industries Inc., Defendant, Cross Defendant: Keith B. Hill, LEAD **[*3]** ATTORNEY, Heyl, Royster et al. - Edwardsville, Edwardsville, IL; James R. Grabowski, Heyl, Royster et al. - Edwardsville, Edwardsville, IL.

For John Crane Inc., Defendant, Cross Defendant: Sean P. Fergus, O'Connell, Tivin, Miller & Burns L.L.C., Chicago, IL.

For Luse-Stevenson Co., Defendant: Robert Spitkovsky, Jr., LEAD ATTORNEY, Johnson & Bell LTD-Chicago, Chicago, IL; Ava Louise Caffarini, Johnson & Bell LTD.-Chicago, Chicago, IL; David A. Cyr, Johnson & Bell LTD-Chicago, Chicago, IL.

For Pneumo Abex LLC, successor-in-interest to Abex Corporation formerly known as Pneumo Abex Corporation, Defendant, Cross Defendant: Thomas L. Orris, LEAD ATTORNEY, Williams Venker & Sanders

LLC, St. Louis, MO; Ross S. Titzer, Williams Venker & Sanders LLC, St. Louis, MO.

For Riley Power Inc., formerly known as Riley Stoker Corporation, Defendant: Keith B. Hill, LEAD ATTORNEY, Heyl, Royster et al. - Edwardsville, Edwardsville, IL.

For Sepco Corporation, Defendant, Cross Defendant: Jeffrey Scott Hood, O'Connell, Tivin, Miller & Burns L.L.C., Chicago, IL.

For Shell Oil Company, Defendant: Jonathan M. Lively, LEAD ATTORNEY, Segal, McCambridge Singer & Mahoney, Ltd, Chicago, IL; Jill Marie Felkins, Segal, McCambridge [*4] Singer & Mahoney, Ltd, Chicago, IL.

For Sprinkmann Sons Corporation, Defendant, Cross Defendant: William Edward Keeler, III, LEAD ATTORNEY, Crivello Carlson SC, Milwaukee, WI.

For United Airlines Inc., Defendant, Cross Defendant: Richard John Leamy, LEAD ATTORNEY, Wiedner & McAuliffe, Ltd., Chicago, IL; James Jason Coggins, Wiedner & McAuliffe, Ltd., Chicago, IL.

For United States Steel Corporation, Defendant, Cross Claimant, Cross Defendant: Brent Eisenberg, LEAD ATTORNEY, Matushek Nilles et al, Chicago, IL.

For Continental Motors, Inc., Defendant, Cross Defendant: Reed W. Sugg, LEAD ATTORNEY, Sandberg, Phoenix et al. - St. Louis, Generally Admitted, St. Louis, MO; Steven Thomas Walsh, Sandberg, Phoenix et al. - St. Louis, St. Louis, MO.

For Boeing Company, Cross Defendant, Cross Claimant: Mark Coad Sampson, Segal, McCambridge et al., Chicago, IL.

For CBS Corporation, a Delaware Corporation, Cross Defendant: Michael R. Dauphin, Foley & Mansfield, PLLP, St. Louis, MO.

For Crane Co., Industrial Holdings Corporation, Ingersoll-Rand Company, Trane U.S. Inc., Cross Defendants: Benjamin J. Wilson, Carl J. Geraci, HeplerBroom LLC-St. Louis, St. Louis, MO.

For Riley Power Inc., Cross Defendant, Cross [*5] Claimant: Keith B. Hill, LEAD ATTORNEY, Heyl, Royster et al. - Edwardsville, Edwardsville, IL.

For Ingersoll-Rand Company, Cross Claimant: Benjamin J. Wilson, Carl J. Geraci, HeplerBroom LLC-St. Louis, St. Louis, MO.

For Pneumo Abex LLC, successor-in-interest to Abex Corporation, Cross Defendant: Ross S. Titzer, Williams Venker & Sanders LLC, St. Louis, MO; Thomas L. Orris,

Williams Venker & Sanders LLC, St. Louis, MO.

For United Airlines Inc., Cross Defendant: Richard John Leamy, LEAD ATTORNEY, James Jason Coggins, Lindsay C. Omolecki, Wiedner & McAuliffe, Ltd., Chicago, IL.

For Hexcel Corporation, Cross Defendant: Luke J. Mangan, LEAD ATTORNEY, Allison K. Sonneveld, Polsinelli Shughart PC - St Louis, St. Louis, MO; Kathleen Ann Hardee, Kirra N. Jones, Polsinelli PC - Kansas City, Kansas City, MO.

For Imo Industries Inc., Cross Defendant: Keith B. Hill, LEAD ATTORNEY, James R. Grabowski, Heyl, Royster et al. - Edwardsville, Edwardsville, IL.

For United Airlines Inc., Cross Defendant: Richard John Leamy, LEAD ATTORNEY, James Jason Coggins, Rachel S. Nevarez, Wiedner & McAuliffe, Ltd., Chicago, IL.

For Continental Motors, Inc., Cross Claimant, Cross Defendant: Reed W. Sugg, LEAD ATTORNEY, [*6] Steven Thomas Walsh, Sandberg, Phoenix et al. - St. Louis, St. Louis, MO.

For Luse-Stevenson Co., Cross Defendant: Robert Spitkovsky, Jr., LEAD ATTORNEY, David A. Cyr, Johnson & Bell LTD-Chicago, Chicago, IL.

For United Airlines Inc., Cross Defendant: Richard John Leamy, LEAD ATTORNEY, James Jason Coggins, Wiedner & McAuliffe, Ltd., Chicago, IL.

For Pneumo Abex LLC, successor-in-interest to Abex Corporation, Cross Defendant: Ross S. Titzer, Thomas L. Orris, Williams Venker & Sanders LLC, St. Louis, MO.

For Beazer East, Inc., Cross Defendant: Kyler H. Stevens, Kurowski Shultz LLC, Swansea, IL.

For Shell Oil Company, Cross Claimant, Cross Defendant: Jonathan M. Lively, LEAD ATTORNEY, Segal, McCambridge Singer & Mahoney, Ltd, Chicago, IL.

For Pneumo Abex LLC, successor-in-interest to Abex Corporation, Cross Claimant, Cross Defendant: Thomas L. Orris, LEAD ATTORNEY, Ross S. Titzer, Williams Venker & Sanders LLC, St. Louis, MO.

For Continental Motors, Inc., Cross Defendant: Reed W. Sugg, LEAD ATTORNEY, Steven Thomas Walsh, Sandberg, Phoenix et al. - St. Louis, Generally Admitted, St. Louis, MO.

For Luse-Stevenson Co., Cross Defendant: Robert Spitkovsky, Jr., LEAD ATTORNEY, Ava Louise Caffarini, [*7] David A. Cyr, Johnson & Bell LTD-

2015 U.S. Dist. LEXIS 159783, *7

Chicago, Chicago, IL.

For United Airlines Inc., Cross Defendant: Richard John Leamy, LEAD ATTORNEY, James Jason Coggins, Wiedner & McAuliffe, Ltd., Chicago, IL; Amy L. Friederich, Wiedner & McAuliffe, Ltd.-St. Louis, St. Louis, MO.

For Shell Oil Company, Cross Defendant: Jonathan M. Lively, LEAD ATTORNEY, Jill Marie Felkins, Segal, McCambridge Singer & Mahoney, Ltd, Chicago, IL.

For Luse-Stevenson Co., Cross Claimant, Cross Defendant: Robert Spitkovsky, Jr., LEAD ATTORNEY, David A. Cyr, Johnson & Bell LTD-Chicago, Chicago, IL; Ava Louise Caffarini, Johnson & Bell LTD.-Chicago, Chicago, IL.

For United Technologies Corporation, Cross Claimant, Cross Defendant: Kyler H. Stevens, LEAD ATTORNEY, Kurowski Shultz LLC, Swansea, IL.

For Goodyear Tire & Rubber Co., Cross Claimant: Kyler H. Stevens, LEAD ATTORNEY, Kurowski Shultz LLC, Swansea, IL.

**Judges:** STACI M. YANDLE, United States District Judge.

**Opinion by:** STACI M. YANDLE

# Opinion

### MEMORADUM AND ORDER

**YANDLE, District Judge:**

Pending before the Court is Plaintiff's Motion to Remand (Doc. 87). For the reasons set forth below, Plaintiff's motion is **GRANTED**.

Plaintiff originally filed this action in the Third Judicial Circuit, Madison County, Illinois, **[*8]** alleging injuries due to exposure to asbestos (*see* Doc. 88-1). Specifically, Plaintiff alleges exposure from his employment from 1958 until 2006 as an aircraft mechanic, helicopter mechanic, and laborer at various locations throughout the United States (Doc. 88-4). Plaintiff testified that he worked as a civilian aircraft mechanic on commercial, non-military aircrafts for United Airlines ("United") from 1966 until 2000 (*see* Doc. 88-2). For the two years prior to his employment with United, Plaintiff served as a helicopter mechanic in the United States Army. *Id.*

In the state court complaint and subsequent amended complaints, Plaintiff included the following disclaimer:

> Plaintiff disclaims any cause of action or recovery for any injuries...resulting from exposure to asbestos dust caused by any acts or omissions of a Defendant committed at the direction of an officer of the United States Government (*see* Docs. 88-3, 88-4).

Plaintiff also filed a "Notice of Disclaimer of Certain Alleged Exposures to Asbestos as the Basis for Any Causes of Action or Relief" in state court. The Notice contained a more specific disclaimer:

> Plaintiff disclaims and hereby waives as the basis for any relief in this **[*9]** case any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred while plaintiff was enlisted in the United States Army between approximately 1963 and 1965, including any exposure to asbestos dust that occurred while plaintiff was stationed at Fort Knox, Kentucky and Fort Richardson, Alaska. Plaintiff also disclaims and hereby waives as the basis for any relief any cause of action or recovery for any injuries resulting from exposure to asbestos dust as a result of plaintiff's work on, and in close proximity to others working on, any military aircraft, specifically including but not limited to the CH-47 Chinook (*see* Doc. 88-5).

On August 12, 2015, Defendant Boeing removed the case to this Court pursuant to the provisions of *28 U.S.C. § 1442(a)(1)*, which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer (Doc. 1). No co-defendant has identified a basis for federal jurisdiction other than the federal officer removal statute and no other co-defendant joined Boeing's notice of removal. In the motion to remand, Plaintiff asserts that because he has filed a waiver of all claims related to his military service, Boeing **[*10]** has no basis to assert federal jurisdiction. The Court agrees.

As a general matter, a civil action is removable from state court only if the action could originally have been brought in federal court at the time of suit. *See 28 U.S.C. § 1441(a)*. When issues of federal law appear on the face of a plaintiff's well-pleaded complaint, the case falls under a federal court's federal question jurisdiction and may be removed on that basis. *Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987)*. The well-pleaded complaint rule makes the plaintiff "the master of the claim; the plaintiff may avoid federal jurisdiction by exclusive reliance on

state law." *Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)*. As a result, a defendant typically may not remove an action on the basis of "an anticipated or actual federal defense" to the plaintiff's state law claims. *Jefferson Cnty., Ala. v. Acker, 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999)*.

The federal officer removal statute, however, is an exception to the well-pled complaint rule. *Ruppel v. CBS Corp., 701 F.3d 1176, 1180 (7th Cir.2012)*(citing *Mesa v. California, 489 U.S. 121, 136, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)*. *Section 1442(a)(1)* permits the removal of the entire case, even though the federal officer defense may not apply to all of the claims. *Alsup v. 3-Day Blinds, Inc., 435 F.Supp.2d 838, 844 (S.D.Ill.2006)*. The party seeking removal bears the burden of proving the grounds for its motion. *Shah v. Inter-Continental Hotel Chi. Operating Corp., 314 F.3d 278, 280 (7th Cir.2002)*. Thus, Boeing must show it was a (1) "person" (2) "acting under" the United States, its agencies, or its officers (3) that has been sued "for or **[*11]** relating to any act under color of such office," and (4) has a colorable federal defense to Plaintiff's claim. *See 28 U.S.C. § 1442(a)*; *Mesa, 489 U.S. at 132-34, 109 S.Ct. 959*. There must be claims against which a federal defense is cognizable.

Here, however, Plaintiff's waiver has rendered any federal defenses moot. To deny remand of this case would affirm Boeing's right to assert a defense against a claim that does not exist. Indeed, in many asbestos cases involving claims originally subject to a federal-contractor defense, remand has been held appropriate following similar waivers. *See Maguire v. A.C. & S., Inc., 2015 U.S. Dist. LEXIS 108938, 2015 WL 4934445, at *2 (S.D.N.Y. Aug. 18, 2015)* (collecting cases);[1] *Hayden v.*

_____

[1] A partial list of cases includes: *Schulz v. Crane Co., 2014 U.S. Dist. LEXIS 9198, 2014 WL 280361, at *1-2 (E.D.Cal. Jan. 23, 2014)* (plaintiff's waiver of claims "arising out of or related to asbestos exposure to or on military or federal government aircraft" precluded federal officer removal); *Lockwood v. Crane Co., 2012 U.S. Dist. LEXIS 57986, 2012 WL 1425157, at * 1-2 (C.D.Cal. Apr. 25, 2012)* (plaintiff's waiver of any claims "relating **[*12]** to or arising out of plaintiff's asbestos exposure at military and federal government jobsites or from U.S. military or other government vessels," filed shortly after removal, was sufficient to justify remand); *Pratt v. Asbestos Corp. Ltd., 2011 U.S. Dist. LEXIS 108217, 2011 WL 4433724, at *1-2 (N.D.Cal. Sept. 22, 2011)* ("Plaintiff's waiver has rendered any federal defenses moot. There must be claims against which a federal defense is

*3M Company, 2015 U.S. Dist. LEXIS 104534, 2015 WL 4730741 (E.D. La. Aug. 10, 2015)*; *Dougherty v. A.O. Smith Corp., 2014 U.S. Dist. LEXIS 125302, 2014 WL 4447293 (D.Del. Sept. 8, 2014)* (noting that federal courts have consistently granted motions to remand where the plaintiff expressly disclaimed the claims upon which the federal officer removal was based and the court was not "aware of [ ] any case in which a federal court has rejected on the merits an express disclaimer of claims relating to asbestos exposure on federal jobsites and military vessels/aircrafts").

Furthermore, this case is distinguishable from other asbestos injury cases cited by Boeing in which a plaintiff's disclaimer was not sufficiently comprehensive to prevent removal or the alleged asbestos exposure occurred exclusively during the plaintiff's military service. *See, e.g., Boyd v. Boeing Co., 2015 U.S. Dist. LEXIS 91226, 2015 WL 4371928, at *6 (E.D. La. July 14, 2015)* (rejecting disclaimer because facts of case suggested that it was likely that the defendants would rely, at least in part, on a government contractor defense); *McMann v. Air & Liquid Sys. Corp., 2014 U.S. Dist. LEXIS 62687, 2014 WL 1794694 (W.D.Wash. May 6, 2014)* (rejecting disclaimer because the scope of factual allegations in the complaint exclusively concerned the plaintiff's work aboard naval vessels); **[*13]** *In re Asbestos Products Liab. Litig. (No. VI), 770 F. Supp. 2d 736, 742 (E.D. Pa. 2011)* (holding that where "the only claims alleged against Defendant arise[ ] from exposure to U.S. Naval ships at U.S. Naval shipyards," "recognizing [the Plaintiff's] disclaimer would deprive the federal officer of the right to have the adequacy of the threshold determination"); *Reaser v. Allis Chambers Corp., 2008 U.S. Dist. LEXIS 112344, 2008 WL 8911521, at *6 (C.D.Cal. June 23, 2008)* (rejecting a disclaimer which waived claims related to exposure in federal enclaves but maintained claims related to exposure aboard naval vessels).

Here, the complaint contains allegations of asbestos exposure spanning Plaintiff's forty-year employment history as an aircraft mechanic, helicopter mechanic, and laborer. In the complaint and the notice of

_____

cognizable, and Plaintiff's waiver has removed any such claims."); *Westbrook v. Asbestos Defendants (BHC), 2001 U.S. Dist. LEXIS 11575, 2001 WL 902642, at *3 (N.D.Cal. July 31, 2001)* (express disclaimer "eviscerated" defendant's ground for removal, therefore justifying remand); *Smith v. Anchor Packing Co., 2008 U.S. Dist. LEXIS 92041, 2008 WL 4899258, at *1 (S.D.N.Y. Nov. 12, 2008)* (granting motion to remand where the only federal claim or defense supporting jurisdiction was eliminated after removal).

2015 U.S. Dist. LEXIS 159783, *13

disclaimer, Plaintiff has made clear statements that his claims do not include any work performed while in the military or on military machinery. Accordingly, the Court finds that Plaintiff has effectively waived any claim based on exposure in the military and Plaintiff's motion is **GRANTED**. The Court **REMANDS** this case to the Third Judicial Circuit, Madison County, Illinois.

**IT IS SO ORDERED**.

**DATED: November 23, 2015**

**/s/ Staci M. Yandle**

**STACI M. YANDLE**

**United States District Judge**

---

End of Document

 Caution
As of: April 8, 2024 9:12 PM Z

## *Madden v. A.H. Voss Co.*

United States District Court for the Northern District of California

October 21, 2009, Decided; October 21, 2009, Filed

No. C 09-03786 JSW

**Reporter**
2009 U.S. Dist. LEXIS 101680 *; 2009 WL 3415377

JOHN MADDEN, Plaintiff, v. A.H. VOSS COMPANY, et al., Defendants.

## Core Terms

removal, military, vessels, courts, state court, jobsites, federal government

**Counsel:** **[*1]** For John Madden, Plaintiff: David R. Donadio, LEAD ATTORNEY, Lindsey E. Manroel, Brayton & Purcell LLP, Attorneys at Law, Novato, CA; Richard Martin Grant, LEAD ATTORNEY, Brayton Purcell LLP, Novato, CA.

For A.H. Voss Company, Defendant: Richard Martin Grant, LEAD ATTORNEY, Brayton Purcell LLP, Novato, CA.

For Viacom, Inc., Defendant: Kevin Douglas Jamison, Pond North LLP, Los Angeles, CA.

For Leslie Controls, Inc., Defendant: Thomas J. Moses, LEAD ATTORNEY, Edward R. Hugo, James Carl Parker, Brydon Hugo & Parker, San Francisco, CA.

**Judges:** JEFFREY S. WHITE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JEFFREY S. WHITE

## Opinion

### ORDER (1) GRANTING PLAINTIFF'S MOTION TO REMAND AND (2) DENYING MOTION TO STAY AS MOOT

Now before the Court are the motions to remand and to stay this action pending a ruling on a motion to transfer the action by the Judicial Panel on Multidistrict Litigation ("MDL"). This matter is now fully briefed and ripe for decision. The Court finds that this matter is appropriate for disposition without oral argument and the matter is deemed submitted. *See* N.D. Civ.L.R. 7-1(b). Accordingly, the hearing set for October 23, 2009 is VACATED. Having considered the parties' arguments, relevant legal authority, **[*2]** and having had the benefit of oral argument, the Court GRANTS the motion to remand and DENIES AS MOOT the motion to stay.

### BACKGROUND

On June 30, 2009, Plaintiff John Madden ("Plaintiff") filed this action in San Francisco Superior Court. On August 18, 2009, Plaintiff filed, in state court, a declaration by David R. Donadio in which he states that "Plaintiff's claims against defendant LESLIE CONTROLS, INC. exclude plaintiff's asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels." (Declaration of Richard M. Grant ("Grant Decl."), Ex. A.) On the same date, Plaintiff also filed a request for dismissal in state court "[a]s to LESLIE CONTROLS, INC, only for claims in plaintiff's Complaint at military and federal government jobsites and aboard U.S. Navy vessels." (*Id.*, Ex. B.)

On August 18, 2009, Defendant Leslie Controls, Inc. ("Leslie Controls") removed this matter on the grounds that Plaintiff's alleged occupational exposure to asbestos occurred aboard various United States Naval ships, and that Leslie Controls, in its manufacture and sale of equipment for the United States Navy, was acting under the direction of an officer of the United States within **[*3]** the meaning of *28 U.S.C. § 1442(a)(1)*.

Plaintiff now moves to remand this action and Leslie Controls moves to stay this action pending a ruling on a motion to transfer the action by the MDL. Both parties argue that the Court should address their motion first.

### ANALYSIS

2009 U.S. Dist. LEXIS 101680, *3

"Generally, jurisdiction is a preliminary matter that should be resolved before all others." *Leeson v. Merck & Co., Inc., 2006 U.S. Dist. LEXIS 3096, 2006 WL 3230047, *2 (E.D.Cal. Jan. 27, 2006)*; *see also Villarreal v. Chrysler Corp., 1996 U.S. Dist. LEXIS 3159, 1996 WL 116832, at *1 (N.D.Cal. Mar. 12, 1996)* ("Judicial economy will best be served by addressing the remand issue [before a party's motion to stay] because a determination on this issue will facilitate litigation in the appropriate forum."). However, some courts have held that "the calculus changes somewhat when deference to a MDL court will further 'the uniformity, consistency, and predictability in litigation that underlies the MDL system.'" *Leeson, 2006 U.S. Dist. LEXIS 3096, 2006 WL 3230047, *2* (quoting *Conroy v. Fresh Del Monte Produce Inc., 325 F. Supp. 2d 1049, 1053 (N.D.Cal.2004))*. "In deciding whether to rule on the motion to remand, courts consider whether the motion raises issues likely to arise in other actions pending in the MDL [*4] transferee court." *Conroy, 325 F. Supp. 2d 1053*. Here, Leslie Controls has not even argued, let alone submitted any evidence to demonstrate, that the pending motion to remand has raised issues that are likely to arise in other actions even if the MDL grants the motion to transfer. Therefore, the Court will address the motion to remand first.

A. **Legal Standards Relevant to Removal**.

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant … to the district court of the United States for the district and division embracing the place where such action is pending." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 7-8, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983)* (citation omitted); *see also 28 U.S.C. § 1441*. However, federal courts are courts of limited jurisdiction. *See, e.g., Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)*. Accordingly, the burden of establishing federal jurisdiction for purposes of removal is on the party seeking removal. *Valdez v. Allstate Ins. Co., 372 F.3d 1115, 1117 (9th Cir. 2004)*; *see also Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992)*. Generally, the removal statute [*5] is strictly construed against removal and any doubt as to the right of removal should be resolved in favor of remand. *Gaus, 980 F.2d at 566*. However, that is not the case concerning the federal officer removal statute. *See Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1252 (9th Cir. 2006)* (noting that, because it is important to the federal government to protect federal officers, removal rights

under *28 U.S.C. § 1442* are much broader than those under *§ 1441*). *Section 1442* is interpreted broadly in favor of removal. *Id.*

B. **Plaintiff's Motion to Remand**.

Leslie Controls removed this matter pursuant to the federal officer removal statute. Under *28 U.S.C. § 1442(a)(1)*, "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office" may remove to federal court. Removal is proper if the moving party can (1) demonstrate that it acted under the direction of a federal officer; (2) raise a colorable defense to the plaintiff's claims; and (3) demonstrate a causal nexus between the plaintiff's claims and acts it performed under color [*6] of federal office. *Fung v. Abex Corp, 816 F. Supp. 569, 571-72 (N.D. Cal. 1992)* (citing *Mesa v. California, 489 U.S. 121, 124-25, 134-35, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)*); *Jefferson County, Alabama v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)* (defense need only be colorable).

Leslie Controls claims that it is shielded from liability by military contractors immunity as set forth in *Boyle v. United Technologies Corp., 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988)*. In *Boyle*, the Court held that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id. at 512*. However, before Leslie Controls removed this matter, Plaintiff filed the following waiver in state court: "Plaintiff's claims against defendant LESLIE CONTROLS, INC. exclude plaintiff's asbestos exposure at military and federal government jobsites and aboard U.S. Navy vessels." Plaintiff also filed a request for dismissal in state court, requesting dismissal "As to LESLIE CONTROLS, [*7] INC., only for claims in plaintiff's complaint at military and federal government jobsites and abroad U.S. Navy vessels." (Grant Decl., Exs. A, B.) Courts have found similar disclaimers sufficient to eviscerate Leslie Controls' grounds for removal. *See Westbrook v. Asbestos Defendants, 2001 U.S. Dist. LEXIS 11575, 2001 WL 902642, *2-3 (N.D. Cal. July 31, 2001)* (finding similar disclaimer waiving claims arising out of work done on federal jobsites and vessels sufficient to warrant remand); *Dobrocke v. Allis-*

2009 U.S. Dist. LEXIS 101680, *7

*Chalmers Corp. Prod. Liability Trust, Case No. C 09-01456 CW, 2009 U.S. Dist. LEXIS 46699 (N.D. Cal. May 26, 2009)* (attached as Exhibit F to Plaintiff's Motion to Remand).

The cases cited to by Leslie Controls in which the courts held that waivers were not sufficient to warrant remand are distinguishable. In those cases, the plaintiffs only waived federal claims, but still intended to bring state law failure to warn claims against the military contractors. *O'Connell v. Fosterwheeler Energy Corp., 544 F. Supp. 2d 51 (D. Mass. 2008)*; *Ballenger v. Agco Corp., 2007 U.S. Dist. LEXIS 47042, *4 (N.D. Cal. June 22, 2007)* (distinguishing *Westbrook* because plaintiffs did not disclaim in writing any claims arising out of work done on U.S. Navy vessels); **[*8]** (*Jenkins v. Allied Packing & Supply, Inc.*, Case No. 09-cv-0101 DMS (LSP) (S.D. Cal. March 25, 2009) (attached as Exhibit F to Leslie Controls' Opposition); *Oberstar v. CBS Corp.*, CV 08-118 PA (JWJx) (C.D. Cal. Feb. 11, 2008) (attached as Exhibit G to Leslie Controls' Opposition); *Nelson v. Alfa Laval, Inc.*, CV 07-8338 VBF (Rcx) (C.D. Cal. Feb. 8, 2008) (attached as Exhibit H to Leslie Controls' Opposition); *Wright v. A.W. Chesterton Co. Inc.*, Case No. C07-05403 MJJ (N.D. Cal. Feb. 21, 2008) (attached as Exhibit I to Leslie Controls' Opposition); *Reaser v. Allis Chambers Corp.*, CV 08-1296 SVW (Ssx) (C.D. Cal. June 23, 2008) (attached as Exhibit J to Leslie Controls' Opposition). In those cases, the waivers or disclaimers at issue were not as broad as the waiver filed by Plaintiff in this matter. The Court thus finds that these authorities are inapposite.

Leslie Controls argues that Plaintiff's waiver was not effective. However, as the court held in *Westbrook*, this Court "sees no reason not to hold plaintiff [] to [his] waiver of claims arising out of work done on federal jobsites and vessels" against Leslie Controls. *See Westbrook, 2001 U.S. Dist. LEXIS 11575, 2001 WL 902642, *3*. If Plaintiff subsequently attempts **[*9]** to bring such claims against Leslie Controls, and is allowed to by the state court despite Plaintiff's waiver and dismissal, Leslie Controls can remove this matter at that time. Accordingly, the Court GRANTS Plaintiff's motion to remand.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion to remand is GRANTED and this matter shall be remanded to the Superior Court for the City and County of San Francisco. Because this Court is remanding the case,

Leslie Controls' motion to stay is DENIED AS MOOT.

**IT IS SO ORDERED**.

Dated: October 21, 2009

/s/ Jeffrey S. White

JEFFREY S. WHITE

UNITED STATES DISTRICT JUDGE

---

**End of Document**

 Caution
As of: April 8, 2024 9:12 PM Z

# *Maine v. 3M Co.*

United States District Court for the District of Maine

July 26, 2023, Decided; July 26, 2023, Filed

No. 2:23-cv-00210-JAW

**Reporter**
2023 U.S. Dist. LEXIS 128740 *; 2023 WL 4758816

STATE OF MAINE, Plaintiff, v. 3M COMPANY, et al., Defendants.

**Subsequent History:** Appeal filed, 08/31/2023

**Prior History:** *In re Aqueous Film-Forming Foams Prods. Liab. Litig., 357 F. Supp. 3d 1391, 2018 U.S. Dist. LEXIS 206582, 2018 WL 6427189 (J.P.M.L., Dec. 7, 2018)*

## Core Terms

Non-AFFF, lawsuit, federal official, removal, contamination, Reply, motion to stay, federal enclaves, disclaimer, Surreply, federal jurisdiction, federal court, Notice, district court, sites, Expedited, parties, argues, cases, Briefing, contends, Aqueous, Foam, multidistrict litigation, express disclaimer, transfer order, state court, transferred, commingled, complaints

**Counsel:  [*1]** For STATE OF MAINE, Plaintiff: AARON M. FREY, LEAD ATTORNEY, OFFICE OF THE MAINE ATTORNEY GENERAL, AUGUSTA, ME; BENJAMIN A. KRASS, MATT F. PAWA, LEAD ATTORNEYS, PRO HAC VICE, SEEGER WEISS LLP, NEWTON CENTRE, MA; JASON HAROLD WILSON, VIOLA VETTER, LEAD ATTORNEYS, PRO HAC VICE, GRANT & EISENHOFER PA, WILMINGTON, DE; KYLE J. MCGEE, LEAD ATTORNEY, PRO HAC VICE, GRANT & EISENHOFER PA, NEW CASTLE, DE; STEVEN J. DAROCI, II, LEAD ATTORNEY, PRO HAC VICE, SEEGER WEISS LLP, RIDGEFIELD PARK, NJ; ROBERT L. MARTIN, III, OFFICE OF THE MAINE ATTORNEY GENERAL, NATURAL RESOURCES DIVISION, AUGUSTA, ME; SCOTT W. BOAK, OFFICE OF THE ATTORNEY GENERAL, AUGUSTA, ME.

For 3M COMPANY, Defendant: DANIEL L. RING, LEAD ATTORNEY, PRO HAC VICE, MAYER BROWN, CHICAGO, IL; JAY S. GELLER, LEAD ATTORNEY, LAW OFFICE OF JAY S. GELLER, FALMOUTH, ME; MICHAEL A. SCODRO, LEAD ATTORNEY, PRO HAC VICE, MAYER, BROWN LLP, CHICAGO, IL.

For EIDP INC, formerly known as E I DU POINT DE NEMOURS AND COMPANY, CHEMOURS COMPANY, CHEMOURS COMPANY FC LLC, Defendants: J. WYLIE DONALD, LEAD ATTORNEY, MCCARTER & ENGLISH LLP, WASHINGTON, DC; JEFFREY D. TALBERT, LEAD ATTORNEY, PRETI, FLAHERTY, PORTLAND, ME; RICHARD DONALD TUCKER, LEAD ATTORNEY, TUCKER **[*2]**  LAW GROUP, BANGOR, ME.

For CORTEVA INC, DUPONT DE NEMOURS INC, Defendants: J. WYLIE DONALD, LEAD ATTORNEY, MCCARTER & ENGLISH LLP, WASHINGTON, DC; JEFFREY D. TALBERT, LEAD ATTORNEY, PRETI, FLAHERTY, PORTLAND, ME; KAYLA ESTES, RICHARD DONALD TUCKER, LEAD ATTORNEYS, TUCKER LAW GROUP, BANGOR, ME.

**Judges:** JOHN A. WOODCOCK, JR., UNITED STATES DISTRICT JUDGE.

**Opinion by:** JOHN A. WOODCOCK, JR.

## Opinion

### ORDER ON MOTIONS TO REMAND AND STAY

Based on a state plaintiff's express and enforceable disclaimer against seeking recovery in this lawsuit from the defendants for claims relating to aqueous film-forming foam, the sole basis for federal jurisdiction, this Court concludes that it does not have jurisdiction over a parens patriae lawsuit against manufacturers of per- and polyfluoroalkyl substances and grants the state's motion to remand the case to state court. The Court declines to stay ruling on the motion to remand while the United States Judicial Panel on Multidistrict Litigation rules on a motion to transfer the case to a multidistrict litigation proceeding because the Court has determined

2023 U.S. Dist. LEXIS 128740, *2

that in any event, it does not have jurisdiction over the lawsuit.

# I. BACKGROUND

## A. Two Lawsuits

On March 29, 2023, the state of Maine (Maine **[*3]** or State) in its parens patriae[1] capacity filed two separate civil actions against 3M Company and other defendants (collectively 3M) in state of Maine Superior Court for Cumberland County. *Notice of Removal, State of Me. v. 3M Co.*, No. 2:23-cv-00197-JAW, Attach. 3, *Compl.*, (ECF No. 1) (*AFFF Compl.*), *id., State Ct. R.*, Attach. 1, *State Ct. Docket* (filed under state docket number PORSC-CV-2023-00122) (ECF No. 9); *Notice of Removal, State of Me. v. 3M Co.*, No. 2:23-cv-00210-JAW, Attach. 3, *Compl.*, (ECF No. 1) (*Non-AFFF Compl.*), *id., State Ct. R.*, Attach. 1, *State Ct. Docket* (filed under state docket number PORSC-CV-2023-00121) (ECF No. 15). Both lawsuits involve per- and polyfluoroalkyl substances (PFAS). But the first lawsuit — docket number 2:23-cv-00197-JAW — is directed to the use of aqueous film-forming foam, and the second lawsuit — docket number 2:23-cv-00210-JAW — is not. The parties refer to the two complaints as either the AFFF Complaint (2:23-cv-00197-JAW) or the Non-AFFF Complaint (2:23-cv-00210-JAW).

## B. The AFFF Complaint

Turning first to the AFFF Complaint, 3M removed the case from state to federal court on May 8, 2023. *Notice of Removal* (ECF No. 1). On May 24, 2023, the United States Judicial Panel on Multidistrict Litigation (JPML) issued a conditional transfer order, accepting the case as a tag-along action for transfer to the United States District Court for the District of South Carolina in *In re: Aqueous Film- Forming Foam Products Liability Litigation, MDL Conditional Transfer Order* (ECF No. 14) (MDL Litigation). On June 9, 2023, that order was certified, *id., MDL Conditional Transfer Order* (ECF **[*4]** No. 15), and the Clerk's Office electronically transferred

the case to the MDL in United States District Court for the District of South Carolina. (ECF No. 16). The transfer of the AFFF Complaint to the District of South Carolina appears noncontroversial.

## C. The Non-AFFF Complaint

The same cannot be said for the Non-AFFF Complaint. On May 17, 2023, 3M removed the case to this Court. *Case No. 2:23-cv-00210-JAW, Notice of Removal* (ECF No. 1). On May 25, 2023, the State moved to remand the case to state of Maine Superior Court and for expedited briefing. *State of Me.'s Mot. to Remand* (ECF No. 10) (*Mot. to Remand*); *State of Me.'s Mot. for Expedited Briefing and Consideration of Mot. to Remand* (ECF No. 11). On June 1, 2023, the JPML declined to accept the Non-AFFF Complaint as part of the MDL Litigation. *Notice of Counsel* (ECF No. 18). On June 8, 2023, 3M filed a motion to stay the Non-AFFF litigation until the JPML resolves 3M's motion to transfer the Non-AFFF Litigation to the District of South Carolina for disposition with the MDL Litigation there. *Def. 3M Company's Mot. to Stay* (ECF No. 31) (*Mot. to Stay*). On June 15, 2023, 3M responded to the State's motion to remand and the State responded **[*5]** to 3M's motion to stay. *Def. 3M Company's Obj. to State of Me.'s Mot. to Remand* (ECF No. 34) (*3M Remand Opp'n*); *Pl.'s Opp'n to Def. 3M Company's Mot. to Stay* (ECF No. 35) (*State's Stay Opp'n*). On June 22, 2023, 3M filed a reply in support of its motion to stay and the State filed a reply in support of its motion to remand. *Def. 3M Company's Reply in Support of Mot. to Stay* (ECF No. 37) (*3M Stay Reply*); *State of Me.'s Reply in Support of Mot. to Remand* (ECF No. 38) (*State Remand Reply*).

## D. The Motions to Strike, File a Surreply, and Expedite Briefing

On June 27, 2023, 3M filed a motion to strike or, in the alternative, a motion for leave to file a surreply. *Def. 3M Company's Mot. to Strike Decl. and Portions of Pl.'s Reply in Support of Mot. to Remand or, in the Alternative, for Leave to File Surreply* (ECF No. 39) (*3M's Mot. to Strike*). On July 1, 2023, the State filed an opposition to the motion to strike or file surreply. *Pl. State of Me.'s Opp'n to Def. 3M Company's Mot. to Strike Decl. and Portions of Pl.'s Reply in Support of Mot. to Remand or, in the Alternative, for Leave to File Surreply* (ECF No. 41) (*State's Strike Opp'n*). On July 1, 2023, the State also filed a motion for expedited **[*6]** briefing and consideration of 3M's motion to strike or file

---

[1] A parens patriae lawsuit "involves a matter of sovereign or quasi-sovereign interest and is brought by a state on behalf of all its citizens." *New Hampshire v. 3M Corporation, No. 22-cv-145-LM, 2023 U.S. Dist. LEXIS 53461, at*3 n.1 (D.N.H. March 29, 2023)* (citation and internal quotations omitted).

surreply. *Pl. State of Me.'s Mot. for Expedited Briefing and Consideration of 3M's Mot. to Strike Decl. and Portions of Pl.'s Reply in Support of Mot. to Remand or, in the Alternative, for Leave to File Surreply* (ECF No. 42) (*State's Expedited Mot.*).

On July 5, 2023, the Court addressed and resolved a controversy between the parties concerning the motion to strike, the motion to stay, and the motion for expedited briefing. *Order on Mot. to Strike, Mot. to Stay, and Mot. for Expedited Briefing* (ECF No. 44). On July 12, 2023, 3M filed a surreply, *3M Co.'s Surreply in Opp'n to Mot. to Remand* (ECF No. 45) (*3M's Surreply*), and on July 17, 2023, the State filed a surrebuttal. *State of Maine's Rebuttal to Def. 3M Co.'s Surreply to State of Maine's Mot. to Remand* (ECF No. 46) (*State Surrebuttal*).

## II. THE CONTROVERSY

In filing two lawsuits in state court, the State has attempted to make a "sharp distinction" between PFAS and AFFF contamination with one lawsuit devoted to PFAS contamination and the other to AFFF contamination. *Mot. to Remand* at 5. By its drafting of the two complaints, the State has chosen a state court forum for its Non-AFFF **[*7]** complaint, while conceding the federal forum for its AFFF claims. *Id.*

In its opposition to the State's motion to remand, 3M contends that the "State's attempt to split its claims and plead around federal jurisdiction fails." *3M's Remand Opp'n* at 1. 3M explains that the AFFF claims fall within federal jurisdiction because AFFF was manufactured in compliance with specifications from the United States Military (MilSpec AFFF) and therefore are subject to federal officer jurisdiction. *Id.* 3M maintains that AFFF and Non-AFFF sources of contamination are commingled and at the very least, 3M has the right to also assert federal government contractor defenses to the Non-AFFF claims. *Id.* at 6. This dispute also provides the context for 3M's motion to stay in which 3M is asking the Court to delay disposition of the motion to remand until the JPML issues a ruling on whether the Non-AFFF lawsuit may be accepted into the MDL Litigation. *Mot. to Stay* at 1-14.

In its opposition to the motion to stay, the State attached a sworn declaration of Victoria Eleftheriou. *State's Stay Opp'n*, Attach. 1, *Decl. of Victoria Eleftheriou in Support of Pl.'s Opp'n to 3M Company's Mot. to Stay* (*Eleftheriou Decl.*). Ms. **[*8]** Eleftheriou, the Deputy Director of the Maine Department of Environmental Protection's Bureau

of Remediation and Waste Management, essentially reviews the specific sites that are the subject of the Non-AFFF contamination litigation and represents that there is no evidence of AFFF contamination in those PFAS sites. *Id.* at 1-7.

This description sets the stage for the State's motion to remand and 3M's motion to stay, except to note that from the perspective of the State, there is some urgency. After June 1, 2023, when the JPML declined to accept transfer of the Non-AFFF lawsuit into the MDL Litigation, 3M moved for the JPML to accept the Non-AFFF lawsuit. *3M's Mot. to Stay* at 3-4. The parties later received notice that the JPML would hear 3M's transfer motion at its meeting on July 27, 2023. *3M Stay Reply*, Attach. 1, *JPML Notice of Hr'g Session* at 4. The State is very concerned that once 3M's motion to transfer is considered by the JPML, it will substantially delay the disposition of its motion to remand. *State Stay Opp'n* at 13. The State therefore has urged the Court to issue a ruling on the motion to remand before the JPML acts on 3M's motion to transfer and 3M has urged the Court to **[*9]** delay ruling on the motion to remand until the JPML has issued its ruling.

## III. THE POSITIONS OF THE PARTIES

### A. The Motion to Remand

#### 1. The State's Motion to Remand

On May 25, 2023, the State moved to remand this case to state of Maine Superior Court. *Mot. to Remand* at 5-15. First, the State stresses that it deliberately split its civil actions between the AFFF and the Non-AFFF lawsuits. *Id.* at 5. The AFFF lawsuit is now subject to the MDL Litigation in South Carolina and the State nowhere argues that this transfer was improper. *Id.* at 5-15. By contrast, in its Non-AFFF lawsuit, the State expressly disclaimed "seeking relief for AFFF-related contamination: 'The State is not seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam.'" *Id.* at 9 (quoting *Compl.* ¶ 15).

For the AFFF complaint, the State acknowledges that this Court may have jurisdiction under so-called "federal officer jurisdiction". *Id.* at 6. Federal officer jurisdiction can be a "colorable federal defense to [a] lawsuit," where there is a "nexus between the allegations in the

complaint and conduct undertaken at the behest of a federal officer." *Id.* at 6-7 (quoting *[\*10] Rhode Island v. Shell Oil Prods. Co., 979 F.3d 50, 59 (1st Cir. 2020)*, vacated on other grounds 141 S. Ct. 2666 (2021) (Rhode Island I, 141 S. Ct. 2666, 210 L. Ed. 2d 830 (2021) (Rhode Island I)). However, the State contends that federal officer jurisdiction is not available for the Non-AFFF complaint. *Id.* at 6-7.

The State observes that to establish federal officer jurisdiction, 3M points to four sites — the Army National Guard facility in Bangor, the former Loring Air Force Base in Aroostook County, the former Brunswick Naval Air Station, and the Portsmouth Naval Shipyard — where 3M asserts that PFAS and AFFF were commingled. *Id.* at 7-8. But the State says that there is no evidence of commingling on any of these four sites. *Id.* Moreover, the State goes on to state that none of these four sites was identified in its Non-AFFF complaint. *Id.* at 8-9. In addition, the State reiterates that even if 3M could demonstrate commingling, the State disclaimed in this lawsuit any relief from the Non-AFFF complaint. *Id.* at 9. For support, the State points to two court decisions in the First Circuit: *New Hampshire v. 3M Corporation, No. 22-cv-145-LM, 2023 U.S. Dist. LEXIS 53461 (D.N.H. Mar. 29, 2023)* and *Rhode Island I, 979 F.3d 50*. The State then distinguishes the cases it anticipated 3M would cite for support. *Id.* at 9-13.

There is a second possible source of federal jurisdiction — federal enclave jurisdiction. *Id.* at 14. The State anticipates that 3M will maintain that Portsmouth Naval *[\*11]* Shipyard and the Brunswick Naval Air Station were federal enclaves, thereby affording federal jurisdiction. *Id.* But the State relies on a First Circuit case, *Rhode Island v. Shell Oil Products, Company, 35 F.4th 44 (1st Cir. 2022)* (*Rhode Island II*), to argue that federal enclave jurisdiction is not available to 3M. *Id.*

**2. 3M's Opposition to Remand**

3M begins its opposition by disputing the premise of the State's argument: namely, that PFS and AFFF sources of contamination can be neatly separated. *3M Remand Opp'n* at 5-6. Instead, 3M says that "PFAS can move through the environment — both from natural processes like transport in groundwater and because people collect, move and spread PFAS-containing waste — so PFAS from AFFF and non-AFFF sources plausibly have *commingled* at various locations." *Id.* at 6 (emphasis in original). 3M maintains that "MilSpec AFFF thus is at issue even in this putative 'non-AFFF' case for statewide

damages." *Id.* 3M contends that AFFF was used in military sites throughout Maine and that the State alleged in its AFFF lawsuit that PFAS and AFFF contaminated sites throughout the state of Maine. *Id.* at 8-9. 3M relies particularly on *Nessel v. Chemguard, Inc., No. 1:20-cv-1080, 2021 U.S. Dist. LEXIS 39175 (W.D. Mich. Jan. 6, 2021)* and *In Re AFFF Products Liability Litigation*, No. 18-nm-2873, ECF No. 325 (D.S.C. Oct. 1, 2019). *Id.* at 10-11. 3M says that the *New Hampshire* case was "wrongly decided" and notes that it is currently *[\*12]* on appeal before the First Circuit. *Id.* at 6, n.3.

3M posits that the State's disclaimer of AFFF liability does not preclude federal jurisdiction. *Id.* at 13. This is because, 3M observes, the well-pleaded complaint rule does not apply to federal officer removal. *Id.* 3M then disputes the State's interpretation of relevant caselaw. *Id.* at 13-16.

Regarding federal enclave jurisdiction, 3M says that the State does not dispute that Brunswick Naval Air Station and Portsmouth Naval Shipyard were federal enclaves and used AFFF. *Id.* at 16. 3M argues that this Court therefore has supplemental jurisdiction over the state claims. *Id.* at 16-17.

**3. The State's Reply**

In reply, the State contends that 3M's arguments in favor of federal jurisdiction are "conclusory, speculative and controverted by actual evidence." *State Remand Reply* at 5. The State analyzes each case 3M cited and maintains that they do not support 3M's contentions. *Id.* at 7-9. Discussing *Rhode Island II*, the State writes that this case does not support federal jurisdiction because all pertinent events did not take place on the federal enclaves. *Id.* at 10-11.

**4. 3M's Surreply**

In its surreply, 3M focuses on the sworn declaration of Victoria *[\*13]* Eleftheriou (attached to the State's reply to the motion to stay), and argues that the Court should not consider her statements for three reasons: (1) because they are "legally irrelevant to whether 3M adequately alleged a plausible basis for federal officer jurisdiction in its Notice of Removal," (2) even if the Court considered the Eleftheriou statements, they "do not address — much less controvert — most of the facts 3M averred in support of federal officer jurisdiction," and (3) it would be "error to order remand based on the

2023 U.S. Dist. LEXIS 128740, *13

Declaration without giving 3M a fair opportunity to contest it." *3M Surreply* at 1.

### 5. The State's Surrebuttal

In its surrebuttal, the State argues that 3M has conceded that the lawsuits involving two water districts, which were the subject of Deputy Director Eleftheriou's declaration, are irrelevant to the Court's remand determination. *State's Surrebuttal* at 8. But the State's overall response is that the Court does not need to consider the Eleftheriou declaration to rule on the motion to remand. *Id.* at 4. Finally, the State rejects 3M's discovery demand, pointing out that the Eleftheriou declaration's reference to the water districts is not mentioned in the **[*14]** 3M Notice of Removal and that 3M has not created a reasonable expectation that discovery would reveal facts relevant to the Court's remand decision. *Id.* at 10. The State ends by arguing that "3M does not want discovery, it wants delay." *Id.* at 11.

### B. The Motion to Stay

### 1. 3M's Motion to Stay

On June 8, 2023, 3M moved this Court to defer action on the State's motion to remand until the JPML has ruled on its motion for transfer. *3M's Stay Mot.* at 1-10. Quoting *Good v. Altria Group, Inc., 624 F. Supp. 2d 132 (D. Me. 2009)*, 3M points out that "[c]ourts frequently grant stays pending a decision by the [JPML] regarding whether to transfer a case." *Id.* at 5 (quoting *Good, 624 F. Supp. 2d at 134*). 3M notes that if the JPML accepts the case for transfer, the MDL would have the authority to rule on the motion to remand, and a MDL ruling on the motion to remand would have the benefit of consistency and judicial economy. *Id.* at 6.

3M then argues that this case would be a "good candidate for transfer" to the MDL. *Id.* 3M observes that the State's other AFFF case has already been transferred to the MDL. *Id.* 3M contends that the JPML has accepted transfer in other cases similar to Maine's Non-AFFF case on the ground that the same water sources were involved. *Id.* at 6-7.

3M discounts any prejudice **[*15]** to the state of Maine by a stay. *Id.* at 7-8. 3M notes that the JPML is scheduled to hear the motion for transfer on July 27,

2023,[2] and it asserts that the JPML typically issues a decision on a motion for transfer within a week or two of the hearing session. *Id.* By contrast, if this Court issues an order on the motion to remand, 3M raises the specter of inconsistent remand decisions, which it argues would greatly prejudice 3M. *Id.*

### 2. The State's Opposition to the Motion to Stay

The State strenuously objects to 3M's motion to stay. *State Stay Opp'n* at 1-14. The State's main point is that the JPML will not address the issue the State has raised: namely, whether federal jurisdiction is proper for this Court. *Id.* at 5. The State maintains that the JPML "reviews only whether, on the face of the various complaints, there is apparent overlap between a given complaint and an MDL." *Id.* The State contends that to allow the JPML to consider whether to accept this case would "needless delay the case even as the State urgently seeks to move it forward to obtain the funds needed to clean up Maine's environment." *Id.* The State says that **[*16]** "[i]n view of established principles of comity and federalism, subject mater jurisdiction can and should be decided at the very outset of the litigation, particularly in a case brought by the sovereign in its own state's court." *Id.*

### 3. 3M's Reply to the State's Stay Opposition

In its reply, 3M cites *Good* and other cases, in which courts have granted a stay to allow the JPML to rule on whether it would accept transfer into the MDL. *3M's Stay Reply* at 4-8. Alternatively, 3M argues that the analysis in *Meyers v. Bayer AG, 143 F. Supp. 2d 1044 (E.D. Wisc. 2001)* counsels against deciding the jurisdictional issue here because 3M views the jurisdictional issue as factually and legally complex. *Id.* at 8-9. 3M deflects any prejudice on the part of the State from a stay and requests that the Court defer decision until the JPML has decided the pending motion to transfer. *Id.* at 10.

### IV. DISCUSSION

---------------------------

[2] At the filing of 3M's motion, it was unclear whether the JPML would hear the 3M motion for transfer on July 27, 2023 or September 28, 2023. *3M Stay Mot.* at 8. Since then, the JPML scheduled the motion for transfer without oral argument for the hearing session of July 27, 2023. *3M Stay Reply, Attach. 1, JPML Notice of Hr'g Session* at 4.

2023 U.S. Dist. LEXIS 128740, *16

Preliminarily, this Court retains jurisdiction to consider the motion to remand: "The pendency of a motion, order to show cause, conditional transfer order or conditional remand order before the Panel pursuant to *28 U.S.C. § 1407* does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that **[\*17]** court." *Nessel, 2021 U.S. Dist. LEXIS 39175, at \*5-6* (quoting *JPML R*. 2.1(d)).

In analyzing the dueling motions to stay and remand, the Court is fortunate that it does not operate from a blank slate. First, the Court finds persuasive the "three-step methodology" for "balance[ing] the imperative of ensuring federal jurisdiction and the benefits of multidistrict litigation" announced in *Meyers, 143 F. Supp. 2d at 1049* and recently applied in the District of Maine in *Eastern Maine Medical Center v. Teva Pharmaceuticals USA Inc., 581 F. Supp. 3d 281, 285-86 (D. Me. 2022)*. The Court adopts Chief Judge Levy's observation that "[t]his three-step approach appropriately accommodates the fundamentality of subject-matter jurisdiction within the federal system and the virtues of judicial economy, efficiency, and consistency promoted by multidistrict litigation." *Id.* In *Eastern Maine*, quoting *Meyers*, Chief Judge Levy described the three-step methodology:

> First, if a "preliminary assessment suggests that removal was improper, the court should promptly . . . remand the case to state court." *Meyers, 143 F. Supp. 2d at 1049*. But if the preliminary assessment instead reveals that the jurisdictional issue is "factually or legally difficult, the court's second step should be to determine whether identical or similar jurisdictional issues have been raised in other cases that have been or may be transferred to the" multidistrict litigation. *Id.* **[\*18]** If so, "the court proceed[s] to the third step and consider[s] the motion to stay," although this third step "does not mandate that a stay should be granted." *Id.*

*E. Maine, 581 F. Supp. 3d at 285*. In accordance with the first step of the three-step methodology, the Court turns first to the motion to remand and next addresses the motion for stay. Next, in addressing the first step of the *Meyers* analysis, the Court has the benefit of a recent decision on a similar question authored by *Chief Judge Landya McCafferty of the District of New Hampshire in New Hampshire, 2023 U.S. Dist. LEXIS 53461, at \*1-28*, a case currently on appeal to the Court of Appeals for the First Circuit.

## A. Motion to Remand

In the two state of Maine complaints, the State has sought to proceed on two distinct factual and legal theories: an AFFF lawsuit, which it concedes has been properly transferred to the MDL, and a Non-AFFF lawsuit, which it contends is not subject to federal jurisdiction. In a typical case, the State as plaintiff is the "master" of its complaint. *The Fair v. Kohler Die and Specialty Co., 228 U.S. 22, 25, 33 S. Ct. 410, 57 L. Ed. 716, 1913 Dec. Comm'r Pat. 530 (1913)* (Holmes, J.). This precept known as the "well-pleaded complaint rule" concentrates a court's attention "on the complaint's terms" and its analysis is "unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose." *Rhode Island II, 35 F.4th at 51* (citing *Taylor v. Anderson, 234 U.S. 74, 75-76, 34 S. Ct. 724, 58 L. Ed. 1218 (1914)*). Based on this precept **[\*19]** alone, the State's position on remand would be unassailable because the State-drafted complaints carefully differentiate between the AFFF and Non-AFFF lawsuits, and the Non-AFFF complaint, especially given its disavowal of any AFFF claim, would be appropriate for remand. *See New Hampshire, 2023 U.S. Dist. LEXIS 53461, at \*28* ("[I]n most circumstances, the non-federal cast of a complaint would prevent a defendant from removing it"); *Rhode Island II, 35 F.4th at 51*. Thus, to the extent 3M purports to remove this case to federal court pursuant to *28 U.S.C. § 1441*, *see Notice of Removal* at 1 ("Defendant 3M Company [3M] by undersigned counsel hereby gives notice of removal of this action, pursuant to *28 U.S.C. §§ 1331*, *1441*, *1442(a)(1)*, and *1446*"), a straightforward review of the Non-AFFF complaint would dictate remand.

But federal jurisdictional law is seldom so simple. As a basis for removal, 3M also invokes *§ 1442(a)(1)*, the federal officer removal statute. In 1999, the United States Supreme Court wrote:

> To remove a case as one falling within federal-question jurisdiction, the federal question ordinarily must appear on the face of a properly pleaded complaint; an anticipated or actual federal defense generally does not qualify a case for removal. *See Louisville & N. R. Co. v. Mottley, 211 U.S. 149, 29 S. Ct. 42, 53 L. Ed. 126 (1908)*. Suits against federal officers are exceptional in this regard. Under the federal **[\*20]** officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal

question element is met if the defense depends on federal law.

*Jefferson Cnty., Ala. v. Acker, 527 U.S. 423, 430-31, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)*. Since *Jefferson County*, Congress broadened the application of the federal officer removal statute to include cases where there is only a connection or association between the act in question and the federal office. *See Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 258 (4th Cir. 2017)*.[3]

Judge McCafferty explained the nexus requirement:

The requirement that a claim be "for" or "relate to" the alleged federal authority is a "nexus" requirement, but not a causation requirement. *Moore [v. Elec. Boat Corp.,] 25 F.4th [30,] 34 & n.2 [1st Cir. 2022]*. That is, only a "nexus" between the claims and the alleged official authority need exist; it is sufficient that at least one of the plaintiff's claims is "connected" or "associated" with the defendant's acts under color of federal office. *Baker v. Atlantic Richfield Co., 962 F.3d 937, 943-44 (7th Cir. 2020)* (explaining that 2011 amendments to *§ 1442(a)(1)* removed requirement of causal connection and collecting appellate cases holding likewise).

*New Hampshire, 2023 U.S. Dist. LEXIS 53461, at *21-22*.

Applying this precedent, the Court turns to whether there is a connection or association between the allegations in the Non-AFFF lawsuit and a federal office. The Court briefly returns **[*21]** to the legal standards. In

---

[3] In *Sawyer v. Foster Wheeler, LLC, 860 F.3d 249 (4th Cir. 2017)*, the Fourth Circuit observed that before 2011, the statutory test in *§ 1442* was whether "there was a causal connection between the charged conduct and the asserted official authority." *Id. at 258* (quoting *Jefferson Cnty., 527 U.S. at 431*). However, in 2011, Congress broadened *§ 1442(a)(1)* to cover actions "for *or relating to* any act under color of [federal] office," adding the words "or relating to" *Removal Clarification Act of 2011, Publ. L. No. 112-51, 125 Stat. 545. Id.* (emphasis in *Sawyer*). This new language "broaden[ed] the universe of acts" that enable federal removal, H.R. Rep. 112-17, 6, 2011 U.S.C.C.A.N. 420, 425, such that there need be only "'a *connection or association* between the act in question and the federal office.'" *Papp v. Fore-Kast Sales Co., 842 F.3d 805, 813 (3d Cir. 2016)* (emphasis added) (quoting *In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Defender Assoc., 790 F.3d 457, 471 (3d Cir. 2015)*).

*Rhode Island I*, the First Circuit described the standard:

Private actors sued in state court can remove the case to federal court where the private actor is "acting under [any federal officer], for any act under color of such office." *28 U.S.C. § 1442(a)(1); accord Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 486-87 (1st Cir. 1989)*. "Acting under" connotes "subjection, guidance, or control" and involves "an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos., 551 U.S. 142, 152, 127 S. Ct. 2301, 168 L. Ed. 2d 42 (2007)* (citations omitted).

*979 F.3d at 59*. The *Rhode Island I* Court went on to state:

To succeed in their argument that federal-officer removal is proper in this case, the oil companies must show that they were acting under a federal officer's authority, that they will assert a colorable federal defense to the suit, and that there exists "a nexus" between the allegations in the complaint and conduct undertaken at the behest of a federal officer. *Jefferson Cty., 527 U.S. at 431* (internal quotation marks and citations omitted). If the oil companies cannot demonstrate all three of these elements, they cannot remove the case to federal court under *§ 1442*.

*Id.* As Chief Judge McCaffrey noted, unlike a *§ 1441* removal, a removal under *§ 1442(a)(1)* "is broadly construed 'in favor of removal.'" *New Hampshire, 2023 U.S. Dist. LEXIS 53461, at *21* (citing *Watson, 551 U.S. at 147-48* (emphasis in *New Hampshire*). This is **[*22]** because "[o]ne of the primary purposes of the removal statute—as its history clearly demonstrates—was to have such defenses litigated in federal court." *Id.* (quoting *Willingham v. Morgan, 395 U.S. 402, 406, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969)*). At the same time, 3M "bears the burden under *§ 1442(a)(1)*." *Moore, 25 F.4th at 34*.

In its Non-AFFF complaint against 3M, the State has made it plain that it is "not seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam, a firefighting material that contains PFAS." *Non-AFFF Compl.* ¶ 15. In addition to this allegation in the Non-AFFF Complaint, the State has represented in its filings that "[i]f it does turn out that contamination in *any* particular site or location is related to AFFF, then the State has disclaimed seeking a recovery in this action for that site

or location." *State's Remand Mot.* at 9 (emphasis in original).

Despite the State's disclaimer and the State's second AFFF lawsuit, 3M maintains that this Court should retain this case under its federal officer jurisdiction. *3M's Remand Opp'n* at 1-17. 3M first observes that PFAS can "move through the environment—both from natural processes like transport in groundwater and because people collect, move, and spread PFAS-containing waste—so [*23] PFAS from AFFF and non-AFFF sources plausibly have *commingled* at various locations." *Id.* at 6 (emphasis in original). If so, 3M says that it "has the right to defend itself by raising the issue of whether alleged 'non-AFFF' PFAS contamination may actually derive from MilSpec AFFF, and by asserting its federal government contractor defense as to any claimed damaged from MilSpec AFFF." *Id.* Next, 3M argues that it properly removed the case based on "federal enclave jurisdiction" because "PFAS from AFFF and non-AFFF products plausibly were released from military bases in Maine that are federal enclaves." *Id.*

In support of its position, 3M points to four and sometimes five military facilities throughout the state of Maine, Brunswick Naval Air Station, Portsmouth Naval Shipyard, Loring Air Force Base, Bangor Air National Guard Base, and the Cutler Naval Air Station, that the State claims in its AFFF Complaint caused PFAS contamination in groundwater "*throughout the State.*" *Id.* at 4 (quoting *AFFF Compl.* ¶ 224) (emphasis in *3M Remand Opp'n*); *see Notice of Removal* at 10.

Although the parties fence about seepage of AFFF contamination in specific instances, such as military installations and water [*24] districts, the determinative question rests on the interplay between the asserted federal affirmative defense and a motion to remand. In *Jefferson County*, the Supreme Court addressed how a district court is to approach the assertion of an affirmative defense as the basis for federal jurisdiction. *527 U.S. at 431*. The *Jefferson County* Court required that the affirmative defense be "colorable," *id.*, and noted that courts should not construe the federal defense requirement with a "narrow, grudging interpretation" because "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Id.* (quoting *Willingham, 395 U.S. at 407*). Thus, as the Supreme Court observed in *Kircher v. Putnam Funds Trust, 547 U.S. 633, 126 S. Ct. 2145, 165 L. Ed. 2d 92 (2006)*, "[t]he federal officer removal statue allows 'suits against federal officer [to] be removed despite the

nonfederal cast of the complaint,' *id. at 645 n.9*, (quoting *Jefferson Cnty., 527 U.S. at 431*), and reflects a congressional policy that 'federal officers, and indeed the Federal Government itself, require the protection of a federal forum.'" *Id.* (quoting *Willingham, 395 U.S. at 407*).

Although the First Circuit has not used this term, courts sometimes describe the burden on the removing party as making a "plausible" claim of federal officer defense. *See Graves v. 3MCo., 17 F.4th 764, 771 (8th Cir. 2021)* ("For a defense [*25] to be considered colorable, it need only be plausible") (citation omitted); *Bennett v. MIS Corp., 607 F.3d 1076, 1089 (6th Cir. 2010)*; *Magnin v. Teledyne Cont'l Motors, 91 F.3d 1424, 1427 (11th Cir. 1996)*.

Applying these principles to AFFF and Non-AFFF litigation, the district courts in *New Hampshire* and *Nessel* reached different conclusions. As here, in *Nessel*, the state of Michigan attempted to strictly divide two lawsuits—one AFFF and the other Non-AFFF—but the district court rejected the distinction, noting that "Plaintiffs cannot decide what defense Defendants might present." *Nessel, 2021 U.S. Dist. LEXIS 39175, at *10*. The *Nessel* Court wrote that "while Plaintiffs attempt to surgically divide their complaints between Commercial and MilSpec AFFF, they cannot prevent Defendants from raising the production of MilSPec AFFF as a defense or an alternative theory, particularly when *Plaintiffs admit* that Defendants produced MilSpec AFF and that PFAS from AFFF spread contamination throughout the state." *Id.* The district court concluded that "Plaintiffs' artful pleading does not obviate the facts on the ground." *Id.* at *10-11.

Against *Nessel* is *New Hampshire*. In *New Hampshire*, the district court focused on the "specific limitations on the scope of [the] plaintiff's claims" and concluded that these limitations "eliminate a potential relationship between the [*26] plaintiff's claims and a defendant's federal acts." *2023 U.S. Dist. LEXIS 53461, at *22*. The district judge noted two other cases, where district courts honored similar disclaimers. *Id. at *22-24* (citing *Hayden v. 3M, No. 15-2275, 2015 U.S. Dist. LEXIS 104534, at *3-4 (E.D. La. Aug. 10, 2015)*; *Batchelor v. Am. Optical Corp., 185 F. Supp. 3d 1358, 1363-64 (S.D. Fla. 2016)* (stating that federal courts have "consistently" granted motions to remand in cases where the plaintiff expressly disclaims recovery for claims on which federal removal is based)). The *New Hampshire* Court distinguished *Nessel* on the ground that *Nessel* involved "two different kinds of AFFF",

whereas *New Hampshire* addressed, as here, AFFF and Non-AFFF contamination. *Id. at *26-27* ("Here, unlike *Nessel*, whether an alternative source of contamination was MilSpec AFFF is irrelevant because this suit does not involve AFFF, regardless of whether it is MilSpec of another version of AFFF").

Finally, the district judge in *New Hampshire* did not find "the reasoning of *Nessel* persuasive." *Id.* The judge explained:

> If the sources of contamination <u>cannot</u> be distinguished, 3M cannot be held liable. That is, the State will fail to establish its own case, which is premised on the existence of contamination from some non-AFFF source. And, if a factfinder can distinguish the sources of contamination, 3M will prevail to the extent the factfinder **[*27]** determines contamination came from AFFF. This is true regardless of whether 3M supplied the AFFF under federal authority or warned the government about its dangers.

*Id.* (emphasis in original).

On balance, the Court concludes that *New Hampshire* is more persuasive. In *Batchelor*, the district court observed that "Federal courts addressing disclaimer provisions in similar actions have 'recognize[d] a distinction between artful pleading for purposes of circumventing federal officer jurisdiction, and express disclaimers of the claims that serve as the ground for removal under *Section 1442(a)(1)*.'" *Batchelor, 185 F. Supp. 3d at 1363* (quoting *Siders v. 20th Century Glove Corp. of Texas, No. 2:15-cv-13278, 2016 U.S. Dist. LEXIS 57210, at *25 (S.D.W.V. Apr. 29, 2016)* (quoting *Dougherty v. A O Smith Corp., Civil Action No. 13-1972-SLR-SRF, 2014 U.S. Dist. LEXIS 96290, at *36 (D. Del. July 16, 2014)*); *Kelleher v. A.W. Chesterton Co., No. 15-cv-893, SMY-SCW, 2015 U.S. Dist. LEXIS 159783, at *13 (S.D. Ill. Nov. 23, 2015)*; *Madden v. A.H. Voss Co., No. C 09-03786 JSW, 2009 U.S. Dist. LEXIS 101680, at *2-3 (N.D. Cal. Oct. 21, 2009)*. Here, the State's disclaimer is express, unambiguous, and plain, and in the Court's view, fits within the category of express disclaimers courts have found effective to justify a remand order. *Dougherty, 2014 U.S. Dist. LEXIS 96290, at *36* (Where express disclaimers are made, "federal courts have consistently granted motions to remand where the plaintiff expressly disclaimed the claims upon which federal officer removal was based").

Furthermore, as Chief Judge McCafferty pointed out, by its disclaimer, the State has taken upon itself the burden as part of its case to demonstrate that the source of contamination in its Non-AFFF lawsuit is not **[*28]** a AFFF source. If the factfinder concludes that the State has failed to meet its burden concerning the source, 3M will prevail. This effectively means that the federal officer defense will not be applicable in the State's Non-AFFF lawsuit because the State by its express disclaimer has imposed upon itself a burden to demonstrate that its claim involves Non-AFFF sources. *Kelleher, 2015 U.S. Dist. LEXIS 159783, at *11* ("Here, however, Plaintiff's waiver has rendered any federal defenses moot").

In sum, because of the State's express disclaimer, the Court concludes that this case must be remanded to the state of Maine Superior Court since the federal officer defense is not applicable.

Finally, the Court concludes that federal enclave jurisdiction does not plausibly exist because "the doctrine of federal enclave jurisdiction generally requires that *all* pertinent events take place on a federal enclave." *Rhode Island II, 35 F.4th at 58* (emphasis in original). 3M suggests that the Court could assume jurisdiction under federal enclave jurisdiction over one site and then "exercise supplemental jurisdiction . . . arising from other sites." *3M's Remand Opp'n* at 17. But even if Brunswick Naval Air Station and Portsmouth Naval Shipyard could fit within federal enclave jurisdiction, **[*29]** the State has disclaimed any AFFF claims, including those arising from a federal enclave, so the argument circles back to the State's disclaimer.

In sum, because of the State's express disclaimer, the Court concludes that this case must be remanded to the state of Maine Superior Court since the federal officer defense is not applicable.

## B. Motion to Stay

Despite this conclusion, the Court addresses why it resolved this issue before the JPML acted on the motion for transfer and not stay resolution to give the JPML an opportunity to decide for itself whether to accept this case as part of the MDL. Federal courts "possess the inherent power to stay [a case] for prudential reasons." *Microfinancial, Inc. v. Premier Holidays Int'l, Inc., 385 F.3d 72, 77 (1st Cir. 2004)*. In evaluating whether to issue a stay, a court will generally consider three factors: "(1) potential prejudice to the non-moving party, (2) hardship and inequity to the moving party without a

2023 U.S. Dist. LEXIS 128740, *29

stay, and (3) judicial economy." *Good, 624 F. Supp. 2d at 134*. "The party seeking the stay bears the burden of demonstrating that a stay is appropriate." *Maine v. Wheeler, No. 1:14-cv-00264-JDL, 2020 U.S. Dist. LEXIS 12334, at *8-9 (D. Me. Jan. 6, 2020)*. Whether to stay a proceeding in anticipation of a transfer ruling from the JPML rests within a court's discretion. *City of Portland v. Pardue Pharma, LP, No. 2:18-cv-282-NT, 1:18-cv-298-NT, 2:18-cv-310-NT; 2018 U.S. Dist. LEXIS 201070, at *16 (D. Me. Nov.18, 2018)*; *Good, 624 F. Supp. 2d at 134*.

Here, applying *Eastern Maine*, the Court's "preliminary assessment suggests that removal **[*30]** was improper," and therefore, "the court should promptly . . . remand the case to state court." *E. Maine, 581 F. Supp. 3d at 285* (quoting *Meyers, 143 F. Supp. 2d at 1049*). "Generally, motions to remand should be resolved before the panel acts on the motion to transfer so the federal court can assure itself of jurisdiction before the case transfers to the MDL." *Nessel, 2021 U.S. Dist. LEXIS 39175, at *6*.

In addition, although the JPML analysis of whether to accept a case for MDL transfer is similar to this Court's jurisdictional inquiry, they are not the same. The JPML's MDL Transfer Order filed on December 7, 2018, stated that "[a]l of the actions on Schedule A involve allegations that aqueous film-forming foams (AFFFs, which are used to extinguish liquid fuel fires) contaminated the groundwater near certain airports and other industrial locations with perfluorooctane sulfonate (PFOS) and/or perfluorooctanoic acid (PFOA), which allegedly were contained in the AFFFs and are toxic." *In re Aqueous Film-Forming Foams Products Liability Litig.*, No. 2:18-mn-02873-RMG, *Transfer Order* at 1 (ECF No. 1). The JPML concluded that "the AFFF actions listed on Schedule A involve common questions of fact, and that centralization will serve the convenience of the parties and witnesses and promote the just **[*31]** and efficient conduct of this litigation." *Id.* at 3.

When considering whether to grant a motion to transfer a case to an MDL, the standard is found in *28 U.S.C. § 1407*, the statute authorizing multi-district litigation. *Section 1407* provides that the JPML shall transfer a case to an MDL "upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." *Id., see e.g., In re Sonic Corp. Customer Data Sec. Breach Litig., 276 F. Supp. 3d 1382, 1383 (JPML Dec. 6, 2017)* ("On the

basis of the papers filed and the hearing session held, we find that centralization under *Section 1407* in the Norther District of Ohio will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation").

As described here, the jurisdictional issue before this Court does not address the *§ 1407* standards, but whether the Court should assume jurisdiction over the case in the first place. Thus, even if the Court were to stay this matter to allow the JPML to determine whether it is an appropriate MDL case, the jurisdiction question in this case would not be answered by the JPML.

"The district courts of the United States . . . are 'courts of limited jurisdiction. They possess only that power authorized **[*32]** by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs. Inc., 545 U.S. 546, 552, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005)* (quoting *Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)*). "The federal courts are under an independent obligation to examine their own jurisdiction . . .." *FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990)*. In reaching and resolving the jurisdictional question, this Court is acting in accordance with its independent obligation to assure that its jurisdiction over this lawsuit is proper.

Finally, as a practical matter, the Court of Appeals for the First Circuit will resolve 3M's appeal in *New Hampshire* and its resolution may well inform the proper disposition of this case, thus any potential prejudice to 3M is mitigated by the fact that it is currently before the First Circuit on a virtually identical issue and ruling.

## V. CONCLUSION

The Court GRANTS the Plaintiff State of Maine's Motion to Remand (ECF No. 10) and DENIES Defendant 3M Company's Motion to Stay (ECF No. 31). The Court REMANDS this case to the State of Maine Superior Court for Cumberland County.

SO ORDERED.

/s/ John A. Woodcock, Jr.

JOHN A. WOODCOCK, JR.

UNITED STATES DISTRICT JUDGE

Dated this 26th day of July, 2023

 Caution
As of: April 8, 2024 9:13 PM Z

# *Maryland v. 3M Co.*

United States District Court for the District of Maryland

February 12, 2024, Filed

Civil Action No. RDB-23-1836

**Reporter**
2024 U.S. Dist. LEXIS 48428 *; 2024 WL 1152568

STATE OF MARYLAND, Plaintiff, v. 3M COMPANY, et al., Defendants.

**Subsequent History:** Appeal filed, 03/14/2024

## Core Terms

removal, federal enclaves, federal official, disclaimed, contamination, federal court, removal statute, government contractor, state court, colorable, alleges

**Counsel: [*1]** For 3M Company, Defendant: Daniel L Ring, PRO HAC VICE, Mayer Brown, Chicago, IL; Katherine Monks Bleicher, Mayer Brown, Washington, DC.

For Corteva Inc., DuPont de Nemours Inc., EIDP Inc., E.I. Du Pont De Nemours and Company, EIDP Inc., formerly known as, The Chemours Company, Defendants: Jaime Walker Luse, LEAD ATTORNEY, Tydings and Rosenberg LLP, Baltimore, MD; James Wylie Donald, LEAD ATTORNEY, McCarter and English LLP, Washington, DC.

For State of Maryland, Plaintiff: Adam Dean Snyder, LEAD ATTORNEY, Office of the Attorney General-State of Maryland, Baltimore, MD; Alexander Latanision, PRO HAC VICE, Law Offices of John K. Dema PC, Christiansted, VI; Ashley B. Campbell, PRO HAC VICE, Stephanie D. Biehl, PRO HAC VICE, Sher Edling LLP, San Francisco, CA; Derek Yoshio Sugimura, Law Offices of John K. Dema, Alexandria, VA; Fanny B. Turcios, PRO HAC VICE, John D.S. Gilmour, PRO HAC VICE, William J. Jackson, PRO HAC VICE, Kelley Drye & Warren LLP, Houston, TX; Julie Beth Kuspa, Patricia V Tipon, LEAD ATTORNEYS, Maryland Office of the Attorney General, Baltimore, MD; Matthew Spencer Zimmerman, LEAD ATTORNEY, Office of the Attorney General of MD, Baltimore, MD; Melissa E. Byroade, PRO HAC **[*2]** VICE, Kelley Drye & Warren LLP, Washington, DC; Scott E. Kauff, LEAD ATTORNEY, Law Offices of John K. Dema P.C., Rockville, MD.

**Judges:** Richard D. Bennett, Senior United States District Judge.

**Opinion by:** Richard D. Bennett

## Opinion

### MEMORANDUM ORDER

This case was brought by the State of Maryland ("the State") against 3M Company ("3M") and other defendants in the Circuit Court for Baltimore City. It was removed to this Court by 3M, alleging that this Court had jurisdiction under the federal officer removal statute, *28 U.S.C. § 1442(a)(1)*, and that federal enclave jurisdiction provided an alternative basis for removal under *28 U.S.C. §§ 1331* and *1441(a)*. (ECF No. 1 at 3.) The Complaint (ECF No. 5), which is one of a series of complaints brought nationwide, alleges that substances are responsible for groundwater and air contamination. Specifically, the Complaint focuses on per-and polyfluoroalkyl substances ("PFAS"), which allegedly leach into groundwater and contaminate drinking water supplies. The Complaint specifically excludes aqueous film-forming foam ("AFFF"), which are used at airports and military bases to extinguish liquid fuel fires. The State of Maryland brought a separate complaint regarding AFFF that was subject to multidistrict litigation ("MDL") and **[*3]** has now been transferred out of this District. In this case (the non-AFFF PFAS case), this Court previously granted a stay awaiting a determination of whether Defendant 3M's motion to transfer under MDL would be granted. The Judicial Panel on Multidistrict Litigation ("JPML") issued an Order denying transfer on October 4, 2023. (ECF No. 44.)

Because transfer was denied, the State's Motion to Remand to the Circuit Court for Baltimore City (ECF No. 23) must now be addressed. The issues regarding

2024 U.S. Dist. LEXIS 48428, *3

vacating this Court's stay order are moot. The State argues that "neither basis that 3M presents—the federal-officer removal statute, *28 U.S.C. § 1442(a)(1)*, and/or the assertion that the case arose on 'federal enclaves'—" adequately provide a basis for removal. (ECF No. 23-1 at 5.)[1] The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons that follow, the State's Motion to Remand to the Circuit Court for Baltimore City (ECF No. 23) is GRANTED and this case is REMANDED to the Circuit Court of Maryland for Baltimore City.

## BACKGROUND

The facts set forth below are viewed in the light most favorable to Plaintiff, as Defendant 3M bears the burden of demonstrating that **[*4]** removal is proper. *Strawn v. AT&T Mobility, LLC, 530 F.3d 293, 297 (4th Cir. 2008)*. The State of Maryland brought "this action against Defendants to address widespread contamination of its natural resources—particularly the drinking water supplies upon which its citizens depend—with toxic per- and polyfluoroalkyl substances ('PFAS'), including but not limited to perfluorooctane sulfonic acid ('PFOS') and perfluorooctanoic acid ('PFOA')." (ECF No. 5 ¶ 1.) "PFAS are highly fluorinated synthetic chemical compounds that include carbon chains containing at least one carbon atom on which all hydrogen atoms are replaced by fluorine atoms." (*Id.* ¶ 29.) Defendants are manufacturers who have allegedly "designed, manufactured, marketed, and sold products that contain PFAS ('PFAS Products')," including "food packaging, carpeting, cookware, clothing, and upholstery." (*Id.* ¶¶ 2-3.) According to the Complaint, "[t]he PFAS family, including PFOS and PFOA, has characteristics that cause extensive and long-lasting environmental contamination." (*Id.* ¶ 30.) Defendants allegedly "knew for decades that their PFAS were toxic and posed significant risks to human health and the environment," and they allegedly "knew specifically that their PFAS were reaching drinking water **[*5]** supplies and accumulating in people's bodies as they were exposed to the chemicals over time." (*Id.* ¶¶ 4-5.) The Complaint alleges that Defendants "have caused significant PFAS contamination in the State's drinking water, groundwater, surface water, soil, sediment, wildlife,

other natural resources, and property held in trust or otherwise owned by the State." (*Id.* ¶ 8.) The Complaint further alleges "that exposure to PFAS may lead to significant negative health effects," including decreased fertility, developmental delays, increased risk of some cancers, hormonal changes, and increased cholesterol levels. (*Id.* ¶ 10.)

On May 30, 2023, "[t]he State filed the instant Complaint in the Circuit Court for Baltimore City, seeking damages to cover the costs of PFAS-related environmental restoration, remediation, and testing, and also equitable relief for abatement." (ECF No. 23-1 at 1.) The 11-count Complaint raised state-law claims for products liability, public nuisance, trespass, negligence, violations of Maryland's Environmental Article, and fraudulent transfer. (ECF No. 5.) The Complaint included a footnote explaining that the term PFAS, as used in the Complaint, does not "include aqueous **[*6]** film-forming foam ('AFFF') or fluorosurfactants that were designed for and specifically incorporated into AFFF, which are the subject of a separate action." (*Id.* at 3 n.2.) Accordingly, the Complaint alleges that the State, in this action, does not "seek any remediation, restoration, damages, or any other relief related to any PFAS contamination caused by AFFF or fluorosurfactants when used as ingredients of AFFF. The State's claims with respect to AFFF are the subject of a separate action." (*Id.* ¶ 13.)

On July 10, 2023, Defendant 3M filed a notice of removal from the Circuit Court for Baltimore City. (ECF No. 1.) On August 1, 2023, Defendant 3M moved to stay this action pending a transfer decision by the Judicial Panel on Multidistrict Litigation ("JPML"). (ECF No. 17.) This Court granted the motion to stay on August 2, 2023. (ECF No. 18.) On August 9, 2023, the State moved for reconsideration on this Court's stay order while also moving to remand the case back to state court. (ECF No. 23.) On October 4, 2023, the JPML denied 3M's motion to transfer. (ECF No. 44.) Accordingly, the State's motion for reconsideration is now moot, and the Motion to Remand is ripe for review.

## STANDARD OF [*7]  REVIEW

A defendant in a state civil action may remove the case to federal court if the federal court can exercise original jurisdiction over at least one of the asserted claims. *28 U.S.C. § 1441(a)-(c)*. Additionally, the federal officer removal statute, *28 U.S.C. § 1442(a)(1)*, authorizes removal of "[a] civil action or criminal prosecution that is

---

[1] Unless otherwise indicated, this Memorandum Order cites to the ECF generated page number rather than the page number at the bottom of the parties' various submissions.

commenced in a State court and that is against or directed to . . . [t]he United States or any agency thereof or any officer (or any person acting under the officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." *28 U.S.C. § 1442(a)(1)*. Once an action is removed to federal court, the plaintiff may file a motion to remand the case to state court if there is a contention that jurisdiction is defective. *28 U.S.C. § 1447(c)*. When considering motions to remand, courts must interpret the federal officer removal statute broadly. *See Arizona v. Manypenny, 451 U.S. 232, 242, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981)* (citing *Willingham v. Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969)*). It is well established that the party seeking removal bears the burden of establishing jurisdiction in the federal court. *Johnson v. Advance America, 549 F.3d 932, 935 (4th Cir. 2008)*.

## ANALYSIS

### I. Federal Officer Removal

To sustain removal under *Section 1442*, a defendant must satisfy three elements. First, the defendant must demonstrate that it is "an officer of the United **[*8]** States or 'acting under' a federal officer within the meaning of the statute." *Mayor and City Council of Balt. v. BP P.L.C., 388 F. Supp. 3d 538, 567 (D. Md. 2019)* (citing *Sawyer v. Foster Wheeler LLC, 860 F.3d 249, 254 (4th Cir. 2017)*). Second, the defendant must establish a causal nexus between its challenged conduct and official authority by showing that the conduct occurred "for or relating to" official federal authority. *Id.* (citing *28 U.S.C. § 1442(a)(1)*). Finally, the defendant must also assert "a colorable federal defense." *Id.* (citing *Sawyer, 395 U.S. at 254*). While the court must construe facts alleged in support of the defendant's colorable federal defense as true, the defendant bears the burden to allege facts sufficient to allow the court to conclude that such a defense is plausible. *North Carolina v. Ivory, 906 F.2d 999, 1001 (4th Cir. 1990)*; *Jefferson Cnty. v. Acker, 527 U.S. 423, 432, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)*. "The central purpose of the federal officer removal statute is to protect the federal government and its operations from potential interference by the states through proceedings in state court." *Illinois ex rel. Raoul v. 3M Co.*, No. 422CV04075SLDJEH, 2023 WL 6160610, at *2 (C.D. Ill. Sept. 21, 2023) (citing *Watson v. Philip Morris Cos., 551 U.S. 142, 150, 127 S. Ct. 2301, 168 L. Ed. 2d 42 (2007)*).

3M attempts to sustain federal officer removal under the government contractor defense. "A government contractor is entitled to removal under *Section 1442* when" it satisfies the federal officer removal requirements. *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC, 865 F.3d 181, 186 (4th Cir. 2017)*. The third element for removal, "a colorable federal defense," may be met by the government contractor defense, which exempts government contractors from liability for design **[*9]** defects in military equipment "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp., 487 U.S. 500, 512, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988)*. However, "[s]imply asserting a federal defense is not, on its own, sufficient to show removal jurisdiction under *§ 1442(a)(1)*. Rather, *§ 1442(a)(1)* also requires that the plaintiff's claims have a nexus to the defendant's acts under federal authority." *New Hampshire v. 3M Co., 665 F. Supp. 3d 215, 229 (D.N.H. 2023)* (citing *Jefferson Cnty., Ala. v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)*).

3M's government contactor defense relies on its production of MilSpec AFFF, which is AFFF "that 3M and others developed and sold to the U.S. military in accordance with rigorous military specifications ('MilSpec') issued by the Department of Defense ('DoD')." (ECF No. 1 ¶ 2.) In this case, 3M has expressly disclaimed "any relief . . . related to any PFAS contamination caused by AFFF or fluorosurfactants when used as ingredients of AFFF." (ECF No. 5 ¶ 13.) That includes 3M's alleged basis for removal, MilSpec AFFF—a chemical that 3M asserts it had official authority to manufacture. By excluding MilSpec AFFF and all other types of AFFF from its **[*10]** Complaint, the State has abandoned any claims in this case that would allow 3M to utilize the government contractor defense. The State's disclaimer here is effective. In three identical cases, federal courts have remanded to state court due to similar disclaimers. *See New Hampshire v. 3M Co., 665 F. Supp. 3d 215, 220 (D.N.H. 2023)* ("The State disclaimed in this suit recovery for harm from AFFF contamination, which eliminates any connection between the State's claims in this suit and 3M's production of MilSpec AFFF."); *Me. v. 3M Co., No. 2:23-CV-00210-JAW, 2023 U.S. Dist. LEXIS 128740, 2023 WL 4758816, at *10 (D. Me. July 26, 2023)* ("[T]he

federal officer defense will not be applicable in the State's Non-AFFF lawsuit because the State by its express disclaimer has imposed upon itself a burden to demonstrate that its claim involves Non-AFFF sources."); *Illinois ex rel. Raoul v. 3M Co.*, No. 422CV04075SLDJEH, 2023 WL 6160610, at *2 (C.D. Ill. Sept. 21, 2023) ("By renouncing all claims stemming from a contractor's work for the federal government, it no longer becomes necessary to assert the federal government contractor defense."). Those courts found that "[c]ourts have consistently granted motions to remand where the plaintiff expressly disclaimed the claims upon which federal officer removal was based." *Illinois*, 2023 WL 6150510, at *5 (quoting *Reinbold v. Advanced Auto Parts, Inc., No. 18-CV-605-SMY-DGW, 2018 U.S. Dist. LEXIS 102399, 2018 WL 3036026, at *2 (S.D. Ill. June 19, 2018)*); *see also Maine, 2023 U.S. Dist. LEXIS 128740, 2023 WL 4758816, at *10* ("Where express disclaimers are made, 'federal courts have consistently granted motions to remand where the plaintiff expressly disclaimed **[*11]** the claims upon which federal officer removal was based.'" (quoting *Dougherty v. A O Smith Corp., No. CV 13-1972-SLR-SRF, 2014 WL 3542243, at *10 (D. Del. July 16, 2014)*)).

Because the State has expressly disclaimed any AFFF-related claims, 3M cannot establish the requisite nexus between charged conduct and asserted official authority. *Northrop, 865 F.3d at 186*. In this case, as in *New Hampshire*, *Maine*, and *Illinois*, the explicit exclusion of AFFF from this lawsuit renders it "impossible for Defendant to be held liable for damages stemming from its actions under federal authority, and so the requisite connection or association is missing." *Illinois*, 2023 WL 6150510, at *6. 3M therefore fails to demonstrate the requisite nexus or colorable federal defense to sustain removal to federal court under the federal officer removal statute. Accordingly, the State's Motion to Remand (ECF No. 23) shall be GRANTED and this case shall be REMANDED to the Circuit Court for Baltimore City.

## II. Federal Enclave Jurisdiction

As an alternative basis for removal, 3M asserts that the State's claims in this case "have arisen in part on federal enclaves," thereby allowing federal enclave jurisdiction. (ECF No. 1 ¶ 5.) Federal enclave jurisdiction provides original federal jurisdiction, which therefore would allow removal under *28 U.S.C. § 1441(a)*. "[F]ederal-question jurisdiction tied **[*12]** to federal enclaves 'generally requires "that *all* pertinent events t[ake] place on a federal enclave."'" *Mayor & City Council of Baltimore v. BP P.L.C., 31 F.4th 178, 219 (4th Cir. 2022)* (second alteration in original) (quoting *Bd. of Cnty. Cmm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc., 25 F.4th 1238, 1271 (10th Cir. 2022)*). However, 3M fails to demonstrate that all pertinent events related to the issues in this case occurred on a federal enclave. Instead, it asserts only that "[s]ome federal facilities in Maryland . . . are or were federal enclaves when AFFF and/or other PFAS or PFAS-containing products were released from such facilities." (ECF No. 1 ¶ 59.) The fact that some of the State's claims may have arisen in part from some federal enclaves is insufficient to grant federal enclave jurisdiction. Quite simply, 3M's allegations are insufficient to meet the requirements for federal enclave jurisdiction. *See Rhode Island v. Shell Oil Prod. Co., 35 F.4th 44, 58 (1st Cir. 2022)* (finding allegation that "a big chunk" of pertinent events occurred on federal enclaves insufficient for federal enclave jurisdiction). Moreover, in this case, as in *Maine*, even if some of the claims arose in part from locations that "could fit within federal enclave jurisdiction, the State has disclaimed any AFFF claims, including those arising from a federal enclave, so the argument circles back to the State's disclaimer." *Maine, 2023 U.S. Dist. LEXIS 128740, 2023 WL 4758816, at *10.* 3M therefore cannot remove **[*13]** under the basis of federal enclave jurisdiction. Accordingly, this case shall be REMANDED to the Circuit Court for Baltimore City.

## CONCLUSION

For the reasons stated above, it is this 12th day of February, 2024, hereby ORDERED that:

1. Plaintiff's Motion to Remand to the Circuit Court for Baltimore City (ECF No. 23) is GRANTED;
2. This case shall be REMANDED to the Circuit Court for Baltimore City;
3. The Clerk shall CLOSE this case; and
4. A copy of this Memorandum Order shall be sent to counsel of record.

/s/ Richard D. Bennett

United States Senior District Judge

 Caution
As of: April 8, 2024 9:13 PM Z

# *Minnesota v. API*

United States District Court for the District of Minnesota

March 31, 2021, Decided; March 31, 2021, Filed

Civil No. 20-1636 (JRT/HB)

**Reporter**

2021 U.S. Dist. LEXIS 62653 *; 51 ELR 20057; 2021 WL 1215656

STATE OF MINNESOTA, by its Attorney General Keith Ellison, Plaintiff, v. AMERICAN PETROLEUM INSTITUTE, EXXON MOBIL CORPORATION, EXXONMOBIL OIL CORPORATION, KOCH INDUSTRIES, INC., FLINT HILLS RESOURCES, LP, and FLINT HILLS RESOURCES PINE BEND, Defendants.

**Subsequent History:** Stay granted by, Motion denied by, Costs and fees proceeding at *Minn. v. API, 2021 U.S. Dist. LEXIS 157845, 2021 WL 3711072 (D. Minn., Aug. 20, 2021)*

Affirmed by, Petition denied by, As moot *Minnesota v. API, 2023 U.S. App. LEXIS 7178 (8th Cir. Minn., Mar. 23, 2023)*

## Core Terms

Defendants', federal common law, climate, federal jurisdiction, removal, federal enclaves, federal official, resources, state law, class action, campaign, state court, interstate, cause of action, federal law, environmental, pollution, disputed, consumers, injuries, alleges, fossil, fuels, consumer protection, federal court, fossil fuel, cases, navigable waters, removal statute, misinformation

**Counsel:** **[*1]** Elizabeth C. Kramer, Leigh K. Currie, Oliver J. Larson, and Peter N. Surdo, OFFICE OF THE MINNESOTA ATTORNEY GENERAL, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101; Matthew Kendall Edling and Victor Marc Sher, SHER EDLING LLP, 100 Montgomery Street, Suite 1410, San Francisco, CA 94104, for plaintiff.

Eric F. Swanson and Thomas H. Boyd, WINTHROP & WEINSTINE PA, 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402; Andrew Gerald McBride, MCGUIRE WOODS LLP, 2001 K Street Northwest, Suite 400, Washington, DC 20006; and Brian David Schmalzbach, MCGUIRE WOODS LLP, 800 East Canal

Street, Richmond, VA 23219, for defendant American Petroleum Institute.

Jerry W. Blackwell and Gurdip S. Atwal, BLACKWELL BURKE PA, 431 South Seventh Street, Suite 2500, Minneapolis, MN 55415; Daniel J. Toal and Theodore V. Wells, Jr., PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, 1285 Avenue of the Americas, New York, NY 10019; Justin Anderson, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, 2001 K Street Northwest, Washington, DC 20006; and Patrick J. Conlon, EXXON MOBIL CORPORATION, 22777 Springwoods Village Parkway, Suite N1.4B.388, Spring, TX 77389, for defendants Exxon Mobil Corporation and ExxonMobil **[*2]** Oil Corporation.

Michelle Schmit and Stephen Andrew Swedlow, QUINN EMANUEL URQUHART & SULLIVAN LLP, 191 North Wacker Drive, Suite 2700, Chicago, IL 60606; William Anthony Burck, QUINN EMANUEL URQUHART & SULLIVAN LLP, 1300 I Street Northwest, Suite 900, Washington, DC 20005; Andrew M. Luger, JONES DAY, 90 South Seventh Street, Suite 4950, Minneapolis, MN 55402; Debra Rose Belott, JONES DAY, 51 Louisiana Avenue Northwest, Washington, DC 20001; and Andrew W. Davis, Peter J. Schwingler, and Todd A. Noteboom, STINSON LLP, 50 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for defendants Koch Industries, Inc., Flint Hills Resources, LP, and Flint Hills Resources Pine Bend.

**Judges:** JOHN R. TUNHEIM, Chief United States District Judge.

**Opinion by:** JOHN R. TUNHEIM

## Opinion

**MEMORANDUM OPINION AND ORDER GRANTING MOTION TO REMAND AND DENYING MOTION TO STAY**

2021 U.S. Dist. LEXIS 62653, *2

Plaintiff State of Minnesota ("the State") commenced this action in Minnesota state court against Defendants American Petroleum Institute ("API"), Exxon Mobil Corporation, ExxonMobil Oil Corporation, Koch Industries, Inc., Flint Hills Resources LP, and Flint Hills Resources Pine Bend asserting five causes of action for violations of Minnesota common law and consumer protection **[\*3]** statutes. The State alleges that Defendants developed a widespread campaign to deceive the public about the dangers of fossil fuels and to undermine the scientific consensus linking fossil fuel emissions to climate change.

Defendants removed the action to federal court on seven independent grounds: federal common law; disputed and substantial federal issues (the *Grable* doctrine); the federal officer removal statute; the Outer Continental Shelf Lands Act; federal enclaves; the Class Action Fairness Act; and diversity. Plaintiff filed a Motion to Remand to state court. Because Defendants have not met their burden of establishing that federal jurisdiction is warranted on any of the grounds presented, the Court will grant the State's Motion.

Defendants Koch Industries, Inc., Flint Hills Resources LP, and Flint Hills Resources Pine Bend (collectively, "FHR Defendants") have also filed a Motion to Stay to await the Supreme Court's decision in *BP p.l.c. v. Mayor & City Council of Baltimore*, No. 19-1189 (U.S.) and the Court's determination on a Petition for Certiorari in *Chevron Corporation et al. v. City of Oakland, et al.* (U.S., Jan. 8, 2021). Plaintiff opposes this motion. Because the Court **[\*4]** finds that the *Baltimore* case is before the Supreme Court on a narrow procedural question not at issue here and the dispensation of the petition in *City of Oakland* is too speculative to warrant a stay in the instant proceedings, the Court will deny FHR Defendants' Motion to Stay.

## BACKGROUND

### I. FACTUAL BACKGROUND

The Attorney General brings this action pursuant to his authority under <u>Minnesota Statutes Chapter 8</u> and his *parens patriae* authority under state common law. (Notice of Removal, Ex. A ("Compl.") ¶ 12, July 27, 2020, Docket No. 1-1.)

Defendant American Petroleum Institute (API) is a nonprofit corporation registered to do business in Minnesota. (*Id.* ¶ 13.) API was established in 1919 and is the country's largest oil trade association, with over 600 members. (*Id.*) Defendant Exxon Mobil Corporation is a multinational, vertically integrated energy and chemicals company incorporated in New Jersey with a principal place of business in Irving, Texas. (*Id.* ¶ 17.) Exxon Mobil Corporation is the parent company for numerous subsidiaries and has done business as or is the successor in liability to numerous entities. (*Id.*) Defendant ExxonMobil Oil Corporation is a wholly owned subsidiary of Exxon Mobil Corporation, incorporated **[\*5]** in New York with a principal place of business in Irving, Texas. (*Id.* ¶ 19.) Defendant Koch Industries, Inc. ("Koch") is an American multinational corporation based in Wichita, Kansas. (*Id.* ¶ 28.) Koch is the parent company for numerous subsidiaries involved in the manufacturing, refining, and distribution of petroleum products. (*Id.* ¶ 29.) Koch, as well as many of its subsidiaries and affiliates, is registered to do business in Minnesota. (*Id.* ¶ 31.)

Defendants Flint Hills Resources LP and Flint Hills Resources Pine Bend, LLC, subsidiaries of Koch, are licensed distributors of petroleum products in Minnesota. (*Id.*) Koch subsidiaries import crude oil from Canada to a terminal in Clearbrook, Minnesota, which is owned and operated by Koch. (*Id.* ¶ 32.) Oil is piped from the Clearbrook terminal to the Flint Hills Resources Pine Bend Refinery via other Koch-owned pipelines. (*Id.*) Flint Hills Resources' Pine Bend Refinery refines the majority of the motor gasoline consumed in Minnesota. (*Id.* ¶ 37.)

### A. Climate Change & Fossil Fuels

Beginning in the 1950s, scientists—including many employed by the fossil fuel industry—began to understand that burning fossil fuels released additional greenhouse **[\*6]** gasses, drove up atmospheric concentration, changed the carbon ratio in the atmosphere, and impacted global temperature and climate. (*Id.* ¶¶ 55-59.) The State alleges that by 1965, Defendants and their predecessors-in-interest were aware that widely used fossil-fuel products would cause global warming by the end of the century and would have wide-ranging and costly consequences. (*Id.* ¶ 60.)

The State alleges that Defendants were at the forefront of scientific discourse about climate change and its relationship to fossil fuels, and were privy to research developed by industry-employed scientists as well as independent analyses, including research commissioned by Defendants and their colleagues. (*Id.*

¶¶ 60-72.) By the 1980s, there was an established consensus among scientists and within the fossil fuel industry that atmospheric $CO_2$ concentrations were reaching dangerous levels and would significantly impact the earth's climate, and international coalitions had begun to emerge to address the issue. (*Id.* ¶ 73.)

## B. Defendants' Alleged Misinformation Campaign

The State alleges that, as the international and scientific consensus coalesced around the relationship between fossil fuels emissions [*7] and climate change, Defendants mounted an aggressive campaign to undermine the public's perception of climate science. (*Id.* ¶¶ 82-87.) Defendants allegedly spent millions of dollars on advertising and public relations campaigns, in Minnesota and elsewhere, to mislead consumers and the general public about the scientific consensus around climate change, the relationship between climate change and their fossil-fuel products, and the urgency of the dangers of climate change. (*Id.* ¶¶ 88-90). The State further alleges that Defendants funneled hundreds of millions more dollars to organizations that publicly promoted false statements about and denied the existence of climate change, and paid scientists to produce misleading reports and materials, which Defendants' then cited and promoted to support their own fraudulent statements. (*Id.* ¶¶ 92-131.)

The State identifies two broad categories of alleged injuries caused by Defendants' misinformation campaign: (1) harms to consumers who relied on Defendants' false information, (*id.* ¶¶ 172-83); and (2) environmental and social harms from increased consumption of fossil fuels, including changes in climate, damage to infrastructure, and worsening public [*8] health, (*id.* ¶¶ 139-71), all of which, the State avers, could have been mitigated, but for Defendants' campaign, (*id.* ¶¶ 172, 213-14).

## II. PROCEDURAL HISTORY

Plaintiff commenced this action in Minnesota state court asserting five counts related to Defendants' alleged misinformation campaign: (1) violations of the *Minnesota Consumer Fraud Act ("CFA"), Minnesota Statutes § 325F.69*; (2) failure to warn under common law theories of strict liability and negligence, against all Defendants except API; (3) common law fraud and misrepresentation; (4) violations of the *Minnesota Deceptive Trade Practices Act ("DTPA"), Minnesota*

*Statutes § 325D.44*; and (5) violations of the *Minnesota False Statement in Advertising Act ("FSAA"), Minnesota Statutes § 325F.67*. (*Id.* ¶¶ 184-242.) The State seeks damages, civil penalties, disgorgement of profits made as a result of unlawful conduct, and an order enjoining Defendants from continued violations of the CFA, DTPA, and FSAA. (*Id.* ¶¶ 244, 247-249.). The State also requests that Defendants be compelled to disclose, disseminate, and publish all research that they conducted directly or indirectly relating to climate change, and fund a corrective climate change public education campaign in Minnesota, administered and controlled by an independent [*9] third party. (*Id.* ¶¶ 245-246).

On July 27, 2020, Defendants removed the action to federal court. (Notice of Removal, July 27, 2020, Docket No. 1.) Defendants raise seven grounds for asserting federal jurisdiction over this matter: (1) the claims arise under federal, not state, common law; (2) the action raises disputed and substantial federal issues that must be adjudicated in a federal forum (the "*Grable* doctrine"); (3) removal is authorized by the federal officer removal statute, *28 U.S.C. § 1442(a)(1)*; (4) federal jurisdiction arises under the *Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)*; (5) the claims are based on conduct arising out of federal enclaves; (6) the action is actually a class action governed by the *Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)*, *28 U.S.C. § 1453(b)*; and (7) the court has diversity jurisdiction under *28 U.S.C. § 1332(a)*, on the theory that the real parties in interest are not the State, but the citizens of Minnesota.

On August 26, 2020, Minnesota moved to remand the case to state court, arguing that the Court lacks subject matter jurisdiction because (a) neither federal common law nor the *Grable* doctrine apply; (b) no federal enclaves are implicated; (c) the Outer Continental Shelf Lands Act is not implicated; (d) the [*10] federal officer removal statute does not apply; (e) the suit is not a "class action" and therefore not subject to the Class Action Fairness Act; and (f) the suit was brought by the State, which is not a citizen for purposes of diversity jurisdiction. (Mot. Remand, Aug. 26, 2020, Docket No. 32.) Defendants oppose this Motion.

The FHR Defendants filed a Motion to Stay, on January 15, 2021, arguing that staying proceedings until the Supreme Court issues a decision in *BP p.l.c. v. Mayor & City Council of Baltimore*, and makes a determination on the Petition for Certiorari in *Chevron Corporation v. City of Oakland, et al.*, would conserve judicial resources

2021 U.S. Dist. LEXIS 62653, *10

and would not prejudice the State. (Mot. Stay, Jan. 15, 2021, Docket No. 56.) The State opposes staying the Motion to Remand.

**DISCUSSION**

**I. MOTION TO REMAND**

**A. Standard of Review**

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton, 568 U.S. 251, 256, 133 S. Ct. 1059, 185 L. Ed. 2d 72 (2013)* (quotation omitted). A defendant may remove a civil action to federal court only if the action could have been filed originally in federal court. *See 28 U.S.C. § 1441(a)-(b)*; *Gore v. TWA, 210 F.3d 944, 948 (8th Cir. 2000)*. The party seeking removal bears the burden of demonstrating that removal was proper, and "all **[*11]** doubts about federal jurisdiction must be resolved in favor of remand." *Cent. Iowa Power Co-op. v. Midwest Indep. Transmission Sys. Operator, Inc., 561 F.3d 904, 912 (8th Cir. 2009)*. Remand is mandatory "at any time before final judgment [if] it appears that the district court lacks subject matter jurisdiction." *28 U.S.C. § 1447(c)*.

**C. The Well-Pleaded Complaint Rule**

"[F]ederal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987)* (citation omitted). Where a complaint pleads only state law claims, a federal court does not have jurisdiction based on a federal defense. *See, e.g., Aetna Health Inc. v. Davila, 542 U.S. 200, 207, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004)*.

There are two relevant exceptions to the well-pleaded complaint rule. First, "[w]hen a plaintiff has artfully pleaded in a manner that avoids an element of the tort that rests on federal law, the court 'may uphold removal even though no federal question appears on the face of plaintiff's complaint.'" *Gore, 210 F.3d at 950* (quoting *Rivet v. Regions Bank of La., 522 U.S. 470, 475, 118 S.*

*Ct. 921, 139 L. Ed. 2d 912 (1998))*. The artful pleading doctrine allows removal where Congress either expressly provides for removal of a particular state law action or where federal law completely preempts a plaintiff's state-law claim. *Rivet, 522 U.S. at 475*.

Second, even where "federal **[*12]** law does not create the cause of action, federal question jurisdiction may exist if [Plaintiff's] 'state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.'" *Great Lakes Gas Trans. Ltd. P'ship v. Essar Steel Minnesota LLC, 843 F.3d 325, 331 (8th Cir. 2016)* (quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005))*. The Supreme Court has recognized a "special and small category" of cases that fit into this framework, *Empire Healthchoice Assur., Inc. v. McVeigh, 547 U.S. 677, 699, 126 S. Ct. 2121, 165 L. Ed. 2d 131 (2006)*, "where vindication of a right under state law necessarily turned on some construction of federal law," *Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 808-09, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986)* (quotation omitted).

**B. Analysis**

**1. Federal Common Law**

Defendants' first asserted ground for removal is that the Court has original jurisdiction because the State's claims arise under federal common law and cannot be resolved under state law. Only a few limited areas of federal common law survived *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*. In particular, courts have determined that federal common law applies where a federal decision is required "to protect uniquely federal interests," *Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427, 84 S. Ct. 923, 11 L. Ed. 2d 804 (1964)*, or where "our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or **[*13]** because the interstate or international nature of the controversy makes it inappropriate for state law to control." *Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641, 101 S. Ct. 2061, 68 L. Ed. 2d 500 (1981)*. Defendants argue that the State's Complaint necessarily arises under three areas controlled by

2021 U.S. Dist. LEXIS 62653, *13

federal common law: interstate pollution, navigable waters, and foreign affairs. Defendants further argue that federal jurisdiction is proper because state law cannot apply to the claims alleged.

### i. Interstate Pollution

First, Defendants argue that the State's claims are premised upon interstate pollution because the State's alleged injuries stem from climate change impacts, which are caused by global emissions and are inherently transboundary in nature. The Supreme Court has specifically recognized federal common law in the arena of transboundary pollution and environmental protection, *see Am. Elec. Power Co. v. Connecticut, 564 U.S. 410, 421, 131 S. Ct. 2527, 180 L. Ed. 2d 435 (2011)* ("When we deal with air and water in their ambient or interstate aspects, there is federal common law."), but has also held that this area of federal common law has largely (though not entirely) been displaced by environmental statutes, including the *Clean Air Act* and *Clean Water Act*, *see e.g.*, *id. at 424* (finding that the "Clean Air Act and the EPA actions it authorizes displace any federal common-law **[*14]** right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants"); *Int'l Paper v. Ouellette, 479 U.S. 481, 497, 107 S. Ct. 805, 93 L. Ed. 2d 883 (1987)* ("The CWA precludes only those suits that may require standards of effluent control that are incompatible with those established by the procedures set forth in the Act.").

Defendants cite a number of cases to support their argument that federal common law should govern; however, in each of these precedential cases, a cause of action for interstate pollution was alleged on the face of the complaint, which is not the case here.[1] Despite

the fact that the State alleges no causes of action related to pollution regulations or disputes between states over emissions standards, Defendants argue that the State has not pleaded sufficient facts to support its consumer protection claims, and therefore the complaint must actually establish a cause of action for interstate pollution under the federal common law.

To adopt Defendants' theory, the Court would have to weave a new claim for interstate pollution out of the threads of the Complaint's statement of injuries. This is a bridge too far. Because Defendants do not plausibly identify any **[*15]** actual disputes related to interstate pollution that must be resolved to reach the merits of the State's pleaded claims, federal common law does not establish a basis for jurisdiction on this ground.

### ii. Navigable Waters

Similarly, Defendants argue that federal common law must govern because the State seeks remedies for injuries related to flooding, damage, and contamination of navigable waters. Again, the cases that Defendants rely on establish that federal common law is required to resolve issues not present here; in particular, to mediate conflict between the states or between states and the federal government related to interstate water bodies.[2] Although flooding is an alleged injury related to the consumer protection claims, the State's action does not purport to regulate, apportion, or mediate other states' or agencies' relationships to navigable waters, and the federal common law of navigable waters is not necessarily raised here.

### iii. Foreign Affairs

Third, Defendants argue that the State's claims are of an inherently international nature because the regulation of energy production and trade has important foreign

---

[1] *See*, *AEP, 564 U.S. at 415* (federal common law public nuisance claims against carbon-dioxide emitters seeking cap on emissions); *Illinois v. Milwaukee, 406 U.S. 91, 93, 92 S. Ct. 1385, 31 L. Ed. 2d 712 (1972)*, *superseded by statute* (cause of action for pollution of Lake Michigan); *Ouellette, 479 U.S. at 483-84 (1987)* (common law nuisance for discharges into interstate lake); *Native Village of Kivalina v. ExxonMobil Corp., 696 F.3d 849, 853 (2012)* (federal common law public nuisance claims against greenhouse gas emissions and climate change injuries); *City of New York v. BP p.l.c., 325 F. Supp. 3d 466, 470 (S.D.N.Y. 2018)* (public nuisance, private nuisance, and trespass claims related to sea level rise, increased flooding, and temperature increases). However, *City of New York* does not provide a framework for removal based

upon federal common law because the action was originally filed in federal court.

[2] *See Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 110, 58 S. Ct. 803, 82 L. Ed. 1202 (1938)* (apportionment of water of an interstate stream between two states is a question of federal common law); *Milwaukee I, 406 U.S. at 105 n.6* (conflict over pollution discharged by one state into water body that bordered four states); *Michigan v. United States Army Corps of Eng'rs, 667 F.3d 765, 767-68 (7th Cir. 2011)* (action related to federal management of interstate waterway).

policy implications and is accordingly within the exclusive purview **[*16]** of the federal courts. Defendants claim that, because fossil fuels are strategically important domestic and international resources, the State's case is intended to have significant impacts on United States foreign policy. The Court declines Defendants' invitation to interpret this well-pleaded consumer protection action as a wholesale attack on all features of global fossil fuel extraction, production, and policy.

#### iv. State Law

Finally, Defendants contend that federal jurisdiction is proper because state law cannot control claims that seek to regulate the interstate and international production and sale of fossil fuels. The State does, however, have a clear interest in preventing fraud and deception and ensuring that citizens have access to accurate information in the consumer marketplace. *See e.g.*, *Edenfield v. Fane, 507 U.S. 761, 768-69, 113 S. Ct. 1792, 123 L. Ed. 2d 543 (1993)*. Because the State's claims fall squarely within that area of state interest, the claims do not open the door for substantive challenges to Minnesota's (or any other state's) emissions or water quality standards. Neither do the claims alleged require the Court to assess federal management of navigable waters or weigh any issues of foreign policy. Accordingly, federal common law is not applicable. **[*17]**

#### v. Federal Common Law as a Basis for Removal

Even if the Court could conjure a separate claim arising from the State's alleged environmental injuries that would fall within an area of federal common law, it still may not confer jurisdiction. Defendants argue that federal common law provides a basis for federal jurisdiction because (1) courts have recognized an exception to the well-pleaded complaint rule where plaintiff's putative state law claims arise under federal common law, and (2) federal common law presents a substantial federal question for the purposes of asserting jurisdiction under the *Grable* doctrine. The Court will address the *Grable* doctrine in Section 2.

As noted above, the Supreme Court has established two exceptions to the well-pleaded complaint rule: express provision of Congress and complete preemption. *Rivet, 522 U.S. at 475*. A federal statute completely preempts artfully pleaded state law claims if

it "provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action[,]" *Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 8, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003)*, and the statute's pre-emptive force is "so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for **[*18]** purposes of the well-pleaded complaint rule." *Caterpillar, Inc., 482 U.S. at 393* (quotation omitted). Complete preemption is distinct from ordinary preemption, which provides a defense against state law claims, but does not establish a pathway for federal jurisdiction. *See Johnson v. MFA Petroleum Co., 701 F.3d 243, 247 (8th Cir. 2012)*.

Defendants suggest that complete preemption is not required for removal because the State's claims inherently arise under federal common law, and artful pleading that disguises a federal cause of action is a separate and distinct basis for removal than complete preemption. However, neither the Eighth Circuit nor the Supreme Court has found that implied federal common law claims establish a separate and independent exception to the well-pleaded complaint rule. To the extent that the cases Defendants cite carve out a third exception, this approach lacks support in this circuit and is contrary to Supreme Court precedent establishing the specific and defined parameters for federal jurisdiction over exclusively state law claims. *See Caterpillar, 482 U.S. at 392-94*; *Rivet, 522 U.S. at 474-75*.

Further, in each of the cases Defendants cite to support this argument, plaintiffs' precise claims were explicitly connected to or relied upon interpretations of a discrete area of federal law.[3] Here, Defendants proffer **[*19]**

---

[3] *See In re Otter Tail Power Co., 116 F.3d 1207, 1215 (8th Cir. 1997)* (state law claims involved tribal regulatory authority and raised important questions of federal law requiring interpretation of treaties, federal statutes, and the federal common law of inherent tribal sovereignty); *Sam L. Majors Jewelers v. ABX, Inc., 117 F.3d 922, 928. (5th Cir. 1997)* (claims arising out of "clearly established federal common law cause of action against air carriers for lost shipments."); *Treiber & Straub, Inc. v. UPS, Inc., 474 F.3d 379, 384 (7th Cir. 2007)* (same); *Caudill v. Blue Cross and Blue Shield of N.C., 999 F.2d 74, 76-77 (4th Cir. 1993)* (applying federal jurisdiction to state-law claims pursuant to *Federal Employees Health Benefits Act*), *abrogated by Empire HealthChoice Assur. Inc. v. McVeigh, 547 U.S. 677, 693, 126 S. Ct. 2121, 165 L. Ed. 2d 131 (2006)*; *Battle v. Seibels Bruce Ins. Co., 288 F.3d 596, 607* (claims requiring interpretation of insurance policies issued pursuant to the National Flood Insurance

2021 U.S. Dist. LEXIS 62653, *19

multiple theories for how Plaintiff's claims might be related to federal common law but as noted above, each of these theories lacks a substantial relationship to the actual claims alleged and would require the Court to invent a separate cause of action. That is beyond the Court's discretion and is not a sound foundation for asserting federal jurisdiction.

Because the Court finds that the claims alleged by the State do not arise under federal common law and Defendants do not plausibly allege that the claims are completely preempted, federal common law is not a sufficient independent basis for removal in this manner.

## 2. *Grable* Jurisdiction

Defendants' second argument for removal is that this action necessarily raises and requires the resolution of substantial questions of federal law. Federal jurisdiction may be asserted over a state-law claim if a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn, 568 U.S. at 258* (citing *Grable & Sons Metal Products, Inc. v. Darue Eng. & Mf'g, 545 U.S. 308, 313-14, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005))*. All four criteria, often referred to as the "*Grable* doctrine," must be met to exercise federal jurisdiction. *Id.*

### i. Necessarily [*20] Raised

Defendants offer various avenues for the Court to find that the claims necessarily raise disputed federal issues, including foreign policy considerations, injuries to and management of the navigable waters of the United States, and transboundary pollution. Defendants also assert that the claims implicate Congress's careful policymaking balance between energy production and environmental protection, Defendants' alleged influence over policymakers' decisions, and constitutional questions of federalism.

The Court has already rejected Defendants' arguments that the Complaint necessarily raises issues related to management of navigable waters, transboundary pollution, or foreign policy. Contrary to Defendants' assertions, the Complaint does not require interpretation of any federal environmental regulations or climate

Program governed exclusively by federal common law); *Newton v. Capital Assur. Co., 245 F.3d 1306, 1308-09 (11th Cir. 2001)* (same).

treaties, nor does it ask a court to review federal agencies' management of interstate waters. The Complaint only requires a court to determine whether Defendants engaged in a misinformation campaign that ran afoul of Minnesota's consumer protection statutes and common law, and whether the State can demonstrate that those alleged violations of discrete state laws caused [*21] harm to Minnesota and Minnesota consumers.

With regard to Congress's careful balance between energy and environmental priorities, Defendants do not appear to argue that Congress sanctioned, directed, or participated in the alleged scheme to defraud the public. Accordingly, determining whether Defendants engaged in a misinformation campaign in violation of Minnesota law does not require a court to second-guess Congress's priorities regarding energy production and environmental protection.

Defendants further argue that the Complaint necessarily asserts federal claims to the extent that it alleges that federal policymakers would have adopted different energy and climate policies but-for Defendants' alleged misrepresentations. However, the Complaint includes policymakers as a category of individuals who relied on Defendants' allegedly fraudulent misrepresentations in deciding to continue to purchase and use Defendants' fossil-fuel products. It does not argue that any particular policies or regulatory decisions would be different but-for Defendants' actions, and therefore does not implicate Congress' careful regulatory framework.

As to questions of federalism, Defendants allege that the State [*22] seeks to supplant the federal government's authority over federal questions and requires the Court to consider the constitutional division of authority between the federal government and the states. This gravely overstates the State's case, and it is unclear to the Court how a state court adjudicating a set of claims that fall well within a state's consumer protection interest will necessarily challenge the foundations of our system of government.

Defendants also claim that proving the specific elements of the causes of action will require a court to wade into disputed and substantial federal questions, including whether fossil fuels are unreasonably dangerous, and whether Defendants actually misrepresented the dangers of climate change and the urgency required to mitigate climate change. Again, Defendants overstate both the State's claims and what is required to prove

them under Minnesota law.[4]

Although Defendants have identified ways in which the State's claims may be tangentially related to federal law, "it takes more than a federal element to open the 'arising under' door" to federal jurisdiction. *Empire Healthchoice, 547 U.S. at 701* (quoting *Grable, 545 U.S. at 313*). The federal issues that Defendants offer are not necessarily **[*23]** raised by the Complaint's state-law claims, and vindication of the State's rights under state consumer protection law does not "necessarily turn on some construction of federal law." *Franchise Tax Bd., 463 U.S. at 9.*

## ii. Actually Disputed and Substantial

Having found that the State's action does not necessarily raise the federal issues offered by Defendants, the Court need not proceed to address the other *Grable* factors. However, the Court notes that, while the complex features of global climate change certainly present many issues of great federal significance that are both disputed and substantial, the State here does not bring claims capable of addressing the panoply of social, environmental, and economic harms posed by climate change. The State's Complaint, far more simply, seeks to address one particular feature of the broader problem—Defendants' alleged misinformation campaign. The State's case is constrained by the causes of action asserted in its Complaint. Accordingly, the State must prove that its purported injuries are related to Defendants' alleged violations of state laws, and any judicial remedies will likely be limited and responsive to those specific claims. As a result, this action does not present **[*24]** the doomsday scenario that Defendants present, and neither does it necessarily raise the disputed and substantial issues of federal law that are required for the Court to assert jurisdiction pursuant to *Grable.*

## iii. Federal/State Balance

Moreover, the Court finds that its efforts to exercise jurisdiction over this case may disrupt the balance between federal and state courts. In this case, the state court will not need to reach any question of federal law to litigate these claims, nor will the state court's holding "stand as binding precedent for any future [consumer fraud or climate-change injury] claim[.]" *Gunn, 568 U.S. 264.* The State asks the court to determine only whether Defendants are liable for misleading the public and engaging in consumer fraud under state law. For the federal court to assert jurisdiction over these areas of traditional state jurisdiction may disrupt the balance between state and federal judicial authority.

Ultimately, Defendants question whether there can be a state law action for alleged climate change injuries at all. The Court does not disagree that assessing this type of injury raises broad and complicated questions. However, allegations of a complex injury do not create **[*25]** a pathway for federal jurisdiction when the actual causes of action arise only under state law. Accepting Defendants' interpretation of *Grable* jurisdiction would require the Court to make an exceptional logical leap and interpret this Complaint as a full-scale assault on all aspects of fossil fuel extraction, production, distribution, and use. That is not what the Complaint asserts on its face, and it is not within the Court's authority to rewrite the Complaint and make it so.

## 3. Federal Officer Removal Statute

---

[4] It is not necessary for the Court to weigh Minnesota's ability to prove the elements of the state law claims here; it is Defendants' burden to demonstrate that these claims warrant federal jurisdiction. Nevertheless, the Court notes that adjudicating the State's failure to warn claims do not require a court to supplant its judgment for Congress's regarding the safety and use of a product, as Defendants allege. While the danger of a product is raised in a failure to warn action, it is in the context of whether a warning was adequate under state law, and does not require a court to determine whether the product should have been manufactured, sold, and consumed generally. *See, e.g., Glorvigen v. Cirrus Design Corp., 816 N.W.2d 572, 582 (Minn. 2012)* (explaining that the duty to warn consists of two duties: (1) to give adequate instructions for safe use; and (2) to warn of dangers inherent in improper use); *Frey v. Montgomery Ward & Co., 258 N.W.2d 782, 788 (Minn. 1977)* (stating the rule that, where a manufacturer has "actual or constructive knowledge of danger to users, the . . . the manufacturer has a duty to warn of such dangers."); *Gray v. Badger Mining Corp., 676 N.W.2d 268, 274 (Minn. 2004)* (explaining conditions of legal adequacy for warnings). As to the State's other statutory claims under Minnesota's various consumer protection and trade practices statutes, Defendants' own explanations of the law demonstrate that the State's claims only require proving that Defendants engaged in misinformation, deception, fraud, or otherwise unfair practices prohibited by state law; the claims alleged do not require the Court to make determinations about fossil fuels or federal energy policy in general.

2021 U.S. Dist. LEXIS 62653, *25

Defendants' next proffered removal ground is the federal officer removal statute, *28 U.S.C. § 1442(a)(1)*, which requires that the removing defendant plausibly allege that (1) the defendant is a "person" under the statute, which is undisputed here; (2) the defendant was "acting under" the direction of a federal officer when it engaged in the allegedly tortious conduct; (3) there is a causal connection between the defendant's actions and the official authority; and (4) the defendant raises a "colorable" federal defense. *See; Jacks v. Meridian Res. Co., 701 F.3d 1224, 1230 (8th Cir. 2012)*. Relevant here is the federal government contractor defense, which provides that suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal **[*26]** cast of the complaint; the federal-question element is met if the defense depends on federal law[.]" *Jefferson County v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)*.

### i. "Acting Under"

Defendants first argue that they were "acting under" the direction of federal officers in the production of fossil fuels and the development of specialized military products in support of multiple war efforts since at least World War II. Second, Defendants argue that they have worked under federal direction to extract and produce critical energy resources for the nation, including exploration and development of resources in the Outer Continental Shelf and as operators and lessees of the Strategic Petroleum Reserve infrastructure. The Court finds that these are plausible ways in which Defendants may have acted under the direction of federal officers, and because the Court lacks information about whether Defendants' alleged tortious conduct occurred when Defendants were acting under federal officer control, the Court will proceed with the analysis.

### ii. Connection to Claims

Historically, courts have considered the causal connection requirement to be a low hurdle. *See, e.g., Graves v. 3M Co., 447 F. Supp. 3d 908, 913 (D. Minn. 2020)* (citing *Isaacson v. Dow Chem. Co., 517 F.3d 129, 137 (2d Cir. 2008)*. Indeed, in 2011, Congress amended the statute to encompass suits "for or **[*27]** relating to** any act under color of [federal] office." *28 U.S.C. § 1442(a)(1) (2011)* (emphasis added); *see also In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia, 790 F.3d 457, 471 (3d Cir. 2015)*, *as amended* (June 16, 2015)

(discussing the 2011 amendment). As a result of the amendment, all that is required is that the case relates to an official act. For example, the Third Circuit has found that the condition is met so long as Defendants' conduct has a "connection" or "association" with a governmental act. *In re Commonwealth's Motion, 790 F.3d at 471*. However, Defendants are still required to demonstrate that the act for which they are being sued occurred at least in part "**because of** what they were asked to do by the Government." *Graves, 447 F. Supp. 3d at 913*. (emphasis in original) (quoting *Isaacson v. Dow Chem. Co., 517 F.3d 129, 137 (2d Cir. 2008)*.

Defendants argue that their fossil fuel activities satisfy the low threshold of connection to or association with actions directed by the federal government. However, Defendants do not claim that any federal officer directed their respective marketing or sales activities, consumer-facing outreach, or even their climate-related data collection. Accordingly, despite the low bar, there does not appear to be any direction from or connection to the federal government related to the specific claims alleged here.

### iii. Colorable Defense

Although the lack of connection to a federal **[*28]** officer alone is fatal to federal officer jurisdiction, the Court notes that the fourth prong also fails. The federal officer removal statute requires that the defendant identify a federal defense to the claim brought against them in state court, but a defendant need only demonstrate that its defense is "colorable," not "clearly sustainable." *Jacks v. Meridian Res. Co., LLC, 701 F.3d 1224, 1235 (8th Cir. 2012)*. "For a defense to be considered colorable, it need only be plausible; *§ 1442(a)(1)* does not require a court to hold that a defense will be successful before removal is appropriate." *United States v. Todd, 245 F.3d 691, 693 (8th Cir. 2001)*.

In a footnote, Defendants claim a number of defenses, including preemption under the Clean Air Act, the *Commerce Clause*, and the *First Amendment*, and the foreign affairs doctrine, although they do not describe any particular defense or why it justifies application of the federal officer removal statute. As discussed with regard to the *Grable* doctrine and federal common law, the State does not raise claims related to environmental regulation or foreign policy, therefore the Clean Air Act and foreign affairs doctrine do not pose colorable defenses. As to the *Commerce Clause* and the *First Amendment*, Defendants do not explain exactly how

Kelly Christopher

2021 U.S. Dist. LEXIS 62653, *28

these defenses relate either to the claims or actions taken at the direction of a foreign officer. Because **[\*29]** it is the Defendants' burden to demonstrate a colorable defense now, and not "the mere possibility of some future evidence as the basis for removal," *Graves, 447 F. Supp. 3d at 916 n.8*, Defendants have not met this hurdle to federal jurisdiction.

Defendants have failed to satisfy three of the four elements of the federal officer removal statute, and the Court cannot, therefore, exercise jurisdiction on this basis.

## 4. Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act ("OCSLA") establishes original jurisdiction in federal district courts over "cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter." *43 U.S.C. § 1349(b)(1)*. The outer Continental Shelf ("OCS") includes all submerged lands lying seaward that are subject to the jurisdiction and control of the United States, but are outside of any particular State. *43 U.S.C. §§ 1301(a), (f), 1331(a)*. The Fifth Circuit has interpreted the jurisdictional grant under OCSLA broadly, only requiring a "but-for connection" between the cause of the action and OCS operation. *In re Deepwater Horizon, 745 F.3d 157, 163 (5th Cir. 2014)*.

Despite Defendants' argument that their **[\*30]** various activities on the OCS necessarily account for a significant portion of the conduct attributable to alleged climate change injuries in Minnesota, the State's claims are rooted not in the Defendants' fossil fuel production, but in its alleged misinformation campaign. Further, Defendants offer no basis for the Court to conclude that Minnesota's alleged injuries would not have occurred but-for the Defendants' extraction activities on the OCS. *Accord Mayor and City Council of Baltimore v. BP, 388 F. Supp. 3d 538, 566-67 (D. Md. 2019)* (rejecting federal jurisdiction under OCSLA based on lack of evidence of but-for causation).

Defendants also argue that, because the Complaint seeks potentially billions of dollars in damages, restitution, and equitable relief, this action could substantially discourage production on the OCS and undermine the viability of the federal government's leasing program. This argument is highly speculative

and quite unlikely and asks the Court to assume both the outcome of the suit in state court and the highest damages award possible. This type of speculation, however, does not establish a stable ground for supporting removal, and the Court finds that it lacks jurisdiction under OCSLA.

## 5. Federal Enclave

Defendants next argue that federal jurisdiction **[\*31]** is appropriate because the action implicates federal enclaves in four distinct ways: (1) by targeting the alleged impacts of Defendants' oil and gas operations, the Complaint necessarily sweeps in operations that occur on military bases and other federal enclaves; (2) the Complaint's allegations of climate change injuries—including extreme heat, crop damage, drought, flooding, infrastructural damage, and disease—necessarily impact federal enclaves in Minnesota, including Fort Snelling Military Reservation, Federal Correctional Institute Sandstone, and Cass Lake Indian Hospital[5] ; (3) the claims arise out of sales of certain Defendants' products within Minnesota, which include sales on unspecified federal enclaves; and (4) to the extent the Complaint asserts that federal policymakers would have adopted different energy and climate policies absent Defendants' alleged misrepresentations, the Complaint touches on conduct occurring in the District of Columbia, a federal enclave.

"A federal enclave is created when a state cedes jurisdiction over land within its borders to the federal government and Congress accepts that cession. These enclaves include numerous military bases [and] **[\*32]** federal facilities." *Allison v. Boeing Laser Tech. Servs., 689 F.3d 1234, 1235 (10th Cir. 2012)*. The constitutional grant of legislative power to Congress over federal enclaves "bars state regulation without specific congressional action." *W. River Elec. Ass'n, Inc. v. Black*

---

[5] To establish a federal enclave, (1) the United States must acquire land in a state for one of the purposes mentioned in the Enclave Clause, (2) the state legislature must consent to the jurisdiction of the federal government, and (3) the federal government must accept the jurisdiction by filing a notice of acceptance with the state governor or in another manner prescribed by the laws of the state. *See 40 U.S.C. § 3112(b)*; *Paul v. United States, 371 U.S. 245, 264, 83 S. Ct. 426, 9 L. Ed. 2d 292 (1963)*; *see also U.S. Const. Art. I, § 8, cl. 17*. Defendants state that these sites in Minnesota are federal enclaves, but do not provide documentation to satisfy the criteria.

*Hills Power & Light Co., 918 F.2d 713, 716 (8th Cir. 1990)* (quoting *Paul v. United States, 371 U.S. 245, 263, 83 S. Ct. 426, 9 L. Ed. 2d 292 (1963)*).

"[I]n enclave jurisdiction, the determinative fact is the precise location of the events giving rise to the claims for relief." *Akin v. Big Three Indus., Inc., 851 F. Supp. 819, 824 (E.D. Tex. 1994)* (emphasis omitted). When an alleged injury has occurred both on and off the federal enclave, federal jurisdiction is proper if the federal enclave was the locus in which the tort claim arose. *See Sultan v. 3m Co., No. 20-1747, 2020 U.S. Dist. LEXIS 225863, 2020 WL 7055576, at *8 (D. Minn. Dec. 2, 2020).* Even if some of the injuries occur inside while some occur outside of the federal enclave, the federal interest in exercising federal jurisdiction over the resultant claims decreases. *See Akin, 851 F. Supp. at 825 n.4.*

The State specifically disclaims "injuries arising on federal property and those that arose from Defendants' provision of fossil fuel products to the federal government for military and national defense purposes." (Compl. ¶ 9 n.4.) Defendants contend that this disclaimer is ineffective because it offers no method to isolate injuries that arose on federal property.[6] However, the burden is on Defendants to demonstrate that federal enclaves are the locus in which the claims arose, and they have **[*33]** not done so. *See Sultan, 2020 U.S. Dist. LEXIS 225863, 2020 WL 7055576, at *4.* While the various injuries alleged in the complaint may be felt on federal enclaves as much as they are felt anywhere, the

Court requires a more substantive and explicit relationship between the actual claims alleged and a specific federal enclave to exercise jurisdiction.

## 6. Class Action Fairness Act

Defendants also raise the possibility of jurisdiction under CAFA, *28 U.S.C. § 1453(b)*, on the theory that the case is actually a class action in which the Attorney General has brought a representative suit on behalf of a group of similarly situated persons. CAFA expands federal diversity jurisdiction to allow for minimal diversity in class actions filed under *Federal Rule of Civil Procedure 23* or similar state statute or rule of judicial procedure, *28 U.S.C. § 1332(d)(1)(B)*, in which more than $5 million is in controversy and there are greater than 100 members of proposed plaintiff classes. *Id. § 1332(d)(5), (6)*; *Pirozzi v. Massage Envy Franchising, Inc., 938 F.3d 981, 983 (8th Cir. 2019).* Defendants argue that, while this case is not styled as a class action, because it is brought in a representative capacity and seeks restitution and damages on behalf of many potential plaintiffs, it resembles a purported class action and should therefore be considered a class action under CAFA.

However liberally interpreted, federal jurisdiction **[*34]** under CAFA is limited to civil actions either filed under *Rule 23* or brought under a similar state mechanism that authorizes class actions. In the Eighth Circuit, an action can be interpreted as a class action subject to CAFA even where Plaintiff has omitted reference to the authorizing procedural rule or statute, but only where the state class action rule actually governs the action. *See Williams v. Emplrs. Mut. Cas. Co., 845 F.3d 891, 901 (8th Cir. 2017).* Defendants have identified no state statute or procedural rule that would classify a suit of this nature as a class action.[7] Further, as the State

---

[6] Further, Defendants counter that the Attorney General cannot sidestep federal jurisdiction by disclaiming damages for events that took place in federal enclaves. However, both of the cases that Defendants cite for this proposition, *Fung v. Abex Corp., 816 F. Supp. 569, 571 (N.D. Cal. 1992)* and *Richard v. Martin, 2012 U.S. Dist. LEXIS 23759, 2012 WL 13081667, at *2 (D.N.M. Feb. 24, 2012)*, involve personal injury claims in which the injuries largely occurred on federal enclaves. In *Fung*, the injuries involved asbestos exposure on submarines that were supervised by a contractor, but that were regularly docked at United States naval bases (there, the Court found the Federal Officer Removal Statute to be of greater significance than the enclaves); in *Richards*, the injuries largely occurred on White Sands Missile Range. Here, Defendants do not claim that any particular injury occurred on a federal enclave; they merely allege that the State cannot effectively disclaim injuries on enclaves. Because neither party has identified injuries that specifically occurred on a federal enclave, these cases do not support Defendants' argument that federal enclave jurisdiction is proper here.

[7] The cases Defendants cite do not support their argument that the present action should, or even could, be subject to CAFA. Both *Addison Automatics, Inc. v. Hartford Cas. Ins. Co., 731 F.3d 740 (7th Cir. 2013)* and *Williams, 845 F.3d 891* are cases in which defendants of certified classes attempted to make separate claims against the same defendants as individuals. In both of those cases, the Courts found that omitting reference to the existing class or applicable state statute did not allow the defendant to dodge CAFA jurisdiction. Neither of these cases dealt with an action brought by an Attorney General on behalf of a state where no class action has been claimed or certified. The case that Defendants characterize as most "instructive," *Song v. Charter Commn's.*

points out, every court to have addressed the application of CAFA to actions brought by a State in *parens patriae* under state common law or consumer protection statutes has found that CAFA is not applicable.[8] Because neither the Eighth Circuit nor any

---

*Inc.*, is an order on a Motion to Compel Arbitration and Stay Proceedings that does not substantively deal with the CAFA issue at all, except to include a short footnote noting that Plaintiff opposed CAFA jurisdiction, but the Court felt that the jurisdictional determination was within its discretion. *No. 17-325, 2017 U.S. Dist. LEXIS 45972, 2017 WL 1149286, at *1 n.1 (S.D. Cal. Mar. 28, 2017)*. *Dart Cherokee Basin Op. Co. LLC v. Owens* deals with a case filed as a class action in state court, where the dispute was about whether the amount in controversy met the $5 million CAFA threshold. *574 U.S. 81, 85, 135 S. Ct. 547, 190 L. Ed. 2d 495 (2014)*. Defendants also cite *Missouri ex rel. Koster v. Portfolio Recovery Assocs., Inc.*, for the proposition that the Eighth Circuit has not weighed in on the issue of CAFA application to *parens* [*35] *patriae* actions. *686 F. Supp. 2d 942, 944-47 (E.D. Mo. 2010)*. However, the court in *Koster* found that a request for treble damages did not convert a *parens patriae* action into either a "mass action" or a "class action" under CAFA and declined to exercise federal jurisdiction. *Id.*

[8] *See Mississippi ex rel. Hood v. AU Optronics Corp., 571 U.S. 161, 164, 134 S. Ct. 736, 187 L. Ed. 2d 654 (2014)* (*parens patriae* suit is not a "mass action" under CAFA); *Hawaii ex rel. Louie v. HSBC Bank Nevada, 761 F.3d 1027, 1040 (9th Cir. 2014)* ("Failure to request class status or its equivalent is fatal to CAFA jurisdiction."); *Purdue Pharma L.P. v. Kentucky, 704 F.3d 208, 212-20 (2d Cir. 2013)* (determining *parens patriae* action was not "filed under" state statute or rule of judicial procedure "similar" to federal class action rule, and thus action did not qualify as a "class action" within the meaning of CAFA); *Mississippi ex rel. Hood v. AU Optronics Corp., 701 F.3d 796, 799 (5th Cir. 2012)*, *rev'd on other grounds*, *571 U.S. 161, 134 S. Ct. 736, 187 L. Ed. 2d 654 (2014)* (*parens patriae* action to enforce state law did not justify removal under CAFA); *LG Display Co. v. Madigan, 665 F.3d 768, 770-72 (7th Cir. 2011)* (case brought by Attorney General was brought under state anti-trust law that did not impose any of the familiar *Rule 23* constraints); *Washington v. Chimei Innolux Corp., 659 F.3d 842, 847-49 (9th Cir. 2011)* ("[P]*arens patriae* suits filed by state Attorneys General may not be removed to federal court because the suits are not 'class actions' within the plain meaning of CAFA."); *West Virginia v. CVS Pharm., Inc., 646 F.3d 169, 174-78 (4th Cir. 2011)*; *Massachusetts v. Exxon Mobil Corp., 462 F. Supp. 3d 31, 48-51 (D. Mass. 2020)* (finding CAFA does not apply to *parens patriae* Attorney General actions); *Town of Randolph v. Purdue Pharma L.P., No. 19-10813, 2019 U.S. Dist. LEXIS 95762, 2019 WL 2394253, at *4 (D. Mass. June 6, 2019)* (finding no federal jurisdiction under CAFA in *parens patriae* opioid action); *City of Galax v. Purdue Pharma, L.P., No. 18-617, 2019 U.S. Dist.*

---

other court has applied CAFA to a State Attorney General's representative action in this way, and because Defendants have not demonstrated that this action was brought under or would meet the standards of either *Rule 23* or any state rule for class certification, CAFA is not applicable here.

## 7. Diversity Jurisdiction

Finally, Defendants argue that the Court has diversity jurisdiction because the real parties in interest are the citizens of Minnesota, who are completely diverse from Defendants, and the amount in controversy undisputedly exceeds $75,000. Defendants argue that the Attorney General seeks compensation for alleged injuries related only to Minnesota consumers, not the State in general, and that the harm alleged is only to consumers who were influenced by the purported misinformation campaign, and thus only applies to a subset of identifiable Minnesotans.

A state "may act as the representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way." *Maryland v. Louisiana, 451 U.S. 725, 737, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981)*. "There is no question that a State is not a 'citizen' for purposes of the diversity jurisdiction." *Moor v. Alameda Cty., 411 U.S. 693, 717, 93 S. Ct. 1785, 36 L. Ed. 2d 596 (1973)*. The Complaint alleges injury to all Minnesotans and the Attorney General brings the action pursuant to state statutes and under *parens patriae authority* on behalf of Minnesota citizens and consumers. Defendants **[*36]** have not offered any precedent or a cognizable argument for treating this as anything other than an action by the State of Minnesota, and therefore this action does not give rise to federal diversity jurisdiction.

## CONCLUSION ON MOTION TO REMAND

The Court recognizes that the vast threat of climate change requires a comprehensive federal, and indeed, global response. The complex environmental impacts of climate change, and its far-reaching consequences for health, economy, and social wellbeing of all people cannot be understated. Given the stakes, the Court has some reluctance in remanding such significant litigation to state court. But the Court is also mindful of the limits

---

*LEXIS 24551, 2019 WL 653010, at *5-6 (W.D. Va. Feb. 14, 2019)* (same).

of its jurisdiction. If the State were—as Defendants suggest—seeking a referendum on the broad landscape of fossil fuel extraction, production, and emission, state court would most certainly be an inappropriate venue. However, the State's action here is far more modest than the caricature Defendants present. States have both the clear authority and primary competence to adjudicate alleged violations of state common law and consumer protection statutes, and a complex injury does not a federal action make. The limits **[\*37]** written into the Complaint likely will restrict the ultimate possible recovery in this case and thus, its possible impact on climate change, but that is the choice the State has made. Because this Court does not have original jurisdiction over this action, and because the claims alleged neither explicitly raise federal claims nor fall within one of the exceptions to the well-pleaded complaint rule, the Court must decline to exercise jurisdiction and remand the matter to state court.

## II. MOTION TO STAY

The FHR Defendants move the Court to stay proceedings until the Supreme Court issues a decision in *BP p.l.c. et al. v. Baltimore* and makes a determination on the Petition for Certiorari in *Chevron et al. v. City of Oakland et al.* (U.S., Jan. 8, 2021). The FHR Defendants argue that a stay is warranted because these cases are similar to the instant action and granting a stay would preserve judicial resources by alleviating the Court's need to decide issues now that may be ruled on by the Supreme Court within a few months. In addition, the FHR Defendants argue that a stay is necessary to prevent serious hardship, particularly if the Court grants the Motion to Remand and the Supreme Court's **[\*38]** decisions in either *Baltimore* or *Oakland* cast doubt on the remand. Finally, the FHR Defendants argue that the State cannot plausibly claim any meaningful harm from such a brief stay. The State opposes this Motion.

Because the Court finds that neither pending matter relied on by the FHR Defendants bear upon the Court's decision to remand the case for lack of federal jurisdiction, the Court will deny the FRH Defendants' Motion.

## A. STANDARD OF REVIEW

The Court has the inherent power and broad discretion to stay proceedings to control its docket, to conserve judicial resources, and to ensure that each matter is handled with economy of time and effort. *Sierra Club v. United States Army Corps of Eng'rs, 446 F.3d 808, 816 (8th Cir. 2006)* (citing *Clinton v. Jones, 520 U.S. 681, 706, 117 S. Ct. 1636, 137 L. Ed. 2d 945 (1997)).* A court may consider factors, including "conservation of judicial resources and the parties' resources, maintaining control of the court's docket, providing for the just determination of cases, and hardship or inequity to the party opposing the stay." *Frable v. Synchrony Bank, 215 F. Supp. 3d 818, 821 (D. Minn. 2016).* The moving party bears the burden of establishing that a stay is necessary. *Jones, 520 U.S. at 708.* When the stay is requested pending disposition of a petition for certiorari, "[a]pplicants bear the burden of persuasion on two questions: whether there is a balance of hardships in their favor; and whether **[\*39]** four Justices of [the Supreme Court] would likely vote to grant a writ of certiorari." *New York Times Co. v. Jascalevich, 439 U.S. 1304, 1304, 98 S. Ct. 3060, 58 L. Ed. 2d 12 (1978).*

## B. ANALYSIS

The question addressed by the Supreme Court in *Baltimore* is specific to the scope of appellate review of remand orders under *28 U.S.C. § 1447(d).* That issue is not present here, and it will arise only if Defendants appeal the Court's decision to grant the motion to remand. The Eighth Circuit, like the Fourth Circuit, has interpreted *28 U.S.C. § 1447(d)* to limit its scope of remand review to the removal grounds established in *28 U.S.C. § 1442* (federal officer removal) or *§ 1443* (civil rights claims). *See Jacks, 701 F.3d at 1229; Thornton v. Holloway, 70 F.3d 522, 524 (8th Cir. 1995).* Accordingly, the Supreme Court's decision in *Baltimore* will only potentially affect this action at the appellate stage, and does not bear upon a district court's determination.

While the petition in the *Oakland* case raises issues that are more pertinent to the instant proceedings, the FHR Defendants speculate that at least four Justices of the Supreme Court are likely to vote to grant certiorari because the Court granted certiorari in *Baltimore.* However, the scope of the *Oakland* defendants' petition is much broader than the narrow petition granted in *Baltimore.* The FHR Defendants generally assert that the Ninth Circuit's rejection of the federal **[\*40]** common law as a basis for removal is contrary to Supreme Court precedent, but provide little else to support their position that certiorari is likely to be granted.

Additionally, although the FHR Defendants argue that a

2021 U.S. Dist. LEXIS 62653, *40

stay will not prejudice the State, the State counters that a stay would be highly prejudicial to the public interest by delaying the proceedings for an indeterminate amount of time for the sake of pending decisions that do not bear upon the merits of this action. Of course, Defendants may appeal this decision which would result inevitably in a much longer delay. But balancing the hardships between the two parties, and not knowing whether the Defendants will appeal the remand, the Court finds that the State would likely be more prejudiced by a stay than Defendants would be by proceeding, particularly because Defendants cannot anticipate any relevant relief at this juncture related to the *Baltimore* case and the status of the *Oakland* petition is still very much uncertain. Ultimately, the possible prejudice to both sides is quite similar, and the Court will choose to try to move the case along as quickly as possible.

The Court therefore finds that Defendants have not met **[*41]** their burden of persuasion that a stay is necessary and denies the Motion.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

    1. Plaintiff's Motion to Remand [Docket No. 32] is **GRANTED**.

    2. FHR Defendants' Motion to Stay [Docket No. 56] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

DATED: March 31, 2021 at Minneapolis, Minnesota.

/s/ John R. Tunheim

JOHN R. TUNHEIM

Chief Judge

United States District Court

---

**End of Document**

 Caution
As of: April 8, 2024 9:14 PM Z

## *Nessel v. Chemguard, Inc.*

United States District Court for the Western District of Michigan, Southern Division

January 6, 2021, Decided; January 6, 2021, Filed

No. 1:20-cv-1080

**Reporter**

2021 U.S. Dist. LEXIS 39175 *; 2021 WL 744683

DANA NESSEL, et al., Plaintiffs, -v- CHEMGUARD, INC., et al., Defendants.

## Core Terms

contractor, color, removal, federal official, injuries, federal government, contamination

**Counsel:** **[*1]** For Amerex Corporation, defendant: Paul Donald Bratt, Warner Norcross & Judd LLP (Grand Rapids), Grand Rapids, MI; Scott Michael Watson, Warner Norcross & Judd LLP (Grand Rapids), Grand Rapids, MI.

For Chemguard Inc., Tyco Fire Products LP, defendants: Shauna Kramer, Williams & Connolly LLP, Washington, DC; Ann Marie Uetz, Foley & Lardner LLP (Detroit), Detroit, MI; Nicholas James Ellis, LEAD ATTORNEY, Foley & Lardner LLP (Detroit), Detroit, MI.

For Dana Nessel, on behalf of the People of the State of Michigan, Michigan State of, plaintiff: Danielle Allison-Yokom, MI Dept Attorney General (ENRA-Lansing), Lansing, MI; Polly A. Synk, MI Dept Attorney General (ENRA-Lansing), Lansing, MI; Amy E. Keller, LEAD ATTORNEY, DiCello Levitt Gutzler LLC, Chicago, IL.

For Dawn Chemical Corporation of Wisconsin Inc., defendant: Karen Libertiny Ludden, Dean & Fulkerson, Troy, MI; Sarah J. Brutman, Dean & Fulkerson, Troy, MI; James K. O'Brien, Dean & Fulkerson PC, Troy, MI.

For Fire Services Plus Inc., defendant: Moheeb H. Murray, Bush Seyferth PLLC (Troy), Troy, MI, Michael Ray Williams, Bush Seyferth PLLC, Kalamazoo, MI.

For Hazard Control Technologies Inc., defendant: Zachary C. Larsen, Clark Hill PLC **[*2]** (Lansing), Lansing, MI; Michael J. Pattwell, Clark Hill PLC (Lansing), Lansing, MI.

For Mine Safety Appliances Company LLC, defendant: Charles M. Denton, Barnes & Thornburg LLP (Grand Rapids), Grand Rapids, MI; Anthony C. Sallah, Barnes

& Thornburg LLP (Grand Rapids), Grand Rapids, MI.

For Perimeter Solutions LP, defendant: Matthew D. Thurlow, Baker & Hostetler LLP (DC), Washington, DC.

For Royal Chemical Company, defendant: Patrick C. Lannen, Plunkett Cooney (Bloomfield Hills), Bloomfield Hills, MI.

For Verde Environmental Inc., Micro-Blaze Inc., also known as, defendant: Cynthia J. Haffey, Butzel Long PC (Detroit), Detroit, MI.

**Judges:** Honorable Paul L. Maloney, United States District Judge.

**Opinion by:** Paul L. Maloney

## Opinion

### ORDER DENYING MOTION TO REMAND

This matter is before the Court on Plaintiffs' motion to remand this case back to Ingham County Circuit Court (ECF No. 25). For the reasons to be explained, the motion will be denied.

I.

This case is one of hundreds of lawsuits brought against manufacturers and distributors of firefighting agents known as aqueous film-forming foams ("AFFF"). The cases claim personal injury, property damage, natural resource damage, or other harms from exposure to certain chemicals **[*3]** contained in AFFF: per-and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid and perfluorooctainesulfonic acid. Plaintiffs allege that PFAS from AFFF "readily migrate in soil, surface water, and groundwater," and that "once these chemicals are released into the environment, they migrate into and cause extensive contamination and injury to State natural resources and property."

2021 U.S. Dist. LEXIS 39175, *3

(Complaint, ECF No. 1-1 at ¶¶ 163-164.) PFAS are "forever" chemicals: they do not degrade in the environment (*Id.* at ¶ 23). Plaintiffs allege that PFAS in the State of Michigan "continue[] to move through groundwater, surface waters, soils, and other natural resources, and cause contamination in new locations, adversely impacting State natural resources and property." (*Id.* at ¶ 237.)

There are two relevant types of AFFF: Commercially available AFFF and military grade ("MilSpec") AFFF. MilSpec AFFF is used on military bases and at federally regulated civilian airports (*Id.* at ¶ 4). Commercial AFFF is used in industrial facilities and in some state and local fire departments (*Id.* at ¶ 18). This case, originally filed in Ingham County Circuit Court, alleges that Defendants distributed, sold, released, **[*4]** supplied, transported, arranged for disposal or treatment, handled, and/or used Commercial AFFF and caused PFAS contamination. A nearly identical complaint, originally filed in this Court at Case No. 1:20-cv-787, alleges that Defendants[1] acted similarly but with MilSpec AFFF.

On November 9, 2020, two Defendants (Chemguard, Inc. and Tyco Fire Products LP) removed the Commercial AFFF case to this Court (ECF No. 1). Removal was based on the "federal government contractor" defense: Chemguard and Tyco are also named Defendants in the MilSpec case, and they argue that it will be impossible to determine which of Plaintiffs' injuries were caused by Commercial AFFF and which were caused by MilSpec AFFF. The injures, Defendants argue, are indivisible, so they intend to assert the same federal government contractor defense in this case that they are asserting in 1:20-cv-787.

There is a Judicial Panel on Multidistrict Litigation ("JPML") considering whether to transfer this action to a multidistrict litigation pending before the Honorable Richard M. Gergel in the District of South Carolina: *In re Aqueous Film-Forming Foams* (AFFF) *Products Liability Litigation* (MDL No. 2873) ("the MDL"). On September **[*5]** 11, 2020, the JMPL issued a conditional transfer order identifying the MilSpec case as appropriate for transfer to the MDL (*see* ECF No. 5 in Case No. 1:20-cv-787); that case was uneventfully transferred. On November 12, 2020, the JPML issued a conditional transfer order identifying this case as appropriate for transfer to the MDL (*see* ECF No. 23-1). However, Plaintiffs have objected to the proposed

transfer, and the JPML must resolve those objections before the transfer becomes effective.

On November 19, Chemguard and Tyco moved to stay this case until after the JPML issues its decision (ECF No. 23). On the same day, Plaintiffs moved to remand the case back to Ingham County Circuit Court (ECF No. 25). Plaintiffs opposed the stay and requested that the Court expedite its decision on their pending motion to remand (ECF Nos. 25, 35). The Court denied the motion to stay and set the motion to remand for oral argument (ECF No. 39). Briefing on the motion to remand has completed, and the Court no longer feels that oral argument is necessary (*see* ECF No. 57).

## II.

As a preliminary matter, this Court has jurisdiction to consider the motion to remand: "The pendency of a motion, order to show cause, **[*6]** conditional transfer order or conditional remand order before the Panel pursuant to *28 U.S.C. § 1407* does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court." JPML Rule 2.1(d).

"Subject matter jurisdiction is always a threshold determination[,]" and, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." *Morrision v. Humana, Inc., No. 3:16-CV-00598-GNS, 2017 U.S. Dist. LEXIS 81179, 2017 WL 2312476, at *2 (W.D. Ky. May 26, 2017)* (quoting *American Telecom Co., LLC v. Republic of Lebanon, 501 F.3d 534, 537 (6th Cir. 2007)* and *28 U.S.C. § 1447(c)*). Federal courts are of limited jurisdiction, so cases are only eligible for transfer to an MDL if jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)*; JPML Rule 1.1(h). Generally, motions to remand should be resolved before the panel acts on the motion to transfer so the federal court can assure itself of jurisdiction before the case transfers to the MDL. *Johnson v. Micron Technology, Inc., 354 F. Supp. 2d 736, 739-40 (E.D. Mich. 2005)*; *see also Curnow v. Stryker Corp., No. 13-13271, 2013 U.S. Dist. LEXIS 147917, 2013 WL 5651439, at *3 (E.D. Mich. Oct. 15, 2013)*.

The Defendants[2] argue that this Court has jurisdiction to

---

[1] Case No. 1:20-cv-787 lists all of the Defendants in this case and some additional defendants.

[2] Most Defendants have not answered yet, but several have

2021 U.S. Dist. LEXIS 39175, *6

hear this case based on their federal government contractor defense. While federal jurisdiction is usually determined solely by the claims presented in the complaint, the federal government contractor defense is an exception to that rule. *See Jefferson County, Alabama v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)*. The federal officer removal provision **[*7]** permits a defendant to remove a state-court action brought against the

> United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

*28 U.S.C. § 1442(a)(1)*. This is intended to provide "broad" removal rights to Defendants working with the federal government. *Willingham v. Morgan, 395 U.S. 402, 406, 89 S. Ct. 1813, 23 L. Ed. 2d 396 (1969)*.

This statute has a three-pronged test to entitle Defendants to removal. First, they must establish that they are "person[s]" within the meaning of the statute who "act[ed] under [a federal] officer[.]" *Bennett v. MIS Corp., 607 F.3d 1076, 1085 (6th Cir. 2010), 28 U.S.C. § 1442(a)(1)*. Second, they must demonstrate that they performed the actions for which they are being sued "under color of [federal] office[.]" *Id.* And finally, they must show that they have raised a colorable federal defense. *Id.*

III.

First, there is no dispute that Defendants are "persons" within the meaning of the statute. The Sixth Circuit has concluded that because *§ 1442* does not exclude corporations, it includes them. Id. And there is also no dispute **[*8]** that Defendants were "acting under" a federal officer. A private contractor is "acting under" a federal officer if it is "helping the Government to produce an item that it needs." *Watson v. Philip Morris Co., Inc., 551 U.S. 142, 153-54, 127 S. Ct. 2301, 168 L. Ed. 2d 42 (2007)*. Essentially, if a private contractor is performing a job that "in the absence of a contract with a private

firm, the Government itself would have had to perform," the contractor is acting under a federal officer. *Id.* In this case, Plaintiffs have admitted that Defendants were producing MilSpec AFFF (*see generally* ECF No. 1 in Case No. 1:20-cv-757). This is a product that the Government would have had to create if Defendants did not exist. Therefore, Defendants have satisfied the "acting under" requirement of *§ 1442(a)(1)*.

Second, Defendants performed the actions for which they are being sued "under color of [federal] office." To satisfy this requirement, Defendants must show a nexus or a "causal connection" between the charged conduct and the asserted official authority. *Bennett, 607 F.3d at 1088*. The Supreme Court has indicated that the "hurdle erected by this requirement is quite low." *Isaacson v. Dow Chemical Co., 517 F.3d 129, 137 (2d Cir. 2008)* (citing *Maryland v. Soper, 270 U.S. 9, 33, 46 S. Ct. 185, 70 L. Ed. 449 (1926))*. It is enough that the challenged conduct occurred while the Defendant was acting at the direction of a federal officer. *Id.* Even if plaintiffs are **[*9]** later able to demonstrate that their injuries occurred "because of an act not contemplated by [the federal contract], it is sufficient for [removal] purposes that [execution of the federal contracts] gave rise of the alleged cross-contamination." *Bennett, 607 F.3d at 1088*. The specific factual questions of whether the challenged act was within the scope of the federal contract are for federal—not state—courts to answer. *Id.*

Here, Plaintiffs argue that the injuries from Commercial AFFF and the injuries from MilSpec AFFF will be distinguishable, but they provide no evidence in support of that allegation: they simply state that they will provide that information "at the appropriate time in the litigation." (ECF No. 25-1 at PageID.340.) The substantial similarity between Plaintiffs' two complaints belies this argument: Plaintiffs admit that each Defendant was producing and selling MilSpec AFFF during the relevant timeframe, and Plaintiffs admit that the chemicals in AFFF get into groundwater and spread contamination throughout the state. The two types of AFFF contain some of the same PFAS compounds (see ECF No. 45-17 at ¶ 4). The Court that ultimately hears this case will likely have to engage in a detailed fact-finding **[*10]** process to determine whether the injuries from MilSpec and Commercial AFFF can be distinguished: right now, there is not clear evidence either way. It is entirely possible that Plaintiffs' injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF.

Plaintiffs argue that that they have divided the two

---

joined Chemguard and Tyco (*see* Dawn Chemical Corporation of Wisconsin, Inc.'s response in opposition to motion to remand, ECF No. 32, and Royal Chemical Company's response in opposition to motion to remand, ECF No. 46). Because their positions align, the Court refers to these four Defendants collectively.

2021 U.S. Dist. LEXIS 39175, *10

complaints, and that they do not seek resolution of any claims related to MilSpec AFFF here, so this prong of the removal test cannot be satisfied. But Plaintiffs cannot decide what defense Defendants might present. Consider, for example, a tort case: a plaintiff can allege that a defendant and *only* that defendant caused his injury, but a plaintiff cannot prevent a defendant from presenting an alternate theory of causation. Thus, while Plaintiffs attempt to surgically divide their complaints between Commercial and MilSpec AFFF, they cannot prevent Defendants from raising the production of MilSpec AFFF as a defense or an alternate theory, particularly when *Plaintiffs admit* that Defendants produced MilSpec AFFF and that PFAS from AFFF spread contamination throughout the state. The Court finds that Plaintiffs' artful pleading does **[*11]** not obviate the facts on the ground. Defendants were at least plausibly acting under color of federal office during the relevant timeframe, and therefore, Defendants have established the nexus required by *§ 1442(a)(1)*.

Finally, Defendants must show that they have raised a colorable federal defense. They assert the government contractor defense articulated in *Boyle v. United Technologies Corp., 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988)*. That defense also has a three-prong test:

> [l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id. at 512*. Defendants need not completely prove the validity of this defense; they must only show that the defense is plausible. *Bennett, 607 F.3d at 1089*.

The Court finds that Defendants (aided by Plaintiffs' admissions about Defendants in 1:20-cv-787) have met this burden by alleging that the Government provided specifications for MilSpec AFFF, that their AFFF conformed to those specifications, and that they were not aware of any dangers unknown to the Government. **[*12]** Whether these facts are true is not for this Court to determine at this stage. The Court need only consider whether the defense is plausible; it is. Therefore, Defendants have raised a colorable federal defense and satisfied the final prong of the test for removal.

IV.

For these reasons, the Court finds that it has subject matter jurisdiction to hear this case. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' motion to remand (ECF No. 25) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to expedite (ECF No. 35) is **DISMISSED** as moot.

**IT IS SO ORDERED**.

Date: January 6, 2021

/s/ Paul L. Maloney

Paul L. Maloney

United States District Judge

---

**End of Document**

 Positive
As of: April 8, 2024 9:15 PM Z

## *Phillips v. Asbestos Corp. Ltd.*

United States District Court for the Northern District of California

February 26, 2014, Decided; February 26, 2014, Filed

No. C 13-5655 CW

**Reporter**
2014 U.S. Dist. LEXIS 24792 *

DAVID PHILLIPS, Plaintiff, v. ASBESTOS CORPORATION LIMITED, et al., Defendants.

**Prior History:** [*1] (Re: Docket No. 27).

## Core Terms

removal, federal official, asbestos, military, federal government, superior court, contractor, color, plaintiff's claim, removal statute, express waiver, federal court, specifications, demonstrates, exposure, immunity, jobsites, supplier, disease, vessels, moves

**Counsel:** For David Phillips, Plaintiff: Alan R. Brayton, David R. Donadio, Kimberly Joy Wai Jun Chu, Richard Martin Grant, Brayton Purcell LLP, Novato, CA.

For Crane Co., Defendant: Peter Edward Soskin, LEAD ATTORNEY, Michele Cherie Barnes, K&L Gates LLP, San Francisco, Ca; Brendan John Tuohy, K&L GATES, LLP, San Francisco, CA.

For Metropolitan Life Insurance Company, Defendant: Lisa Marie Petrovsky, Steptoe and Johnson LLP, Los Angeles, CA.

For CBS Corporation, formerly known as Viacom Inc., formerly known as Westinghouse Electric Corporation, Defendant: Amit Palta, Mary Katherine Back, Pond North LLP, Los Angeles, CA.

For Cleaver-Brooks, Inc., Defendant: Nicole Denine Brown Yuen, Oakland, CA.

For J.T. Thorpe & Son, Inc., Defendant: Reshma Amarlal Bajaj, Attorney at Law, Bassi Edlin Huie Blum LLP, San Francisco, CA.

For ITT Corporation, formerly known as ITT Industries, Inc., Defendant: Arpi Galfayan, Prindle, Amaro, Goetz, Hillyard, Barnes and Reinholtz LLP, Long Beach, CA; Carla Lynn Crochet, Prindle, Decker and Amaro, Long Beach, CA; Jeremy David Milbrodt, Long Beach, CA.

For Hennessy Industries, Inc., Defendant: Mitchell B

Malachowski, Gordon and Rees LLP, San Diego, CA.

**Judges:** CLAUDIA [*2] WILKEN, United States District Judge.

**Opinion by:** CLAUDIA WILKEN

## Opinion

ORDER GRANTING MOTION TO REMAND

Plaintiff David Phillips moves to remand this case back to San Francisco superior court. Defendant Crane Co. opposes. The Court finds this motion suitable for disposition without oral argument pursuant to Civil *Local Rule 7-1(b).* Having considered the papers submitted by the parties, the Court GRANTS Phillips' motion to remand.

FACTUAL BACKGROUND

On December 20, 2011, Phillips filed suit in San Francisco superior court against Crane and other defendants, asserting negligence and other state law claims for causing him asbestos - related injuries. Specifically, Phillips worked at several locations containing asbestos, including the Mare Island Naval Shipyard, and now suffers from asbestos-related pleural disease and asbestosis, serious lung diseases that are associated with the inhalation of asbestos fibers. In his complaint, Phillips expressly waived claims against Crane relating to his exposure to asbestos at military and federal government jobsites, or from U.S. military vessels, aircraft, or equipment. Complaint ¶ 6.

On December 6, 2013, Crane removed this action to federal court. Phillips now moves to [*3] remand the suit back to San Francisco superior court.

DISCUSSION

Crane argues that it properly removed this action under the federal officer removal statute, which provides that

2014 U.S. Dist. LEXIS 24792, *3

an action may be removed by "any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." *28 U.S.C. § 1442(a)(1)*. Suits against federal officers are exceptional in that they may be removed to federal court despite the nonfederal nature of the complaint. *Jefferson County v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999)*. Although removal under *§ 1441* is strictly construed, with any doubt resolved in favor of remand, the removal rights of *§ 1442* are broader than those provided by *§ 1441* because it is important to the federal government to protect its officers. See *Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992)*; *Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1252 (9th Cir. 2006)*. The Ninth Circuit instructs that there is a "clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret *section 1442* broadly in favor of removal." *Durham, 445 F.3d at 1252* (quoting *Arizona v. Manypenny, 451 U.S. 232, 242, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981))*.

Thus, **[*4]** the fact that Phillips' complaint expressly disavows any federal claims is not determinative. Rather, removal is proper under the federal officer removal statute if the removing party: (1) demonstrates that it acted under the direction of a federal officer; (2) raises a colorable federal defense to the plaintiff's claims; and (3) demonstrates a causal nexus between the plaintiff's claims and the defendant's acts performed under color of federal office. *Mesa v. California, 489 U.S. 121, 124-25, 134-35, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989)*; *Fung v. Abex Corp., 816 F. Supp. 569, 571-72 (N.D. Cal. 1992)*.

Here, Crane claims that the federal defense of military contractor immunity shields it from liability. This doctrine provides, "Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Technologies Corp., 487 U.S. 500, 512, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988)*. The justification for this defense is that liability for independent **[*5]** contractors performing work for the federal government constitutes a uniquely federal concern. *Id. at 505*.

In the present case, however, Phillips has expressly disclaimed and waived any claim arising out of or

related to any asbestos exposure aboard federal jobsites and navy vessels. This removes any claims to which military contractor immunity might act as a defense. The Court sees no reason not to hold Phillips to this waiver; this same waiver language was found to justify remand in many cases in this district with very similar facts.[1] The waiver justifies remand. If Phillips later attempts to reverse course, and is allowed to do so by the state court despite his express waiver, Crane can remove once again.[2]

IT IS SO ORDERED.

Dated: 2/26/2014

/s/ Claudia Wilken

CLAUDIA WILKEN

United States District Judge

---

**End of Document**

---

[1] See, e.g., *Pratt v. Asbestos Corp., Ltd., 2011 U.S. Dist. LEXIS 108217, 2011 WL 4433724 (N.D. Cal.)*; *Dobrocke v. Allis-Chalmers Corp. Product Liability Trust, 2009 U.S. Dist. LEXIS 46699, 2009 WL 1464153 (N.D. Cal.)*; *Madden v. A.H. Voss Co., 2009 U.S. Dist. LEXIS 46699, 2009 WL 341377 (N.D. Cal.)*; *Westbrook v. Asbestos Defendants, 2001 U.S. Dist. LEXIS 11575, 2001 WL 902642 (N.D. Cal.)*.

[2] See *28 U.S.C. § 1446(b)(3)* ("if the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant . . . of a copy of an amended pleading, **[*6]** motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.").

Kelly Christopher

Q Questioned
As of: April 8, 2024 9:15 PM Z

## *Robinson v. Pfizer Inc.*

United States District Court for the Eastern District of Missouri, Eastern Division

April 29, 2016, Decided; April 29, 2016, Filed

Case No. 4:16-CV-439 (CEJ)

**Reporter**
2016 U.S. Dist. LEXIS 57174 *

ELAINE ROBINSON, et al., Plaintiffs, vs. PFIZER INC., Defendant.

**Subsequent History:** Costs and fees proceeding at *Robinson v. Pfizer Inc., 2016 U.S. Dist. LEXIS 65920 (E.D. Mo., May 19, 2016)*

## Core Terms

plaintiffs', fraudulent, diversity, joinder, misjoinder, joined, out-of-state, non-diverse, removal, parties, subject matter jurisdiction, fraudulent joinder, egregious

**Counsel:** **[*1]** For Elaine Robinson, Helen Psaras, Rebecca Couture, Vanesa Ford, Georgia Lee Harlan, Claire A. Holmes, Tina Loomis, Juana Miles, Deloris Mitchell, Himilce Negron, Carol L. Qualls, Rhonda Robinson, Harriet L. Scott, Charlottte L. Shaw, Susan M. Simcox, Linda C. Tanguay, Violet E. Wyers, Kim Diling, Rebekah McDonald, Socorro Perez, Cynthia Weddle, Mary Higdon, Yolanda Baker, Priscilla Billingslea, Yiona Bryant, Diane Ezell, Janet Gallo, Ladessa Lewis, Quynh Nguyen, Isabel Power, Denise Proulx, Sharon Wheelehan, Patricia Herrera, Carol Henriques, Linda Christner, Rita Probst, Patricia Johnson, Lois Morton, Sharon Bowers, Henrietta Eatman, Sharon Murdock, Mildred Watley, Delayne Wharton, Patricia Trotman, Gladys Bates, Helen Courtney, Myrtle White-Royes, Carol Peterson, Elena Barnovics, Victoria Elleman, Eleftheria Karamihalis, Linda L. Jackson, Gladys F. Brent, Mary Robinson, Martha Farr, Eliza Taylor, Rose Rush-Gaswirth, Ardell R. Martinez, Carol A. Moran, Lou Anne Box, Barbara L. Kuikahi, Elizabeth A. Parks-McDonald, Willie Williams, Clara Yarborough, Plaintiffs: Trent B. Miracle, LEAD ATTORNEY, Eric S. Johnson, SIMMONS AND HANLY, LLC, Alton, IL.

For Pfizer, Inc., Defendant: Mark C. Hegarty, **[*2]** LEAD ATTORNEY, SHOOK AND HARDY, LLP, Kansas City, MO.

**Judges:** CAROL E. JACKSON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** CAROL E. JACKSON

## Opinion

**MEMORANDUM AND ORDER**

This matter is before the Court on plaintiffs' motion to remand the complaint to the Missouri state court from which the case was removed pursuant to *28 U.S.C. § 1447(c)*. Defendant has responded in opposition. Also before the Court is defendant's motion to stay the proceedings in this action pending a decision by the Judicial Panel on Multidistrict Litigation regarding the transfer of this action to a Multidistrict Litigation (MDL) action pending in the District of South Carolina, to which plaintiff has responded in opposition.

### I. Background

On February 29, 2016, sixty-four plaintiffs from twenty-nine states filed this action in the Circuit Court for the City of St. Louis, Missouri, alleging seven state law causes of action against defendant arising out of its manufacture and sale of the prescription medication Lipitor (atorvastatin calcium). Plaintiffs allege that they developed Type II diabetes as a result of ingesting Lipitor. Plaintiffs assert claims of product liability for failure to warn, negligence, breach of implied warranty, fraud, constructive fraud, unjust **[*3]** enrichment, and punitive damages.

On March 31, 2016, defendant removed the action to this Court on the basis of diversity jurisdiction, *28 U.S.C. § 1332*. Defendant is a citizen of Delaware and New York. Six plaintiffs are also citizens of New York.

Despite the lack of complete diversity on the face of the complaint, defendant argues that diversity jurisdiction exists because the out-of-state plaintiffs' claims were either fraudulently joined or procedurally misjoined, and thus, the out-of-state plaintiffs should be ignored for purposes of determining jurisdiction. Plaintiffs move to remand, arguing that the out-of-state plaintiffs' claims have been properly joined, and the Court lacks subject matter jurisdiction over this action in the absence of complete diversity of the parties.

## II. Discussion

### A. Motion to Stay

Defendant moves to stay the proceedings until the Judicial Panel on Multidistrict Litigation (JPML) rules on its motion to transfer this case to the MDL proceeding In re: Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation (No. II), MDL No. 2502. However, "[a] putative transferor court need not automatically postpone rulings on pending motions, or in any **[\*4]** way generally suspend proceedings, merely on grounds that an MDL transfer motion has been filed." _Spears v. Fresenius Med. Care N. Am., Inc., No. 4:13-CV-855 (CEJ), 2013 U.S. Dist. LEXIS 82423, 2013 WL 2643302, at \*1 (E.D. Mo. June 12, 2013)_ (quoting _T.F. v. Pfizer, Inc., No. 4:12-CV-1221 (CDP), 2012 U.S. Dist. LEXIS 101859, 2012 WL 3000229, at \*1 (E.D. Mo. July 23, 2012))_. "This is especially true where, as here, [a] pending motion is one for remand and goes to the Court's subject matter jurisdiction." _Id._ "This Court is in the best position to determine subject matter jurisdiction, and waiting for a decision by the JPML before ruling on the motion to remand 'would not promote the efficient administration of justice.'" _Id._ Accordingly, defendant's motion to stay will be denied.

### B. Motion to Remand

An action is removable to federal court if the claims originally could have been filed in federal court. _28 U.S.C. § 1441_; _In re Prempro Prods. Liab. Litig., 591 F.3d 613, 619 (8th Cir. 2010)_. The defendant bears the burden of establishing federal jurisdiction by a preponderance of the evidence. _Altimore v. Mount Mercy Coll., 420 F.3d 763, 768 (8th Cir. 2005)_. A case must be remanded if, at any time, it appears that the district court lacks subject-matter jurisdiction. _28 U.S.C. § 1447(c)_; _Fed. R. Civ. P. 12(h)(3)_. Any doubts about

the propriety of removal are resolved in favor of remand. _Wilkinson v. Shackelford, 478 F.3d 957, 963 (8th Cir. 2007)_.

Removal in this case was premised on diversity jurisdiction, which requires an amount in controversy greater than $75,000 and complete diversity of citizenship among **[\*5]** the litigants. _28 U.S.C. § 1332(a)_. "Complete diversity of citizenship exists where no defendant holds citizenship in the same state where any plaintiff holds citizenship." _OnePoint Solutions, LLC v. Borchert, 486 F.3d 342, 346 (8th Cir. 2007)_. There is no dispute that the amount in controversy is over $75,000. Likewise, the parties agree that six plaintiffs are citizens of the same state as defendant and, thus, complete diversity is lacking on the face of the complaint. Defendant argues that this Court nonetheless has diversity jurisdiction because the out-of-state plaintiffs' claims were either fraudulently joined or procedurally misjoined.

"Courts have long recognized fraudulent joinder as an exception to the complete diversity rule." _Prempro, 591 F.3d at 620_. "Fraudulent joinder occurs when a plaintiff files a frivolous or illegitimate claim against a non-diverse defendant solely to prevent removal." _Id._ To prove fraudulent joinder, the removing party must show that "the plaintiff's claim against the diversity-destroying defendant has 'no reasonable basis in fact and law.'" _Knudson v. Sys. Painters, Inc., 634 F.3d 968, 980 (8th Cir. 2011)_ (quoting _Filla v. Norfolk S. Ry. Co., 336 F.3d 806, 810 (8th Cir. 2003))_. "[I]f it is _clear_ under governing state law that the complaint does not state a cause of action against the non-diverse defendant, the joinder is fraudulent." _Id._ Conversely, "joinder is not fraudulent where 'there **[\*6]** is arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved.'" _Id._ (quoting _Filla, 336 F.3d at 811_).

Fraudulent misjoinder, a doctrine the Eighth Circuit has neither accepted nor rejected, occurs when a plaintiff joins a viable claim, either by another non-diverse plaintiff or against another non-diverse defendant, with "no reasonable procedural basis to join them in one action" because the claim that destroys diversity has "no real connection with the controversy." _Prempro, 591 F.3d at 620_ (footnotes and citations omitted); see _id. at 622_ ("[W]e conclude that even if we adopted the doctrine, the plaintiffs' alleged misjoinder in this case is not so egregious as to constitute fraudulent misjoinder."). Whether a party has been fraudulently misjoined depends on whether there has been an

2016 U.S. Dist. LEXIS 57174, *6

"egregious and grossly improper" joinder "under the broadly-interpreted joinder standards." *Id. at 624*.

Thus, fraudulent misjoinder challenges the propriety of joining viable claims into a single action while fraudulent joinder challenges the viability of the claims themselves. In other words, alleging fraudulent joinder "requires the court to look, at least somewhat, at the substantive merits of the claim," while **[*7]** fraudulent misjoinder is a question of procedure. See *Bowling v. Kerry, Inc., 406 F. Supp. 2d 1057, 1060 (E.D. Mo. 2005)* (referring to fraudulent misjoinder as "procedural misjoinder").

Here, defendant is not asking the Court to assess the out-of-state plaintiffs' claims to determine if the plaintiffs have a cause of action under substantive state law; rather, defendants are challenging the propriety of joining the out-of-state plaintiffs' claims into a single action.[1] Correctly characterized, defendants' argument is based on the theory of fraudulent misjoinder. Thus, the real issue is whether the out-of-state plaintiffs' claims have been properly joined under *Rule 20 of the Federal Rules of Civil Procedure*. As in *Prempro* and several recent cases before this Court, even if the fraudulent misjoinder doctrine is applied, it does not support this Court's exercise of jurisdiction. See, e.g., *Morgan v. Janssen Pharms., Inc., No. 4:14-CV-1346 (CAS), 2014 U.S. Dist. LEXIS 164811, 2014 WL 6678959 (E.D. Mo. Nov. 25, 2014)*; *Butler v. Ortho-McNeil-Janssen Pharms., Inc., No. 4:14-CV-1485*

_____

[1] According to defendant, no federal or state court in Missouri can exercise personal jurisdiction over defendant and comport with due process with respect to the out-of-state plaintiffs' claims. The parties do not dispute, however, that Missouri **[*8]** courts have personal jurisdiction over defendant with respect to the in-state plaintiffs' claims. Missouri courts, thus, may properly exercise personal jurisdiction over defendant with respect to this cause of action as a whole arising out of or related to its contacts and conduct in Missouri. See *Shaffer v. Heitner, 433 U.S. 186, 204, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977)* (stating that the proper focus of the due process inquiry for the exercise of personal jurisdiction is "the relationship among the defendant, the forum, and the litigation"); see also *Walden v. Fiore, 134 S. Ct. 1115, 1126, 188 L. Ed. 2d 12 (U.S. 2014)* ("[I]t is the defendant, not the plaintiff or third parties, who must create contacts with the forum State."); *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 779, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)* (permitting a forum State to assert personal jurisdiction over a nonresident defendant on a claim related to the defendant's activities within the forum State when the plaintiff's contacts with the forum were "extremely limited" or even "entirely lacking").

*(RWS), 2014 U.S. Dist. LEXIS 142985, 2014 WL 5025833 (E.D. Mo. Oct. 8, 2014)*; *Orrick v. Smithkline Beecham Corp., No. 4:13-CV-2149 (SNLJ), 2014 U.S. Dist. LEXIS 112003, 2014 WL 3956547 (E.D. Mo. Aug. 13, 2014)*.

*Rule 20* "allows multiple plaintiffs to join in a single action if (i) they assert claims 'with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences;' and (ii) 'any question of law or fact common to all plaintiffs will arise in the action.'" *Prempro, 591 F.3d at 622* (quoting *Fed. R. Civ. P. 20(a)(1)*). Missouri's permissive joinder rule is substantively **[*9]** identical. *Mo. Sup. Ct. R. 52.05(a)*; *State ex rel. Allen v. Barker, 581 S.W.2d 818, 826 (Mo. banc 979)*. "In construing *Rule 20*, the Eighth Circuit has provided a very broad definition for the term 'transaction.'" *Prempro, 591 F.3d at 622*. "It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Mosley v. Gen. Motors Corp., 497 F.2d 1330, 1333 (8th Cir. 1974)*. Accordingly, *Rule 20* "permit[s] all reasonably related claims for relief by or against different parties to be tried in a single proceeding," without requiring "[a]bsolute identity of all events." *Prempro, 591 F.3d at 622*.

"Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers v. Gibbs, 383 U.S. 715, 724, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)*. Plaintiffs' subjective intent in adding non-diverse parties is irrelevant to the Court's *Rule 20* analysis. As the Eighth Circuit has held, "if the nondiverse plaintiff is a real party in interest, the fact that his joinder was motivated by a desire to defeat federal jurisdiction is not material." *Iowa Pub. Serv. Co. v. Med. Bow Coal Co., 556 F.2d 400, 404 (8th Cir. 1977)*; *id. at 406* ("[I]f [a plaintiff] can avoid the federal forum by the device of properly joining a nondiverse defendant or a nondiverse co-plaintiff, he is free to do so.").

On numerous occasions, this Court has determined that the joinder of plaintiffs alleging injury from a single **[*10]** drug is not "egregious," because common issues of law and fact connect the plaintiffs' claims. See, e.g., *Parker v. Pfizer, Inc., No. 4:15-CV-441 (CAS), 2015 U.S. Dist. LEXIS 84554, 2015 WL 3971169 (E.D. Mo. June 30, 2015)* (Viagra); *Gracey v. Janssen Pharms., Inc., No. 4:15-CV-407 (CEJ), 2015 U.S. Dist. LEXIS 57990, 2015 WL 2066242 (E.D. Mo. May 4, 2015)* (Risperidone);

*Hebron v. Abbvie Inc., No. 4:14-CV-1910 (ERW), 2014 U.S. Dist. LEXIS 183715 (E.D. Mo. Dec. 18, 2014)* (AndroGel); *Polk v. Pfizer, Inc., No. 4:15-CV-542 (ERW), 2015 U.S. Dist. LEXIS 57335, 2015 WL 1976370 (E.D. Mo. May 1, 2015)* (Lipitor); *T.F. ex rel. Foster v. Pfizer, Inc., No. 4:12-CV-1221 (CDP), 2012 U.S. Dist. LEXIS 101859, 2012 WL 3000229 (E.D. Mo. July 23, 2012)* (Zoloft); *Douglas v. GlaxoSmithKline, LLC, No. 4:10-CV-971 (CDP), 2010 U.S. Dist. LEXIS 66234, 2010 WL 2680308 (E.D. Mo. July 1, 2010)* (Avandia). The Court finds that here, as in those cases, plaintiffs' claims satisfy *Rule 20(a)*'s standard. First, plaintiffs' complaint raises common questions of law or fact regarding injuries alleged from use of the same product and arising from the same design, testing, development, labeling, packaging, distribution, marketing, and sales practices for that product. Also, because plaintiffs' allegations relate to defendant's design, manufacture, testing, and promotion of Lipitor—occurrences common as to all plaintiffs—their claims also arise out of the same transaction or occurrence, or series thereof. That is so even if the end-of-the-line exposures occurred in different states and under the supervision of different medical **[*11]** professionals. Thus, defendant has failed to demonstrate that the joinder of the out-of-state plaintiffs' claims with the in-state plaintiffs' claims is so egregious as to constitute fraudulent misjoinder. See *Prempro, 591 F.3d at 624*.

Accordingly, the Court finds that joinder of all sixty-four plaintiffs' claims under *Rule 20(a)* is proper. Because the joinder of claims in this case does not constitute egregious misjoinder, complete diversity does not exist. Thus, Defendant has not met its burden of demonstrating that this Court has jurisdiction over this case as required by *28 U.S.C. § 1332*. Because the Court lacks subject matter jurisdiction over this case, the case will be remanded to state court.

Finally, plaintiffs requests attorneys' fees and costs pursuant to *28 U.S.C. § 1447(c)*, which grants courts the authority "to require payment of just costs and actual expenses, including attorney fees, incurred as a result of the removal." The cases in which this defendant has been informed by this Court under substantially similar circumstances that joinder of the plaintiffs' claims is proper under *Rule 20* and controlling Eighth Circuit case law include: *Clark v. Pfizer, Inc., No. 4:15-CV-546 (HEA), 2015 U.S. Dist. LEXIS 102173, 2015 WL 4648019 (E.D. Mo. Aug. 5, 2015)*; *Parker, 2015 U.S. Dist. LEXIS 84554, 2015 WL 3971169*; *Polk, 2015 U.S. Dist. LEXIS 57335, 2015 WL 1976370*; *Davood v. Pfizer Inc., No. 4:14-CV-970 (CEJ), 2014 U.S. Dist.*

LEXIS 78678, 2014 WL 2589198 (E.D. Mo. June 10, 2014)*; *Jennings v. Pfizer Inc., No. 4:14-CV-276 (HEA), 2014 U.S. Dist. LEXIS 81044 (E.D. Mo. May 8, 2014)* **[*12]** ; *Lovett v. Pfizer Inc., No. 4:14-CV-458 (CEJ), 2014 U.S. Dist. LEXIS 39983, 2014 WL 1255956 (E.D. Mo. Mar. 26, 2014)*; *Jackson v. Pfizer Inc., No. 4:13-CV-1915 (RWS), 2013 U.S. Dist. LEXIS 186545 (E.D. Mo. Oct. 15, 2013)*; S.L. v. Pfizer, Inc., No. 4:12-CV-420 (CEJ) (E.D. Mo. Apr. 29, 2013); *T.F. ex rel. Foster, 2012 U.S. Dist. LEXIS 101859, 2012 WL 3000229*. In at least twenty-five other cases, this Court has remanded for lack of subject matter jurisdiction when other defendants have attempted to remove matters to federal court asserting substantially similar arguments. See e.g., *Littlejohn v. Janssen Research & Dev., LLC, No. 4:15-CV-194 (CDP), 2015 U.S. Dist. LEXIS 48048, 2015 WL 1647901 (E.D. Mo. Apr. 13, 2015)*; *Swann v. Johnson & Johnson, No. 4:14-CV-1546 (CAS), 2014 U.S. Dist. LEXIS 167254, 2014 WL 6850766 (E.D. Mo. Dec. 3, 2014)*; *Morgan, 2014 U.S. Dist. LEXIS 164811, 2014 WL 6678959*; *Butler, 2014 U.S. Dist. LEXIS 142985, 2014 WL 5025833*; *McGee v. Fresenius Med. Care N. Am., Inc., No. 4:14-CV-967 (SNLJ), 2014 U.S. Dist. LEXIS 90735, 2014 WL 2993755 (E.D. Mo. July 3, 2014)*; *Coleman v. Bayer Corp., No. 4:10-CV-1639 (SNLJ), 2010 U.S. Dist. LEXIS 143673, 2010 WL 10806572 (E.D. Mo. Dec. 9, 2010)*. In light of these repeated admonishments and remands to state court for six years, defendant can no longer argue that its asserted basis for seeking removal to federal court in these circumstances is objectively reasonable. Accordingly, the Court finds that plaintiffs are entitled to just costs and actual expenses because defendant lacked an objectively reasonable basis for seeking removal. Plaintiffs will be required to submit a bill of costs and expenses in support of their request for the Court's approval.

* * * **[*13]**  *

For the reasons set forth above,

**IT IS HEREBY ORDERED** that defendant's motion to stay the proceedings in this action pending MDL transfer [Doc. #8] is **denied**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for remand [Doc. #11] is **granted**.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall remand this action to the Twenty-Second Judicial Circuit Court of Missouri (City of St. Louis), from which it was removed.

2016 U.S. Dist. LEXIS 57174, *13

**IT IS FURTHER ORDERED** that plaintiffs shall have five days from the date of this order to submit documentation of the costs and expenses they reasonably incurred as a result of defendant's removal in support of their request for attorney fees and costs under *28 U.S.C. § 1447(c)*.

/s/ Carol E. Jackson

CAROL E. JACKSON

UNITED STATES DISTRICT JUDGE

Dated this 29th day of April, 2016.

---

**End of Document**

 Positive
As of: April 8, 2024 9:16 PM Z

# *Schulz v. Crane Co.*

United States District Court for the Eastern District of California

January 23, 2014, Decided; January 23, 2014, Filed

No. 2:13-cv-02370-KJM-AC

**Reporter**
2014 U.S. Dist. LEXIS 9198 *; 2014 WL 280361

PAUL SCHULZ, Plaintiff, v. CRANE CO., et al., Defendants.

## Core Terms

removal, colorable, sufficient justification, military, government contractor, virtually identical, asbestos exposure, plaintiff's claim, federal official, district court, instant motion, asbestos case, jobsites, vessels, waivers, courts, Reply

**Counsel:** **[*1]** For Paul Schulz, Plaintiff: Alan R. Brayton, Richard M. Grant, LEAD ATTORNEYS, Brayton Purcell LLP, Novato, CA.

For Honeywell International, Inc., Defendant: Eric D Sentlinger, LEAD ATTORNEY, Perkins Coie LLP, San Francisco, CA.

For Republic Supply Company, RPI Company, Defendants: Christine L. Hawkins, LEAD ATTORNEY, Foley & Mansfield, PLLP, Oakland, CA.

For CBS Corporation, formerly known as Viacom Inc., formerly known as Westinghouse Electric Corporation, Defendant: Amit Palta, Mary Katherine Back, LEAD ATTORNEYS, Pond North LLP, San Francisco, CA; Kevin D. Jamison, LEAD ATTORNEY, Pond North LLP, Los Angeles, CA.

For Genuine Parts Company, Defendant: Howard David Ruddell, Pond North, LLP, LEAD ATTORNEY, Pond North, LLP, Los Angeles, CA.

For CSK Auto, Inc., Defendant: Mirna J. Scheffy, LEAD ATTORNEY, Hawkins Parnell Thackston & Young LLP, San Francisco, CA.

For Grinnell LLC, formerly known as Grinnell Corporation, formerly known as Grinnell Fire, Santa Fe Braun, Inc., as Successor-in-interest to C.F. Braun, Inc., Defendants: Kristina Francia Almquist, LEAD ATTORNEY, Morgan Lewis & Bockius, San Francisco, CA.

For Exxon Mobil Corporation, Defendant: Bradley K. Kaplan, LEAD ATTORNEY, Armstrong **[*2]** & Associates, Oakland, CA.

For Anheuser-Busch, LLC, formerly known as Anheuser-Busch, Inc., Defendant: Cristyn Nicole Chadwick, Reed Smith, LLP, Los Angeles, CA.

For Fluor Corporation, Defendant: Thomas J. Tarkoff, LEAD ATTORNEY, Foley & Mansfield, Oakland, CA.

For Crane Co., Defendant: Roseanna Maria Castillo, LEAD ATTORNEY, Peter Edward Soskin, K&L Gates LLP, San Francisco, CA.

**Judges:** KIMBERLY J. MUELLER, UNITED STATES DISTRICT JUDGE.

**Opinion by:** KIMBERLY J. MUELLER

## Opinion

ORDER

This matter is before the court on plaintiff Paul Schulz's Motion to Remand this case to the Solano County Superior Court. (Pl.'s Mot. Remand, ECF 13.) Defendant Crane Co. opposes the motion. (Def.'s Opp'n, ECF 28.) The court decided the motion without a hearing. As explained below, the court GRANTS plaintiff's Motion to Remand.

I. INTRODUCTION AND PROCEDURAL BACKGROUND

This case arises out of plaintiff's alleged exposure to asbestos. (ECF 13 at 1.) On September 9, 2013, plaintiff filed a complaint in the Solano County Superior Court against forty defendants alleging the following claims: (1) negligence; (2) products liability; (3) aiding and abetting battery; (4) concert of action; and (5) fraud. (Def.'s Notice of Removal, Compl., Ex. 1 ("Compl."), **[*3]** ECF 1.) On November 14, 2013, one of the

defendants, Crane Co., removed the case to this court, invoking this court's jurisdiction under *28 U.S.C. § 1442(a)(1)*. (ECF 1.) On December 3, 2013, plaintiff filed the instant Motion to Remand. (ECF 13.) Defendant filed an opposition on January 3, 2014. (ECF 28.) Plaintiff filed a reply on January 10, 2014. (Pl.'s Reply, ECF 29.)

## II. LEGAL STANDARD

A civil action commenced in a state court against any person "acting under" the direction of a United States officer may be removed to the district court. *28 U.S.C. § 1442(a)(1)*. A party seeking removal under *§ 1442(a)(1)* must show that: "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1251 (9th Cir. 2006)* (citations omitted). Unlike courts' jurisdiction under *section 1441*, which is strictly construed, courts "do not interpret . . . jurisdiction under *section 1442* so strictly." *Id. at 1252*. Therefore, "when federal officers and their agents are seeking a federal forum, **[*4]** [courts] are to interpret *section 1442* broadly in favor of removal." *Id.* Removals under *§ 1442* are not subject to the well-pleaded complaint rule, and a "federal officer or agency defendant can unilaterally remove a case" without other defendants' consent. *Id.*

## III. DISCUSSION

Defendant removed the case to this court arguing that it meets all three requirements as provided above for removal under *§ 1442(a)(1)*. However, the primary question raised by the instant motion is defendant's ability to raise a colorable federal defense. Specifically, defendant argues it can raise the government contractor defense as a colorable federal defense to plaintiff's claims. (ECF 1 at 4.) Plaintiff responds because the "specific waiver eliminates the possibility of removal based upon a government contractor defense," defendant cannot raise that defense and thus defendant cannot meet the colorable defense requirement. (ECF 13 at 7.)

Here, on November 21, 2013, shortly after defendant removed the case, plaintiff filed the following express waiver:

> Plaintiff hereby waives any claims against defendant CRANE CO. relating to or arising out of plaintiff's asbestos exposure during military service, employment by **[*5]** the government, from products sold or supplied to the U.S. military or government,

at military and federal government jobsites or from U.S. military vessels or missiles.

(Notice of Pl.'s Waiver, ECF 6 at 1.) Defendant's argument that the waiver is invalid because "[plaintiff's] complaint remains unchanged" is unavailing. (ECF 28 at 2.) *See Lara v. CBS Corp., CV 13-5569 ABC MANX, 2013 U.S. Dist. LEXIS 128265, 2013 WL 4807168, at *1 (C.D. Cal. Sept. 6, 2013)* ("The form of plaintiffs' post-removal waiver does not undercut its effectiveness."); *Lockwood v. Crane Co., 2:12-CV-01473-JHN-CW, 2012 U.S. Dist. LEXIS 57986, 2012 WL 1425157, at *2 (C.D. Cal. Apr. 25, 2012)* (plaintiff's "Notice of Waiver of Claims" filed shortly after removal sufficient to justify remand). Plaintiff says he "does[] [not] know how to make [it] any clearer" that "there simply is no claim against Crane Co." arising out of "asbestos exposure at federal enclaves or on Navy ships." (ECF 29 at 2.)

The court agrees with the several district courts that have found similar waivers in asbestos cases sufficient to justify remand. *See, e.g., Lara, 2013 U.S. Dist. LEXIS 128265, 2013 WL 4807168, at *2* (finding "the substance of similar waivers in asbestos cases sufficient to justify remand"); *Lockwood, 2012 U.S. Dist. LEXIS 57986, 2012 WL 1425157, at *2* **[*6]** (finding "virtually identical waiver[] in virtually identical situation[] sufficient to justify remand"); *Pratt v. Asbestos Corp. Ltd., C-11-3503 EMC, 2011 U.S. Dist. LEXIS 108217, 2011 WL 4433724, at *1 (N.D. Cal. Sept. 22, 2011)* ("Plaintiff's waiver has rendered any federal defenses moot. There must be claims against which a federal defense is cognizable, and Plaintiff's waiver has removed any such claims"); *Westbrook v. Asbestos Defendants (BHC), C-01-1661 VRW, 2001 U.S. Dist. LEXIS 11575, 2001 WL 902642, at *3 (N.D. Cal. July 31, 2001)* ("The court sees no reason not to hold plaintiffs in this case to their waiver of claims arising out of work done on federal jobsites and vessels. This waiver, therefore, justifies remand."). Because plaintiff no longer states any claims against which defendant could raise a colorable federal defense, this court no longer has jurisdiction under *§ 1442(a)(1)*.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS plaintiff's Motion to Remand and the case is remanded to the Solano County Superior Court.

IT IS SO ORDERED.

DATED: January 23, 2014.

2014 U.S. Dist. LEXIS 9198, *6

/s/ Kimberly J. Mueller

UNITED STATES DISTRICT JUDGE

---

**End of Document**

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG<br><br>**This Order Relates To**<br>*State of South Carolina v. 3M Company et al.*,<br>No. 2:23-cv-05979-RMG |

Before the Court is the State of South Carolina's motion to remand its claims to South Carolina state court. (Dkt. No. 8).[1] For the reasons set forth below, the motion is granted.

**I.    Background**

South Carolina brought this suit in state court against Defendants 3M Company, Corteva, Inc, Dupont De Nemours Inc., E.I. Dupont De Nemours and Company, The Chemours Company, and The Chemours Company FC, LLC asserting state law claims for public nuisance, private nuisance, trespass, and violation of the South Carolina Unfair Trade Practices Act. (Dkt. No. 1-1 at 3, 37-45). South Carolina alleges that Defendants supplied products containing certain per- and polyfluoroalkyl substances, which are commonly known as PFAS or PFAS compounds, that contaminated the State's natural resources and property, including South Carolina drinking water. (*Id.* at 3-4).

In this suit, South Carolina specifically disclaimed recovery for PFAS contamination from Aqueous Film Forming Foam, or AFFF. (*Id.* at 7-8). South Carolina filed a separate case expressly

---

[1] Unless otherwise noted, citations are to the docket in C.A. No. 2:23-5979-RMG.

1

seeking recovery for PFAS contamination caused by AFFF. (*South Carolina v. 3M Co.*, 23-cv-5734 (D.S.C. Nov. 9 2023), Dkt. No. 1-1).

3M removed this matter, invoking federal officer removal under 28 U.S.C. § 1442(a)(1) and federal enclave jurisdiction under § 1441(a). (Dkt. No. 1 at 3-4). 3M argues federal officer removal is proper because some of the contamination at issue in this case overlaps with, or has commingled with, PFAS contamination from AFFF products that 3M supplied to the United States military per a military-created specification, referred to as MilSpec AFFF. (*Id.* at 8). 3M intends to assert the federal government contractor defense for PFAS contamination that originated from MilSpec AFFF and argues that the assertion of that defense entitles it to a federal forum. (*Id.*at 2). 3M also argues that federal enclave removal is proper because PFAS from AFFF and non-AFFF products were released from military facilities in South Carolina that are federal enclaves. (*Id.* at 28-29).

South Carolina now moves to remand this case to state court, arguing that 3M has not met the requirements for federal officer removal or federal enclave removal because the State disclaimed recovery for PFAS contamination from AFFF products in this suit. (Dkt. No. 8). 3M filed a response in opposition to the motion (Dkt. No. 11), and South Carolina replied (Dkt. No. 12). The matter is now ripe for the Court's review.

## II.    Standard

As the party that invoked the Court's jurisdiction, 3M bears the burden of establishing that the case was properly removed from state court. *Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148, 151 (4th Cir. 1994); *see also Bennett v. Bally Mfg. Corp.*, 785 F. Supp. 559, 560 (D.S.C. 1992). The Court should strictly construe removal jurisdiction because it "raises federalism concerns." *Mulcahey*, 29 F.3d at 151 (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100

(1941)); *see also S.C. v. Boehringer Ingelheim Roxane, Inc.*, No. 3:07-cv-00665-CMC, 2007 WL 1232156, at *1 (D.S.C. Apr. 26, 2007). Doubts as to the Court's jurisdiction should weigh in favor of remanding to state court. *Mulcahey*, 29 F.3d at 151.

## III. Discussion

### A. Federal Officer Removal

3M argues that federal officer removal is proper because it intends to assert the federal government contractor defense for PFAS contamination originating from the use, storage, and/or disposal of MilSpec AFFF.

The federal officer removal statute authorizes removal to federal court of any civil action or criminal prosecution commenced in state court against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Thus, a private defendant, such as a government contractor, who seeks to remove a case under § 1441(a)(1) must show (1) that it was a "person acting under" a federal officer, *see e.g., Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209 (4th Cir. 2016); (2) that it has a "colorable federal defense," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999); and (3) that the charged conduct was carried out for or in relation to the asserted official authority, *see* 28 U.S.C. § 1442(a)(1). "In imposing these requirements, the statute aims to protect the Federal Government from interference with its 'operations,' primarily by providing 'a federal forum for a federal defense.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017) (quoting *Watson*, 551 U.S. at 147). In reviewing removal on a motion to remand, the Court should reject a "narrow, grudging interpretation of the statute, recognizing that one of the most important reasons

3

for removal is to have the validity of the defense of official immunity tried in federal court." *Acker*, 527 U.S. at 431.

The requirement that a claim be "for or in relation to" the alleged federal authority is a "nexus" requirement, but not a causation requirement. *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 & n.2 (1st Cir. 2022); *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017). "[T]here need be only 'a connection or association between the act in question and the federal office.'" *Sawyer*, F.3d at 258 (citation omitted).

Addressing motions to remand in similar non-AFFF, PFAS lawsuits, two district courts in the First Circuit and one district court in the Seventh Circuit found that federal officer removal is not proper by concluding that the AFFF disclaimer eliminates the connection between the claims and 3M's production of MilSpec AFFF for the United States military. *New Hampshire v. 3M Co.*, 665 F.Supp.3d 215, 227 (D.N.H. 2023) ("The State disclaimed in this suit recovery for harm from AFFF contamination, which eliminates any connection between the State's claims in this suit and 3M's production of MilSpec AFFF."); *Maine v. 3M Co.*, No. 2:23-cv-00210-JAW, 2023 WL 4758816 at *10 (D. Me. July 26, 2023) ("Here, the State's disclaimer is express, unambiguous, and plain, and in the Court's view, fits within the category of express disclaimers courts have found effective to justify a remand order."); *Illinois ex rel. Raoul v. 3M Co.*, ---F.Supp.3d---, 4:22-cv-04075-SLD-JEH, 2023 WL 6160610, at *6 (C.D. Ill. Sept. 21, 2023) ("Permitting Defendant to remove this suit under the federal officer removal statute when the federal government contractor defense is irrelevant to the eventual resolution of the case and any PFAS it produced as a military contractor is explicitly excluded from this suit would defeat the purpose of the statute. It is thus impossible for Defendant to be held liable for damages stemming from its actions under federal authority, and so the requisite connection or association is missing."). Those courts reasoned that

3M would not be able to raise its federal officer defense because, due to the states' disclaimers, 3M could not be held liable for contamination that stemmed from an AFFF source. *New Hampshire*, F.Supp.3d at 228 ("[Regardless of whether 3M's AFFF conformed to a specification required by the United States military or whether 3M appropriately warned the government about the dangers of PFAS, 3M cannot be liable in this case for contamination resulting from its alleged supply of MilSpec AFF."); *Maine*, 2023 WL 4758816, at *10 ("[T]he federal officer defense will not be applicable in the State's Non-AFFF lawsuit because the State by its express disclaimer has imposed upon itself a burden to demonstrate that its claim involves Non-AFFF sources."); *Raoul*, 2023 WL 6160610, at *6 ("[O]nce Defendant shows that a certain portion of the contamination stemmed from MilSpec AFFF . . . , that contamination is eliminated from the case, whether or not that MilSpec AFFF was produced according to rigorous military specifications and the government was warned of any dangers of which it was unaware.").

The Court here agrees that the disclaimers moot 3M's government contractor defense because, whether or not 3M meets the requirements for the defense, it cannot be held liable in this case for PFAS contamination originating from AFFF. Because it does not matter that 3M acted in accordance with federal authority, the charged conduct here is not connected to the alleged federal authority. Accordingly, there is no nexus and federal officer removal is not available.

**B. Federal Enclave Jurisdiction**

The federal enclave doctrine arises out of Congress's constitutional authority to "exercise exclusive legislation" over the District of Columbia "and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." U.S. Const. art. I, § 8, cl. 17. A federal enclave is a "portion of land over which the United States government exercises

federal legislative jurisdiction." *Brookhaven Sci. Assocs., LLC v. Donaldson*, No. 04 Civ. 4013 (LAP), 2007 WL 2319141, at *5 (S.D.N.Y. Aug. 9, 2007); *see also Stokes v. Adair*, 265 F.2d 662, 666 (4th Cir. 1959). "[F]ederal-question jurisdiction tied to federal enclaves 'generally requires 'that *all* pertinent events take place on a federal enclave.'" *Mayor and City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 219 (4th Cir. 2022).

3M argues that, even for non-AFFF claims, the Court could assume jurisdiction "over the State's claims to the extent they arose on federal enclaves" and "exercise supplemental jurisdiction over the rest of the State's case" under 28 U.S.C. § 1367. (Dkt. No. 11 at 30).

To support its argument 3M relies on a case in this MDL where the State of New York brought claims related to the use of AFFF on a U.S. Air Force base and other sites. *In re: AFFF*, 2019 WL 2807266, at *4 (D.S.C. May 24, 2019). This Court held that removal was proper as to the claims arising out of AFFF product use and contamination from the Air Force base and exercised supplemental jurisdiction over claims related to the other sites. *Id.* The Court noted, however, that it "may decline to exercise its jurisdiction where tort claims arising from [the other sites] 'predominate' over the claim arising from [the Air Force base], or for other 'compelling reasons.'" *Id.* (quoting 28 U.S.C. § 1367(c)).

Assuming that some of South Carolina's claims arose on federal enclaves, the Court here declines to exercise supplemental jurisdiction over the non-federal enclave claims. The Court finds that the claims arising from the parts of the State that are not considered federal enclaves "predominate" over the claims arising from military facilities. Additionally, the Court finds that South Carolina's disclaimer of any AFFF claims, which includes those arising from MilSpec AFFF use and storage on military bases, is a compelling reason to decline supplemental jurisdiction. Accordingly, federal enclave removal is not available.

6

**IV.    Conclusion**

   For the foregoing reasons, the South Carolina's motion to remand (Dkt. No. 8) is

**GRANTED**. This matter is **REMANDED** to Richland County Court of Common Pleas.

                   _s/Richard Mark Gergel_
                   Richard Mark Gergel
                   United States District Judge

February 29, 2024
Charleston, South Carolina